**SYLVESTER OWINO**
**A97-469-354**
**San Diego Detention Center (CCA)**
**P.O. Box 439049**
**San Ysidro, CA 92143**

FILED
2008 JAN 29 PM 1:32
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ______ DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

NUNC PRO TUNC
JAN 28 2008

| | |
|---|---|
| **SYLVESTER OWINO, [A97-469-354]** Petitioner, v. **MICHAEL CHERTOFF, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, MICHAEL MUKASEY, ATTORNEY GENERAL, ROBIN BAKER, DIRECTOR OF SAN DIEGO FIELD OFFICE, BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT, JOHN A. GARZON, OFFICER-IN-CHARGE,** Respondents. | Case No. 07CV2267-WQH (POR) **STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER'S MOTION** |

**I**

**PROCEDURAL HISTORY**

On December 3, 2007, Petitioner filed a petition for writ of habeas corpus and a motion for appointment of counsel. On December 18, 2007, the Court denied Petitioner's request for appointment of counsel, without prejudice, but issued an order to show cause. The Respondent's Return to the petition was due on January 18, 2008, and Petitioner's Traverse on February 15, 2008.

Respondents filed their Return on January 18, 2008. In the Return, Respondents allege petitioner has failed to cooperate with removal efforts, and therefore his removal period has been extended under 8 U.S.C. § 1231(a)(1)(C). Return at 3-4. Moreover, Respondents argue that Petitioner fails to state a claim under the lead cases cited by him, Tijani v. Willis, 430 F.3d 1241 (9th Cir. 2005), and Nadarajah v. Gonzales, 443 F.3d

1069 (9th Cir. 2006). Return at 5-7.

Petitioner's Traverse is due on February 15, 2008.

## II

## STATEMENT OF FACTS

As noted in the previously filed Motion for Appointment of Counsel, Petitioner is a native and citizen of Kenya. He fled to the United States in December 1998, when he was 22 years old, following abuse and threats at the hands of the Kenyan police. He was lawfully admitted on a student visa.

After his admission to the United States, petitioner was convicted of second degree robbery in 2003 and was sentenced to the mid-term of three years' imprisonment. After completion of the term of imprisonment prescribed by law, petitioner was transferred to custody of the respondents on November 8, 2005, which is the beginning of his present period of detention. On April 10, 2006, a removal hearing was held. The immigration judge found petitioner removable and denied petitioner's applications for asylum and withholding of removal and denied his claim for deferral of removal under the Convention Against Torture, making an adverse credibility finding due to lack of corroboration.

Petitioner timely appealed the decision of the immigration judge to the Board of Immigration Appeals. Petitioner argued that the immigration judge had erred in denying CAT relief. The BIA affirmed on August 2, 2006. Petitioner then filed a timely petition for review *pro se* with the Ninth Circuit Court of Appeals on September 1, 2006, in Case No. 06-74297. The same day, petitioner moved for a stay of deportation pending appeal; the government filed an opposition to the stay on November 24, 2006. The Court of Appeals denied the stay of removal on February 23, 2007. Petitioner filed a motion for reconsideration en banc of the denial. Reconsideration was denied as untimely on June 5, 2007.

Petitioner's opening brief was filed on June 5, 2007. Respondents filed their brief by June 25, 2007. Petitioner's reply brief was filed on September 10, 2007. The appeal awaits assignment to a merits panel for

argument and submission. Respondents, however, have requested a remand on the credibility issue.

On December 18, 2007, this Court denied Petitioner's motion for appointment of counsel without prejudice, stating he "has clearly presented the facts and law" in the Petition, and in light of that, "failure to appoint counsel at this stage of the proceedings would not amount to a denial of due process."

Based on the arguments set forth below, Petitioner requests that the Court reconsider its previous Order denying appointment of counsel, as professional representation is necessary for him adequately to respond to the Government's Return.

## III

## ARGUMENT

### THIS COURT SHOULD APPOINT COUNSEL FOR THE PETITIONER.

Habeas corpus proceedings "are of 'fundamental importance . . . in our constitutional scheme because they directly protect our most valued rights.'" Brown v. Vasquez, 952 F.2d 1164, 1169 (9th Cir. 1991) (quoting Bounds v. Smith, 430 U.S. 817, 828 (1977)) (citations omitted). Consequently, federal law permits a district court to appoint counsel in a habeas proceeding under 28 U.S.C. § 2241 when the "interests of justice so require," if a petitioner has shown that he is unable to afford an attorney. 18 U.S.C. §3006A(a)(2)(B). To make this decision, this Court must "evaluate [1] the likelihood of success on the merits as well as [2] the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved." Weygandt v. Look, 718 F.2d 952, 954 (9th Cir. 1983); see also Rand v. Rowland, 113 F.3d 1520, 1525 (9th Cir. 1997) (same) (citations omitted).

As previously noted in the original Motion for Appointment of Counsel, although Petitioner is likely to succeed on the merits of his claim if properly presented, he will not be able to articulate effectively his claims through a pro se action, in light of his limited educational background and the requirements of litigation in this case.

Although Petitioner completed higher education in the United States, he has no background or familiarity with the legal system that would allow him to prosecute a petition for writ of habeas corpus dealing with the highly complex area of immigration law. See United States v. Ahumada-Aguilar, 295 F.3d 943, 950 (9th Cir. 2002) (" '[w]ith only a small degree of hyperbole, the immigration laws have been deemed second only to the Internal Revenue Code in complexity.' " and "[a] lawyer is often the only person who could thread the labyrinth.") (citations and internal quotations omitted). Moreover, the particular claims raised by Petitioner under Tijani and Nadarajah relate to **an emerging and actively evolving area of law** at the intersection of two complex bodies of jurisprudence: administrative immigration law and the substantive law and procedure of habeas corpus. These are areas into which even experienced counsel may hesitate to tread, let alone an unaided layman. Also, it is clear Petitioner cannot otherwise afford to retain counsel for the litigation of his petition under 28 U.S.C. § 2241. See Motion to Proceed *in forma pauperis* attached to the Petition. Thus, the appointment of counsel is appropriate.[2]

As noted, Petitioner is likely to succeed, because the IJ abused his discretion in not allowing telephonic testimony corroborating accounts of torture and abuse by Kenyan police, which went to the heart of the IJ's adverse credibility finding. Moreover, although no stay of the removal order is currently in effect, Respondents have not succeeded in securing Petitioner's removal to Kenya. The political turmoil and oppression by the ruling majority ethnic group in Kenya has since intensified, and the courts can take judicial notice of that fact under Fed. R. Evid. 210(b)(2) & (d). See Appendix A attached hereto (selected recent articles on Kenya from international and U.S. news sources). The news reports indicate that ethnic violence directed at Petitioner's minority group is mounting, and brutal attacks reminiscent of the Rwandan genocide have been reported. The opposition has sought an indictment for crimes against humanity against the Kenyan

---

[2]Petitioner refers the Court to his original motions filed on December 3, 2007, for further discussion.

government in the International Criminal Court. These post-removal developments clearly corroborate Petitioner's accusations of official abuse.

Such a claim would count as a "substantial question" under Judge Tashima's analysis in Tijani and shows Petitioner has a reasonable basis for his legal challenges. As Judge Tashima observed, the detainee need not show certainty of outcome to gain release, just that "a closer look is surely required." Tijani, 430 F.3d at 1248 (Tashima, J., concurring).

Also, as in Nadarajah, Petitioner can demonstrate a basis for release under the factors applied there. He raises a substantive and complex legal question. His continued loss of personal liberty in itself constitutes irreparable harm. As for the balance of hardships, whereas the Court in Nadarajah found that 52 months' detention was a very burdensome hardship which correspondingly lessened the required showing of likely success on appeal, Petitioner here has been in respondents' custody for a substantial period, over 25 months. His burden of probable success, too, must be correspondingly lessened.

Balancing the factors identified in case law for release of detainees while legal challenges are pending, Petitioner is entitled to release as much as the petitioners in Tijani and Nadarajah. In addition to the severe harm generally flowing from a continued deprivation of personal liberty, his ability to pursue his appeal is seriously impaired by continued detention.

Moreover, the new developments in Kenya raise a new reason for Petitioner's non-removability: the intransigence of the Kenyan government to receive back members of the ethnic minority which is the target of official oppression and the source of the anti-government opposition. Thus, although Petitioner original filed his Petition arguing he was eligible for the extended scope of due process recognized in Tijani and Nadarajah, it has developed that he is now also non-removable under a pure Zadvydas v. Davis, 533 U.S. 678 (2001), analysis, since it is not significantly likely that Kenya will accept Petitioner's return in the reasonably foreseeable future.

Appointment of counsel should be granted, because the recent developments in Kenya have shifted the focus of the original claims in the Petition. Adequate presentation of Petitioner's case in the Traverse will now require significant development and factual research to substantiate the effect of these events on his underlying CAT claim and the now-appearing pure Zadvydas argument. In addition, the need to explain and explore the interaction of the two, independent legal theories underlying Petitioner's claims requires the skilled advocacy of a legal professional. Although Petitioner has some higher education, he has no legal training, and his detention by ICE impedes his ability to develop his response in light of developing events and the Respondents' arguments.

Also, Respondents allege Petitioner has not cooperated, based on a refusal to sign applications forms nearly two years ago. Whether this one act constitutes bad faith obstruction under Pelich v. INS, 329 F.3d 1057 (9th Cir. 2003), as Respondents claim, will require review of Petitioner's A-file and inquires with the Kenyan diplomatic missions in Los Angeles and Washington. Petitioner denies he has failed to cooperate in good faith, but substantiating his claim will require discovery, investigation, and legal research which he cannot accomplish without the assistance of legal representation. For instance, the Kenyan embassy has specifically stated it cannot provide corroboration of its processing of Petitioner's claim directly, and will only deal with counsel. See Weygandt, 718 F.2d at 954 (appointment of counsel may be appropriate during federal habeas proceedings if it is "necessary for the effective utilization of discovery procedures, . . . [or] if an evidentiary hearing is required.").

In denying the original motion, the Court reasoned that the Petition had "presented the facts and law" sufficiently to permit adequate consideration of his claims. However, in light of the evolving factual and legal nature of the claims for release and the crucial need for investigation and professional legal advocacy to respond to the Government's arguments in its Return, the Court should reconsider and grant the motion for appointment of counsel. Since one restricted by the limitations of physical custody would be unfairly

hampered in the ability to review the records, assistance of counsel is necessary. As the Return demonstrates, Respondents have information and documents relevant to Petitioner's habeas Petition, including information relating to his criminal history, his bail or parole history, his institutional history, the content of communications between federal immigration officials and the embassy of the Petitioner's native country, and other documents relating to his detention by the ICE. Moreover, should factual disputes regarding these materials arise, it may be necessary–despite the Court's initial ruling to the contrary–that a hearing or at least oral argument may be required to air fully the contested issues in this case. That, too, strongly supports the granting of legal representation in this case. See Weygandt, 718 F.2d at 954 (need for evidentiary hearing warrants appointment of counsel).

Petitioner cannot effectively pursue and obtain discovery from Respondents that he will need to present his claims and his suitability for relief without the assistance of counsel, in light of his limited education, lack of familiarity with the legal procedures involved in requesting and obtaining discovery under the unique rules for habeas corpus proceedings, and the severe physical limitations on one in custody.

The need for professional advocacy in ordinary Zadvydas cases has been repeatedly and consistently recognized by this Court in the past. See Appendices attached to the Fife Declaration and the additional orders attached hereto in Appendix B. These orders show that it is the regular response of this Court to appoint counsel precisely for those in Petitioner's circumstances. The only difference between this and the other cases is that the legal issues here are significantly more complex. Intricate as regular Zadvydas cases can be, the present Petition hinges on the scope and interpretation of recent and emerging Ninth Circuit case law. Petitioner's claims under Tijani and Nadarajah are based on very recent precedents, which to date have no subsequent, binding analysis or explication. Such discussion is currently evolving, as all of the issues the Respondents raise in their Return have been presented to the Court of Appeals in the case of Casas-Castrillon v. Lockyer, No. 07-56261, (9th Cir.) now pending on expedited appeal. Thus, the issues involved in this case

are not well-settled principles which a layman can fully grasp and adequately present. This case engages the intertwined jurisprudence of immigration law and habeas corpus, two highly complex and unique fields of law. Moreover, the arguments raised by Respondents in their Return have been vigorously contested in a number of district court decisions in Tijani/Nadarajah petitions. See Martinez v. Gonzales, 504 F. Supp.2d 887 (C.D. Cal. 2007). A layman cannot be expected to digest the arguments and rulings in these various decisions and effectively relate them to the arguments now raised by Respondents. This is currently a very contentious area of law, one requiring the skills of trained counsel, not only to preserve Petitioner's right to due process, but also to ensure that the issues are fully and adequately aired, permitting this Court to make a correct legal decision on the claims.

The interplay now arising between the extended applications of Zadvydas, Zadvydas proper, and Respondents' Pelich claims add even greater complexity to the issues presented by this case. Full consideration of a complex area of emerging law justifies the appointment of counsel to represent Petitioner in this case.

## IV

## CONCLUSION

For the foregoing reasons, Petitioner respectfully request an order granting his request for appointment of counsel in time to allow counsel to file an appropriate Traverse in a timely fashion.

Respectfully submitted,

Dated: 01/25/08

[signature]

**SYLVESTER OWINO**
Petitioner

# Appendix A

1/22/08 Int'l Herald Trib. 2
2008 WLNR 1222499

International Herald Tribune
Copyright 2008 the International Herald Tribune. All Rights Reserved.

**January 22, 2008**

Section: News

# Signs of premeditation behind **Kenya** unrest

Jeffrey Gettleman

KERINGET, **Kenya** At first the **violence** seemed as spontaneous as it was shocking, with machete-wielding mobs hacking people to death and burning women and children alive in a country that was celebrated as one of Africa's most stable.

But a closer look at what has unfolded in the last three weeks, since a deeply flawed election plunged **Kenya** into chaos, shows that some of the bloodletting that has left more than 650 people dead may have been premeditated and organized.

Leaflets calling for ethnic killings appeared before the voting. Politicians with both the government and opposition parties gave speeches that stoked longstanding hatred among ethnic groups. And local tribal chiefs held meetings to plot attacks on their rivals, according to some of them and their followers.

As soon as the election results were announced, handing a suspiciously thin margin of victory to the Kenyan president, Mwai Kibaki - whose policies of favoring his own ethnic group have marginalized about half the country - all the elements aligned for an explosion of **violence**.

Thousands of young men swept the countryside, burning homes and attacking members of rival ethnic groups. And the killings go on. On Friday, six corpses arrived at a morgue in the town of Narok, northwest of Nairobi, some with deep spear wounds. A strip of white medical tape affixed to the victims' foreheads carried their names, dates of death and the cause: ''post-election **violence**.''

''It wasn't like people just woke up and started fighting each other,'' said Dan Juma, the acting deputy director of the **Kenya** Human Rights Commission. ''It was organized.''

What is not clear is if there was a systematic plan to launch a nationwide ethnic war and whether high-level political leaders played a role beyond possibly inciting **violence** through hate speech.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Before the election, it was easy to forget that even **Kenya**, with its reputation as an African success story and land of tolerance, is split along ethnic lines that are ripe for political manipulation. The grievances, typically about land, economic opportunity and political power, are real and often justified, though usually held in check.

Nowhere are those tensions more evident than in the Rift Valley of western **Kenya**, which has some of the most fabled and productive land in Africa but recently has been turned into a scene out of ''The Grapes of Wrath,'' with tens of thousands of desperate people fleeing in battered pickups piled high with beds, chairs, blankets and children. Some trucks are so overloaded their bumpers hang just millimeters above the road.

The **violence** out here is decidedly different from that which grinds on in **Kenya's** slums, where police officers have opened fire on unarmed demonstrators and rival gangs prowl the alleyways with rocks in their hands.

In the Rift Valley, people do not keep their hatreds or activities secret. Those who have participated in the killings say the attacks have been community efforts, sanctioned by elders and guided by traditions that celebrate a warrior culture.

On a recent day, a dozen young men with faces smeared with mud stepped out of the forest near the small town of Keringet.

They were from the Kalenjin ethnic group and said they had killed 20 people this month. They were armed with bows, arrows, clubs and knives. Some wore animal skins with cellphones tucked in the folds.

Rono Kibet, one of the men, said elders in his community called a big meeting on Dec. 30. That was the night that **Kenya's** election results were announced, giving Kibaki the victory over Raila Odinga, the top opposition leader, despite widespread evidence of vote rigging. More than 2,000 young men gathered, Kibet said, and the elders urged them to kill Kikuyus, Kibaki's ethnic group, and burn down their houses.

The Kalenjin had fought fiercely with them before.

''The community raised the money for the gasoline,'' Kibet said.

He explained how the elders blessed the young men, who then split into teams of 50 to hunt down Kikuyus with bows and arrows. He did not feel badly about shooting them, he said.

''We attack people, we burn their homes and then we take their animals,'' Kibet said matter-of-factly.

A few villages away, and a couple of hours later, Kikuyu farmers scanned the hilltops with a pair of old field glasses that never quite seemed in focus. They carried homemade guns built from wood, water pipes and the springs of umbrellas, highly illegal but highly necessary, they said.

Some of the sentinels were among the most educated people in the area. One, Wilson

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Muiruri, a student at the University of Nairobi, was spending his winter vacation moonlighting as a warrior.

''I don't hate Kalenjins at the university,'' he said. ''But out here, it's different.''

In Nairobi, the capital, a senior Kenyan police official cracked open a thick binder with the subject line ''ethnic clashes'' that revealed evidence of what he called a pattern of highly orchestrated mayhem in the Rift Valley.

According to the reports, a three-meter, or nine-foot, ditch had been cut in an asphalt road by an earth mover, apparently to prevent the authorities from being able to get to conflict zones to intervene; thousands of armed men suddenly materialized in thinly populated villages and a roadblock had been built with 10 tons of concrete.

''You don't move 10 tons of concrete on your back,'' said the police official, who spoke on the condition of anonymity because he was not authorized to share this information publicly. ''This is a full military operation.''

Most clashes are in rural areas, which are difficult for the police to get to, and the government strategy so far has been to use military escorts to evacuate the people who want to leave.

But government officials may have also been involved.

About a month before the election, the police found a large weapons cache - 20 bows, 50 arrows, 30 clubs, 30 machetes and 30 swords - in a government car belonging to an assistant minister and member of the president's political party. The assistant minister, who was not in the car at the time and has denied involvement, has yet to be charged.

In any case, several residents in the Rift Valley and local aid workers said parliamentary candidates had been arming young men, though no arrests have been made.

While the authorities have not produced any evidence directly linking top politicians to **violence**, human rights groups documented speeches by political leaders bashing certain ethnic groups before the election. William Ruto, a charismatic opposition leader and Kalenjin chief, was quoted talking about Kikuyu domination. Kikuyu politicians, meanwhile, made disparaging remarks about Luos and how Odinga, a Luo, was not fit to rule because he was uncircumcised.

At the same time, fliers appeared in several towns in the Rift Valley, telling Kikuyus to leave the area.

''Warning! Warning! Warning!'' read one flier. ''Anyone who does not obey will die.''

In some cases, the literature appeared to be part of a campaign of dirty tricks to tarnish rival groups. In November, a document surfaced in Nairobi, marked confidential and allegedly written by opposition leaders, that laid out a strategy

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

to use ''ethnic tensions/**violence** as a last resort.''

''Its absolutely fake,'' said Peter Wanyande, an opposition strategist whose name appears on the document, with the wrong first name. ''Our opponents are the ones using ethnic **violence**. It's terrible.''

The government is blaming opposition supporters and their leaders for the Rift Valley **violence**, especially the incident in which up to 50 women and children seeking sanctuary in a church were burned alive.

''This is ethnic cleansing,'' said Alfred Mutua, a spokesman for the Kenyan government.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Human Rights (1HU19); Social Issues (1SO05); Government (1GO80); Political Parties (1PO73); Minority & Ethnic Groups (1MI43); Public Affairs (1PU31))

INDUSTRY: (Science & Engineering (1SC33); Social Science (1SO92); Science (1SC89))

REGION: (**Kenya** (1KE61); Africa (1AF90); East Africa (1EA80))

Language: EN

OTHER INDEXING: (KALENJIN; KIBAKI; KIKUYU; KIKUYUS; LUOS; NAIROBI; UNIVERSITY OF NAIROBI) (Alfred Mutua; Dan Juma; Kibet; Leaflets; Odinga; Peter Wanyande; Raila Odinga; Rono Kibet; Signs; Warning; William Ruto; Wilson Muiruri)

EDITION: 4

Word Count: 1539
1/22/08 INTLHT 2
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw. NewsRoom



1/21/08 Int'l Herald Trib. 5
2008 WLNR 1158537

International Herald Tribune
Copyright 2008 the International Herald Tribune. All Rights Reserved.

**January 21, 2008**

Section: News

# Fresh ethnic clashes erupt in **Kenya** slum

NAIROBI Renewed ethnic fighting broke out Sunday in a Nairobi slum, and residents said several people were beaten and hacked to death with machetes and homes were set ablaze in **violence** stemming from the country's disputed presidential election.

Elsewhere, the police on Sunday managed to quell more than two days of fierce fighting around a Catholic monastery in the Rift Valley in which 22 people were killed and 200 homes were destroyed by fire, officials said.

The **violence** was yet another eruption of the ethnic clashes that have plagued the East African country following the disputed re-election of President Mwai Kibaki on Dec. 27.

The bloodshed Sunday in the Mathare slum, like much of the fighting since the ballot, was between the Kikuyu and Luo ethnic groups, a resident, Boniface Shikami, said. President Kibaki is a Kikuyu and the opposition leader Raila Odinga, who charges that Kibaki stole the December election, is a Luo.

''No need to kill somebody because of his tribe, even if he did not vote for me,'' Odinga told several hundred supporters as he came out of a church service in the Kibera slum, its roads blackened with the remains of days of flaming barricades.

Odinga said that a memorial service would be held at a sports field in central Nairobi on Wednesday for those who had died and repeated a call for more demonstrations Thursday, despite police orders to prevent rallies.

''You can beat our body, but you cannot break our spirit of justice,'' he told cheering supporters, some holding up banners that said ''Raila our solution'' or ''Kibaki hand over to Raila.'''

More than 650 people have been killed since Kibaki was sworn into office in an election that the opposition says was rigged and observers said was seriously

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

flawed.

On Sunday, an Associated Press reporter saw the body of a Luo man who had been beaten to death after riding a bicycle through a group of Kikuyus in Mathare. Another man staggered past, blood streaming from the stump of his lower arm, which had been cut off with a machete. The arm was taken by a group of youths and placed on top of a pile of stones barricading an alleyway.

The maimed man, Peter Kyalo, arrived later at Kenyatta Hospital with his father, who Kyalo said suffered a stroke after seeing his son's injury.

Kyalo said that he was warned Saturday night by Luo friends that he might be targeted because he was a Kamba, the same tribe as the vice president, a former presidential candidate who joined Kibaki's government this month.

In a separate incident, about 50 people attacked the welder Dominic Owour, a 23-year-old Luo, and tried to cut off his hands at the forearm, Owour said.

Both Owour and Kyalo, among 13 people being treated at the hospital, most for ax and machete wounds - said the police watching the attacks had not intervened.

A Mathare resident, Moses Ogolla, said that he saw four bodies being put into a police vehicle Sunday morning with deep machete cuts. ''I think it was a gang who attacked them because some bodies, the head had six, seven, eight cuts on it,'' he said. Ogolla said he believed that the victims were Luo because he had heard the families conversing in the Luo language.

''The Luo guys say they are going to revenge this,'' Ogolla said.

In the Rift Valley, about 300 kilometers, or 190 miles, northwest of Nairobi, the police on Sunday afternoon appeared to have stopped fighting that began Friday in three villages around the Catholic Kipkelion Monastery.

Kalenjin people native to the area had attacked Kisii and Kikuyu settlers there with machetes, swords and bows and arrows. The Kalenjin generally support the opposition party. Villagers sought refuge at three schools and the monastery, which was being guarded by the police.

A local reporter at the scene saw 17 people who had died from machete and arrow wounds and five who had been shot. The death toll was confirmed by district administrator Aden Alhake.

Edward Ndirangu, who said two of his houses were razed, was searching for his wife and three children. ''I am not sure about their safety,'' he said. ''We fled as they were looting and torched my homes.'' He was among 2,500 Kikuyus and Kisii who fled to the monastery and the schools.

As Kibaki's power becomes more entrenched each day, the opposition's best hope may be to arrange a power-sharing agreement that might make Odinga prime minister or vice president. International mediation thus far has failed to broker any such deal.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Kibaki has said that he wants direct talks with Odinga, while the opposition leader says he will negotiate only through a mediator who can provide an internationally guaranteed agreement. Odinga supported Kibaki in the 2002 election in return for a promise that he would be prime minister, a posting that failed to materialize.

---- INDEX REFERENCES ----

INDUSTRY: (Science & Engineering (1SC33); Social Science (1SO92); Science (1SC89))

REGION: (**Kenya** (1KE61); Africa (1AF90); East Africa (1EA80))

Language: EN

OTHER INDEXING: (CATHOLIC KIPKELION MONASTERY; FRESH; KENYATTA HOSPITAL; KIBERA; MATHARE) (Aden Alhake; Boniface Shikami; Dominic Owour; Edward Ndirangu; Kalenjin; Kibaki; Kikuyu; Kyalo; Luo; Moses Ogolla; Mwai Kibaki; Odinga; Ogolla; Owour; Peter Kyalo; Raila; Raila Odinga)

EDITION: 4

Word Count: 953
1/21/08 INTLHT 5
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1/19/08 Int'l Herald Trib. 4
2008 WLNR 1131648

International Herald Tribune
Copyright 2008 the International Herald Tribune. All Rights Reserved.

**January 19, 2008**

Section: News

# Bloodshed mounting in **Kenya**

From news reports

NAIROBI At least 13 people were killed in **Kenya** on Friday when the police fired into a Nairobi slum and tribal groups clashed during protests over the disputed re-election of President Mwai Kibaki.

The worst bloodshed was in the Kibera shantytown, an opposition stronghold, where at least seven people were killed and a dozen wounded by automatic gunfire by the police. Médecins Sans Frontières called it a ''massacre".

The police also opened fire and lobbed tear gas in the coastal city of Mombasa, where one person was killed in protests after Muslim prayers Friday.

At least 21 people have been killed in three days of demonstrations, which were expected to end on Friday. About 650 people have been killed since the disputed election Dec. 27.

The opposition said it would follow up the street protests by calling for a ''boycott of companies owned by hard-liners who are around Mr. Kibaki,'' an opposition spokesman, Salim Lone, said. He said the boycott would include one of the biggest Kenyan banks, a prominent bus company and a major dairy producer. Lone said the opposition would work with unions ''to organize strikes in selected industries.'' He declined to give details.

**Kenya**, formerly one of Africa's most stable and prosperous nations, exploded in **violence** after the election, the tightest race in the country's history. Kibaki's main challenger, Raila Odinga, insists that the president won the election fraudulently, and international observers and the electoral chief have questioned the results.

Furious over the allegations of vote-rigging, Odinga's supporters rose up, burning homes, clashing with the police and exposing long-simmering ethnic tensions. Hundreds of thousands of people have flee their homes in the worst **violence** in

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**Kenya** since a failed 1982 coup attempt.

**Kenya's** economy, which draws nearly $1 billion annually from tourists who flock to wildlife reserves, is already reeling from the unrest.

Despite threats to keep up pressure against Kibaki, Lone said Odinga was open to dialogue. ''We are completely ready to negotiate in good faith. We want peace in the country,'' Lone said. ''Our people are suffering.''

Kibaki's government has made similar statements, but both sides appear recalcitrant and envoys from the United States and the African Union have failed even to bring Odinga and Kibaki together for talks. Three former African presidents - Benjamin Mkapa of Tanzania, Joachim Chissano of Mozambique and Ketumile Masire of Botswana - are in Nairobi to try to ease the crisis and have met with both Odinga and Kibaki, Odinga said after a meeting with the team Friday. He said that he told them ''what we want, and they are going to convey that to the other side.''

The opposition has called for Kibaki to step down and acknowledge that the vote tally that declared him victor was skewed. They have also called for a transitional government that could lead until the crisis is resolved.

The United States blamed both leaders for the unrest. ''There are clashes because of the political deadlock,'' a U.S. State Department spokesman, Sean McCormack, said, adding that Kibaki and Odinga needed to reach a political accommodation.

On Thursday, the police cracked down fiercely, firing tear gas and bullets in Nairobi and the western towns of Eldoret and Kisumu. Overnight in the Mathare slum of Nairobi, mobs attacked and wounded eight people and killed another, a resident, Alice Nduko, 35, said Friday.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Government (1GO80); World Elections (1WO93); Global Politics (1GL73); Public Affairs (1PU31))

REGION: (**Kenya** (1KE61); Africa (1AF90); East Africa (1EA80))

Language: EN

OTHER INDEXING: (AFRICAN; AFRICAN UNION; ELDORET; JOACHIM CHISSANO; MÉDECINS SANS FRONTIÈRES; US STATE DEPARTMENT) (Alice Nduko; Benjamin Mkapa; Furious; Ketumile Masire; Kibaki; Kisumu; Lone; Mwai Kibaki; Odinga; Overnight; Raila Odinga; Salim Lone; Sean McCormack)

EDITION: 3

Word Count: 689
1/19/08 INTLHT 4
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw. NewsRoom



1/22/08 AP DataStream 16:15:52

AP DataStream
Copyright 2008 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

**January 22, 2008**

**Kenya** opposition files international court complaint against the government as mediators arrive
TOM MALITI
Associated Press Writer

NAIROBI, **Kenya** _The former U.N. chief and other mediators trying to bring **Kenya's** warring politicians together found the opposition accusing the government of "crimes against humanity" Tuesday in a complaint it planned to file at the Hague.

The opposition and President Mwai Kibaki's administration have traded accusations in the **violence** stemming from the Dec. 27 election, with both sides accusing the other of "genocide." The death toll has reached 685, the government said Tuesday.

The opposition comments Tuesday were the latest sign the two sides are far from a compromise, and came just hours before former U.N. Secretary-General Kofi Annan was due in **Kenya** to mediate.

Yoweri Museveni, president of neighboring Uganda, met with Kibaki Tuesday on another mediation mission.

Anyang Nyongo, secretary-general of opposition leader Raila Odinga's Orange Democratic Movement, said the party would file a complaint against the government and police with the International Criminal Court about "the abuse of rights by the police in this country." The case would name Kibaki, Cabinet ministers and the police commissioner, he said.

"The complaint states that crimes against humanity and state-sponsored terrorism are being committed by individuals as part of a systematic plan to target selected civilian populations in pursuit of political goals," Nyongo said.

It was not clear the complaint would result in an international investigation. The Hague-based court has looked into information sent to it by scores of groups citing possible abuses in places ranging from Iraq to Ivory Coast, but has not yet opened a formal investigation based on such tips. It also investigates complaints sent to it by the U.N. Security Council or countries that signed the treaty creating the court in 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

So far the court has launched formal cases in just four countries: Sudan, Congo, Uganda and Central African Republic.

In a statement Tuesday from the Hague on the Kenyan opposition plans, the ICC Office of the Prosecutor noted **Kenya** was a party to the international statute establishing the court, and that it "considers carefully all information relating to alleged crimes within its jurisdiction committed on the territory of States Parties or by nationals of States Parties, regardless of the individuals or group alleged to have committed the crime."

The Dec. 27 Kenyan election returned Kibaki to power for a second five-year term, with official results putting Odinga second in the closest presidential race in **Kenya's** history. Odinga accused Kibaki of stealing the vote, and protests exploded into riots and ethnic fighting.

Foreign and local election observers have said the vote count was deeply flawed. Although the electoral chief pronounced Kibaki the victor, he later said he had been pressured to do so and did not know who won.

U.S. Ambassador Michael Ranneberger urged a political settlement.

"The tragedy **Kenya** is now suffering, and the extremely bitter polarization of Kenyan society, demands that all leaders and institutions speak in a responsible, respectful and dignified tone," Ranneberger said in a statement Tuesday.

The election has tapped into resentments that resurface regularly at election time in **Kenya**. But never before has the anger been so prolonged or taken so many lives.

On Tuesday, police fired tear gas Tuesday to disperse dozens of Kibaki supporters.

"Kibaki is our president!" the supporters shouted in downtown Nairobi before riot police broke up the gathering.

As Kibaki's power becomes more entrenched each day, the opposition's best hope may rest in working out a power-sharing agreement that could make Odinga prime minister or vice president.

Odinga has called for another "peaceful protest" on Thursday, saying, "let them bring their guns and we will face them."

The protest will take place in defiance of a ban and despite the deaths of at least 24 people in three days of protests last week _ most blamed on police.

Odinga also has urged supporters to boycott companies owned by Kibaki allies, including Brookside Diaries and bus companies Citi Hoppa and **Kenya** Bus. On Monday, the government condemned the economic boycott as sabotage.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Legal (1LE33); United Nations (1UN54); Benelux (1BE50); World Elections (1WO93); Government (1GO80); Global Politics (1GL73); International Law (1IN60); World Organizations (1IN77); Economics & Trade (1EC26); Public Affairs

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(1PU31))

REGION: (**Kenya** (1KE61); East Africa (1EA80); Uganda (1UG45); Africa (1AF90))

Language: EN

OTHER INDEXING: (HAGUE; ORANGE DEMOCRATIC MOVEMENT; STATES PARTIES; UN; UN SECURITY COUNCIL) (Anyang Nyongo; Brookside Diaries; Citi Hoppa; Foreign; Kibaki; Kofi Annan; Michael Ranneberger; Mwai Kibaki; Nyongo; Odinga; Raila Odinga; Ranneberger; Yoweri Museveni)

KEYWORDS: (i)

Word Count: 831
1/22/08 APDATASTREAM 16:15:52
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1/21/08 AP DataStream 01:11:28

AP DataStream
Copyright 2008 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

**January 21, 2008**

Residents say several Kenyans beaten, hacked to death with machetes as **violence** flares
MICHELLE FAUL
Associated Press Writer

NAIROBI, **Kenya** _Several people were beaten and hacked to death with machetes in a Nairobi slum Sunday in renewed ethnic fighting over **Kenya's** disputed election, residents said.

Elsewhere, police managed to quell more than two days of fierce fighting around a Catholic monastery that killed 22 people and left 200 homes burned in the Rift Valley, 190 miles northwest of the capital Nairobi, officials said.

The re-election of President Mwai Kibaki has tapped into a well of resentments that resurfaces regularly at election time in **Kenya**. But never before has it been so prolonged or taken so many lives.

A government commission says more than 600 people have been killed in **violence** that erupted after the Dec. 27 election, which opposition leader Raila Odinga accused Kibaki of stealing.

As Kibaki's power becomes more entrenched each day, the opposition's best hope may rest in wrangling a power-sharing agreement that might make Odinga prime minister or vice president. International mediation has so far failed to broker such a deal.

Odinga has called for another "peaceful protest" on Thursday, saying, "let them bring their guns and we will face them." The protest will take place in defiance of a ban and despite the deaths of at least 24 people in three days of protests last week _ most of them blamed on police.

Sunday's bloodshed in Nairobi's Mathare slum, like much of the fighting since the vote, was between the Kikuyu and Luo ethnic groups, said resident Boniface Shikami. President Kibaki is a Kikuyu and Odinga is a Luo.

Shikami said Luos in his street had received notices warning them to leave by nightfall or risk attack.

One man staggered past with blood streaming from the stump of his arm, which had been cut off with a machete. The arm was taken by a group of youths and placed on

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

top of a pile of stones barricading an alleyway.

The maimed man, Peter Kyalo, arrived later at Kenyatta Hospital. He said he was warned on Saturday night by Luo friends he might be targeted because he is a Kamba, the same tribe as the vice president, a former presidential candidate who joined Kibaki's government this month.

In a separate incident, around 50 people attacked welder Dominic Owour, a 23-year-old Luo, and tried to cut off both his hands at the forearm, Owour said.

Both men said police watching the attacks did not intervene.

Dr. Njoroge Waithaka said 13 people had been admitted to Kenyatta Hospital from the area around Mathare, mostly with ax and machete cuts on the upper limbs and head. Filipe Rebeiro of aid group Doctors Without Borders said his organization had treated 10 people for machete and ax wounds on Sunday morning alone.

Joshua Omukolong, the area police chief, confirmed at least two people died from overnight fighting.

Resident Moses Ogolla said he saw four bodies loaded into a police vehicle Sunday morning with deep machete cuts.

"I think it was a gang who attacked them because some bodies, the head had six, seven, eight cuts on it," he said. Ogolla said that he believed the victims were Luo because he heard relatives conversing in the Luo language. "The Luo guys say they are going to avenge this."

In the Rift Valley, around the Catholic Kipkelion Monastery, fighting since Friday has pitted Kalenjin people native to the area against Kisii and Kikuyus who settled there in the 1960s and 1970s.

Police appeared to have quelled the **violence** by early Sunday afternoon but still were recovering bodies.

A local reporter at the scene counted 14 people dead from machete wounds, three bodies stuck with arrows and five people shot dead by police.

The death toll also was confirmed by district administrator Aden Alhake, who said some 200 homes have been burned down in three days of clashes.

Land always has been a tool of Kenyan politicians, who distribute it as favors to their own and allied tribes, and use it as a weapon, settling their supporters in hostile areas in order to win votes at election time.

In the Rift Valley, Kalenjin people who feel they have been wrongly stripped of their land generally support the opposition.

Edward Ndirangu, who said two of his houses were razed, was searching for his wife and three children.

"I am not sure about their safety. ... We fled as they were looting and torched my

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

homes," he said.

He said the Kalenjin were the aggressors. Alhake said 2,500 people taking refuge at three schools and the monastery all were Kikuyu and Kisii.

---

Associated Press writers Katharine Houreld and Tom Odula contributed to this report.

---- INDEX REFERENCES ----

NEWS SUBJECT: (HR & Labor Management (1HR87); Social Issues (1SO05); Business Management (1BU42); Executive Personnel Changes (1EX23))

REGION: (**Kenya** (1KE61); Africa (1AF90); East Africa (1EA80))

Language: EN

OTHER INDEXING: (CATHOLIC KIPKELION MONASTERY; KENYATTA HOSPITAL) (Aden Alhake; Alhake; Boniface Shikami; Borders; Dominic Owour; Edward Ndirangu; Filipe Rebeiro; International; Joshua Omukolong; Kalenjin; Katharine Houreld; Kibaki; Luo; Moses Ogolla; Mwai Kibaki; Njoroge Waithaka; Odinga; Ogolla; Owour; Peter Kyalo; Raila Odinga; Shikami; Sunday; Tom Odula)

KEYWORDS: (i)

Word Count: 898
1/21/08 APDATASTREAM 01:11:28
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw. NewsRoom



1/21/08 Chi. Trib. 8
2008 WLNR 1156885

CHICAGO TRIBUNE
Copyright 2008 Chicago Tribune Company

**January 21, 2008**

Section: News

# Signs in **Kenya** of planned bloodshed
## Ethnic tensions were stoked before election

Jeffrey Gettleman, NEW YORK TIMES NEWS SERVICE

KERINGET, **Kenya** At first the **violence** seemed as spontaneous as it was shocking, with machete-wielding mobs hacking people to death and burning women and children alive in a country that was celebrated as one of Africa's most stable.

But a closer look at what has unfolded in the past three weeks, since a deeply flawed election plunged **Kenya** into chaos, shows that some of the bloodletting that has left more than 650 people dead may have been premeditated and organized.

Leaflets calling for ethnic killings mysteriously appeared before the voting. Politicians with both the government and opposition parties gave speeches that stoked long-standing hatred among ethnic groups. And tribal chiefs held meetings to plot attacks on their rivals, according to some of them and their followers.

As soon as the election results were announced, handing a thin margin of victory to President Mwai Kibaki, the elements aligned for an explosion of **violence**.

Thousands of young men swept the countryside, burning homes and attacking members of rival ethnic groups. And the killings go on. On Sunday, several people were beaten and hacked to death with machetes in Nairobi, according to The Associated Press.

What is not clear is if there was a systematic plan to launch a nationwide ethnic war, and whether high-level leaders played a role beyond possibly inciting **violence** through hate speech.

But about a month before the election, police found a large weapons cache in a government car belonging to an assistant minister and member of the president's political party. The assistant minister, who was not in the car at the time and has denied involvement, has not been charged. In any case, several residents in the Rift Valley and local aide workers said parliamentary candidates had been

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

arming young men, though no arrests have been made.

Photo (color): Kenyan police clash with demonstrators Sunday in Nairobi, which saw more killings over the weekend. Getty Images photo by Uriel Sinai

---- INDEX REFERENCES ----

NEWS SUBJECT: (Government (1GO80); Political Parties (1PO73); Public Affairs (1PU31))

INDUSTRY: (Science & Engineering (1SC33); Social Science (1SO92); Science (1SC89))

REGION: (**Kenya** (1KE61); Africa (1AF90); East Africa (1EA80))

Language: EN

OTHER INDEXING: (Getty Images; Leaflets; Mwai Kibaki; Politicians; Uriel Sinai)

KEYWORDS: **KENYA**; **VIOLENCE**; ETHNIC; OPPOSITION; ELECTION; ISSUE (World)

EDITION: Chicagoland Final

Word Count: 395
1/21/08 CHICAGOTR 8
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# Appendix B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE ROGER T. BENITEZ)**

JAMES ANESTOR [A96-386-816],

Petitioner,

v.

MICHAEL CHERTOFF, et al.,

Respondents.

Case No. 06cv2170-BEN (JMA)

ORDER GRANTING REQUEST FOR APPOINTMENT OF COUNSEL AND SETTING SCHEDULE FOR TRAVERSE

Petitioner requests that the Court appoint Federal Defenders of San Diego, Inc. ("Federal Defenders") as his counsel pursuant to 18 U.S.C. § 3006A(a)(2)(B).

Based upon the allegations of the Petition and motion for appointment of counsel, in the interest of justice, the Court hereby **GRANTS** Petitioner's request for appointment of counsel. Federal Defenders is hereby appointed counsel for Petitioner.

Additionally, any traverse or reply by Petitioner must be filed on or before May 18, 2007.

Upon review of the reply, the Court shall set a hearing date, if one is necessary.

**IT IS SO ORDERED.**

DATED: April 24, 2007

Hon. Roger T. Benitez
United States District Judge

FILED
2006 NOV 16 AM 10: 18
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ______ DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

PHILLIP HARRIS,

Petitioner,

vs.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

CASE NO. 06CV1768-BEN (POR)

**ORDER APPOINTING COUNSEL [Doc. No. 3]; SCHEDULING ORDER**

## I. Motion for Appointment of Counsel

Petitioner requests the appointment of counsel to assist him in prosecuting his Petition for Writ of Habeas Corpus brought pursuant to 28 U.S.C. §2241 because he has little legal experience, lacks the financial wherewithal to obtain representation, and, given the complexity of the issues raised, cannot adequately address the issues raised in the Petition. The Constitution provides no right to appointment of counsel in a civil case unless an indigent litigant may lose her physical liberty if she loses the litigation. See Lassiter v. Dept. of Social Services, 452 U.S. 18, 25 (1981). Under 18 U.S.C. §3006A(a)(2)(B) and 28 U.S.C. § 1915(e)(1), however, district courts are granted discretion to appoint counsel for indigent persons under "exceptional circumstances" or in the "interests of justice." See Terrell v. Brewer, 935 F.2d 1015, 1017 (9th Cir. 1991). "A finding of exceptional circumstances requires an evaluation of both the 'likelihood of success on the merits and the ability of the plaintiff to articulate [his] claims pro se in light of the complexity of the legal

issues involved.' Neither of these issues is dispositive and both must be viewed together before reaching a decision.'" Id. (quoting Wilborn v. Escalderon, 789 F.2d 1328, 1331 (9th Cir. 1986)).

In light of the legal and factual issues raised in the Petition, the court finds that it is in the interests of justice to appoint counsel to represent Petitioner in this matter. See 18 U.S.C. §3006A(a)(2)(B). The legal and factual issues raised by Petitioner are sufficiently complex such that the interests of justice are furthered by appointment of counsel to address the constitutional and immigration law issues. The court appoints the Federal Defenders of San Diego, Inc. to represent Petitioner

**II. Scheduling Order**

Upon preliminary review of the Petition:

1. **RESPONDENT IS ORDERED** to file an answer or other responsive pleading to the Motion. Respondent shall file the pleading no later than **December 15, 2006.** The answer shall include any and all transcripts or other documents relevant to the determination of the issues presented in the Petition.

2. **RESPONDENT IS FURTHER ORDERED** to serve a copy of the pleading upon the Petitioner concurrent with the filing of the pleading with the Court.

3. **IT IS FURTHER ORDERED** that if Petitioner wishes to reply to the pleading, a traverse or other appropriate pleading must be filed no later than **January 3, 2007.**

4. **IT IS FURTHER ORDERED** that Petitioner shall serve upon Respondent or, if appearance has been entered by counsel, upon Respondent's attorney, a copy of every further pleading or other document submitted for this Court's consideration. Petitioner shall include with the original paper to be filed with the Clerk of Court a certificate stating the manner in which a true and correct copy of any document was served on the Respondent or Respondent's counsel and the date of service. Any paper received by a district judge or magistrate judge which has not been filed with the clerk or which fails to include a certificate of service will be disregarded by the Court.

5. **IT IS FURTHER ORDERED** that the Clerk of Court shall serve a copy of this order and the petition on the United States Attorney General or an authorized representative.

6. **IT IS FURTHER ORDERED** that this matter may be taken under submission without

oral argument at the time of submission of the traverse. After review of the fully-briefed Petition, the parties will be notified of an oral argument hearing date, if any.

**SO ORDERED.**

DATED: 11/15/06

ROGER T. BENITEZ
United States District Judge

cc: All parties and respective counsel

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

HYWORTH RUTANHIRA,

Petitioner,

vs.

MICHAEL CHERTOFF, Secretary of the Department of Homeland Security, et al.,

Respondents.

CASE NO. 07CV867 IEG (WMc)

**ORDER (1) GRANTING PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL; (2) GRANTING PETITIONER *IN FORMA PAUPERIS* STATUS and (3) DIRECTING RESPONDENTS TO SHOW CAUSE WHY PETITIONER'S REQUEST FOR HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2241 SHOULD NOT BE GRANTED**

[Doc. Nos. 2, 3]

On May 14, 2007, Muharem Kantarevic, ("petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. No. 1), challenging his detention by respondents Michael Chertoff, Secretary, Department of Homeland Security; Alberto Gonzales, Attorney General; Ron Smith, Director of the Bureau of Immigration and Customs Enforcement's San Diego Field Office; and Gabriela Pacheco, Officer-in-Charge (collectively, "respondents").

On that same day, petitioner filed a motion for appointment of counsel pursuant to 18 U.S.C. § 3006A. (Doc. No. 2.) Section 3006A(a)(2)(b) provides, when the Court determines that "the interests of justice so require," the Court may appoint counsel for financially eligible individuals who are seeking relief under § 2241. The Court finds the appointment of counsel is appropriate in this case. Federal Defenders of San Diego, Inc., has requested to be appointed to

represent petitioner in this matter. [Fife Decla. ISO Motions.] The Court therefore **GRANTS** petitioner's motion for appointment of counsel and **APPOINTS** Federal Defenders of San Diego, Inc. to represent him.

On the same day, petitioner filed a motion to proceed *in forma pauperis* under 28 U.S.C. § 1915. (Doc. No. 3.) Petitioner has $90 on his prison account. Having reviewed petitioner's application and good cause appearing, the Court **GRANTS** petitioner *in forma pauperis* status.

Furthermore, upon receipt of the petition, and finding the matter is not appropriate for summary disposition, the Court **ORDERS** respondents to show cause why the petition should not be granted. Respondents shall have until **Monday, June 25, 2007**, to file and personally serve an answer to the petition. Petitioner may file a traverse by no later than **Monday, July 23, 2007**. Unless the Court orders otherwise, the matter will be taken under submission and decided without oral argument. Local Rule 7.1(d)(1).

**IT IS SO ORDERED.**

**DATED: May 23, 2007**

*Irma E. Gonzalez*

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

FILED
06 FEB 15 PM 2:36
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARUTYUN BALTAYAN,<br><br>Petitioner,<br><br>vs.<br><br>MICHAEL CHERTOFF, Secretary of the Department of Homeland Security, et al.,<br><br>Respondents. | CASE NO. 06CV305 -IEG (BLM)<br><br>**ORDER (1) GRANTING PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL; (2) GRANTING PETITIONER *IN FORMA PAUPERIS* STATUS and (3) DIRECTING RESPONDENTS TO SHOW CAUSE WHY PETITIONER'S REQUEST FOR HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2241 SHOULD NOT BE GRANTED** |

On February 9, 2006, Arutyun Baltayan, ("petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging his detention by respondents Michael Chertoff, Secretary, Department of Homeland Security; Alberto Gonzales, Attorney General; Ron Smith, Director of San Diego Field Office, U.S. Immigration and Customs Enforcement; and Michael McGee, Officer-in-Charge (collectively "respondents" or the "government").

On that same day, petitioner filed a motion for appointment of counsel pursuant to 18 U.S.C. § 3006A. Section 3006A(a)(2)(b) provides that when the Court determines that "the interests of justice so require," the Court may appoint counsel for financially eligible individuals who are seeking relief under section 2241. The Court finds that the appointment of counsel is appropriate in this case. Federal Defenders of San Diego, Inc., has requested to be appointed to represent petitioner in this matter. The Court therefore **GRANTS** petitioner's motion for



5

appointment of counsel and **APPOINTS** Federal Defenders of San Diego, Inc. to represent him.

On the same day, petitioner filed a motion to proceed *in forma pauperis* under 28 U.S.C. § 1915. Having reviewed petitioner's application and good cause appearing, the Court **GRANTS** petitioner *in forma pauperis* status.

Furthermore, upon receipt of the petition, and finding that the matter is not appropriate for summary disposition, the Court **ORDERS** respondents to show cause why the petition should not be granted. Respondents shall have until **Monday, March 13, 2006**, to file and personally serve an answer to the petition. Petitioner may file a traverse by no later than **Monday, April 3, 2006**. Unless the Court orders otherwise, the matter will be taken under submission and decided without oral argument. Local Rule 7.1(d)(1).

**IT IS SO ORDERED.**

**Dated:** 2/14/06

[signature]
**HON. IRMA E. GONZALEZ, Chief Judge**
United States District Court

FILED

06 MAR -6 PM 2:27

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY [signature] DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUHAREM KANTAREVIC,<br>Petitioner,<br>vs.<br>MICHAEL CHERTOFF, Secretary of the Department of Homeland Security, et al.,<br>Respondents. | CASE NO. 06CV429 -IEG (CAB)<br>**ORDER (1) GRANTING PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL; (2) GRANTING PETITIONER *IN FORMA PAUPERIS* STATUS and (3) DIRECTING RESPONDENTS TO SHOW CAUSE WHY PETITIONER'S REQUEST FOR HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2241 SHOULD NOT BE GRANTED** |

On February 24, 2006, Muharem Kantarevic, ("petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging his detention by respondents Michael Chertoff, Secretary, Department of Homeland Security; Alberto Gonzales, Attorney General; Ron Smith, Director of San Diego Field Office, U.S. Immigration and Customs Enforcement; and Michael McGee, Officer-in-Charge (collectively "respondents" or the "government").

On that same day, petitioner filed a motion for appointment of counsel pursuant to 18 U.S.C. § 3006A. Section 3006A(a)(2)(b) provides that when the Court determines that "the interests of justice so require," the Court may appoint counsel for financially eligible individuals who are seeking relief under section 2241. The Court finds that the appointment of counsel is appropriate in this case. Federal Defenders of San Diego, Inc., has requested to be appointed to represent petitioner in this matter. The Court therefore **GRANTS** petitioner's motion for





5

appointment of counsel and **APPOINTS** Federal Defenders of San Diego, Inc. to represent him.

On the same day, petitioner filed a motion to proceed *in forma pauperis* under 28 U.S.C. § 1915. Having reviewed petitioner's application and good cause appearing, the Court **GRANTS** petitioner *in forma pauperis* status.

Furthermore, upon receipt of the petition, and finding that the matter is not appropriate for summary disposition, the Court **ORDERS** respondents to show cause why the petition should not be granted. Respondents shall have until **Monday, April 3, 2006,** to file and personally serve an answer to the petition. Petitioner may file a traverse by no later than **Monday, April 24, 2006.** Unless the Court orders otherwise, the matter will be taken under submission and decided without oral argument. Local Rule 7.1(d)(1).

**IT IS SO ORDERED.**

**Dated:** 3/3/06

**HON. IRMA E. GONZALEZ, Chief Judge**
United States District Court

FILED
2006 JAN 12 AM 9:20
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ________ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GURUDAYAL SINGH, Plaintiff, vs. MICHAEL CHERTOFF, et al., Defendant. | CASE NO. 05CV2342 IEG (WMc) **ORDER (1) GRANTING PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL, and (2) ORDERING RESPONDENTS TO SHOW CAUSE WHY PETITIONER'S REQUEST FOR HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2241 SHOULD NOT BE GRANTED** (Doc. Nos. 1 & 5.) |

On December 23, 2005, Gurudayal Singh ("petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging his detention by respondents Michael Chertoff, Alberto Gonzalez, Ron Smith, and Robert Culley (collectively "respondents" or the "government"). Simultaneously, petitioner filed a motion for appointment of counsel. For the following reasons, the Court grants petitioner's motion for appointment of counsel and orders respondents to show cause why the petition should not be granted.

Petitioner moves for appointment of counsel pursuant to 18 U.S.C. § 3006A. Federal Defenders of San Diego, Inc., is ready and able to assist petitioner in this matter. Section 3006A(a)(2)(b) provides that when the Court determines that "the interests of justice so require," the Court may appoint counsel for financially eligible individuals who are seeking relief under section




6

2241. The Court finds that the appointment of counsel is appropriate in this case. The Court therefore **GRANTS** petitioner's motion for appointment of counsel and **APPOINTS** Federal Defenders of San Diego, Inc. to represent him.

Upon receipt of the petition, and finding that the matter is not appropriate for summary disposition, the Court furthermore **ORDERS** respondents to show cause why the petition should not be granted. Respondents shall have until **Monday, February 13, 2006**, to file and personally serve an answer to the petition. Petitioner may file a traverse by no later than **Monday, February 27, 2006.** Unless the Court orders otherwise, the matter will be taken under submission and decided without oral argument. Local Rule 7.1(d)(1).

**IT IS SO ORDERED.**

**Dated:** 1/11/06

**IRMA E. GONZALEZ, Chief Judge**
United States District Judge
Southern District of California

cc: all parties

Zandra L. Lopez
Federal Defenders of San Diego
225 Broadway
San Diego, CA 92101

FILED
2007 APR 18 PM 3:38
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY [signature] DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANNA MIKEAL,<br>Petitioner,<br>v.<br>MICHAEL CHERTOFF, Secretary, et al.,<br>Respondents. | CASE NO: 07-CV-0557 W (BLM)<br><br>**ORDER GRANTING PETITIONER'S REQUEST FOR APPOINTMENT OF COUNSEL** |

Petitioner, a Department of Homeland Security detainee proceeding with the assistance of the Federal Defenders, has submitted a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. He now moves for appointment of counsel. For the reasons outlined below, the Court **GRANTS** Petitioner's request.

The Court may appoint counsel for financially eligible persons seeking habeas relief if "the interests of justice so require." 28 U.S.C. § 3006A (a)(2)(B). "In deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved." Weygandt v.

Look, 718 F.2d 952, 954 (9th Cir. 1983); see also Rand v. Rowland, 113 F.3d 1520, 1525 (9th Cir. 1997). Additionally, appointed counsel is mandated when (1) necessary for effective discovery, or (2) an evidentiary hearing may occur. Weygandt, 718 F.2d at 954.

According to the motion, Petitioner was initially ordered removed to Iraq on October 24, 2002, but was immediately granted relief under the Convention Against Torture ("CAT") and released on order of supervision. (Mt. at 2.) The removal order became final in 2002.

On November 24, 2006, Petitioner was returned to the custody of U.S. Immigration and Customs Enforcement ("ICE"), where he has remained. Petitioner asserts that ICE then conducted a Post-Order Custody review, and decided on March 9, 2007 to continue the detention based on the allegation that Petitioner is a danger to the community. Petitioner asserts that he remains in custody, "although there is **categorically no possibility he can be removed** by ICE to Iraq in the reasonably foreseeable future." (Id., emphasis in original.) Petitioner further contends that his detention is based on Respondents "misconstrual of their statutory authority to indefinitely detain non-removal aliens under 8 U.S.C. § 1231(a)(6). . . ." (Id.)

"Section 1231(a)(6) does not authorize indefinite post-removal period detention, but instead imposes an implied six-month limit on such detention, provided that removal is not reasonably foreseeable." Arango Marquez v. I.N.S., 346 F.3d 892, 898–899 (9th Cir. 2003). "[O]nce the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." Zadvydas v. Davis, 533 U.S. 688, 701 (2001) Because Petitioner's allegations demonstrate that there is no significant likelihood of removal in the reasonably foreseeable future, Petitioner has demonstrated a likelihood of success on the merits.

Moreover, the Court finds that based on Petitioner's background, and the complex Constitutional and statutory analysis required in this case, Petitioner is unable

to articulate his claims *pro se*. And as established by this Court's order granting Petitioner's application to proceed in forma pauperis, Petitioner cannot affort to retain counsel.

For these reasons, the Court **GRANTS** Petitioner's request for appointment of counsel.

**IT IS SO ORDERED.**

**DATE: April 18, 2007**

**HON. THOMAS J. WHELAN**
United States District Court
Southern District of California

cc: All parties and respective counsel
Federal Defenders of San Diego, Inc., (James Fife)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESMATULLAH DURANI,<br><br>Petitioner,<br><br>v.<br><br>MICHAEL CHERTOFF, Secretary of the Department of Homeland Security, et. al.,<br><br>Respondents. | Civil No. 06cv2662 JAH (BLM)<br><br>**ORDER GRANTING PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL AND ORDER TO SHOW CAUSE** |

Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, together with a request to proceed *in forma pauperis* under 28 U.S.C. § 1915(a), and a motion for appointment of counsel under 18 U.S.C. § 3006A. By separate order, the Court granted Petitioner's motion to proceed *in forma pauperis*. After careful consideration, and for the reasons set forth below, this Court GRANTS Petitioner's motion for appointment of counsel and issues an order to show cause requiring Respondents to file a return to the petition.

**1. Motion for Appointment of Counsel**

Petitioner moves for appointment of counsel under 18 U.S.C. § 3006A(a)(2). Under this statute, the district court may appoint counsel for financially eligible petitioners seeking relief under 28 U.S.C. § 2241 when the interests of justice so require. The Court considers whether there is a likelihood of success on the merits and whether the unrepresented petitioner has the ability to articulate his claims in light of the complexity of the issues presented. Weygandt v. Look, 718 F.2d 952, 954 (9th Cir. 1983).

Petitioner has demonstrated that he is financially unable to pay the $5.00 filing fee, and thus has demonstrated he is also unable to obtain counsel with his limited financial resources. Having carefully considered the motion and the record, the Court finds Petitioner is financially eligible for a court-appointed attorney.

Further, the Court finds the issues presented in this action warrant appointment of counsel. Petitioner, a citizen of Afghanistan, was lawfully admitted into the United States and is under a final order of removal. Petitioner contends he cannot be removed to his country of origin in the reasonably foreseeable future. The United States has not received documents that will permit Petitioner's repatriation to Afghanistan. Petitioner argues his continued detention beyond the statutory removal period is not lawful.

In Zadvydas v. Davis, 121 S. Ct. 2491, 2505 (2001), the Supreme Court held that 8 U.S.C. § 1231(a)(6) does not authorize indefinite detention and, once an alien has been held for six months under the post-removal-period statute and provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must furnish evidence sufficient to rebut that showing. Petitioner's allegations and prevailing law suggests Petitioner may succeed on his claim. Petitioner arrived in the United States at age 20, English is his second language, he has limited education in the United States, has no legal training or background and may not be able to obtain discovery without the aid of counsel. Thus, having carefully considered Petitioner's motion, the record, and applicable law, the Court finds that the interests of justice require appointment of counsel. Based upon Petitioner's motion and the declaration of James Fife, an attorney with the Federal Defenders of San Diego, Inc., who indicates Federal Defenders is ready and able to assist Petitioner, the Court appoints the Federal Defenders of San Diego, Inc. to represent Petitioner. Accordingly, Petitioner's motion for appointment of counsel is **GRANTED.**

**2. Order to Show Cause**

Having received and reviewed Petitioner's petition for writ of habeas corpus under 28 U.S.C. § 2241, **IT IS HEREBY ORDERED**:

1. Respondents shall file a return to the petition for writ of habeas corpus on or

before **January 26, 2007**. Respondents shall include copies of all pertinent documents, orders, and transcripts relevant to this petition, and shall also make a recommendation regarding the need for an evidentiary hearing on the merits of the petition.

2. Petitioner shall file a traverse on or before **February 9, 2007**. *The matter will be deemed under submission at that time.*

DATED: December 19, 2006

HON. JOHN A. HOUSTON
United States District Judge

**TRAN CAM LIU, Petitioner, v. MICHAEL CHERTOFF, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; ALBERTO GONZALES, ATTORNEY GENERAL; ROBIN F. BAKER, DIRECTOR OF SAN DIEGO FIELD OFFICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ANTHONY CERONE, OFFICER-IN-CHARGE, Respondents.**

**Civil No.07CV1654 JAH (RBB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 62550**

**August 24, 2007, Decided**
**August 24, 2007, Filed**

**COUNSEL:** [*1] For Tran Cam Liu, Petitioner: Janet Tung, LEAD ATTORNEY, Federal Defenders of San Diego, San Diego, CA.

For Michael Chertoff, Secretary of the Department of Homeland Security, Alberto Gonzales, Attorney General, Robin F Baker, Director of San Diego Field Office, US Immigration and Customs Enforcement, Anthony Cerone, Officer-in-Charge, Respondents: U S Attorney CV, LEAD ATTORNEY, U S Attorneys Office Southern District of California, San Diego, CA.

**JUDGES:** HON. JOHN A. HOUSTON, United States District Judge.

**OPINION BY:** JOHN A. HOUSTON

**OPINION**

**ORDER (1) GRANTING PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL; AND (2) DIRECTING RESPONDENTS TO SHOW CAUSE WHY PETITIONER'S REQUEST FOR HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2241 SHOULD NOT BE GRANTED**

Pending before the Court are Petitioner Tran Cam Liu's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. No. 1) and motion for appointment of counsel pursuant to 18 U.S.C. § 3006A(a)(2)(B) (Doc. No. 2), both filed on August 21, 2007.

Petitioner has been subject to a final order of removal since December 21, 2006. Petitioner has been detained in the custody of Michael Chertoff, Secretary of the Department of Homeland Security; Alberto Gonzales, Attorney [*2] General; Robin F. Baker, Director of San Diego Field Office, U.S. Immigration and Customs Enforcement; and Anthony Cerone, Officer-in-Charge (collectively "Respondents or the "Government") since February 8, 2007. Petitioner alleges that his continued and indefinite detention is unlawful because (1) he has been detained beyond the presumptively reasonable period of six months and (2) there is no significant likelihood of removal in the reasonably foreseeable future. *See* Zadvydas v. Davis, 533 U.S. 678 (2001); Nadarajah vs. Gonzalez, 443 F.3d 1069 (9th Cir. 2006).

Petitioner seeks appointment of counsel in the habeas proceedings under 28 U.S.C. § 2241 in the interests of justice because (1) he is unable to afford counsel; (2) he is highly likely to succeed on the merits of his claim and (3) his limited educational background will prevent him from effectively articulating his claims.

**ORDER TO SHOW CAUSE**

Having reviewed Petitioner's claims, the Court finds that Petitioner has stated cognizable claims for relief under 28 U.S.C. § 2241, and therefore, summary disposition of the petition is unwarranted at this time. *See*

Kourteva v. INS, 151 F. Supp. 2d 1126, 1128 (N.D. Cal. 201). Accordingly, [*3] Respondents are **ORDERED TO SHOW CAUSE** why the petition should not be granted by:

1. filing a written return no later than **Friday September 21, 2007;**

2. filing copies of all pertinent documents, orders and transcripts relevant to the petition; and

3. filing a memorandum of law stating Respondents' position and making a recommendation the need for an evidentiary hearing on the merits of the Petition.

If Petitioner wishes to reply to the return, he may do so by way of a traverse filed no later than Friday, October 12, 2007. This matter will be deemed under submission at that time.

**APPOINTMENT OF COUNSEL**

Petitioner moves for appointment of counsel under 18 U.S.C. § 3006A(a)(2). Under this statute, the district court may appoint counsel for an impoverished habeas petitioner seeking relief under 28 U.S.C. § 2241 whenever "the court determines that the interests of justice so require ..." Bashor v. Risley, 730 F.2d 1228, 1234 (9th Cir. 1984), quoting 18 U.S.C. 3006A(g); Chaney v. Lewis, 801 F.2d 1191, 1196 (9th Cir. 1986). The Court "must evaluate both the likelihood of success on the merits and the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal [*4] issues involved." Rand v. Rowland, 113 F.3d 1520, 1525 (9th Cir. 1997) (citations omitted); Weygandt vs. Look, 718 F.2d 952, 954 (9th Cir. 1983); *see also* Abdullah v. Norris, 18 F.3d 571, 573 (8th Cir. 1994).

**1. Likelihood of Success on the Merits**

It is likely that Petitioner will prevail on his claim. *See* Rand vs. Rowland, 113 F.3d at 1525. Petitioner claims that he is detained in violation of 8 U.S.C. 1231(a)(6). The Supreme Court has held that a post-removal detention exceeding six months from the issuance of a final order of removal or deportation is presumptively unreasonable. *See* Zadvydas vs. Davis, 533 U.S. at 701; *see also,* Arango Marquex v. I.N.S., 346 F3d 892, 898-899 (9th Cir. 2003)

According to Petitioner, he was ordered removed to Vietnam by an immigration judge on December 21, 2006 and waived appeal of the decision. Petitioner was taken into custody for the first time on February 8, 2007, and has been in the custody of the Government under a final order since. The six-month limitation period in Petitioner's case expired on or about August 9, 2007.

Petitioner was born in a refugee camp in Hong Kong in 1979. His parents fled Vietnam before he was born. Petitioner stayed in [*5] a refugee camp in Hong Kong until he came to the United States in 1982, at age 2, as a lawful permanent resident. Petitioner has no Chinese passport or any other official documents. His parents and grandparents are Vietnamese citizens.

On May 14, 2007 Immigration and Customs Enforcement ("ICE") denied Petitioner's release after a custody review. *See* Appendix A to Petition. The decision to continue detention states that the ICE requested and is waiting for a travel document from China. Further, that if Petitioner is still in custody in August 2007, jurisdiction will transfer to the Headquarters Post-Order Detention Unit ("HQPDU").

Petitioner claims he has received no further communication regarding his custody status from HQPDU. However, Petitioner has never been to China, and other than being born in a refugee camp in Hong Kong, which was not part of China at his birth, he has no ties with that country. The Government has not received travel documents that would permit Petitioner's removal to China. Vietnam has no repatriation agreement with the United States. Therefore, it is extremely unlikely that the Vietnamese government will issue travel documents to permit Petitioner's removal [*6] there in the reasonably foreseeable future. There appears to be no indication that Petitioner can be removed to Vietnam, China or any other country in the reasonably foreseeable future.

In light of Ma vs. Reno, 208 F.3d 815 (9th Cir. 2000) and cases cited above, the Court finds that it is likely Petitioner will prevail on the merits of his claim.

**2. Complexity of Legal Issues**

In addition, Petitioner is not capable of articulating his claims pro se. The case involves complex Constitutional and statutory analysis, and interpretation

of Supreme Court precedent. An analysis of immigration law will be required, as Petitioner is in the custody of federal immigration officials. The Ninth Circuit has declared that "[w]ith only a small degree of hyperbole, the immigration laws have been deemed second only to the Internal Revenue Code in complexity." United States vs. Ahumada-Aguilar, 295 F.3d 943, 950 (9th Cir. 2002).

Petitioner's lack of expertise in legal issues and limited education warrant the appointment of counsel. Legal issues remain unresolved including the determination of release terms and conditions. Additionally, the need for discovery, such as criminal history, content of communications [*7] between government officials and the embassy of Vietnam, and other documents not readily available to a person lacking familiarity with legal procedures is necessary to protect Petitioner's rights during the habeas proceedings

**3. Financial Eligibility**

Finally, Petitioner cannot afford to retain counsel. He has no income or assets. He has $ 400.00 in his account at the San Diego Detention Center and a checking account. (Exhibit A to Petition). Petitioner has not worked since May of 2001. Having carefully considered the Petitioner's petition and exhibits, the Court finds that the interests of justice require appointment of counsel. Based upon Petitioner's petition and the declaration of Janet Tung, an attorney with the Federal Defenders of San Diego, Inc., who indicates she is ready and able to assist the Petitioner, the Court appoints the Federal Defenders of San Diego, Inc. (Janet Tung) to represent Petitioner. Accordingly, Petitioner's motion for appointment of counsel is **GRANTED.**

DATED: August 24, 2007

HON. JOHN A. HOUSTON

United States District Judge

FILED
AUG 1 4 2006
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANK GARAPET,<br>Petitioner,<br>v.<br>MICHAEL CHERTOFF, Secretary of the Department of Homeland Security, *et al.*,<br>Respondents. | Civil No. 06CV1515 JAH(JMA)<br>**ORDER GRANTING PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL AND ORDER TO SHOW CAUSE** |

Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, together with a request to proceed *in forma pauperis* under 28 U.S.C. § 1915(a), and a motion for appointment of counsel under 18 U.S.C. § 3006A. By separate order, the Court has granted petitioner's motion to proceed *in forma pauperis*. After careful consideration, and for the reasons set forth below, this Court GRANTS petitioner's motion for appointment of counsel and issues an order to show cause requiring respondents to file a return to the petition.

**I. Motion for Appointment of Counsel**

Petitioner moves for appointment of counsel under 18 U.S.C. § 3006A(a)(2). Under this statute, the district court may appoint counsel for financially eligible petitioners seeking relief under 28 U.S.C. § 2241 when the interests of justice so require. The Court considers whether there is a likelihood of success on the merits and whether the unrepresented petitioner has the ability to articulate his claims in light of the complexity of the issues presented. Weygandt v. Look, 718 F.2d 952, 954 (9th Cir. 1983).

7 RIR

Petitioner has demonstrated that he is financially unable to pay the $5.00 filing fee, and thus has demonstrated he is also unable to obtain counsel with his limited financial resources. Having carefully considered the petitioner's motion and the record, the Court finds that petitioner is financially eligible for a court-appointed attorney.

Further, the Court finds the issues presented in this action warrant appointment of counsel. Petitioner, a citizen of Iran, was lawfully admitted into the United States and is under a final order of removal. Petitioner contends he cannot be removed to his country of origin in the reasonably foreseeable future. The United States has neither requested nor received documents that will permit the petitioner's repatriation to Iran. Petitioner argues his continued detention beyond the statutory removal period is not lawful.

In Zadvydas v. Davis, 121 S. Ct. 2491, 2505 (2001), the Supreme Court held that 8 U.S.C. § 1231(a)(6) does not authorize indefinite detention and, once an alien has been held for six months under the post-removal-period statute and provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must furnish evidence sufficient to rebut that showing. Petitioner's allegations and prevailing law suggests petitioner may succeed on his claim. Petitioner has a limited education, no legal training or background and may not be able to obtain discovery without the aid of counsel. Thus, having carefully considered petitioner's motion, the record, and applicable law, the Court finds that the interests of justice require appointment of counsel. Based upon petitioner's motion and the declaration of James Fife, an attorney with the Federal Defenders of San Diego, Inc., who indicates he is ready and able to assist petitioner, the Court appoints the Federal Defenders of San Diego, Inc. to represent petitioner. Accordingly, petitioner's motion for appointment of counsel is **GRANTED.**

## 2. Order to Show Cause

Having received and reviewed petitioner's petition for writ of habeas corpus under 28 U.S.C. § 2241, **IT IS HEREBY ORDERED** that:

1. Respondents shall file a return to the petition for writ of habeas corpus on or before **September 15, 2006.** Respondents shall include copies of all pertinent documents,

orders, and transcripts relevant to this petition, and shall also make a recommendation regarding the need for an evidentiary hearing on the merits of the petition.

2. Petitioner shall file a traverse on or before **September 29, 2006**. *The matter will be deemed under submission at that time.*

Dated: August 11, 2006

JOHN A. HOUSTON
United States District Judge

cc: Magistrate Judge Adler
All Counsel of Record

FILED

06 FEB 14 AM 9:13

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID SALEM, Petitioner, vs. MICHAEL CHERTOFF, Secretary of the Department of Homeland Security, et al., Respondents. | CASE NO. 05cv2172 JM<br><br>ORDER GRANTING MOTION FOR APPOINTMENT OF COUNSEL; SCHEDULING ORDER |

Petitioner renews his request for appointment of counsel. Petitioner identifies that Respondents have been unable to effectuate his removal to Ethiopia and that he has been detained for over one year. Petitioner also identifies that he cannot adequately review and evaluate his Alien registration file without the assistance of counsel. Under these circumstances the court finds that it is in the interests of justice to appoint counsel to represent Petitioner. The court hereby appoints the Federal Defenders to represent Petitioner.

Finally, Petitioner shall file a traverse no later than March 10, 2006. Unless otherwise notified by the Court, the motion will be taken under submission at that time pursuant to Local Rule 7.1(d)(1).

**IT IS SO ORDERED.**

DATED: 2/13, 2006

JEFFREY T. MILLER
United States District Judge

cc: All parties
Federal Defenders

12

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI OSMAN EGAL, [A70-174-141]<br>Petitioner,<br>vs.<br>MICHAEL CHERTOFF, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, et al.<br>Respondents. | CASE NO. 06CV2057 JM (BLM)<br>ORDER (1) GRANTING MOTION FOR APPOINTMENT OF COUNSEL, AND (2) DIRECTING RESPONDENTS TO SHOW CAUSE WHY PETITIONER'S REQUEST FOR HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2241 SHOULD NOT BE GRANTED |

On September 21, 2006, petitioner filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. He also filed the present motion for appointment of counsel.

Petitioner was ordered removed to Somalia on February 7, 2006 and has been in U.S. Immigration and Customs Enforcement ("ICE") custody since March 24, 2005. Thus, petitioner has remained in ICE custody for approximately eighteen months. On June 6, 2006, ICE continued petitioner's detention because of risk of flight. Petitioner contends he was scheduled for a custody review by the Headquarters Post-Order Detention Unit on or about August 8, 2006, but has not yet received a decision and remains in custody. In addition, petitioner avers that he cannot be removed to Somalia in the reasonably foreseeable future since Somalia has no functioning central government which can process his return.

///

A motion for appointment of counsel may be granted "if the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(B). The court hereby finds that appointment of counsel is appropriate in this case. This case involves complex issues of constitutional law, statutory construction, and immigration law. Petitioner's native language is Somali and English is his second language. Petitioner has a zero balance in his custody trust account and is unable to afford his own counsel. Therefore, the court **GRANTS** the motion for appointment of counsel and appoints Federal Defenders of San Diego, Inc. to represent petitioner.

The court further **ORDERS** respondents to show cause why the petition should not be granted. Respondents shall file and serve an answer to the petition no later than **Friday, November 10, 2006**. Petitioner may file a traverse no later than **Friday, December 1, 2006**.

Pursuant to Local Rule 7.1(d)(1), this matter will be taken under submission without oral argument.

**IT IS SO ORDERED.**

DATED: October 3, 2006

/s/ JOHN A. HOUSTON for
**JEFFREY T. MILLER**
United States District Judge

**cc: All parties**

FILED
2006 MAR 28 AM 8:23
CLERK US DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA
BY ______ DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

SADIQ GAMER

Petitioner,

vs.

MICHAEL CHERTOFF, SECRETARY DEPARTMENT OF HOMELAND SECURITY, et al.

Respondents.

CASE NO. 06cv0525 JM (POR)

ORDER (1) GRANTING MOTION FOR APPOINTMENT OF COUNSEL, AND (2) DIRECTING RESPONDENTS TO SHOW CAUSE WHY PETITIONER'S REQUEST FOR HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2241 SHOULD NOT BE GRANTED

On March 10, 2006, Petitioner, Sadiq Gamer, filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Petitioner filed a contemporaneous motion to proceed in forma pauperis ("IFP") and a motion for appointment of counsel. This court granted Petitioner's motion for IFP status on March 16, 2006.

A motion for appointment of counsel may be granted "if the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(B). Petitioner has been detained by the U.S. Immigration and Customs Enforcement for fourteen months, awaiting removal and repatriation to Kenya. According to Petitioner, a review by the Headquarters Post-Order Detention Unit pursuant to 8 C.F.R. § 241.13(b)(2)(ii) has not taken place. The court hereby finds that appointment of counsel is appropriate in this case. Federal Defenders has requested to be appointed to represent Petitioner in this action. Accordingly, the court **GRANTS** Petitioner's motion for appointment of counsel and **APPOINTS** Federal Defenders to represent him.

The court further **ORDERS** Respondents to show cause why the petition should not be granted. Respondents shall file and serve an answer to the petition no later than **Friday, April 28, 2006**. Petitioner may file a traverse no later than **Friday, May 19, 2006**.

Pursuant to Local Rule 7.1(d)(1), this matter will be taken under submission without oral argument.

**IT IS SO ORDERED.**

DATED: 3/24, 2006

Jeffrey T. Miller
**JEFFREY T. MILLER**
United States District Judge

cc: All parties

FILED
06 MAY 30 AM 11:42
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

KAYODE GEORGE GANSAH,
Petitioner,
vs.
MICHAEL CHERTOFF et al.,
Respondents.

CASE NO. 06cv430 BTM (CAB)

**ORDER TO SHOW CAUSE AND ORDER GRANTING (1) MOTION FOR SCHEDULING ORDER (2) MOTION FOR APPOINTMENT OF COUNSEL AND (3) MOTION TO PROCEED IN FORMA PAUPERIS**

Petitioner has filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2241. He has also filed a motion seeking a scheduling order. His motion is hereby **GRANTED**. By order of the Court, Respondents are ordered to show cause why Petitioner is not entitled to the relief requested in the Petition. Respondents' return to the Petition must be filed on or before June 16, 2006. Any reply by Petitioner must be filed on or before June 23, 2006. The matter will be set for hearing and deemed under submission on June 26, 2006 at 11:00 a.m. Unless otherwise directed by the Court, no oral argument is requested and no appearances are necessary on the hearing date.

Petitioner has also filed a motion pursuant to 18 U.S.C. § 3006A(a)(2)(B) for the appointment of Federal Defenders of San Diego, Inc. ("Federal Defenders") as counsel. In deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved. Weygandt v. Look, 718

8 MYC

F.2d 953, 954 (9th Cir. 1983).

Based upon the allegations of the Petition, Petitioner has presented a substantial claim under Zadvydas v. Davis, 533 U.S. 678 (2001). In addition, the Court finds that assistance of counsel is necessary to enable Petitioner to obtain the discovery needed to present his claims. Accordingly, in the interests of justice, the Court hereby **GRANTS** Petitioner's request for appointment of counsel. Federal Defenders is hereby appointed counsel for Petitioner.

Finally, Petitioner has moved to proceed in forma pauperis. He is currently incarcerated and has no money in his prison account. Although he states he has an allowance of $300 a month, he has no savings. In addition, he has a wife and three dependents. Accordingly, the Court hereby **GRANTS** Petitioner's motion to proceed in forma pauperis.

**IT IS SO ORDERED.**

Dated: 5-26-2006

[signature]

**HONORABLE BARRY TED MOSKOWITZ**
United States District Judge

cc: all parties and counsel of record

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVESTER OWINO, [A97-469-354]<br><br>Plaintiff,<br><br>sv.<br><br>MICHAEL CHERTOFF, et al.,<br><br>Defendant. | Case No. 07cv2267-WQH (POR)<br><br>PROOF OF SERVICE |

I, the undersigned, say:

1) That I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party in the within action;

2) That my business address is 225 Broadway, Suite 900, San Diego, California, 92101;

3) That I served the within **NOTICE OF MOTION AND MOTION TO RECONSIDER MOTION FOR APPOINTMENT OF COUNSEL**delivering a true copy of the above-mentioned document on January 28, 2008, to:

**U S Attorney CV**
U S Attorneys Office Southern District of California
Civil Division
880 Front Street
Suite 6253
San Diego, CA 92101

I certify under the laws of the State of California that the foregoing is true and correct.

Executed on 28 January 2008 at San Diego, California.

SYLVIA FREEMAN