ORIGINAL

**SYLVESTER OWINO**
**A97-469-354**
**San Diego Detention Center (CCA)**
**P.O. Box 439049**
**San Ysidro, CA 92143**

FILED
2008 FEB 15 PM 3:30
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY Rm DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SYLVESTER OWINO,**<br>**[A97-469-354],**<br><br>**Petitioner,**<br><br>**v.**<br><br>**MICHAEL CHERTOFF, et al.,**<br><br>**Respondents.** | Case No. 07CV2267-WQH (POR)<br><br>**PETITIONER'S TRAVERSE** |

ck

# TABLE OF CONTENTS


TABLE OF CONTENTS

STATEMENT OF THE CASE

ARGUMENT

I MR. OWINO'S PRIOR, GOOD FAITH REFUSAL TO SIGN APPLICATION FORMS DOES NOT PRECLUDE HIS CLAIM FOR RELEASE, ESPECIALLY IN LIGHT OF RESPONDENTS' OWN LACK OF DILIGENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II RESPONDENTS' CLAIMS LACK MERIT THAT THIS CASE IS MATERIALLY DISTINGUISHABLE FROM THE GOVERNING CASES RELIED UPON BY MR. OWINO. . 6

III THERE IS GOOD REASON TO BELIEVE THAT REMOVAL IS NOT SIGNIFICANTLY LIKELY IN THE REASONABLY FORESEEABLE FUTURE UNDER ZADVYDAS. . . . . . . 11

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

EXHIBIT A
EXHIBIT B
EXHIBIT C
EXHIBIT D
EXHIBIT E
EXHIBIT F

PROOF OF SERVICE

## TABLE OF AUTHORITIES

### FEDERAL CASES

Demore v. Kim,
538 U.S. 510 (2003) . . . . 8,10
Nadarajah v. Gonzales,
443 F.3d 1069 (9th Cir. 2006) . . . . 1,2,6,8,10,11,14
Pelich v. INS,
329 F.3d 1057 (9th Cir. 2003) . . . . 2,3,4,6
Rasul v. Bush,
542 U.S. 466 (2004) . . . . 7
Tijani v. Willis,
430 F.3d 1241 (9th Cir. 2005) . . . . 1,2,6,8,9,10,11,14
Zadvydas v. Davis,
533 U.S. 678 (2001) . . . . 1,6,7,10,11,12,14

### DOCKETED CASES

Judulang v. Chertoff,
No. 07CV1414-IEG (CAB) . . . . 9
Mustanich v. Gonzales,
No. 07CV1100-WQH (LSP), 2007 WL 2819732 (S.D. Cal. Sept. 27, 2007) . . . . 11,14

### FEDERAL STATUTES

8 U.S.C. § 1231(a)(1)(C) . . . . 1,2,3,5
8 U.S.C. § 1226(c) . . . . 8
28 U.S.C. § 2241 . . . . 1

### FEDERAL RULES

8 C.F.R. § 241.4(g)(1)(ii) . . . . 2,3,5

### MISCELLANEOUS

Office of Immigration Statistics, Dep't of Homeland Security, 2005 Yearbook of Immigration Statistics 92, 106 (Nov. 2006) . . . . 13

**SYLVESTER OWINO**
**A97-469-354**
**San Diego Detention Center (CCA)**
**P.O. Box 439049**
**San Ysidro, CA 92143**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SYLVESTER OWINO, [A97-469-354],** Petitioner, v. **MICHAEL CHERTOFF, et al.,** Respondents. | Case No. 07CV2267-WQH (POR) **PETITIONER'S TRAVERSE** |

**STATEMENT OF THE CASE**

Petitioner, Sylvester Owino, filed the instant Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 on December 3, 2007. Mr. Owino sought release pending the outcome of his challenges to his deportation order under the authority of Tijani v. Willis, 430 F.3d 1241 (9th Cir. 2005), and Nadarajah v. Gonzales, 443 F.3d 1069 (9th Cir. 2006). Those decisions applied the due process principles of Zadvydas v. Davis, 533 U.S. 678 (2001), against unreasonable, civil immigration detention to cases where the order of removal is subject to further legal challenges.

Respondents filed their Return on January 18, 2008. Respondents argue the Petition should be denied, because Mr. Owino's statutory removal period has been extended under 8 U.S.C. § 1231(a)(1)(C), permitting

continued detention under Pelich v. INS, 329 F.3d 1057 (9th Cir. 2003). Return at 3-4. Respondents also argue that Tijani and Nadarajah are distinguishable from this case, and so do not provide a basis for relief. Return at 5-7.

For the reasons below, these contentions should be rejected, and this Court should grant the Petition.

## ARGUMENT

### I

### MR. OWINO'S PRIOR, GOOD FAITH REFUSAL TO SIGN APPLICATION FORMS DOES NOT PRECLUDE HIS CLAIM FOR RELEASE, ESPECIALLY IN LIGHT OF RESPONDENTS' OWN LACK OF DILIGENCE.

Respondents argue that Mr. Owino's single, past refusal to sign an application for obtaining travel permission to Kenya brings this case within the indefinite detention provisions of Pelich. Return at 3-4. Their argument fails, for several reasons.

First, the provisions sanctioning detainees for failure to cooperate patently apply *only* during the statutory removal period. See 8 U.S.C. § 1231(a)(1)(C) ("the *removal period* shall be extended beyond a period of 90 days and the alien may remain in detention" for bad faith refusal to cooperate in removal efforts); 8 C.F.R. § 241.4(g)(1)(ii) (extension for non-cooperation applies "before the expiration of *the removal period*"); 8 C.F.R. § 241.4(g)(5)(iii) (effect of non-cooperation is "extending *the removal period* as provided by law, if the removal period has not yet expired"). However, over half of the delay in this case occurred during a time when the removal period had not yet begun to run. Respondents agree that from September 2006 until June 2007, a stay of the removal order was in effect. See Return at 3 ("[Mr.] Owino also requested a stay of removal which resulted in an automatic stay until June 5, 2007" (footnote omitted)). Under 8 U.S.C. §

1231(a)(1)(B)(ii), the removal period does not start until the Court of Appeals vacates its stay order. Thus, for about 10 months, the removal period was not even running, so the sanctions under § 1231(a)(1)(C) could not apply. Mr. Owino's failure to cooperate prior to the start of this period is not subject to sanction. Moreover, once the lack of cooperation ends, ICE is allowed only "a reasonable period of time in order to effect the alien's removal." 8 C.F.R. § 241.4(g)(1)(ii). Thus, the suspension under the statute is confined by strict limits to non-cooperation *during* the removal period and only for as long as the non-cooperation lasts.

Second, Mr. Owino's conduct does not rise to the level justifying prolonged detention. In Pelich, the Ninth Circuit found that § 1231(a)(1)(C) applied to one who deliberately obstructed the deportation efforts during the removal period by not only refusing to sign the application forms, but by asserting he had a different name, nationality, ethnicity, and birthdate than the one originally used to obtain travel documents. See 329 F.3d at 1058. Thus, the conduct which led the Court of Appeals to label Pelich's acts "recalcitrant refusal to cooperate in effectuating his removal," id. at 1062, was not simply a failure to sign forms, but that "Pelich has provided the INS with conflicting information regarding his name, his parents' names, his parents' birthplaces and residences, his birthplace and his nationality." Id. at 1059. In light of such bad faith lack of cooperation, continued detention was not deemed unreasonable. See id. at 1061.

This case is nothing like Pelich. Mr. Owino's refusal to sign the application for travel documents is not based on bad faith efforts to obfuscate the record or impair the process of removal with false or conflicting information. Mr. Owino refused to sign applications on the good faith belief that doing so would vitiate his right to appeal the BIA decision. See Exhibit A attached hereto (Declaration of Sylvester Owino). He believed–erroneously, as it turned out–that agreeing to sign the documents would result in waiving further

appeal. See id. Mr. Owino made clear to the ICE officials that he refused to fill in the forms, because he intended to appeal. The deportation officer did not correct this misconception. See id.

Following this initial, good faith (but mistaken) refusal in August 2006, ICE never again asked Mr. Owino to fill in the applications. His custody review worksheet from 2006 referred solely to this initial refusal and provides no evidence that any subsequent attempts or refusals occurred. See Return Exhibits at 18. ICE did not approach Mr. Owino again with the application until the day Respondents' Return was due, January 18, 2008, proffering the identical forms as in 2006. Exhibit A at 2. Mr. Owino asked for a short delay to seek legal advice, but ICE immediately issued a Warning for Failure to Depart without allowing Mr. Owino this usual courtesy. See Exhibit A at 2-3; Return Exhibits at 22-23. Once Mr. Owino contacted counsel and learned that his signing the forms is not a waiver of his claims on appeal or consenting to removal, he immediately complied and filled in the forms. See Exhibit B attached hereto (copies of completed Kenyan application forms). When Mr. Owino informed his deportation officer that the forms were ready to be submitted to the embassy, he received no response. Exhibit A at 2-3.

Thus, Mr. Owino's initial refusal was made on the basis of a good faith mistake of law, and at the first opportunity to cooperate that ICE gave him after August 2006, after requesting a short delay to consult with counsel, he complied fully.[1] He has never provided any false or misleading information in an effort to thwart the removal efforts, as was done in Pelich. Moreover, there can be no claim that Mr. Owino refused to sign as a ploy to remain in this country despite the removal order. Completely independently of ICE's removal

---

[1] The items which ICE indicated Mr. Owino needed to provide to comply in 2008 are identical to those it originally requested in 2006. Cf. Return Exhibits at 23 with Exhibit C attached hereto. Thus, nothing indicates that Mr. Owino has failed to cooperate in any additional way between 2006 and 2008.

efforts, which had not even begun yet, Mr. Owino made multiple attempts to seek permission for removal to alternate destinations, just so he was not returned to Kenya, where he is subject to physical abuse and persecution. See Exhibit A at 3. Thus, Mr. Owino has attempted on his own to obtain travel permission to Germany, the Netherlands, Switzerland, South Africa, the United Kingdom, Italy, Norway, Spain, Denmark, Australia, Austria, Belgium, Sweden, Greece, and Canada, and has sought relocation assistance from the U.N. High Commissioner for Refugees. See Exhibit D attached hereto. These efforts show Mr. Owino's good faith willingness to comply with *an* order of removal, as long as he will not be subject to torture or death in Kenya.

This demonstrates that, far from seeking to obstruct his removal from the United States, Mr. Owino has made a much more concrete attempt to effect his deportation than has ICE, which was apparently uninterested in making any new request for compliance for 16 months, between September 2006 and January 2008. Although there may have been no practical reason to make a request while a temporary stay was in place, Mr. Owino's motion for a permanent stay was denied in February 2007, and his motion for reconsideration denied in June 2007. See Return Exhibits at 13. After both denials ICE made no new request, but sat on its hands for another seven months before making any effort to remove Mr. Owino. The regulations provide that once cooperation is obtained, there is no further disability, and ICE is allowed only "*a reasonable period of time* in order to effect the alien's removal." 8 C.F.R. § 241.4(g)(1)(ii) (emphasis added). Mr. Owino's statutory removal period commenced at the latest when the stay was vacated in June 2007. The removal period lasts 90 days. See 8 U.S.C. § 1231(a)(1)(A). However, three months following the lifting of the stay, ICE had still not asked Mr. Owino to submit an application. It was not until January 2008 that ICE made its first attempt during the current removal period to secure Mr. Owino's cooperation, and then immediately

labeled his request to seek legal advice a refusal, seemingly so that a timely exhibit to the Return could be produced to shore up the Government's Pelich argument.

Respondents cannot rely on a failure to cooperate from 18 months ago, with no subsequent attempts to secure Mr. Owino's compliance, as a basis for indefinite, prolonged detention. One past instance of good faith refusal does not provide a continuing basis for an obstruction finding on the level of Pelich. As an equitable matter, Mr. Owino should not be burdened with the result of ICE's failing to act within a "reasonable period of time" once the temporary stay was lifted.[2]

## II
## RESPONDENTS' CLAIMS LACK MERIT THAT THIS CASE IS MATERIALLY DISTINGUISHABLE FROM THE GOVERNING CASES RELIED UPON BY MR. OWINO.

Respondents argue that Mr. Owino failed to state a claim under the controlling cases, Tijani and Nadarajah, but their arguments lack merit.

First, Respondents argue that Mr. Owino's *substantive due process* claim should fail, because he has not shown a violation of *procedural due process.* Return at 5. However, the Supreme Court specifically rejected this argument in Zadvydas. Justice Kennedy argued at length in his dissent that relief should not be granted for substantive due process deprivation, because the detainees had been given adequate custody reviews under the regulations governing immigration detention. See Zadvydas, 533 U.S. at 720-24 (Kennedy, J., dissenting). However, Zadvydas expressly rejected his reasoning and instead held that following the procedural niceties did not vitiate a substantive due process claim: "And, for the reasons we have set forth, we believe that an

---

[2] *Vigilantibus, et non dormientibus, jura subveniunt* 'The laws serve the vigilant, not those who sleep on their rights.'

alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, *irrespective of the procedures used*, cf. post, [121 S. Ct.] at 2515-2517 (Kennedy, J., dissenting), the Constitution permits detention that is indefinite and potentially permanent." Zadvydas, 533 U.S. at 696 (emphasis added).

The Government cites no authority that failure to support a procedural due process claim somehow detracts from the validity of a substantive due process claim. And, in fact, none of the cases in the Zadvydas line have noted this as a prerequisite to relief. See, e.g., Zadvydas, 533 U.S. at 683-84 (describing the custody review process, but never indicating a deficiency claim had been alleged); Martinez v. Gonzales, 504 F. Supp. 2d 887, 890 (C.D. Cal. 2007) (granting Tijani/Nadarajah relief despite noting that petitioner had received periodic custody reviews).

Nor does it matter that Mr. Owino "does not blame Respondents" for the prolonged detention. Return at 5. A writ of habeas corpus acts " 'upon the person who holds [the prisoner] in what is alleged to be unlawful custody,' " Rasul v. Bush, 542 U.S. 466, 478 (2004) (quoting Braden v. 30th Judicial Circuit Court of Ky., 410 U.S. 484, 494-95 (1973)), not on the particular *cause* of the illegal detention. Were the law otherwise–requiring the custodian to be the source of the illegality–no habeas relief would lie for claims such as ineffective assistance of counsel or jury misconduct, since neither the prisoner's warden nor any government actor would be responsible for the constitutional flaw meriting relief. Mr. Owino is entitled to release from unreasonable detention, because he is unlawfully detained by Respondents: "Freedom from imprisonment–from government custody, detention, or other forms of physical restraint–lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects." Zadvydas, 533 U.S. at 690.

Respondents' argument is unsupported by any language or logic in either Tijani or Nadarajah.

Even if it were a requirement for supporting a substantive due process claim to show a procedural deficiency, that would be met here by Respondents' own admission. Respondents assert that Mr. Owino's removal proceedings lasted nearly ten months. Return at 2. However, the benchmarks applied by the Supreme Court for timely removals stated that the average time for completing such proceedings was 47 days (with a median of 30 days), and that in the 15% of cases where further review is sought, the average time of resolution was four months. See Demore v. Kim, 538 U.S. 510, 529 (2003). "In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." Id. at 530. Here, on the contrary, the removal proceedings twice exceeded the "very brief" period which the Supreme Court approved in Kim.

Next Respondents state that Mr. Owino's case differs from Nadarajah in that, unlike Mr. Nadarajah, Mr. Owino has hitherto been unsuccessful in asserting his challenge to removal. Return at 6. While it is true that the facts in Nadarajah show the Government persisted in unsuccessfully challenging the petitioner's solid string of administrative wins, see Nadarajah, 443 F.3d at 1081, that fact was never identified as a criterion to obtain relief. Thus, as Judge Hatter observed in rejecting the identical claim by the Government in Martinez, 504 F. Supp. 2d at 899, "the Ninth Circuit did not suggest that the rare success enjoyed by the petitioner in Nadarajah was a prerequisite for demonstrating the absence of a significant likelihood of removal in the reasonably foreseeable future." Likewise, the petitioner in Tijani had not "won at every administrative level," or at any level until then, and yet the Court of Appeals reversed the denial of habeas corpus. See Tijani, 430

F.3d at 1247 & n.7 (noting adverse IJ and BIA results in underlying case).

In addition, the fact that Mr. Owino has not yet won his petition for review does not mean it lacks merit. To prevail, Mr. Owino must show he has raised a "substantial argument" in his petition for review. That is the standard for relief proposed by Judge Tashima in Tijani, and Judge Tashima expressly noted that "[t]he majority does not reject such a substantial argument standard. Rather, it simply does not reach the question . . . ." Tijani, 430 F.3d at 1247 n.6 (Tashima, J., concurring). Mr. Owino does not need to show to a certainty that he will inevitably win; as Judge Tashima noted, "Indeed, Tijani's arguments may ultimately not be convincing. Nonetheless, a closer look is surely required. Tijani's moral turpitude argument, therefore, easily rises to the level of 'substantial'." Id. at 1248 (Tahsima, J., concurring).[3]

Although the BIA agreed with Mr. Owino and found the IJ had erred in making an adverse credibility finding as to him, it nonetheless held the burden to prove a CAT claim had not been met. See Return Exhibits at 7-9. However, both the IJ and the BIA denied relief, despite the proffering of evidence in corroboration of Mr. Owino's claims, relying on untimeliness of the proffers, not on their insufficiency. Id. He presented evidence of his official maltreatment by Kenyan officials and his abiding fear that if he were returned there, the persecution would re-commence, but the IJ abused his discretion in not allowing Mr. Owino's brother to testify telephonically from Sweden in support of the CAT claim. In the appeal before the BIA, Mr. Owino submitted supporting documentation that he was in police custody without charge at the time of his physical

---

[3] Chief Judge Gonzalez recently accepted and applied Judge Tashima's "substantial argument" standard in a Tijani habeas case. See Order Granting in Part Petition for Writ of Habeas Corpus, Judulang v. Chertoff, No. 07CV1414-IEG (CAB) at 7 (S.D. Cal. Feb. 12, 2008), attached hereto in Exhibit E.

abuse and that a warrant remains outstanding for his arrest. Mr. Owino argues that these failures to consider substantive evidence that he was and will be subjected to abuse and persecution on his return to Kenya only due to technical deficiencies in proffering the evidence violates due process and the United States' commitments under international humanitarian law.

It must be borne in mind, too, that as the length of detention increases, the required showing to obtain relief correspondingly lessens. See Zadvydas, 533 U.S. at 701; Nadarajah, 443 F.3d at 1084; Kim, 538 U.S. at 532 (Kennedy, J., concurring). Mr. Owino, whose detention of 27 months approaches the 32 months in Tijani, should have his detention factored into the analysis of whether he raises a "substantial argument."

Finally, Respondents distinguish Tijani by stating that Tijani involved delay during administrative review, whereas Mr. Owino's case is now before the Court of Appeals.[4] Return at 6-7. However, Tijani and Nadarajah make clear that the focus is on excessive detention pending the outcome of immigration proceedings—whether they are labeled administrative, judicial, or some other thing. See Tijani, 430 F.3d at 1242 (holding that "two years and eight months" was excessive, without parsing out how much of that time was spent mired in administrative proceedings); see also Nadarajah, 443 F.3d at 1079-80 (concluding that "length of detention in this case has been unreasonable" without regard to whether Nadarajah had a case

---

[4] Respondents can make this distinction only by conveniently confining its discussion to Mr. Tijani's length of detention "at the time of oral argument" in that case. Return at 6. This Court should reject any use of oral argument as freezing in time the operative facts and law of the ultimate decision. If, as Respondents claim, administrative proceedings must be pending at the time of oral argument in order for Tijani to apply, what happens if the Court of Appeals does not grant oral argument? A district court lacks the ability to foresee the procedural posture that a separate immigration case will be in at the time the habeas appeal makes it to argument to decide whether Tijani and Nadarajah are applicable.

pending in a judicial or quasi-judicial forum). Tijani expressly considered as part of the "foreseeable process" the time the Ninth Circuit would take to consider his petition for review. See 430 F.3d at 1242 ("[T]he foreseeable process in this court, where the government's brief in Tijani's appeal of the removal was only filed last month after two extensions of time, is a year or more."). Nadarajah held that the relevant consideration on a detainee's due process challenge under Zadvydas was whether removal was "reasonably foreseeable"—not whether a period of detention, admittedly far in excess of the six-month presumptively reasonable period, could somehow escape the protections of the due process clause, because the detainee chose to seek judicial review. See 443 F.3d at 1078; see also Martinez, 504 F. Supp. 2d at 889 (granting habeas on basis of Tijani/Nadarajah even though the removal order was administratively final for four years).[5]

## III

## THERE IS GOOD REASON TO BELIEVE THAT REMOVAL IS NOT SIGNIFICANTLY LIKELY IN THE REASONABLY FORESEEABLE FUTURE UNDER ZADVYDAS.

Respondents never directly address the applicability of Zadvydas, except to claim that removal is reasonably foreseeable but for the purported act of obstruction. Return at 3-4. However, since the filing of the Petition in this case, it has become increasingly apparent that not only has the review process resulted in unreasonably prolonged civil detention, but also that Kenya is not likely to respond to any travel permission request any time in the reasonably foreseeable future.

---

[5] This Court has likewise rejected the contention that Tijani/Nadarajah relief is predicated on a distinction between administrative vs. judicial posture of the prolonged review process. See Order Granting Writ of Habeas Corpus in Part, Mustanich v. Gonzales, No. 07CV1100-WQH (LSP), 2007 WL 2819732, at *8-9 (S.D. Cal. Sept. 27, 2007). Judge Gonzalez recently ruled likewise. See Exhibit E at 5-6.

To obtain release under Zadvydas, a detainee must show "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." 553 U.S. at 701. Once such a showing is made, the burden shifts to the Government to rebut this and show removal is imminent. See id.

Simple reference to recent news dispatches shows that the political situation in Kenya is extremely grave. See Appendix A attached to the Motion to Reconsider Appointment of Counsel, Dckt. Entry No. 11. The recent developments in Kenya support the view that removal there is not likely in the reasonably foreseeable future. Ethnic violence between members of the dominant Kikuyu tribe and other groups in the country has reached proportions reminiscent of the Rwandan genocide in the 1990s. See id. Coordinated attacks, including hacking people to death with machetes, have been reported recently. The opposition group in Kenya has filed a complaint for crimes against humanity with the International Criminal Court. See id.

Even since filing the Motion to Reconsider, the situation in Kenya has worsened. See Exhibit F attached hereto. The top U.S. envoy in Africa has referred to the acts of both sides in the struggle as "ethnic cleansing." Ethnic groups are carving out protective enclaves and erecting roadblocks into their areas. About 1,000 people have been killed since the violence erupted in December, and about 30,000 people have been displaced by the troubles. The Chicago Tribune describes the upheaval as leading to a looming, economic catastrophe, as the country's critical tourism sector collapses. Former Secretary General Kofi Annan has personally intervened in an effort to broker a power-sharing arrangement between the Kikuyu president Kibaki and the opposition leader Odinga, a member of the Luo tribe. Clashes continue despite minor acts of cooperation between the two sides. In the United States, congressional committees are holding hearings on the violence

in both the House and Senate. The United States and Great Britain are considering banning travel to their countries by Kenyans until the situation stabilizes; Canada has already done so. See Exhibit F. As a result, the possibility now exists that the Kenyan government will respond to such travel bans with tit-for-tat, stepping up their reluctance to repatriate deportees. Thus, the situation as regards ability to remove aliens to Kenya has altered significantly, and removability in general is not even as likely as in the past.

In addition, and more specifically, Mr. Owino is a member of the Luo minority group, the same ethnic group as the leader of the opposition. See Exhibit A. Given the turmoil and reprisals occurring on a daily basis in Kenya, the possibility of economic collapse and a large-scale humanitarian disaster, there is good reason to believe that the Kenyan government is not significantly likely to reply favorably in the reasonably foreseeable future to the return of a member of an ethnic group identified with the political opposition. Moreover, the situation in Kenya further bolsters Mr. Owino's CAT claims. For, as Mr. Owino fears, any readiness by the Kikuyu-dominated bureaucracy to accept him back may have a more sinister motive, and that he will not be released on arrival, after he officially claimed the government tortured and abused him in the past. In light of developments in Kenya, a timely response from a government under siege is unlikely.

Respondents provide no basis to believe otherwise. The most they state is that "[t]he Department of Homeland Security routinely repatriates Kenyans, and [Mr.] Owino's case does not appear to be exceptional." Return at 4. They cite no support for these assertions. In fact, in 2005, prior to the eruption of widespread violence and political turmoil in Kenya, ICE's success rate at removing Kenyans was just over 50%. See Office of Immigration Statistics, Dep't of Homeland Security, 2005 Yearbook of Immigration Statistics 92,

106 (Nov. 2006) (showing of 146 deportable aliens from Kenya, 83 were successfully removed). Not considering tribal affiliations, only every other deportable Kenyan was removed during the fiscal year.

Under the consistent principle articulated in Zadvydas, Tijani, and Nadarajah, deportable aliens whose civil detention becomes unreasonably prolonged must be released to avoid deprivation of substantive due process. Whether the delay in removal is due to (in)action by a foreign government, typical delays in pursuing judicial review, or bureaucratic viscosity, when removal is no longer reasonably foreseeable, the rationale for civil detention ceases, and so does the authority to detain. See Zadvydas, 533 U.S. at 699. The mere fact that *some* resolution will occur eventually, either in Mr. Owino's appeal or in the upheavals in Kenya, is immaterial. An alien is indefinitely detained, if there is no date certain for a resolution leading to release or removal. As the Ninth Circuit has stated, "Nor are we persuaded by the government's argument that because the Attorney General will someday review Nadarajah's case, his detention will at some point end, and so he is not being held indefinitely. No one can satisfactorily assure us as to when that day will arrive. Meanwhile, petitioner remains in detention." Nadarajah, 443 F.3d at 1081; see also Martinez, 504 F. Supp.2d at 899-900 (removal was not "reasonably foreseeable" because no set date by which Court of Appeals must rule); Mustanich, 2007 WL 2819732, at *9. Likewise here, although Mr. Owino's appeal will be decided at some unspecified future date, "[m]eanwhile, [he] remains in detention."

//

//

//

## CONCLUSION

For the above reasons, and those stated in the Petition, the Court should grant a writ of habeas corpus ordering Mr. Owino's release forthwith on appropriate conditions of supervision. See 8 U.S.C. § 1231(a)(3).

Respectfully submitted,

Dated: 02/11/08

SYLVESTER OWINO
Petitioner