# Exhibit A

**SYLVESTER OWINO**
**A97-469-354**
**San Diego Detention Center (CCA)**
**P.O. Box 439049**
**San Ysidro, CA 92143**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SYLVESTER OWINO,** **[A97-469-354],** **Petitioner,** v. **MICHAEL CHERTOFF, et al.,** **Respondents.** | Case No. 07CV2267-WQH (POR) **PETITIONER'S DECLARATION IN SUPPORT OF TRAVERSE** |

I, Sylvester Owino, declare:

1. I am the Petitioner in the above-captioned habeas corpus action. If called to testify, I would be a competent witness to the facts attested to below in this Declaration.

2. I am a native-born national of Kenya, a member of the minority Luo tribe.

3. The Board of Immigration Appeals denied the appeal of my deportation order on August 2, 2006.

4. Shortly after the denial, Deportation Officer Padilla brought me application forms to seek travel documents from the Kenyan government. I told him that since I intended to file a petition for review of the BIA decision, I would not sign the forms.

5. It was my understanding at the time that if I signed the forms, I would be abandoning any further appeal of the removal order. I now know, after consulting with current counsel, that my belief in August 2006 was incorrect, and that signing the application forms is not a waiver of the right to appeal.

6. No ICE officer explained to me the purpose of signing the application forms, or that I had the right to pursue my petition for review from abroad. I was, however, willing to abandon my petition, if another country besides Kenya were willing to accept me. However, because of my fear of returning to Kenya where the majority Kikuyu tribe officials would subject me to abuse and inhumane treatment.

7. After this one occasion in August 2006, no ICE official approached me again with a request to sign applications for travel documents until January 18, 2008. On that day, Deportation Officer Coronado brought me the same forms I had been offered in 2006. I asked Officer Coronado for a few days to seek legal advice.

8. During that time, I contacted present counsel and was advised that filling out the forms does not waive my appeal rights.

9. After learning this, I filled in the forms and signed them four days later, on January 22, 2008. I then sent a message to Officer Coronado that the forms were complete and ready to be picked up.

10. Officer Coronado never returned to retrieve the forms and has not contacted me about them. Instead, I was served with a Warning for Failure to Depart, executed on the same day that I was

given the forms and I asked for a few days to seek legal advice.

11. Since even before the denial of my appeal to the BIA, I have been, on my own initiative, actively seeking to find an alternate destination to which I can be removed. It was never my intention to block my removal from the United States. But because of my fear of harm from officials controlled by the ruling tribe in Kenya, against whom there are now on record my official complaints of torture, and particularly after the escalation in killing and oppression in Kenya recently, I am fully willing to depart the United States, if another country other than Kenya is willing to accept me.

12. I supplied counsel with copies of the response letters from various other countries where I have sought permission for removal. Copies of these letters and of the Kenyan application form which I completed are attached as an exhibit to the Traverse.

13. It is my belief that my individual attempts to seek refuge in another country would be more successful if ICE did not focus all its efforts on removing me to Kenya, and assisted me in seeking an alternative destination.

I declare under penalty of perjury that the foregoing is true and correct, except for matters stated to be on information and belief, and as to those matters, I believe them to be true.

Executed this 11th day of February, 2008, at San Diego, California.

[signature]

**SYLVESTER OWINO**
Declarant

# Exhibit B

PP. 3

R..........

# MAOMBI YA KUBADILISHA PASI ILIYOKWISHA MUDA
# APPLICATION FOR RENEWAL OF PASSPORT

(TAZAMA MAELEZO)
(SEE NOTES)

(1) Mimi niliyetia sahihi hapo chini / I, the undersigned: Sylvester Owino Otieno
(*Majina kamili kwa herufi kubwa*) (*Full names in block capitals*)

Nimezaliwa / Born at: Kisumu (KENYA) (*mahali na nchi*) (*place and country*) tarehe / on: 04/05/76 (*date of birth*)

Jina la usichana (iwapo muombaji ni mwanamke aliyeolewa) / Maiden name (if applicant is a woman who is or has been married): N/A

Kwa sasa nakaa / At present residing at: C.C.A San Diego CA

Naomba kupewa pasi mpya kwa muda zaidi wa miaka.......... badili ya pasi hii No..........

iliokwisha muda iliyoko pamoja na fomu hii niliopewa.......... tarehe..........

Hereby apply for the renewal of the attached Kenya passport No. A-418119 issued to me at Nairobi Kenya on the August 1997 for a further period of 5 years.

(2) Wanawake walioolewa ni lazima wajaze sehemu (*a*) au (*b*).
Married Women. Section (*a*) or (*b*) must be completed.

(*a*) Ikiwa muombaji ni mwanamke aliyeolewa taja—
If applicant is a woman who is or has been married state—

Majina kamili ya mume / Husband's full name: N/A N/A

Mahali na nchi aliozaliwa mume / Husband's place and country of birth: N/A — Tarehe aliozaliwa mume / Husband's date of birth: ..........

(*b*) Iwapo jina la mke wa mwenye pasi latakiwa katika pasi taja—
If wife of bearer is included on the passport state—

Majina kamili / Full names: N/A — Jina kamili la usichana / Maiden surname: ..........

Mahali na nchi ya kuzaliwa / Place and country of birth: N/A — Tarehe ya kuzaliwa / Date of birth: ..........

(3) Iwapo majina ya watoto yamo katika pasi (mtoto mwenye umri juu ya miaka 16 atakiwa awe na pasi yake mwenyewe).
Children if included on passport (*Note.*—Children over 16 years require separate passports).

| Majina kamili<br>Full names | Mahali na tarehe ya kuzaliwa<br>Place and date of birth |
|---|---|
| N/A | N/A |

(4) Mimi ni mwananchi wa Kenya kwa—

Kuzaliwa Ukoo Kujiandikisha
(*Futa kwa mstari matamko yasiokuhusu*)

I am a citizen of Kenya by—

Birth (circled) ~~Descent~~ ~~Registration~~ ~~Naturalization~~
(*Delete words which do not apply*)

(5) MAJULISHO—

Mimi najulisha kuwa sijapoteza haki ya uananchi wa Kenya na yote niliyoyasema humu ni ya kweli. Tena najulisha kuwa sina pasi nyingine ifaayo.

DECLARATION—

I declare that I have not lost the status of a citizen of Kenya and that all the particulars given by me in respect of this application are true. I further declare that I have no other valid passport in my possession.

Tarehe / Date: 01/22/08    Sahihi ya muombaji / Signature of applicant: [signature]

Kazi / Profession: N/A

**Jambo Muhimu:** Muombaji anahadharishwa kuwa aweza kuingia matatani iwapo maelezo yake yoyote yaliomo humu yatathubutu kuwa si ya kweli.

**Important:** Applicants are warned that should any of the statements contained in their declaration prove to be untrue the consequences to them may be serious.

## MAELEZO

1. Ada ya kubadilisha pasi iliokwisha muda ni Sh. 50 kwa kuongeza muda wa miaka 5 kutoka tarehe ya kwisha muda. Pasi hazitolewi kwa muda unaozidi miaka 10 kutoka tarehe ya kupewa pasi kwa mara ya kwanza. Ada yatakiwa kwa noti au shilingi au pesa za posta zitwazo "postal order" cheki hazikubaliwi.

2. Barua ya idhini ya baba (au mama, iwapo baba amekufa) yatakiwa wakati pasi ziliokwisha muda zikiletwa na mtu umri wa chini ya miaka 21 ambae hajaowa/olewa, au iwapo majina ya watoto yamo katika pasi. Barua ya idhini ni lazima ionyeshe uhusiano juu ya mtoto. Iwapo mama au mtu mwengine anadai kuwa yeye ni mlezi wa halali wa mtoto, hali babake mtoto yu hai, basi ni lazima aonyeshe ushuhuda wa amri ya korti iliyomruhusu mtoto awe chini ya ulezi wake.

3. Maombi yapelekwe ofisi ya kutoa pasi yaani Passport Control Office, P.O. Box 30191, Nairobi au huko Mombasa yaani Branch Passport Control Office, P.O. Box 90284, Mombasa. Maombi yapelekwe, kwa uchache, siku 14 kabla ya muombaji kutaka kusafiri.

4. Mtu alie nje ya Kenya hawezi kubadilishiwa pasi yake iliokwisha muda. Mtu huyo atakiwa apeleke maombi yake kwa naibu wa Kenya yaani Kenya Consulate au High Commissioner, alie karibu nae, au iwapo hapana naibu wa Kenya, apeleke maombi yake kwa naibu wa Uingereza alie karibu nae. Pasi hazitolewi nje ya Kenya kwa njia ya posta.

## NOTES

1. The fee for renewal is Sh. 50 for a further 5 years from date of expiry. Passports are not available beyond 10 years from the date of issue. The fee must be paid in cash or crossed postal orders. Cheques are not accepted.

2. When a passport is presented for renewal by an unmarried person under 21 years of age or when children are included in the passport the written consent of the father, or if the father is dead, the mother, is required. Letters of consent should state relationship to child.

N.B.—The mother, or any other person claiming legal custody during the lifetime of the father, must produce the court order committing the child to her or that person's custody.

3. Applications should be submitted to either the Passport Control Office, P.O. Box 30191, Nairobi, or the Branch Passport Control Office, P.O. Box 90284, Mombasa, at least 14 days before the applicant desires to travel.

4. A passport cannot be issued or renewed by the Passport Control Officer on behalf of a person already abroad. Such persons should apply to the nearest Kenya Consulate or Office of a Kenya High Commissioner, or, where there is no Kenya Representative, to the nearest United Kingdom Representative.

Passports are not sent out of Kenya by post.

---

FOR OFFICIAL USE ONLY

# Exhibit C

EXHIBIT 1

U.S. Department of Homeland Security
Immigration and Customs Enforcement

# Warning for Failure to Depart

| Name: | District Office: | File #: |
|---|---|---|
| OWINO, Sylvester | SAN DIEGO | A 97 469 354 |

Section 243(a) of the Immigration and Nationality Act provides, in part, that:

> Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a) who--
>
> (A) willfully fails or refuses to depart from the United States within a period of 90 days* from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,
>
> (B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,
>
> (C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or
>
> (D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,
>
> shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.

Nothing in this section shall make it a violation to take proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

Any action the Immigration and Naturalization Service may take to obtain a travel document for your departure or to remove you will *NOT* relieve you of the liability for compliance with the provisions of law referred to in the first paragraph above.

* Section 241(a)(1)(C) provides for the extension of the statutory removal period if the alien refuses, during the removal period, to make application in good faith, for a travel or other document necessary for the alien's removal or departure or conspires or acts to preve the alien's removal subject to an order of removal.

| Date Order Final: | Ordered Removed under Section: |
|---|---|
| 08/02/2006 | 237(a)(2)(A)(iii) |

## Record of Service
(Check method used)

( ) **Record of Personal Service**

Served By: (Print Name and Title of Officer) Andy Padilla — Date: 8/11/06

Officer's Signature: [signature] — Location of Service: SND

Served On: (Alien's Signature) Refused to sign — Date:

( ) **Warning administered in Court** (Copy of order attached)

( ) **Certified Mail Service**

Attach certified mail receipts here.

**Record of Personal Service (Cont.)**

Fingerprint of Alien (Specify finger used)

rm I-229(a)
evised 12/04/02)

# INSTRUCTION SHEET TO DETAINEE REGARDING REQUIREMENT TO ASSIST IN REMOVAL

EXHIBIT 1

The following is a list of things you are required to complete within 30 days of receiving this form, in order comply with your obligation to assist in obtaining a travel document:

*Mandatory requirements will be checked off by the INS officer depending on the facts of each case. Failure to comply or provide sufficient evidence of your inability to comply, may result in the extension of the removal period and subject you to further detention. In addition, you may be subject to criminal prosecution. If you need assistance in complying with any of the requirements, please contact a Deportation Officer.*

✓ Submit passports (current and expired) to the INS. If you have a copy of your passport, you are to submit it.

✓ Apply for a travel document/passport from your embassy or consulate, or directly from your government in your native country, or any other embassy or consulate of your native country in another country.

✓ Comply with all instructions from all embassies or consulates requiring completion of documentation for issuance of a travel document.

✓ Submit to the INS birth certificates, national identification cards and any other document issued by a foreign government indicating your citizenship, nationality, place of birth, and place of residence prior to entering the United States.

✓ Provide names and addresses of family and friends residing in the United States and request that they contact your embassy or consulate in the United States, in order to facilitate the issuance of a travel document.

✓ Provide names and addresses of family and friends residing in your country of citizenship and request family and friends residing abroad contact your government in reference to issuing a travel document.

You are required to take measures to request reinstatement of your previous nationality, register as required, or take any other action that will ensure the issuance of a travel document and your removal from the United States.

Provide INS with written copies of requests to embassies or consulates requesting issuance of a travel document.

Provide INS with written copies of responses from embassies or consulates regarding your requests.

Solicit permission from another country, which may be able to accept you, to enter that country to effect your removal from the United States.

Other: __________________________________________

Alien's Signature ____________________ [signature]

Number ________

Served by __________________ on __________ at __________

Officer's Name Date

Location

To be served with I-229 (a) no later than 30 days after the final order

(Rev. 10/3/02)

# Exhibit D

Generalkonsulat
der Bundesrepublik Deutschland
Los Angeles
Consulate General
of the Federal Republic of Germany

Los Angeles, 24.07.2006

Gz.: RK 516.80 Hamidi
(Bitte bei Antwort angeben)

Sylvester O. Owino
97469354 C/K 101
San Diego Detention Facility C.C.A.
P.O.Box 439049
San Diego, CA 92143

Dear Sir:

Thank you for your letter dated 12/15/2003. According to German law, political asylum can be granted only when a refugee reaches German territory. I regret to inform you that German Consulates and Embassies are not in a position to accept applications for political asylum.

Wishing you all the best for your future,
Sincerely,

Uwe Hahn
Vice Consul

Adresse:
6222 Wilshire Blvd., Suite 500
Telefon:
(323) 930-2703
Telefax:
(323) 930-2805
E-Mail:
Website:

Consulaat-Generaal van het
**Koninkrijk der Nederlanden**

Sylvester O. Owino
97469354 C/K 101
San Diego Detention Facility CCA
PO Box 439049
San Diego, CA 92143

11766 Wilshire Blvd, Suite 1150
Los Angeles, CA 90025

*Date* July 25, 2006
*Our ref.*
*Page* 1/2
*Encl.* -
*Re* Asylum request
*Cc* -

*Contact* Marco van Vemden
*Tel.* (310) 268 1598
*Fax* (310) 312 0989
los-ca@minbuza.nl
www.ncla.org

Dear Mr. Owino,

With reference to your letter dated 20 July 2006, I inform you as follows.

The government of The Netherlands cannot accept applications for political asylum from people that are situated in the US, due to the fact that the United States of America is party to the 1967 Protocol and the Convention of 1951 concerning the status of refugees.

The United States has established asylum procedures in its domestic laws for purposes to determine the refugee status of a person. If the US authorities rejected an application for political asylum, the government of The Netherlands will respect that decision.

If you feel however, that your rights are seriously violated you might consider bringing your case to the notice of:

The United Nations High Commissioner for Refugees (UNHCR)
Regional Office for the United States of America
1775 K Street, NW
Suite 300
Washington DC, 20006

SCHWEIZERISCHES GENERALKONSULAT
CONSULAT GENERAL DE SUISSE
CONSOLATO GENERALE DI SVIZZERA
CONSULAT GENERAL SVIZZER

Los Angeles,
11766 Wilshire Blvd. Ste 1400
Los Angeles, CA 90025

E-Mail:
vertretung@los.rep.admin.ch
Website: www.swissemb.org/la

Tel: ++ 1 310 / 575 1145, ext. 214
Fax: ++ 1 310 / 575 1982

25.07.2006

Mr. Sylvester O. Owino
97469354 C/K 101
San Deigo Detention Facility
C.C.A.
P.O.Box 439049
San Diego, CA 92143

Our reference 131.4(02)-RAL

**Request for Asylum in Switzerland**

Dear Sir,

I acknowledge receipt of your letter of July 20, 2006, in which you describe your case and express the wish to be accepted as a refugee in Switzerland.

Since Switzerland and the United States share the same principles with regard to asylum policy, the fact that your request has been rejected in this country means that your case would most certainly be denied in Switzerland, too. Furthermore, you have no link whatsoever to Switzerland According to the Swiss laws on asylum, the examining authorities have to determine whether it can be expected that the candidate settles down in a country which is familiar to his or her culture. Therefore, in your case, the likelihood that an application to enter Switzerland would be granted is very slim.

As you can see, the Swiss asylum application procedure is very restrictive, and under these circumstances authorization to enter the country is granted in very few cases.

I regret that I am not able to give you a more favorable response.

Best regards,

FOR THE CONSUL GENERAL OF SWITZERLAND

Alain Roh

**SOUTH AFRICAN CONSULATE-GENERAL**

6300 Wilshire Boulevard, Suite 600 • Los Angeles, CA 90048 • Tel: 323-651-0902 • Fax: 323-651-5969 • E-mail: sacgla@link2sa.com
Website: www.link2southafrica.com

Ref: CONS/16 26 July 2006

Sylverster O Owino
97469354 C/K 101
San Diego Detention Facility, C.C.A.
P.O. Box 439049
San Diego, CA 92143

Dear Mr Owino,

Thank you for your letter dated July 20, 2006, regarding admission for refugee status in South Africa.

South Africa requires that asylum seekers present themselves at a port of entry; for example airport, seaport, or land border post, to have their asylum cases heard.

Included is a visa application form and instructions, should you wish to apply for a visa that, if granted, will give you authorization to report to a port of entry.

Sincerely,

for CONSUL-GENERAL

JTN/am

*Consolato Generale d'Italia*
*Los Angeles*

*12400 Wilshire Blvd. Suite 300*
*Los Angeles, CA 90025*
*Tel. (310) 820.0622*
*Fax: (310) 820.0727*

*http://sedi.esteri.it/losangeles*

**Mr. Sylvester O OWINO**
**97469354 C/K 101**
**San Diego Detention Facility**
**C.C.a./ BICE**
**P.O. Box 439049**
**San Diego, CA 92143**

005442

July 31, 2006

Re: political asylum

Dear Mr Owin,

With reference to your letter dated July 20th, 2006, we regret to inform you that the Italian Consulates or Embassies abroad are not entitled to receive request for political asylum. Eligible candidates should apply directly with the Italian border Police Offices as stated by the Italian law (Legge n. 39 of June 15, 1990).

Sincerely,

Consul General of Italy
Diego Brasioli

ROYAL NORWEGIAN CONSULATE GENERAL

Sylvester O. Owino
97469354 C/K 101
San Diego Detention Facility C.C.A
PO Box 439049
San Diego, CA 92143

| Your ref.: | Our ref.: | Date: |
|---|---|---|
| July 20, 2006 | Jnr.256/06/KMM - 441.4 | 1 August 2006 |

**Re.: Request for Asylum in Norway**

Reference is made to your letter dated July 20, 2006, requesting asylum in Norway.

Please note that applications for asylum must be submitted from within Norway or at the Norwegian border. Applications submitted from abroad will generally be rejected on a formal basis.

We ask that you please direct your request to United Nation's High Commissioner for Refugees at their Regional Office in Washington, D.C. at the following address:

1775 K Street, N.W., Suite 300
Washington, D.C. 20006

Their telephone no. is: (202) 296-5191 , Fax: (202) 296-5660.

1882721913

Sincerely,

Hege Haaland
Acting Consul General

Postal address:
20 California Street
6th floor
San Francisco, CA 94111-4803

Office address:
20 California Street
6th floor
San Francisco, CA 94111-4803

Telephone:
+1 (415) 986-0766-8
Telefax:
+1 (415) 986-3318

Enquiries to:
Karl Morten Myrvold
cgsfo@mfa.no
www.norway.org

**CONSULADO GENERAL DE ESPAÑA**
**LOS ANGELES**

Los Angeles, 31 de julio de 2006

Mr. Sylvester O Owino
97446354 C/K 101
Sana Diego Detention Facility
C.C.A
P.O. Box 439049
San Diego, CA. 92143

Dear Sir:

I acknowledge receipt of your letter requesting political asylum in Spain. In order to send your petition to our authorities in Madrid, Spain, you will need to fill out the enclosed forms with as much information as possible.

Filing a petition does not guarantee that your petition is going to be approved.

Regards,

Inocencio F. Arias Llamas
Cónsul General de España

SYLVESTER O OWINO
A# 97469354 A/D 116
C.C.A
P.O.BOX 439049
SAN DIEGO CA 92143-9049.
08-01-2007

TO **(Spain consulate General)**

Dear Sir/Madam,

**RE: Status of my application .**

I am writing this letter so as to inquire the status of my application to migrate in your country, ***(please see attached response letter from you dated 31stJuly 2006)*** I am at the verge of being deported to Kenya anytime soon. Please advise on current status of my application. If possible, please I request you to issue me with a temporary permit to allow me reach your territory and be placed on your custody as a conclusion on the decision to my request is being reached.

Please reply back so as to notify me of the status of my application and the requests to issue a temporary permit to allow me reach your territory.

Thank in advance.

Yours truly,

Sylvester Owino.

ROYAL DANISH CONSULATE GENERAL
New York
One Dag Hammarskjöld Plaza

885 Second Avenue, 18th Floor
New York, NY 10017
Phone: +1 (212)223-4545
Fax: +1 (212)754-1904

Sylvester O. Owino
97469654 C/K 101
San Diego Detention Facility
C.C.A.
P.O. BOX 439049
San Diego, CA 92143

Enclosure

File
17.Dan.6 NYC

August 11, 2006

Dear Mr. Owino,

Reference is made to your letter requesting asylum in Denmark. Please be advised that according to Danish law, Danish consular and diplomatic representations abroad cannot receive applications for asylum. Applications for asylum in Denmark can only be accepted from persons, who are already physically present in Denmark.

Unfortunately, we will not be able to provide further assistance in your case.

Yours Sincerely,

Charlotte Bording Pedersen
Consular officer

E-mail:information@denmark.org
http://www.denmark.org

**UNHCR**
**United Nations High Commissioner for Refugees**
Haut Commissariat des Nations Unies pour les réfugiés

UNHCR

1775 K Street NW
Suite 300
Washington, DC 20006

Tel. 2022965191
Fax: 2022965660
Email: USAWA@unhcr.ch

14 August 2006

Mr. Sylvester Owino
A# 97-469-354, C/K 101
San Diego Detention Facility
PO Box 439049
San Diego, CA 92143

***Re: Request for Assistance / Owino / Kenya / ROW# 75546***

Dear Mr. Owino:

I am writing in response to your request that this Office facilitate your resettlement to a third country. Please be advised that, as a general matter, this Office does not make refugee status determinations or seek resettlement in another country for refugees or persons who are already in a country that is a party to the 1951 Convention or the 1967 Protocol relating to the Status of Refugees. This is because of the exceedingly large number of refugees throughout the world who are in countries that are not parties to the Convention or the Protocol and are in need of protection in another country. The United States is a signatory to the 1967 Protocol and has established asylum procedures. As such, I am afraid our Office cannot assist you in the manner requested.

We encourage you to contact directly the embassies or consulates of those countries to which you might wish to immigrate. We understand that some consulates are informing individuals who contact them that they must obtain a UNHCR referral before they will consider a request for refugee protection. We are in the process of informing the various consulates of the UNHCR policy regarding resettlement referrals from the US, as explained above. We are hopeful that consulates will establish the necessary procedures to adjudicate internally such requests for assistance. You may wish to provide a copy of this letter to the consulates if you receive such a response.

If you have any further questions, please contact us in writing. In future correspondence, please refer to your UNHCR ROW number noted above.

Protection Unit
Regional Office Washington

AP/pa

AUSTRALIA

**EMBASSY OF AUSTRALIA ♦ IMMIGRATION SECTION**
1601 MASSACHUSETTS AVE NW, WASHINGTON DC 20036-2273
PHONE: (202) 797-3000 FAX: (202) 797-3040

22nd August 2006

File No: 2006022917

Mr Otieno Otolo Sylvester Owino,
San Deigo Detention Facility,
C.C.A,
P.O. Box 439049 SD
LA 92143

Dear Mr Sylvester Owino,

I am pleased to confirm that we have received your application for refugee and humanitarian status in Australia. To help you to help us process your application more quickly and efficiently, please closely read the following information.

Processing times

Average processing times for refugee applications is 12 – 18 months.

You should note, however, that processing times vary from case to case. We may take longer to process your application if there are medical, child custody, character or other issues that we need to examine.

Contacting this office

We aim to spend the maximum amount of time actually processing applications rather than answering queries about an application's progress. For this reason, **please do not contact this office about your application until your case officer contacts you.**

Your application file number is: **2006022917**

Thank you for your interest in migrating to Australia.

Immigration Section

***Austrian Consulate General***
***Los Angeles***

*11859 Wilshire Blvd., Suite 501*
*Los Angeles, CA 90025*

*Tel. (310) 444 9310*
*Fax (310) 477 9897*
*E-Mail: los-angeles-gk@bmaa.gv.at*
*Internet: www.austria-la.org*

Ref. No. 3440/ 4 /2006

Los Angeles, August 22, 2006

Sylvester O Owino
97469354 C/K 101 San Diego Detention Facility
C.C.A
P O Box 439049
San Diego, CA 92143

Dear Mr. Owino,

Referring to your letter from July 20th, 2006, I would like to inform you by phone about the current requirements and (very low) chances for your request for Political Asylum in Austria.

Please call me at **310 – 444 93 10 Ext. 12.**

Your application for Asylum falls into the jurisdiction of the competent US-authority (for persons residing in Southern California it is the Los Angeles Asylum Office – see next page) according to "The 1951 Geneva Refugee Convention" of the United Nations. If the US authorities deny your application, it is highly expected that the Austrian authorities will refuse your request for asylum as well. However the competent authority in Austria for Asylum is:

Bundesasylamt
Landstrasser Hauptstr. 171
A-1030 Wien

Sincerely Yours

Stefan Hochmuth
Consul

T:\Kanzler\KONSULAR\Asyl\Sylvester O Owino 22.8.06.DOC

**Consulat général de Belgique**
**Consulaat-generaal van België**
**Consulate General of Belgium**
**à / in**
**Los Angeles**

6100 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90048-5107
☎ (323)857.1244
(323) 936.2564
www.diplobel.us
losangeles@diplobel.org

Los Angeles, September 8, 2006

**C4.1**
N°: 1608
Reference:
Enclosure(s): /

Sylvester O Owino
97469354 C/K 101
San Diego Detention Facility
C.C.A
P.O. Box 439049
San Diego, CA. 92143

Dear Sir,

RE : Request for asylum.

Thank you for your letter dated 26 June 2006.

I regret to inform you that your request is not admissible.

As a Chinese national, staying in a third country (USA), your request must be submitted to the US authorities.

Yours sincerely,

Véronique MAROUNEK
Consul.

CONSULATE GENERAL
OF SWEDEN

Los Angeles, 14 September 2006

*Vice Consul*
*Ingela Sorensson*
*(310)231-5128*

Sylvester O Owino
97469354 C/K 101
San Diego Detention Facility
CCA
P.O. Box 439049
San Diego, CA 92143

**RE: Application for asylum**

Dear Mr. Owino:

We have received your letter dated September 4, 2006.

Enclosed, please find an application form for asylum in Sweden. You should be aware that approval is highly unlikely.

The application should be mailed to:
Consulate General of Sweden
10940 Wilshire Blvd., Suite 700
Los Angeles, CA 90024

Sincerely,

Ingela Sorensson
Vice Consul

CONSULATE GENERAL OF GREECE
IN LOS ANGELES

Los Angeles, September 25, 2006

Mr. Sylvester O Owino
97-469-354 C/K 101
San Diego Detention Facility
C.C.A.
P.O. Box 439049
San Diego, CA 92143

Dear Mr. Owino,

I would like to inform you that we received your request, dated 07/20/06, to obtain refugee status in Greece. Your request was forwarded to our authorities for their consideration. Their response will be communicated to you as soon as we receive it.

I thank you for your interest.

Sincerely,

Dimitris Caramitsos-Tziras
Consul General

**British Consulate General, Los Angeles**

**<Suite 1200>**
**<11766 Wilshire Boulevard>**
**<Los Angeles>**
**<CA 90025>**

**Tel: <Phone Number>**
**Fax: <Fax Number>**
**E-mail: <Email Address>**

29 September 2006

Mr Sylvester O Owino
97469354 C/K 101
San Diego Detention Facility CCA
P.O. Box 439049
San Diego, CA 92143

Dear Mr Owino,

Thank you for your letter of 4 September in which you enquire about the possibility of residing permanently in the United Kingdom.

This office, however, cannot accept such an application which, in the circumstances, would fall to be refused. You are also currently in what is considered to be a safe country and I would suggest that it is to this country you should consider making a case for permanent residence.

Yours sincerely,

Mr J B Mee
HM Consul
British Consulate-General, Los Angeles

cc:

Government of Canada
Consulate General of Canada

Gouvernement du Canada
Consulat général du Canada

Immigration Regional Program Center
3000 HSBC Center, Buffalo, NY 14203
e-mail: buffalo-im-enquiry@international.gc.ca

March 20, 2007

Sylvester Otieno Owino
c/o Wayne Perkins
1042 West 81st Place
Los Angeles, CA 90044

Dear Applicant,

This concerns your application for Criminal Rehabilitation to enter Canada.

After reviewing your file, it has been determined that you are ineligible for rehabilitation. A person may be eligible for rehabilitation if five years have elapsed since the end of the sentence imposed, including the payment of fines, the restoration of driving privileges, and the termination of probation. You were convicted of 2nd degree robbery on April 7, 2003 and were sentenced to three years in prison. Therefore you ineligible for rehabilitation until at least April 7, 2011.

You state that you wish to live in Canada. Please be advised that you must apply for permanent residence. Please visit our website to learn more information:

http://www.cic.gc.ca

Thank you for your interest in Canada.

Regards,
Rehabilitation Unit

Canada

# Exhibit E

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JOEL JUDULANG,

Petitioner,

vs.

MICHAEL CHERTOFF, ALBERTO GONZALES, ROBIN F. BAKER, and GABRIELA PACHECO,

Respondents.

CASE NO. 07CV1414

**ORDER GRANTING IN PART PETITION FOR WRIT OF HABEAS CORPUS**

Presently before the Court is petitioner Joel Judulang's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. (Doc. No. 1.) For the following reasons, the Court grants the petition in part and orders respondents to provide petitioner with a bail hearing.

BACKGROUND

**Factual Background**

The parties agree as to the relevant facts. Petitioner, born in the Phillipines, has been a lawful permanent resident of the United States since July 4, 1974. On October 11, 1989, petitioner was convicted of voluntary manslaughter in California state court and sentenced to a six-year suspended sentence. (Respondents' Opposition, Ex. B.) On June 12, 2003, petitioner was convicted of grand theft in California state court and sentenced to two years and eight months in prison. (Id. Ex. C.)

On July 7, 2005, petitioner was taken into custody by Respondents due to the initiation of

removal proceedings. He was charged with deportability pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii) and (iii) which allow the deportation of an alien convicted of an aggravated felony and the deportation of an alien convicted of two or more crimes involving moral turpitude. Two and a half years later, petitioner remains in custody at the Immigrations and Customs Enforcement ("ICE") El Centro Detention Center. On September 28, 2005, an immigration judge ordered petitioner removed. (Opp. Ex. E.) Petitioner appealed to the Board of Immigration Appeals ("BIA"), which denied his appeal on February 3, 2006. (Opp. Ex. F.)

Petitioner filed a petition for review of the BIA's decision in the Ninth Circuit Court of Appeals on February 24, 2006. (Opp. Ex. G.) His petition for review contests his removability on several grounds. Petitioner concurrently filed a motion for stay of removal, which Respondents did not oppose, and the court granted on July 7, 2006. (Id.) Petitioner filed his opening brief on October 23, 2006, and Respondents filed an opposition on December 7, 2006. (Id.) The Ninth Circuit heard oral argument on June 4, 2007. (Id.) The Ninth Circuit then stayed petitioner's case pending the outcome of another case addressing the same issue raised by petitioner, Abebe v. Gonzales. In a published opinion in Abebe, 493 F.3d 1092, 1099 (9th Cir. 2007), the court rejected a detainee's argument under Section 212(c) of the Immigration and Naturalization Act which was identical to one of petitioner's claims in his appeal. The Ninth Circuit has since withdrawn its opinion pending rehearing of Abebe en banc (Petitioner's Notice, Doc. No. 9). The court cited Abebe in denying petitioner's appeal as to his Section 212(c) argument (id. at 5), and petitioner argues the court is likely to rehear his case after rehearing Abebe (Doc. No. 11).

According to the documents attached to respondents' opposition in this case, petitioner's continued detention has been reviewed twice during the pendency of his Ninth Circuit appeal. On June 6, 2006, petitioner was informed of ICE's decision to continue to detain him due to his failure "to demonstrate" he "will not pose a flight risk." (Opp. Ex. I.) On June 5, 2007, petitioner was informed of the ICE's decision to continue detention by a letter explaining he is "an extreme threat to the community" and thus will remain in ICE custody pending removal from the United States. (Opp. Ex. H.)

**Procedural Background**

After the instant petition was filed on August 2, 2007, the Court granted petitioner's accompanying motions to proceed *in forma pauperis* and motion for appointment of counsel. (Docs. No. 1-4). Respondents filed a return in opposition on September 17, 2007. (Doc. No. 8.) On October 1, 2007, respondents filed a notice of the Ninth Circuit's denial of petitioner's appeal. (Doc. No. 9.) On October 9, 2007, petitioner filed a traverse. (Doc. No. 10.) On January 28, 2008, petitioner filed a notice of the Ninth Circuit's decision to rehear Abebe en banc. (Doc. No. 11.)

DISCUSSION

**Jurisdiction**

Pursuant to 28 U.S.C. § 2241, alien detainees can properly challenge "the extent of the Attorney General's authority" to detain a removable alien under the statutes authorizing detention. Zadvydas v. Davis, 533 U.S. 678, 687-89 (2001); see also Denmore v. Kim, 538 U.S. 510, 516-17 (2003). Where, as here, an administrative order of removal is not final, "habeas corpus jurisdiction remains in the district court." Nadarajah v. Gonzales, 443 F.3d 1069, 1075-76 (9th Cir. 2006); see also 8 U.S.C. § 1231(a)(1) (describing how a removal order becomes final).

**Petitioner's Claim**

As an initial matter, the Court considers the statutory authorization for petitioner's detention pending the outcome of his Ninth Circuit appeal. Respondents contend petitioner is being detained pursuant to the discretionary authority of 8 U.S.C. § 1226(a)(1) rather than the mandatory provision of Section 1226(c). Section 1226(a) permits the arrest and detention of an alien "pending a decision on whether the alien is to be removed from the United States." Section 1226(c) sets out specific cases in which that detention is mandatory, for example, when the alien has committed certain classes of criminal offenses. Respondents contend Section 1226(c) only applies during administrative removal proceedings, while Section 1226(a) continues to apply after the end of the administrative process and through judicial review. No such temporal distinction is

made in the statute.[1] The court rejects the argument petitioner's detention, previously mandatory under Section 1226(c), is now discretionary under Section 1226(a).[2] Moreover, the distinctions between Sections 1226(a) and (c) are not relevant in assessing the reasonableness of prolonged detention under either provision. Discretionary detention, like mandatory detention, must comply with due process of law. Nadarajah v. Gonzales, 443 F.3d 1069, 1076, 1079-80 (9th Cir. 2006) (assessing reasonableness of discretionary detention under another statutory provision).[3]

The Supreme Court and the Ninth Circuit have previously assessed the reasonableness of detention under Section 1226(c) pending a final order of removal. In Demore v. Kim, the Supreme Court held aliens may be detained under Section 1226(c) "for the brief period necessary for their removal proceedings." 538 U.S. 510, 513 (2003). In that case, detainee Hyung Joon Kim conceded deportability and was held for approximately six months during his administrative proceedings. Kim argued he could not be detained without the government establishing, at an individualized bond hearing, that he was a flight risk or a danger to the community. The Court rejected his argument. First, the Court distinguished an earlier case in which it held aliens could not be detained indefinitely after being ordered removed. Zadvydas v. Davis, 533 U.S. 678 (2001). In distinguishing Zadvydas, the Court noted an alien's detention during removal proceedings serves government interests which are not furthered by the continued detention of individuals who, while ordered removed, have no prospect of future removal. Kim, 538 U.S. at 527-28. The Court also emphasized detention during removal proceedings is "of a much shorter duration" than the "indefinite" and "potentially permanent" detention at issue in Zadvydas. Id. at

---

[1]Respondents support their argument by citing the regulations, which specify "no alien described in section 236(c)(1) of the Act may be released from custody during removal proceedings." 8 C.F.R. § 1236.1(c)(1)(i). Respondents then argue "removal proceedings" only encompasses administrative proceedings, citing Demore v. Kim, 538 U.S. 510, 513, 517-18, 527-28 (2003). While the Court in that case only considered administrative proceedings, those were the only proceedings the petitioner had undergone. Moreover, the Court never stated removal proceedings only included those before the administrative agency, nor did it interpret the statute or the regulations containing such a limitation. Respondents have cited no authority stating Section 1226(c) only applies during administrative proceedings.

[2]In a factually analogous case in which an alien was detained pending judicial review of the BIA's decision, Tijani v. Willis, the Ninth Circuit evaluated the detention under Section 1226(c). 430 F.3d 1241, 1242 & 1246 (9th Cir. 2005). Judge William Q. Hayes rejected respondents' argument in an unpublished decision in Mustanich v. Gonzales, No. 07cv1100 WQH, 2007 WL 2819732 at *5 (S.D. Cal. Sept. 26, 2007).

[3]Accordingly, while the Court evaluates petitioner's detention in light of the decisions interpreting Section 1226(c), the Court would do the same if Section 1226(a) applied.

528. Reviewing statistics from the Executive Office for Immigration Review, the Court concluded removal proceedings "last an average time of 47 days and a median of 30 days." Id. at 529. Appeals to the BIA, taken by about 15% of aliens, take "an average of four months." Id. The Court found Kim's detention for six months was reasonable despite being slightly longer than average. Id.

However, the Ninth Circuit has since held prolonged detention during removal proceedings is not permissible under section 1226(c). Tijani v. Willis, 430 F.3d 1241, 1242 (9th Cir. 2005). The court distinguished Kim because the petitioner, Monsuru Tijani, had not conceded deportability. Id. In a brief opinion, the court stated in part:

> As of today's date, Tijani has been deprived of his liberty by the government for a period of over two years and eight months. This deprivation has been inflicted not as the result of any adjudication of crime but as a bureaucratic application of the authority conferred on the Attorney General by 8 U.S.C. § 1226(c). Despite the substantial powers that Congress may exercise in regard to aliens, it is constitutionally doubtful that Congress may authorize imprisonment of this duration for lawfully admitted resident aliens who are subject to removal. . . . . Two years and eight months of process is not expeditious; and the foreseeable process in this court, where the government's brief in Tijani's appeal of the removal was only filed last month after two extensions of time, is a year or more.

Id.

Petitioner argues, and the court agrees, Tijani mandates a bail hearing in petitioner's case. Respondents argue Tijani does not apply because petitioner's detention became "voluntary" when he chose to appeal to the Ninth Circuit.[4] Some district courts have limited Tijani's application to cases in which the unreasonably long detention occurred primarily during administrative proceedings, rather than during an appeal by the detainee to the Ninth Circuit.[5] But as other

---

[4]Respondents rely on an unpublished decision in Cruz-Ortiz v. Gonzales, 221 F. App'x 531 (9th Cir. 2007). In that case, the court found the district court lacked jurisdiction. Without citation to Tijani, the court then stated "[i]n any event, appellant is being voluntarily detained–upon his requested stay of removal–pending appeal of his final removal order." Id. The brief, unpublished decision does not explain the facts of the case, the statutory basis for detention, or whether the petitioner contested removability. Moreover, Tijani had appealed to the Ninth Circuit and the court did not hold in that published decision his detention had thus become "voluntary." Tijani, 430 F.3d at 1242.

[5]See, e.g., Raghunath v. Crawford, No. CV 07-0282 PHX-FJM, 2007 WL 4285387 at *3 (D. Ariz. Dec. 03, 2007) (holding Tijani did not apply where prolonged detention was due to petitioner's Ninth Circuit appeal); Mboussi-Ona v. Crawford, No. CV 06-2897 PHX-NVW, 2007 WL 3026946 at *5 (D. Ariz. Sept. 27, 2007) (finding "normal judicial appeal time" does not count toward unreasonableness of detention); see also Bernal v. Chertoff, No. 06cv2184 JAH at 4 (attached as Exhibit K to Respondent's Opposition) ("[Petitioner] is awaiting his pending judicial appeal–an appeal that he has chosen to pursue in the United States. Because it was Petitioner's own doing that he is still in detention here, there is no

district courts have noted,[6] Tijani expressly considered the length of detention attributable to judicial review in concluding the detention had been unreasonably long. 430 F.3d at 1242. By ordering a bail hearing for Tijani after the end of his administrative proceedings and while he was seeking Ninth Circuit review of his removal order, the court implicitly rejected the view his detention had become "voluntary." The court's result, granting Tijani's writ of habeas corpus, is inconsistent with respondents' argument detention during an alien's appeal is "voluntary."

This Court therefore agrees with the other district courts which have included time detained pending judicial review in assessing the reasonableness of a prolonged detention.[7] This approach is consistent with the Supreme Court's decision in Kim. In that case, the Court placed great weight on the expedient nature of removal proceedings in holding detention during that "brief period" was permissible without a showing of dangerousness or flight risk. 538 U.S. at 529. Judicial appeals, whether undertaken by the detainee or the government, necessarily prolong detention past the "brief period" approved by Kim.[8]

The district courts which have disregarded appellate time in assessing the reasonableness

---

'detention by default' as it was in Tijani.").

[6]As Judge Hayes wrote in Mustanich:

> Whether detention pending judicial review can be considered in assessing the reasonableness of an alien's mandatory detention pursuant to 8 U.S.C. § 1226(c), and if so, how it should be considered, is a question that has not been explicitly addressed by either the United States Supreme Court of the Court of Appeals for the Ninth Circuit. However, the Court of Appeals for the Ninth Circuit referenced the period of judicial review which had elapsed and that which was yet to come in support of its holding in Tijani that the alien's removal proceedings were not expeditious, and it is apparent that the Tijani Court included at least some time which accrued during judicial review in its conclusion that the petitioner had been detained for two years and four months.

2007 WL 2819732 at *9 (internal citations omitted); but see Mboussi-Ona, 2007 WL 3026946 at *4 ("[A]lthough the court mentioned the length of Tijani's judicial appeal, that fact was not encompassed within an articulated rationale of the court" because the administrative time predominated.).

[7]See, e.g., Martinez v. Gonzalez, 504 F. Supp. 2d 887, 897 (C.D. Cal. 2007) (rejecting argument time detained during judicial appeals does not count toward the reasonableness of a lengthy detention); Mustanich, 2007 WL 2819732 at *8 ("After reviewing the relevant case law, and particularly Tijani, the Court concludes that it can and must consider periods of detention which accrue pending judicial review in determining whether removal proceedings and detention pursuant to 8 U.S.C. § 1226(c) are expeditious and reasonable."); Ali v. Crawford, No. CV 06-01149 PHX-EHC, 2007 WL 1670165 at *4 (D. Ariz. June 8, 2007) (holding where petitioner contested removability, prolonged detention violated Tijani even if not due to the unreasonable delay of the INS); Yoon v. Crawford, No. CIV 06-3068 PHX-SMM (MHB), 2007 WL 4609573 at *4 (D. Ariz. Aug. 22, 2007) (recommending the district court apply Tijani despite the majority of the detention being attributable to Ninth Circuit appeal) (adopted by the district court in 2008 WL 45405 (Jan. 02, 2008)).

[8]As in Tijani, and unlike in Kim, petitioner's Ninth Circuit appeal contests deportability. Tijani found this a persuasive distinction. 430 F.3d at 1242.

of prolonged detention were concerned with the potential for dilatory tactics and frivolous appeals by detainees. E.g. Mboussi-Ona v. Crawford, No. CV 06-2897 PHX-NVW, 2007 WL 3026946 at *5 (D. Ariz. Sept. 27, 2007) (stating if appellate time counted, "merely by seeking judicial review, every alien found removable would be entitled to an individualized bond hearing and possible release"). But these concerns do not require the Court to disregard detention during judicial review. Instead, "[a] court must 'be sensitive to the possibility' that a removable alien may engage in 'dilatory tactics' in order to 'compel a determination' that his detention was unreasonably long." Martinez v. Gonzalez, 504 F. Supp. 2d 887, 898 (C.D. Cal. 2007) (internal citations omitted); see also Mustanich, 2007 WL 2819732 at *9. Circuit Judge Tashima, concurring in Tijani, would require a detainee's appeal to raise a "substantial argument" in order for detention during judicial review to be included in assessing reasonableness. 430 F.3d at 1247.

Here, respondents do not argue petitioner's appeal is without merit. See Martinez, 504 F. Supp. 2d at 899. Petitioner's appeal relies on a Second Circuit decision, Blake v. Carbone, 489 F.3d 88 (2d Cir. 2007), which conflicts with the Ninth Circuit's decision in Abebe v. Gonzales. In Abebe, Circuit Judge Berzon wrote a concurring opinion agreeing with the Second Circuit's decision in Blake and urging reconsideration of the case. 493 F.3d 1092, 1106 (Berzon, C.J., concurring). The Ninth Circuit has voted to rehear Abebe en banc. Thus petitioner's appeal has raised a "substantial question," and resolution of his appeal is likely to take up to a year while the court reviews Abebe and its decision in petitioner's case. See Tijani, 430 F.3d at 1242 (anticipating another year of litigation at the Ninth Circuit). The length of petitioner's detention during appeal is attributable to the complexity of the issues he has raised, not dilatory tactics on the part of petitioner or the government.

The Court thus concludes detaining petitioner for two and a half years without showing he is a flight risk or a danger to the community is unreasonable and not statutorily authorized by 1226(c). Cf. Tijani, 430 F.3d at 1242 (finding two years and eight months unreasonable); Zadyvdas, 533 U.S. at 701 (finding six months presumably reasonable); Kim, 538 U.S. at 529 (finding six months reasonable).

//

**Remedy**

Petitioner requests he be released, or, in the alternative, given a release hearing to evaluate his eligibility for supervision "under appropriate conditions." (Petition at 9.) The Ninth Circuit in Tijani remanded the case to the district court:

> with directions to grant the writ unless the government within 60 days of this order provides a hearing to Tijani before an Immigration Judge with the power to grant him bail unless the government establishes that he is a flight risk or will be a danger to the community.

430 F.3d at 1242. In Mustanich, Judge Hayes also found it appropriate to grant the petitioner a bail hearing before an Immigration Judge within ten days. 2007 WL 2819732 at *8. A bail hearing will give respondents an opportunity to assess whether petitioner's continued detention is justified.

Respondents argue immigration judges lose jurisdiction over bond decisions after the end of administrative proceedings, citing 8 C.F.R. § 1003.19(a). Under that section, "[c]ustody and bond determinations . . . may be reviewed by an Immigration Judge pursuant to 8 CFR part 1236." Section 1003.19(c)(1) states applications by a detainee for review of a bond determination shall be made to "the Immigration Court having jurisdiction over the place of detention." Respondents have cited no authority which states or implies an immigration judge would not have jurisdiction to review the custody determination in petitioner's case, and the Court's independent review found no support for respondents' position.[9]

//

//

//

//

//

//

---

[9]The cases indicate an immigration judge can hold such a hearing. Without addressing the immigration judge's authority, the Ninth Circuit ordered a bond hearing in Tijani, after the administrative proceedings had ended. In Mustanich, Judge Hayes ordered a bail bond hearing for a detainee held pending Ninth Circuit review. According to later submissions by the petitioner, that bond hearing was held within ten days. (Motion to Alter Judgment by Jess Mustanich, Doc. No. 7, Case No. 07cv1100.)

CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART the petition for writ of habeas corpus. Respondents are ORDERED to provide petitioner a hearing within thirty days of this order before an immigration judge with the power to grant him bail unless the government establishes that he is a flight risk or will be a danger to the community.

**IT IS SO ORDERED.**

**DATED: February 12, 2008**

Irma E. Gonzalez

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

# Exhibit F

2/11/08 U.S. News & World Rep. 24
2008 WLNR 1946698

U.S. News & World Report
Copyright 2008 U.S. News & World Report

**February 11, 2008**

Volume 144; Issue 4

Section: World Briefs

# The Flames of Ethnic Cleansing; Thumbs Down for a U.N. Envoy; Placing Blame for a Financial Debacle; A Stop to Public Hangings, Maybe

Edited by Terry Atlas

## The Flames of Ethnic Cleansing

As **Kenya** spirals more deeply into tribal violence, its political leaders seem in no hurry to turn the situation around. More than 800 people have been killed since the disputed December 27 election--and a new wave of retaliatory violence came after an opposition lawmaker was assassinated last week. The top U.S. envoy to Africa, Jendayi Frazer, said that neither **Kenya's** president nor his chief opposition rival is doing enough to stem what she called "ethnic cleansing." She added that the United States is reviewing its large aid package to **Kenya** , but Washington is unlikely to penalize its longtime East African ally.

## Thumbs Down for a U.N. Envoy

He was the right man at the right time--or so many western diplomats thought--when former British politician Paddy Ashdown was named as the new United Nations super-envoy to Afghanistan. At a time when many are worried that international focus on Afghanistan is drifting--and the Taliban are resurgent--this veteran of the Balkan wars was heralded as the kind of tough talker who could twist the arms of recalcitrant Afghan officials and NATO leaders alike. After all, as a former U.N. envoy to Bosnia, Ashdown is no stranger to overseeing complex reconstruction efforts in war-torn areas.

But it was not to be. Ashdown's nomination was torpedoed by an unlikely source--Afghan President Hamid Karzai. While Karzai's motives are not clear, he claimed that he was objecting to the broader powers to be wielded by Ashdown. The surprise move adds to concerns that rebuilding efforts will continue to be hobbled by turf battles and a lack of funding and focus--and that Karzai, long seen as a stalwart friend of the West, may be more sensitive to political pressures of his own ahead of planned elections next year.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

2/8/08 AP DataStream 21:11:28

AP DataStream
Copyright 2008 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

**February 8, 2008**

**Kenya's** rivals close to power-sharing agreement, Kofi Annan says
HEIDI VOGT
Associated Press Writer

NAIROBI, **Kenya** _ **Kenya's** rival political parties moved toward an agreement to share power, the chief mediator said Friday, raising hopes for a breakthrough in the postelection crisis that has left more than 1,000 people dead.

In another sign tensions were easing, the internal security minister lifted the ban on public rallies imposed after violence broke out over the East African country's disputed Dec. 27 presidential election.

Former U.N. chief Kofi Annan, who is mediating talks, said he expected to complete work on a settlement by early next week. "We are making progress," Annan said.

A power-sharing agreement would be a major breakthrough in the political deadlock gripping the country since the announcement of President Mwai Kibaki's narrow victory after a vote count that foreign and local observers say was flawed. The ensuing violence has often pitted many of the country's myriad ethnic groups against one another.

Government negotiator Mutula Kilonzo said the two sides had no other choice.

"We have agreed that the solution is in a political settlement. How, when, where and by whom will be discussed on Monday," Kilonzo said. "We have no choice. We can't allow our people to kill each other because of election results."

Earlier, an opposition lawmaker on the negotiating team claimed a power sharing deal had been reached. William Ruto said the two sides still were discussing who would lead the government and what roles each party would play. But Annan said Ruto "was jumping the gun."

Opposition leader Raila Odinga originally said that only new elections would bring peace, while Kibaki maintained his position as president was not negotiable. The two came under international pressure to form a power-sharing government.

On Thursday, Odinga retreated from his earlier calls that Kibaki should step down.

"We are saying that we are willing to give and take. Initially our stand was that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

we won the elections, and Mr. Kibaki lost the elections, he should resign, and we should be sworn in, but we have said that we are not static on that point," Odinga told reporters.

Speaking at a prayer meeting in Nairobi Friday, Kibaki said he was "encouraged" by progress in talks and reiterated "my personal support and that of my entire government to this process."

Tens of thousands of opposition supporters took the street in the week after the announcement of election results. The government imposed a ban on public rallies, and police used live bullets, tear gas and water cannon to enforce the order.

Internal Security Minister George Saitoti said the ban was lifted Friday because "security has generally improved." He urged legislators and others to hold meetings "to promote peace and national reconciliation" and not to use rallies as "avenues to incite violence."

But some opposition supporters insisted they would not back down until Odinga was named president.

"We won't, we can't agree. We want our rights, we will go back to the streets," said Evans Omogi, a driver in the western city of Kisumu, the scene of much of the worst violence.

On Friday, about 5,000 people fled a makeshift camp for those forced from their homes in the western town of Kericho, fearing violence ahead of Saturday's funeral for an opposition lawmaker slain last week. Only about 1,000 people were left in the camp, said Red Cross official Susan Onyango.

Kericho's main street was packed with families hastily piling furniture onto government trucks taking them to areas where their ethnic group was predominant.

The slain legislator was killed in what the opposition described as a political assassination, but what police said was a crime of passion by a traffic policeman who believed his girlfriend was involved with the politician. The killing had sparked attacks on the policeman's ethnic group, the Kisii.

Also Friday, State Department spokesman Tom Casey said that the U.S. has now notified 13 Kenyan politicians and business people suspected of supporting or inciting violence that their U.S. visa status is under review.

The announcement came a day after Casey said the visa reviews probably would take place over the next few days and were directed at "more regional figures" than top officials from both major political movements.

Both Kibaki's government and the opposition welcomed the U.S. decision and insisted they had nothing to do with the violence. But Kenyan human rights groups, foreign observers and diplomats say there is ample evidence that both parties helped incite and orchestrate attacks.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

2/8/08 Chi. Trib. 1
2008 WLNR 2455219

CHICAGO TRIBUNE
Copyright 2008 Chicago Tribune Company

**February 8, 2008**

Section: News

# On road to **Kenya's** past, future looks bleak

Kenyans face era of economic gloomAs a battered country's crucial tourism industry dies, an economic calamity looms

Paul Salopek, TRIBUNE CORRESPONDENT

THE NAROK ROAD, **Kenya** Tourists loved this road.

Seesawing down the eastern scarp of the Great Rift Valley from Nairobi, it delivers the sort of operatic vistas of grass and sky that steep into memory -- the first luminous glimpse of wild Africa for generations of awed travelers.

But the tourists are largely gone now. And so, in important ways, is the iconic **Kenya** they came to see.

On the fabled Narok road today, the battered trucks that used to haul sacks of grain or cattle are instead crammed with standing refugees. Expressionless, clutching children or bedrolls, their heads bounce in time with the bucking of wheels through potholes.

Farther on, at Narok town, once a popular launch pad for budget safaris, young toughs armed in the style of medieval infantry patrol the rocky streets. Like nightmare tour guides, they offer to point out with their clubs and swords where neighbors fell in the orgy of political violence that has ravaged this country since its disastrous Dec. 27 elections.

An hour away sprawls the elephant-dotted Masai Mara, **Kenya's** premier wildlife destination. About 700,000 people visited the huge savanna park last year. Today, crowds of Maasai women rush the few cars that still arrive at its gates each day. Frantic to make a sale, they fling their beadwork into the cars. Some even try climbing through the car windows.

"You know what's strange?" said James Ndirangu, the melancholy duty manager at one of the reserve's dying luxury lodges. "It's actually a great time to come to the Mara. The reserve is empty. It's silent. Like the **Kenya** of 100 years ago."

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Ndirangu was sitting in his deserted bar when he said this. He was a kind man. He had instructed the house guitarist to croon **Kenya's** national anthem to boost the spirits of his beleaguered staff, who like some 20,000 other tourism workers face mass layoffs as **Kenya's** vital tourism industry collapses. Still, he was wrong about visiting the Mara.

To travel the beautiful Narok road today isn't to journey into the past. It's a safari into a poorer, more balkanized and permanently scarred future **Kenya**.

It seems absurd to worry about tourism as **Kenya** self-destructs.

More than a month of factional killings has left, by the latest counts, some 1,000 people dead in the formerly peaceful East African nation. More than 300,000 others remain homeless due to communal violence between supporters of President Mwai Kibaki, a grandfatherly politician who often seems disconnected from the suffering of his people, and Raila Odinga, his younger and more hot-blooded challenger, whose followers often seem prepared to burn the country down to prove that the election was stolen.

Kofi Annan, the former United Nations chief, is mediating between the two archrivals.

Yet even as TV crews focus obsessively on every burning roadblock or machete-swinging youth, another hidden calamity is building: The destruction of one of the most dynamic economies in Africa, one that is propped up by a billion-dollar tourism trade.

David Ndii, an independent financial analyst in Nairobi, calculates that **Kenya's** economic output already has shrunk by up to 40 percent because of the political crisis.
The largest foreign-revenue earner by far -- tourism -- is dead. Tens of thousands of European, Asian and American tourists have abandoned **Kenya's** world-class beaches, game parks and resorts. A recent meeting of Kenyan tour operators reported that mass cancellations have cost **Kenya** at least $280 million so far.

"This is going to hit the Kenyan middle class hard," said Nancy Imunde, a spokeswoman for the Sarova Hotels chain. "We're talking job losses in construction, industrial agriculture, transportation and all the other skilled industries that feed into tourism. This will only make the situation more volatile."

One of the most lamentable victims of post-election chaos has been the **Kenya** Wildlife Service.

Once plagued by corruption and mismanagement, the agency responsible for protecting **Kenya's** vast herds of free-roaming animals had made a remarkable turnaround lately. Under a new, house-cleaning director, it logged a record $28 million profit last year from park fees. Today, it is begging money from the national treasury. An order for 101 new park vehicles has been scrapped.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Because of this, wildlife biologists worry that plummeting tourist revenue, coupled with anarchy around the reserves, will spark a resurgence of poaching. At the moment, **Kenya's** once-imperiled elephants are experiencing a fragile comeback.

"We are doing our best to watch this closely," said Paul Udoto, a wildlife service spokesman. "So far, refugees have occupied some of our facilities."

Udoto wanted to broadcast a message to tourists: "Please come to **Kenya**. Our war is internal. If hooligans block the roads, they always let the tourists pass. They only harass other Kenyans."

There currently are no roadblocks on the Narok road.

Burnt tires do smudge the streets of Narok, however, from bloody rioting two weeks ago. One hilly quarter of the town, called Majengo, is eerily depopulated. This is a familiar sight in the rift valley today. Ethnic groups associated with one candidate or the other -- in this case, Kikuyus linked with President Kibaki -- were expelled at the point of knives or poisoned arrows. One recent afternoon, a few stragglers there were packing for a different type of safari.

"We are getting death threats," whispered a Kikuyu construction foreman who gave his name only as Sammy. "They say, 'The Kikuyus must lie down in the grass like antelope.'"

Sammy was piling a truck with his household belongings. He was born in Narok, he said, and had no destination in mind. A scowling mob had gathered around, and Dolly Parton warbled "Wings of a Dove" on a radio. Some young men in the crowd gripped clubs. That night, they said, they would burn down Sammy's house.

The people making the death threats in Narok are mainly Maasai. Virtually all voted for opposition leader Odinga. The Maasai are perhaps **Kenya's** best-known ethnic group. They are romanticized as haughty warriors in Western literature about **Kenya**, such as Isak Dinesen's "Out of Africa." Their slim, red-cloaked frames appear in travel posters.

In dusty Narok, the Maasai voiced the usual grievances against the Kikuyu clique that dominates government in **Kenya**. Their roads are terrible. Decent jobs are scarce. By burning out their Kikuyu neighbors, however, they have cemented their poverty, probably for years to come. Such ethnic evictions have poisoned **Kenya's** image abroad. And the Narok County Council receives 90 percent of its revenue -- some $10 million annually in previous years -- from tourist fees at the nearby Masai Mara.
"We don't care if the economy goes down or up," insisted William Ole Ntimama, the local parliamentarian with Odinga's opposition party. "We will see this thing through. The Maasai are being oppressed by members of a certain ethnic community."

Ntimama was using the politically correct code for Kikuyus. He spoke in a large house outside Narok that was guarded by men armed with bayonet-like knives. He was being investigated by police for incitement; jugs of gasoline had been discovered

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

in one of his Land Rovers. Declaring his innocence, Ntimama blamed his drivers. He was, he said, an admirer of Abraham Lincoln.

The scenic Narok road, or at least one branch of it, dead-ends at the plush Sarova Mara lodge.

Normally, the likes of Richard Branson, the flamboyant chairman of Virgin Group, stay here. The lodge offers golf, swimming, game drives, sunset picnics, shows of traditional Maasai dancing, even bow-and-arrow lessons -- though manager James Ndirangu's voice faltered, listing that particular service.

One evening, about a month after the Kenyan elections, there were 11 tourists staying at the opulent 150-bed facility. A couple from Pennsylvania said they felt strangely heartbroken by the royal treatment they received. Ndirangu, an easygoing Kikuyu, seated the guests together at meals, so they wouldn't feel lonely. And he cajoled his staff, who included nine of **Kenya's** 41 ethnic groups, to watch televised soccer together.

Layoffs, he conjectured, would begin in mid-February.

"This is the strangest time I have ever lived through," he said, as dusk fell over the savanna. "Who would have thought it? In **Kenya**?"

Even the weather felt wrong, Ndirangu added. Rain was falling much too early on the Mara. If it continued, he said, the grass would turn unseasonably green across the plains. The wildlife wouldn't seek better pastures. Like everything else in **Kenya**, one of the world's great animal migrations could grind slowly to a halt.

----------

psalopek@tribune.com

Photo (color): A family fleeing ethnic violence loads belongings into a truck in Narok, western **Kenya**. The area is a magnet for tourism, a cornerstone of the economy that has suffered mightily since a contested presidential election sparked unrest.
Photo (color): A truck on safari plies the Masai Mara nature reserve in southwestern **Kenya**. Such trips have become rare as rampant violence in the country over the past month has kept tourists away.
Photo (color): Koshel Iita, a game scout at the Mara Porini Camp in the Masai Mara, has little to do these days. The eco-tour camp on a Maasai- owned nature conservancy is empty and has had only one booking for the month.
Photo (color): Maasai women sell trinkets at the gates of the Masai Mara preserve. They rush the few cars that still arrive at the gates each day, frantic to make a sale. Some throw their beadwork into cars; others try to climb through the car windows.
Tribune photos by E. Jason Wambsgans

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

2/8/08 Christian Sci. Monitor 7
2008 WLNR 2371403

Christian Science Monitor (USA)
Copyright 2008 The Christian Science Monitor

**February 8, 2008**

Section: WORLD

# **Kenya** talks focus on easing violence

Scott Baldauf - and Rob Crilly - Staff writer of The Christian Science Monitor | Correspondent of The Christian Science Monitor

JOHANNESBURG, South Africa; AND NAIROBI, **Kenya** Since his arrival in **Kenya** on Jan. 22, former United Nations Secretary-General Kofi Annan has deftly given the impression of steady success in mediating between **Kenya's** two main rivals, President Mwai Kibaki and opposition leader Raila Odinga. But in talks this week, President Kibaki's Party of National Unity (PNU) apparently rejected a transitional government that would share power with Mr. Odinga's Orange Democratic Movement (ODM), according to an ODM source with knowledge of the ongoing discussions. Few details of the talks have emerged. The emphasis still appears to be on preventing the violence and breaking the leaders away from their intransigence, rather than the makeup of any kind of power-sharing government.

Kibaki still claims he won the disputed Dec. 27 vote, while Odinga maintains that Kibaki stole the election at the last minute. ODM negotiators are insisting that the disputed elections be re-run and a transitional government be set up in the meantime. Kibaki's team says that is a nonstarter. The only agreement so far is that the discredited Electoral Commission of **Kenya** be disbanded. Last Friday, however, the two sides also agreed to end the violence and work together to ensure the delivery of humanitarian aid. But the agreement coincided with fresh clashes in the western Rift Valley following the murder of an opposition parliamentarian. "Since then, in the past three or four days, things have calmed down," says Abbas Gullet, executive director of the **Kenya** Red Cross. "Whether that's down to the Annan talks or other factors it's difficult to say. What I can say is that there's huge, huge hope among Kenyan people that things are moving in the right direction and settling down." But the western Rift Valley has seen a series of flare-ups since President Kibaki was sworn in for a controversial second term, and the toll continues to tick upwards; more than 1,000 have died and more than 300,000 were forced from their homes. "Ever since Kofi Annan emerged with those two men for the handshake, everyone thought that a solution was possible," says Wafula Okumu, a **Kenya** expert at the Institute for Security Studies in Pretoria, or Tshwane, as the South African capital city now calls itself. "Then I started hearing that because

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

of the higher expectations, if these talks fail, the consequences will be more dire than" what we've seen before. As if to focus the minds of the two rivals, the UN Security Council Wednesday condemned the "ethnically motivated attacks" in **Kenya**, and also expressed "strong concern at the continuing dire humanitarian situation in **Kenya** and [called] for the protection of refugees and internally displaced persons." Applying further pressure, United States Ambassador Michael Rannenberger announced travel bans against 10 members of parliament, reportedly from both the president's party and the opposition, for their participation "in the instigation of violence, violation of human rights and breaking of democratic practices." The travel bans apply against the politicians as well as their families, including children attending school in the US. The challenges facing **Kenya's** leaders have deep and personal roots. Rulers who awarded land to their cronies and favored their ethnic kin would be reluctant to give up that tangible lever of power, unless forced. Rulers would be even more loath to give up the absolute powers - of apportioning budgets, choosing members of the judiciary, and clamping down on opposition and press freedoms at will - that **Kenya's** liberation-era Constitution gives its office of presidency. Yet analysts, both in **Kenya** and across Africa, say that **Kenya's** only hope for peace is if it addresses those very issues now. "**Kenya** sits as an indication of a broader problem, the African problem of how to organize the political state," says Francis Kornegay, a senior analyst at the Center for Policy Studies in Johannesburg. With men like Kibaki and Odinga and their respective entourages, "We are dealing with a political class that has come from years of dictatorship. These habits die hard." In a Kenyan context, political leaders typically have drawn their support primarily from members of their own tribes. Odinga's biggest supporters come from the Luo tribe who live in the western part of the country, and he has forged alliances with a "Pentagon" of opposition leaders representing other ethnic groups. Mwai Kibaki's supporters come from the Kikuyus of central **Kenya**. This means that any political dispute can quickly transform into ethnic violence. Immediately following the announcement on Dec. 29 that Kibaki had won the polls, violence broke out against Kikuyus in areas where the opposition ODM vote was strongest. In recent days, members of Odinga's Luo party have been chased from their homes in villages in Central Province, the traditional Kikuyu homeland. Francois Grignon, Africa program director of the International Crisis Group think tank, says the talks still have a long way to go if they are to help ordinary Kenyans. "Progress has been made because they are meeting, they are talking to one another, they are making commitments to the reconciliation process," he says. "But as far as the political issues go, they are still a long way apart."

---- INDEX REFERENCES ----

COMPANY: UNITED NATIONS

NEWS SUBJECT: (World Organizations (1IN77); Human Rights (1HU19); Social Issues (1SO05); United Nations (1UN54); Government (1GO80); Public Affairs (1PU31))

REGION: (**Kenya** (1KE61); Africa (1AF90); Southern Africa (1SO66); East Africa (1EA80); South Africa (1SO81))

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

2/8/08 N.Y. Times A6
2008 WLNR 2438063

New York Times (NY)
Copyright 2008 The New York Times Company

**February 8, 2008**

Section: A

# U.S. Intensifies Efforts to End Deadly Conflict in **Kenya**

JEFFREY GETTLEMAN

NAIROBI, **Kenya** The American government is playing an increasingly active role in trying to restore peace in **Kenya** , holding hearings in Washington on Thursday and threatening to prohibit some Kenyan politicians from entering the United States.

A spokesman for the American Embassy in **Kenya** said Thursday that the embassy had written to 10 politicians and businessmen warning that they and their relatives would be denied entry into the United States if the embassy determined that they had instigated or taken part in violence.

More than 1,000 people have been killed in **Kenya** since a disputed election in December, and human rights groups have said much of the violence was organized. The American Embassy is warning people in the government and the opposition, and is trying to use the issue of visas to press the leaders to act responsibly and support efforts to reach a political compromise.

''We consider the violence as the most immediate issue to deal with,'' said T. J. Dowling, the embassy spokesman. ''We wanted to let these people know that we are scrutinizing their acts and we will take action accordingly.''

On Thursday, the Senate held hearings into the underlying causes of the unrest and how it affected other countries in the region. Until December, **Kenya** was known as an anchor state in East Africa, and it remains a base of operations for extensive aid efforts in some of its more turbulent neighbors, like Somalia, Sudan and Congo. The House of Representatives held similar hearings on Wednesday.

''**Kenya** is an important partner for the United States,'' said Russ Feingold, Democrat of Wisconsin and chairman of the Senate's subcommittee on African affairs, in a statement. ''But the lack of progress in addressing a number of deep-rooted problems, including political marginalization, land disputes and endemic corruption, appear to have taken a toll. By many accounts, the situation in **Kenya** could still get much worse.''

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

The American government has temporarily removed nearly 150 Peace Corps volunteers from **Kenya**. American officials said that even though Americans had not been the targets of attacks, the continuing instability, which included mob killings and roadblocks across the country, had made it dangerous for the volunteers to remain at their rural posts.

The Kenyan government seems to be swinging into action as well. On Thursday, police officials announced that they were charging an officer with murder in the shooting of an unarmed protester.

Eric Kiraithe, a spokesman for the Kenyan police, said the government had arrested the officer, who was shown on Kenyan television last month shooting a protester at close range, then kicking him in the ribs with combat boots. The protester was unarmed and had been dancing and making faces. He later died. The same police officer has also been charged in the shooting death of another unarmed protester at the same demonstration.

Police officials were quick to note that the officer was from the Kalenjin ethnic group, which tends to support the opposition.

''This appears to be a clear case of criminal misconduct,'' Mr. Kiraithe said. ''It has nothing to do with tribe.''

Police officers have also arrested more than 20 men this week on suspicion of terrorizing women in Naivasha, where mobs recently killed dozens of people. The men have been accused of molesting and attacking women who wore pants instead of skirts. The police said the suspects were part of a gang that took advantage of the disorder to push its harsh, and often mysterious, code of conduct.

**Kenya** plunged into turmoil in December after its electoral commission declared that President Mwai Kibaki had narrowly beaten the top opposition leader, Raila Odinga. Observers cited widespread evidence of vote rigging.

The controversy uncorked years of frustration over political, economic and land issues, pitting opposition supporters against members of the president's ethnic group and groups perceived as supporting the government. Representatives from the government and the opposition have been meeting for the past week with Kofi Annan, the former United Nations secretary general, to seek a resolution. On Thursday, the talks became more tense, with each side claiming to have won the election and neither offering meaningful concessions, said an official who was not authorized to speak publicly.

PHOTO: Members of an ethnic Luo family waited Thursday in a truck at a camp for the displaced in Nakuru to go to their ancestral home. (PHOTOGRAPH BY JOAO SILVA FOR THE NEW YORK TIMES)

---- INDEX REFERENCES ----

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

2/8/08 South Florida Sun-Sentinel 18A
2008 WLNR 2459496

South Florida Sun-Sentinel
Copyright 2008 Sun-Sentinel

**February 8, 2008**

Section: News

U.S. MIGHT BAR SOME KENYANS

NAIROBI, **Kenya** {BYLINE} The Associated Press Washington is wielding a visa weapon against prominent Kenyans who purportedly incited weeks of post-election bloodshed, threatening to bar politicians and businessmen from visiting the United States, the U.S. ambassador said Thursday.

Ambassador Michael Ranneberger said warnings already made to 10 people on all sides of **Kenya's** political divide had "hit a nerve" among the country's elite and he warned that more people could be targets because of suspicions they have been financing violence.

"There is money changing hands," Ranneberger said. "People are paying 4,000 shillings [$60] to burn down a house."

Canada's ambassador, Ross Hynes, reportedly said Thursday that his country was already barring some Kenyans from entering.

Britain, **Kenya's** former colonial ruler, said it could take similar steps.

Long considered one of Africa's most stable democracies, **Kenya** has been devastated by strife since a Dec. 27 election.

Opposition leaders say President Mwai Kibaki stole the presidential vote from rival candidate Raila Odinga and should step down.

Kibaki insists he was fairly re-elected and says his opponents should take their case to **Kenya's** courts, which are stacked with his supporters.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Government (1GO80); World Elections (1WO93); Global Politics (1GL73); Public Affairs (1PU31))

REGION: (**Kenya** (1KE61); Africa (1AF90); East Africa (1EA80))

Language: EN

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

OTHER INDEXING: (Kibaki; Michael Ranneberger; Mwai Kibaki; Opposition; Raila Odinga; Ranneberger; Ross Hynes)

EDITION: Broward Metro

Word Count: 247
2/8/08 SFLSUN-SENT 18A
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVESTER OWINO, [A97-469-354]<br><br>Plaintiff,<br><br>sv.<br><br>MICHAEL CHERTOFF, et al.,<br><br>Defendant. | Case No. 07cv2267-WQH (POR)<br><br><u>PROOF OF SERVICE</u> |

I, the undersigned, say:

1) That I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party in the within action;

2) That my business address is 225 Broadway, Suite 900, San Diego, California, 92101;

3) That I served the within **Petitioner's Traverse,** placing a true copy of the above-mentioned document in the United States mail on February 15, 2008, to:

**Samuel Bettwy, Assistant U. S. Attorney**
U S Attorneys Office Southern District of California
Civil Division
880 Front Street
Suite 6253
San Diego, CA 92101

I certify under the laws of the State of California that the foregoing is true and correct. Executed on 15 February 2008 at San Diego, California.

SYLVIA FREEMAN