**JAMES FIFE**
California State Bar No. 237620
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101
Telephone No. (619) 234-8467
E-mail: james_fife@fd.org

Attorneys for Mr. OWINO

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## (HONORABLE WILLIAM Q. HAYES)

| | |
|---|---|
| **SYLVESTER OWINO,** | CASE No. 07CV2267-WQH (POR) |
| **Petitioner,** | |
| **v.** | **COURT-ORDERED POST-HEARING OPENING BRIEF** |
| **JANET NAPOLITANO, et al.,** | |
| **Respondents.** | [Special Briefing Schedule Ordered–CivLR 7.1(e)(8)] |

**TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I    APPLICABLE STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II    EVIDENCE OF KENYA'S INTRANSIGENCE TO REPATRIATION . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Specific History of Removal Efforts in This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    General Factors Indicative of Diplomatic Intransigence Toward ICE's Removal Efforts . . . . . 6

III    FAILURE OF REMOVAL CANNOT BE ATTRIBUTED TO NON-COOPERATION . . . . . . . . . 8

    A.    Petitioner Has Cooperated Without Impeding Removal Efforts . . . . . . . . . . . . . . . . . . . . . . 8

    B.    Delay in Removal Is Partially Due to ICE's Misfeasance . . . . . . . . . . . . . . . . . . . . . . . 10

IV    RESPONDENTS FAIL TO REBUT PETITIONER'S SHOWING . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

APPENDIX

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

Aguilar-Turcios v. Holder,
___ F.3d ___, 2009 WL 3086012 (9th Cir. Sept. 29, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Casas-Castrillon v. DHS,
535 F.3d 942 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Demore v. Kim,
538 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Diouf v. Mukasey,
542 F.3d 1222 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,11

Korkees v. Reno,
137 F. Supp. 2d 590, 598-99 (M.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Owino v. Napolitano,
575 F.3d 952 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pelich v. INS,
329 F.3d 1057 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Rajigah v. Conway,
268 F. Supp. 2d 159 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6

Seretse-Khama v. Ashcroft,
215 F. Supp. 2d 37 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6,7,8

Ulysse v. DHS,
291 F. Supp. 2d 1318, 1326 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Zadvydas v. Davis,
533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,14

## FEDERAL REGULATIONS

8 C.F.R. § 241.4(g)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## FEDERAL STATUTES

8 U.S.C. § 1231(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## MISCELLANEOUS

Vera Institute of Justice, *Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program*, Vol. I, at 33, 36 (Aug. 1, 2000)
Vol. I, at 33, 36 (Aug. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. General Accounting Office, *Immigration Enforcement* 19 (May 2004) . . . . . . . . . . . . . . . . . . . . . . 14

**JAMES FIFE**
California State Bar No. 237620
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101
Telephone No. (619) 234-8467
E-mail: james_fife@fd.org

Attorneys for Mr. OWINO

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### (HONORABLE WILLIAM Q. HAYES)

| | |
|---|---|
| **SYLVESTER OWINO,**<br><br>                    Petitioner,<br><br>    **v.**<br><br>**JANET NAPOLITANO, et al.,**<br><br>                    Respondents. | CASE No. 07CV2267-WQH (POR)<br><br>**COURT-ORDERED POST-HEARING OPENING BRIEF**<br><br>[Special Briefing Schedule Ordered–CivLR 7.1(e)(8)] |

**I**

**APPLICABLE STANDARD**

Under the remand order in *Owino v. Napolitano*, 575 F.3d 952, 955 (9th Cir. 2009) (per curiam), this Court "must decide whether Owino 'faces a significant likelihood of removal to [Kenya] once his judicial and administrative review process is complete.' "

The Court ruled that determination of the question on remand involved conducting a hearing at which "[t]he parties may present evidence on whether Kenya will accept repatriation of Petitioner in the event that Petitioner is unable to obtain relief from removal in his immigration case," citing *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Owino v. Napolitano, 07CV2267-WQH (POR), Dckt. Entry # 57, at 3 (S.D. Cal. Sept. 21,

2009).

The precise standard articulated by the Supreme Court is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Once Petitioner meets this standard, "the Government must respond with evidence sufficient to rebut that showing." *Id.* Moreover, the relative showings on each side adjust as the length of detention increases: "And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* Accordingly, where the unencumbered period during which the removal period has run is over 31 months since the stay of removal was lifted–six times the presumptively reasonable time to effect removal established in *Zadvydas*–Respondents must now show removal is indeed imminent to justify further detention.

The "good reason to believe" standard is patently an objective one. Respondents cannot support their burden or refute Petitioner's showing by evidence of a deportee's subjective beliefs about the likelihood of removal, as some of Respondents' questioning implied. HRT 24-27.[1] That is particularly so here, where Mr. Owino testified he had no personal knowledge of Kenya's history of repatriation or its criteria to issue travel documents, except what was stated by the embassy officials he contacted, and all of those statements revealed removal was not imminent. HRT 34-35. Consequently, this Court should look only to the objective evidence whether Kenya is significantly likely to permit repatriation within the shortened period now obtaining under the *Zadvydas* sliding scale.

---

[1] "HRT" refers to the reporter's transcript of the evidentiary hearing held on September 29, 2009, a copy of which is attached as the Appendix.

Mr. Owino points to two major indicia that removal is unlikely: the specific history of delay in his case (Part II *infra*) and general obstacles to ICE's efforts to repatriate, suggesting Kenya's likely continued resistance to removal (Part III, *infra*). Respondents' efforts at rebuttal based on non-cooperation and statistics fail to refute Mr. Owino's showing (Part IV, *infra*). Release is therefore required under *Zadvydas*.

## II

## EVIDENCE OF KENYA'S INTRANSIGENCE TO REPATRIATION

There is good reason to believe that removal to Kenya is not significantly likely after the completion of Mr. Owino's administrative proceedings. The evidence for this appears in both the specific history of removal in his case and in general considerations indicative of resistance to repatriation.

**A.** **Specific History of Removal Efforts in This Case**

The *Zadvydas* standard requires the Court to make a prediction about the future: whether good reason shows removal is not significantly likely in the reasonably foreseeable future.[2] The strongest objective evidence for future prediction on deportation is always the concrete facts of past history of removal efforts. In that light, the evidence here is stark that Kenya is unlikely to repatriate Mr. Owino in a reasonable time.

The stay of the removal order was lifted on February 23, 2007. In the nearly 32 months since, ICE has had no success in obtaining travel permission to Kenya. The delay in Mr. Owino's case is quintuple the

---

[2] Respondents argued that the *Zadvydas* standard is inapplicable to this case, which it claimed "is a completely different posture" and that "[t]his is not a *Zadvydas* case. This is a *Casas* case, and more it's an *Owino/Casas* case." HRT 101-02. While Petitioner agrees that the status of his petition for review puts the habeas matter in a particular procedural setting, that alone does not impose a different mode of analysis from the standard *Zadvydas* inquiry. This Court repeatedly recognized that fact in its Order of September 21, describing the inquiry as encompassing a typical "*Zadvydas* hearing." Order at 2-4.

presumptively reasonable time to effect removal set in *Zadvydas*. In other words, Kenya has been

unreasonable in its intransigence toward repatriation to a magnitude of five; that basic fact is strong, concrete

evidence that repatriation is not significantly likely in the reasonably foreseeable future.

Nor does Kenya's asserted reason(s) for the delay make this five-fold unreasonable delay any less telling.

The evidence shows that Kenya's reasons for not acting on ICE's requests are shifting and unpredictable.

Both Officer Hayes and Mr. Owino testified and declared that initially the Kenyan mission insisted that its

policy barred removal while the deportee's appeal was pending. *See* HRT 21, 51; Exhibits 1-4. Officer Hayes

indicated that this was the Kenyan embassy's fixed response, even after Officer Hayes provided consular

officer Ndwiga a copy of the Ninth Circuit's order lifting the temporary stay. HRT 48; Exhibit 3, ¶9; Exhibit

4, ¶ 4. However, after Officer Hayes made repeated inquiries in May and June 2008, Ms. Ndwiga suddenly

reversed course and claimed that they would indeed repatriate Mr. Owino–pending appeal notwithstanding–if

he would "only tell the consulate that he would like to return home." Exhibit 4, ¶5. Officer Hayes testified

that Ms. Ndwiga did not claim this change in the fixed response had been due to any orders from the

ambassador or the government in Nairobi; it was apparently made on her own say-so. HRT 51. Thus,

Kenya's "policy" is really no policy at all, if it can be vigorously maintained despite repeated pleas from ICE,

but then altered at the whim of a low-level consular official. This indicates that Kenya's reasons for the

failure to repatriate are arbitrary and pretextual.

However, even if the Kenyan authorities' statement of their current "policy" is taken at face value, it is

even stronger evidence that removal is unlikely to occur. Mr. Owino testified he has no desire to return to

Kenya at this time.  HRT 22.  Therefore, if a subjective desire to "return home" is Kenya's criterion for repatriation, and Mr. Owino truthfully does not want to return, then travel permission is not forthcoming.

In this regard, this case is identical to the situation in *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37 (D.D.C. 2002).  There, the detainee truthfully told the Liberian consulate officials that he did not wish to return to Liberia, since he left when he was younger and had no family ties remaining there.  *See id.* at 51. The Liberian government, apparently not wishing to return deportees with no support systems in place, refused to repatriate.  The district court held that Seretse-Khama's truthful statements were not deliberate obstruction of the removal efforts, and therefore there was no non-cooperation under *Pelich v. INS*, 329 F.3d 1057 (9th Cir. 2003), to justify further detention.  *See id.* at 53-54.  Similarly here, Mr. Owino's truthful aversion to returning to Kenya to be arrested by the same police force that tortured him previously cannot be a basis for claiming non-cooperation.  *Seretse-Khama* demonstrates that a refusal to repatriate on this basis suffices to grant *Zadvyas* relief.

Similarly, in *Rajigah v. Conway*, 268 F. Supp. 2d 159 (E.D.N.Y. 2003), the detainee's attorney truthfully told the Guyana mission that he was considering further appeal.  Since the embassy had a policy not to repatriate while appeals were pending, this statement, too, was not a bad-faith act of obstruction.  *See id.* at 165-66.  Similarly, *Rajigah* shows that such refusals are grounds for release under *Zadvydas*.  *See id.* at 167.

The concrete history of delay and the shifting, pretextual nature of Kenya's excuses for not accepting removal demonstrate that removal is not significantly likely following the remand hearing in immigration court.

**B.  General Factors Indicative of Diplomatic Intransigence Toward ICE's Removal Efforts**

Official government studies indicate certain factors that correlate with diplomatic intransigence toward repatriation.  The evidence here shows the presence of several of these factors.

In a study of enforcement of removal orders and compliance with *Zadvydas*, the General Accounting Office reported a number of reasons why certain countries showed marked reluctance toward repatriating deportees from the United States.  *See* Exhibit 8 at 21.  Among the "variety of reasons" for countries' intransigence were long absences from the country; loss of family or other ties; economic burdens on the state; criminal convictions of the deportees; and individual political factors in the country.  *See id.*  The record here exhibits evidence of all of these circumstances known to discourage repatriation.

First, Mr. Owino testified that in the ten years since he left Kenya, all of his family, as far as he knows, has fled the country to Uganda and Europe.  HRT 8-9.  He therefore has no familial ties remaining in Kenya.  *Cf. Seretse-Khama*, 215 F. Supp. 2d at 52 (primary reason for Liberia's refusal was its reluctance to return someone with no remaining ties to country).

The lack of family connections or support comports with the GAO's citation of the 'public charge' concerns for deportees.  Deportees with no prospects and no support system will become a burden on society, which discourages foreign governments' cooperation with removals.  In that light, it is significant that Kenya has suffered a sharp downturn in its economy since the recent post-election insurgency.  *See* Exhibit 9.  The CIA World Factbook reports that Kenya currently has a 40% unemployment rate, with 50% of the population living below the poverty line.  The GDP was cut to a third of its former level in 2007 and inflation is running

at 26%. *See id.* at 9-10. Given that Kenya has no welfare system, HRT 9, it is unlikely it would look favorably on repatriating Mr. Owino, who has no ties, no support, no property, and no job prospects upon returning. HRT 8-9.

Third, Mr. Owino's being deported on account of a felony conviction provides another common disincentive to repatriate. Just as the United States seeks to remove aliens with criminal convictions, their home countries also look askance at their return and find pretexts not to cooperate with those efforts.

Finally, countries have their own internal political agendas that may make repatriation of certain political undesireables impossible. In Mr. Owino's case, he is a member of the Luo tribe, the main ethnic group associated with opposition to the Kikuyu-dominated government. Indeed, the power-sharing government implemented to quell the rampant post-election violence in 2007-2008 installed the Luo leader, Raila Odinga, as prime minister to balance the power of President Kibaki. *See* Exhibit 9 at 1. Moreover, Mr. Owino is known to the police as a government opponent, that being the basis of their past persecution. And now he has raised a formal CAT allegation against Kenya. All of these factors would make Kenya less likely to favor return of someone pegged by the government as an opponent and potential insurgent.

Finally, timely repatriation is unlikely because of the general level of corruption and break down in the rule of law in Kenya, showing the country will not attend to the legal niceties of repatriation in an efficient manner. Exhibit 10 is the State Department's most recent human rights conditions report for Kenya. It documents not only a number of current human rights abuses in Kenya, but also attests to the generally high level of official corruption. That corruption is not only subjectively perceived by the population of Kenya

to be large-scale and extending to the highest levels of government, but is also confirmed by the World Bank's 2007 study of worldwide governance standards. *See id.* Consequently, the legal and administrative ethos in Kenya suggests inefficiency and a systemic lack of fair play. Not all foreign countries are alike in their devotion to fairness and the rule of law; removal to Canada is surely qualitatively different from removal to Zimbabwe, for instance.

Both the specific history of removal efforts in this case and the general trends noted by studies of removal efforts provide good reason to believe Kenya is not significantly likely to repatriate Mr. Owino in a timely fashion.

**III**

**FAILURE OF REMOVAL CANNOT BE ATTRIBUTED TO NON-COOPERATION**

**A. <u>Petitioner Has Cooperated Without Impeding Removal Efforts</u>**

Respondents previously attempted to rebut the *Zadvydas* showing with a claim of non-cooperation under *Pelich,* and it can be anticipated they will attempt to do so again. However, their claim of non-cooperation is simply unsupported on the record.

The testimony at the hearing indicated Mr. Owino never engaged in any of the usual acts alleged in the cases, such as refusing to conduct an interview, refusing to provide documents, or providing incorrect information. HRT 53-54; *see also Seretse-Khama*, 215 F. Supp. 2d at 51 (listing typical acts of obstruction). The one incident of non-cooperation appearing in the record was Mr. Owino's uncounseled refusal to sign the travel document request during the short, 30-day window between denial in the BIA and filing of his

petition for review in August 2006.  HRT 9-10, 54.  The testimony revealed that Mr. Owino believed signing the forms would waive his appeal, but Officer Padilla did not explain to Mr. Owino that he was mistaken.  HRT 10.  In any event, Mr. Owino's petition for review was filed about three weeks later, resulting in an automatic temporary stay of the removal order.  HRT 9-10.

ICE did not attempt to obtain travel applications from Mr. Owino again for over 17 months, on January 18, 2008.  HRT 11-12, 54; Exhibit 5.  On that date, the day the Return to the Petition was due, ICE suddenly proffered the travel document application to Mr. Owino and insisted he sign then and there.  Officer Hayes was not aware of any specific reason for this sudden urgency.  HRT 56.  Pursuant to ICE policy, Mr. Owino was served with a form I-229, which Respondents used in the Return as evidence of non-cooperation.  Return at 2.  However, Mr. Owino did not refuse outright, but only asked for time to contact his attorney.  HRT 11-12.  But ICE apparently views such requests to consult with an attorney as a refusal.  HRT 54-55.  Mr. Owino did contact his lawyer, was corrected about his error of law, and then offered the completed forms to ICE four days later.  HRT 11-12; Exhibit 6.  However, ICE lacked any urgency at the point and did not retrieve them.  HRT 12.  Officer Hayes could think of no reason why Officer Coronado would not respond to Mr. Owino's written request and retrieve the forms once they were offered.  HRT 55.

Even if these two incidents were properly considered acts of bad-faith non-cooperation, the law states that ICE has only a "reasonable period" following the return to cooperation to effect removal.  8 C.F.R. § 241.4(g)(1)(ii).  The Ninth Circuit has interpreted this to mean ICE has 90 days from a return to cooperation to remove the deportee.  *See Diouf v. Mukasey*, 542 F.3d 1222, 1231 (9th Cir. 2008).  Thus, at most,

Respondents had until **April 21, 2008,** to remove Mr. Owino, but that date passed 17 months ago. Respondents' non-cooperation argument collapses on its own weight.

As noted above, Part II.A, Respondents' alternative argument that failing falsely to claim a desire to return to Kenya counts as bad-faith obstruction is contrary to law and logic.

The final proof that Mr. Owino is not malingering or seeking to stay in the United States is his extraordinary effort to self-remove by finding an alternate destination. HRT 13-15; Exhibit 7. Far from seeking to frustrate the government's efforts, Mr. Owino has done more than ICE to effect removal, by contacting foreign government directly and seeking to replace his lost passport to allow him to travel to those countries' territory to perfect his asylum claim. HRT 15-19, 25-30. Until recently, his efforts went unaided by ICE, but a new deportation officer has pro-actively assisted Mr. Owino in seeking asylum in the United Kingdom. HRT 15. That effort was, unfortunately, unsuccessful, but the incident demonstrates Mr. Owino is not avoiding removal, just removal to the country where he was previously tortured.

**B.    Delay in Removal Is Partially Due to ICE's Misfeasance**

As the above outline of Mr. Owino's actual cooperation shows, it is ICE that has been the bigger obstruction to timely removal efforts. ICE made one attempt to seek Mr. Owino's cooperation just days after the BIA appeal was dismissed in August 2006 and before the 30-day appeal period had elapsed. ICE did not correct Mr. Owino's misconception that signing would waive his appeal. Nonetheless, he did file his petition for review before the end of August, staying any removal efforts that might have commenced during that brief window.

ICE made no efforts to remove Mr. Owino again for 17 months, including the 11 months following the denial of the permanent stay and the lifting of any legal bar to removal. HRT 46. Officer Hayes claimed this was pursuant to some practice that ICE does not even attempt removal when they suspect the foreign country will not repatriate while appeals are pending, a policy which she testified was "common" among destination countries. *See id.* However, Officer Hayes's practice seems in contradiction to the clear statutory duty to remove deportees within 90 days. *See* 8 U.S.C. § 1231(a)(1)(A) ("the Attorney General shall remove the alien from the United States within a period of 90 days"). It also is in stark contrast to ICE's improper alacrity in removing deportees who have a stay order from the Ninth Circuit. *See Aguilar-Turcios v. Holder*, ___ F.3d ___, 2009 WL 3086012, at *4 n.5 (9th Cir. Sept. 29, 2009) (alien held at CCA, the same facility as Mr. Owino, was removed by ICE during alien's appeal despite stay order). On the one hand, Officer Hayes portrays ICE as taking a wait-and-see approach when appeals are pending, but other ICE officers in this district, as in *Aguilar-Turcios*, will remove in spite of a lawful stay. Finally, it is unclear that Respondents' claim of non-cooperation holds any water now, if, in fact, ICE simply fails to make any removal efforts on the basis of some informal practice regarding pending appeals. *See Ulysse v. DHS*, 291 F. Supp. 2d 1318, 1326 (M.D. Fla. 2003) (release under *Zadvydas* warranted when delay in removal was due to ICE's defective implementation of a policy of "artifice and trickery" to enforce removal orders rather than a straightforward effort to contact the alien to seek voluntary surrender). Indeed, ICE affirmatively tried to discourage Mr. Owino's independent efforts to find an alternate destination country, without any legal right to limit his communication with the embassy. HRT 17-18, 57-59. Mr. Owino should not be made to pay the price of

ICE's lack of diligence or failure to fulfil its statutory mandates through misguided practices of official inertia.

The report of the Inspector General of Homeland Security in Exhibit 11 confirms that removal efforts are sometimes impeded by ICE's own deficient operations. The Inspector General found that field offices sometimes send the wrong materials to embassies in the effort to obtain travel documents. Exhibit 11 at 9, 24-25. Cases are not prioritized, so that detainees who are security threats may be given second place attention over deportees of less urgency. *Id.* at 25. Nonetheless, the Inspector General noted a proclivity to blame the detainee for these delays, even when unwarranted. *See id.* at 9, 17-18.

The history of this case shows that the delay in removal must be charged to Kenyan reluctance and, in part, to ICE's lack of diligence. Civil detention of deportees is constitutional only on the assumption that removal proceedings will be expedited. *See Demore v. Kim*, 538 U.S. 510, 529 (2003); *Casas-Castrillon v. DHS,* 535 F.3d 942, 950 (9th Cir. 2008). The failure of ICE to do its statutory duty ratchets up the unreasonableness of Mr. Owino's detention, favoring release.

## IV

## RESPONDENTS FAIL TO REBUT PETITIONER'S SHOWING

Respondents' efforts to rebut Mr. Owino's showing must fail. The examination of Officers Hayes and McCormick showed only that some Kenyans can be removed, not that removal is significantly likely in this case. In fact, both officers' views were severely limited and their assertions highly general.

Officer Hayes had had only one other case of removing a Kenyan. HRT 42. Officer McCormick's experience was limited to the last 12 months as a headquarters officer, so her knowledge of removal success

was limited to those cases referred to headquarters.  HRT 63-64, 77.  She had only vague ideas of the national statistics on removal to Kenya, as she did not know about any cases that were not referred to headquarters for assistance.  HRT 77-78.  In any event, she reported that about 50% of the Kenyan deportees were removed in her experience.  HRT 65 (stating the "majority" and "definitely over 50%" of her cases were removed *"or awaiting removal."*).  That figure contrasts with the Inspector General's global average of timely removal of 80%.  *See* Exhibit 11 at 10.  Put another way, if ICE's removal efforts rate a 'B-' globally, in the case of removals to Kenya its grade is an 'F.'

The usefulness of Officer McCormick's raw estimates is limited by the fact that they do not break down by the likelihood of removability in relation to significant factors known to bear on removal rates.  *See* Part II.B *supra*.  For instance, because her figures were based solely on those cases passing through her office, there is no known overall basis of removable Kenyans to compare her figures to.  HRT 77-78.  That is, she was successful in removing 50% of her caseload, but since she did not have figures for total numbers of Kenyan deportees nationwide, there is no basis for comparison.  In other words, removing 200 aliens means one thing if there are only 250 waiting, and something else if there are 1,500.  Her figures were not broken down to control for significant factors such as number of removals with criminal convictions, length of absence from Kenya, existence of family ties, or even ethnic or political factors.  HRT 79-81.  In short, Officer McCormick's raw numbers, limited to the snapshot of one year, do not provide any meaningful insight into the likely removal of Mr. Owino based on the significant factors in his circumstances, and she has had no personal involvement in his case.  HRT 68.  Instead, her conclusion was based on the nature of identity

documents available in this case. HRT 69, 83-84. Her opinion–based on the mechanical existence of certain documents in the A-file–fails to account for the fact that those same documents were present in the A-file since February 2007, when the stay was lifted, *and yet removal has still not proceeded in the last 31 months*. Her opinion is utterly contradicted by the concrete history of Mr. Owino's case, and so has virtually no predictive power about what will likely happen in the future.

**CONCLUSION**

Mr. Owino's Petition seeks his release from prolonged civil detention, not an end to the efforts to remove him, ICE's primary interest in detaining any aliens. *See Zadvydas*, 533 U.S. at 690-91. Contrary to the impression Respondents would give, detention and removal are not one and the same thing. Removal efforts do not stop simply because the deportee is not detained.

ICE currently supervises some 16,000 undetained deportees. *See* U.S. General Accounting Office, *Immigration Enforcement* 19 (May 2004). Releasing Mr. Owino creates no appreciable burden ICE is not already structured to meet. Studies show that release of deportees does not result in elevated absconding from immigration proceedings. *See* Vera Institute of Justice, *Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program*, Vol. I, at 33, 36 (Aug. 1, 2000), *available at* http://www.vera.org/publications/ publications_5.asp?publication_id=12 (study finding that 94% of criminal aliens who had gone from jail or prison directly to immigration custody and subsequently released under supervision had a perfect attendance record of their subsequent immigration hearings); *see also Korkees v. Reno*, 137 F. Supp. 2d 590, 598-99 (M.D. Pa. 2001) (the regulations governing supervision of released

deportees "are sufficient to prevent any risk of flight or threat to the community.").  Given the likelihood of

obtaining relief from removal, Mr. Owino has even less reason to abscond than other deportees.

As *Zadvydas* recognized, the right to personal liberty is too valuable to yield to the governmental

convenience of having deportees immediately at hand, even when there is no significant likelihood removal

will come reasonably soon.  That is the circumstance here: specific and general factors indicate Kenya is

unlikely to proceed expeditiously in repatriating Mr. Owino, whether or not he has an appeal pending,

whether or not he expresses a desire to "return home" to arrest.  After over 31 months of failed removal

efforts, return to Kenya is not significantly likely, and release may in fact prove the more efficient and

expeditious step in removal, by allowing Mr. Owino greater ability to seek relocation to a third country from

outside the walls of his detention facility.


DATE: October 6, 2009                    *s/ James Fife*
                                         **JAMES FIFE**
                                         **FEDERAL DEFENDERS OF SAN DIEGO, INC**.
                                         Attorneys for Petitioner Mr. Owino

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SYLVESTER OWINO,                      )
                                      )        No. 07CV2267-WQH (POR)
                Petitioner,           )
                                      )
v.                                    )
                                      )        CERTIFICATE OF SERVICE
JANET NAPOLITANO, et al.,             )
                                      )
                Respondents.          )
_____ )

        Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of his information and belief, and that a copy of the foregoing Court-Ordered Briefing on Procedure on Remand has been electronically served this day upon:

        Samuel Bettwy, Assistant United States Attorney
        880 Front Street
        San Diego, CA  92101
        samuel.bettwy@usdoj.gov

and a copy mailed to:
        Sylvester Owino
        Petitioner

Dated: October 6, 2009                 _s/ James Fife_
                                       JAMES FIFE
                                       Federal Defenders
                                       225 Broadway, Suite 900
                                       San Diego, CA 92101-5030
                                       (619) 234-8467  (tel)
                                       (619) 687-2666  (fax)
                                       james_fife@fd.org

# APPENDIX

```
 1                 UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   SYLVESTER OWINO,             )

 5          PETITIONER,           )   CASE NO. 07CV2267-WQH

 6                                )

 7      VS.                       )   SAN DIEGO, CALIFORNIA

 8                                )   SEPTEMBMER 29, 2009

 9   JANET NAPOLITANO, SECRETARY  )

10   OF HOMELAND SECURITY, ET AL., )

11          RESPONDENTS.          )

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    MOTION HEARING

16       BEFORE THE HONORABLE WILLIAM Q. HAYES

17             UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23   COURT REPORTER:          MAURALEE A. RAMIREZ
                              OFFICIAL COURT REPORTER
24                            UNITED STATES DISTRICT COURT
                              880 FRONT STREET, ROOM 4290
25                            SAN DIEGO, CALIFORNIA 92101
                              TEL.  619-381-1247
```

COMPUTER-AIDED TRANSCRIPTION

1    A P P E A R A N C E S:

2    FOR THE PETITIONER:

3         FEDERAL DEFENDERS OF SAN DIEGO, INC.
          BY:  JAMES FIFE, TRIAL ATTORNEY
4              JASON SER, TRIAL ATTORNEY
          225 BROADWAY, SUITE 900
5         SAN DIEGO, CALIFORNIA 92101

6    FOR THE RESPONDENT:

7         UNITED STATES ATTORNEY'S OFFICE
          BY:  SAMUEL W. BETTWY
8         ASSITANT U.S. ATTORNEY
          880 FRONT STREET
9         SAN DIEGO, CALIFORNIA 92101

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                            I N D E X

2                        INDEX TO WITNESSES

3   FOR THE PETITIONER         DIRECT  CROSS  REDIRECT   RECROSS

4   OWINO, SYLVESTER

5     BY MR. FIFE                8              34

6     BY MR. BETTWY                     22

7

8

9   FOR THE RESPONDENT

10  HAYES, ELIANA

11    BY MR. BETTWY              36

12    BY MR. FIFE                       43

13

14  MC CORMICK, MARCY

15    BY MR. BETTWY              62

16    BY MR. FIFE                       69

17                        INDEX TO EXHIBITS

18  TRIAL EXHIBITS                                RECEIVED

19  PETITIONER'S:

20  1                                               86

21  2                                               86

22  3                                               86

23  4                                               86

24  5                                               86

25  6                                               86
```

```
 1                    INDEX TO EXHIBITS (CONTINUED)

 2     TRIAL EXHIBITS                              RECEIVED

 3     PETITIONER'S:

 4     7                                               86

 5     8                                               87

 6     9                                               87

 7     10                                              87

 8     11                                              87

 9     12                                              87

10

11     RESPONDENT'S:                               RECEIVED

12     A                                               35

13     B                                               86

14     C                                               86

15     D                                               86

16     E                                               86

17     F                                               86

18     G                                               86

19     H                                               86

20     I                                               86

21     J                                               86

22     K                                               86

23

24

25
```

1          SAN DIEGO, CALIFORNIA; TUESDAY, SEPTEMBER 29, 2009

2                  1:00 P.M.

3   *(CALL TO ORDER OF THE COURT.)*

4      *THE CLERK:*  CALLING NO. 3 ON CALENDAR, CASE NO.

5   07CV2267, SYLVESTER OWINO V. JANET NAPOLITANO, ET AL., ON FOR

6   MOTION HEARING.

7      *MR. BETTWY:*  YOUR HONOR, GOOD AFTERNOON.  SAM BETTWY

8   REPRESENTING THE GOVERNMENT.

9      *THE COURT:*  GOOD AFTERNOON.

10     *MR. FIFE:*  YOUR HONOR, JAMES FIFE OF FEDERAL DEFENDERS

11  REPRESENTING MR. OWINO, AND I'M HERE WITH JASON SER OF OUR

12  OFFICE.

13     *THE COURT:*  GOOD AFTERNOON.

14     *MR. BETTWY:*  YOUR HONOR, I HAVE ASKED OFFICER HAYES TO

15  BE HERE.  SHE WENT TO THE REST ROOM.

16     *THE COURT:*  IS MR. OWINO HERE?

17     *MR. FIFE:*  WE UNDERSTAND THE MARSHALS ARE BACK THERE.

18  THEY JUST HAVEN'T BROUGHT HIM OUT YET.

19     *THE COURT:*  ALL RIGHT.

20   *(PAUSE IN THE PROCEEDINGS.)*

21   *(DEFENDANT ENTERING COURTROOM.)*

22     *THE COURT:*  YOUR CLIENT IS PRESENT AT THIS TIME; IS

23  THAT CORRECT, MR. FIFE?

24     *MR. FIFE:*  THAT'S CORRECT, YOUR HONOR.

25     *THE COURT:*  ARE YOU PREPARED TO GO FORWARD WITH THE

1  HEARING, SIR?

2      *MR. FIFE:*  YES, WE ARE, YOUR HONOR.  BEFORE WE BEGIN,

3  I WOULD ASK THAT THE COURT EXCLUDE THE WITNESSES.  IN THIS

4  CASE, OFFICER HAYES AND MR. OWINO HAVE SUBMITTED DIFFERING

5  DECLARATIONS ON THIS MATTER, AND I WOULD PREFER MS. HAYES IS

6  NOT PRESENT DURING MR. OWINO'S TESTIMONY.

7      *THE COURT:*  MR. BETTWY.

8      *MR. BETTWY:*  I KNOW WE HAD AN ARGUMENT OVER WHEN WE

9  WE'RE HERE BEFORE WHETHER HE WAS COOPERATING.  SHE MANAGES HIS

10  CASE DAY-TO-DAY.  THEY HAVE CONSTANT COMMUNICATION.

11      *THE COURT:*  DO YOU INTEND TO CALL MR. OWINO FIRST?

12      *MR. FIFE:*  PARDON, YOUR HONOR?

13      *THE COURT:*  DO YOU INTEND TO CALL MR. OWINO FIRST?

14      *MR. FIFE:*  YES, THAT'S CORRECT.

15      *THE COURT:*  ALL RIGHT.  WE'LL JUST HAVE MS. HAYES STEP

16  OUT DURING HIS TESTIMONY, AND THEN WHEN HE IS COMPLETED,

17  MS. HAYES CAN REMAIN DURING REST OF THE PROCEEDINGS.

18      *(OFFICER HAYES EXITING COURTROOM.)*

19      *MR. FIFE:*  JUST TO BEGIN, YOUR HONOR, I HAVE PUT

20  TOGETHER A PACKET OF EXHIBITS.  SOME OF THESE ARE JUST SIMPLY

21  DUPLICATES OF MATERIALS IN THE CASE FILE HERE, BUT I FILED THEM

22  FOR THE COURT'S CONVENIENCE FOR THIS HEARING.  THERE ARE

23  ADDITIONAL ITEMS I WOULD BE SUBMITTING AS NEW EVIDENCE IN THIS

24  CASE.

25      *THE COURT:*  DO YOU HAVE A COPY FOR GOVERNMENT COUNSEL?

1          MR. FIFE:  I DO, YOUR HONOR.

2          THE COURT:  HAVE YOU IDENTIFIED THE EXHIBITS THAT ARE

3    ALREADY IN THE COURT FILE AS OPPOSED TO THE DOCUMENTS THAT

4    YOU'RE GOING TO BE SEEKING THE ADMISSION OF?

5          MR. FIFE:  YOUR HONOR, I THINK --

6          THE COURT:  WE CAN DO THIS AT ANOTHER -- OR DURING THE

7    HEARING, BUT ARE YOU PREPARED TO ANSWER THOSE QUESTIONS NOW?

8          MR. FIFE:  YES.  IN FACT, YOUR HONOR, EXHIBITS 1

9    THROUGH 7 ARE MATERIALS THAT ARE ALREADY IN THE RECORD.  8

10   THROUGH 12 ARE NEW THINGS THAT I AM OFFERING.

11         THE COURT:  ALL RIGHT.  AND SO, FIRST, WITH RESPECT TO

12   THE EXHIBITS 1 THROUGH 7, ARE THERE ANY OBJECTION TO THOSE,

13   MR. BETTWY, OR WOULD YOU LIKE SOME TIME TO REVIEW THOSE?

14         MR. BETTWY:  YES, YOUR HONOR.

15         THE COURT:  THEY HAVE BEEN PROVIDED TO COUNSEL.  1

16   THROUGH 7, THE REPRESENTATION IS THOSE ARE IN THE FILE, AND

17   THEN, 8 THROUGH 12 ARE ADDITIONAL DOCUMENTS YOU'RE SEEKING TO

18   INTRODUCE, AND I'LL ALLOW THE GOVERNMENT TO REVIEW THE

19   DOCUMENTS AND TO WEIGH IN BEFORE I RULE ON THEIR ADMISSION.

20         MR. FIFE:  OKAY.  THANK YOU, YOUR HONOR.  ALSO AT THE

21   BEGINNING, INITIALLY, WE WOULD LIKE TO, FOR THE RECORD, OBJECT

22   TO THE COURT'S DETERMINATION THAT THE MERITS OF THE CAT CLAIM

23   ARE NOT THE PROPER SCOPE OF THIS HEARING.  WE FEEL THAT IS NOT

24   IN CONFLICT WITH THE CASE LAW AND THE LAW OF THE CASE IN THIS

25   PARTICULAR INSTANCE AND THAT WE SHOULD -- THAT IS A PRIME

1 DETERMINATION AS TO WHETHER MR. OWINO IS LIKELY TO BE REMOVED.

2       *THE COURT:* I UNDERSTAND, AND YOUR OBJECTION IS NOTED,

3 SIR.

4       *MR. FIFE:* THANK YOU, YOUR HONOR.

5       THE PETITIONER WILL CALL PETITIONER SYLVESTER OWINO TO

6 THE STAND.

7   SYLVESTER OWINO, CALLED AS A WITNESS, TESTIFIES AS FOLLOWS:

8       *THE COURT:* PLEASE COME FORWARD, SIR.

9   *(WITNESS GIVEN AN OATH.)*

10       *THE CLERK:* PLEASE TAKE THE STAND. PLEASE STATE YOUR

11 FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

12       *THE WITNESS:* MY LAST NAME IS OWINO, O-W-I-N-O. FIRST

13 NAME IS SYLVESTER.

14                 DIRECT EXAMINATION

15 *Q.* *(BY MR. FIFE)* GOOD AFTERNOON, MR. OWINO.

16 *A.* GOOD AFTERNOON.

17 *Q.* ARE YOU THE PETITIONER IN THIS CASE?

18 *A.* YES, I AM.

19 *Q.* ARE YOU A CITIZEN OF KENYA?

20 *A.* YES, I AM.

21 *Q.* WHEN DID YOU LEAVE KENYA?

22 *A.* IN 1998, AROUND DECEMBER.

23 *Q.* DECEMBER OF '98. DO YOU HAVE ANY FAMILY REMAINING THERE IN

24 KENYA?

25 *A.* NOT THAT I KNOW OF. SOME OF MY FAMILY IS IN UGANDA AND

1   EUROPE.

2   *Q.*  DO YOU OWN ANY PROPERTY IN KENYA?

3   *A.*  NO, I DON'T.

4   *Q.*  DO YOU HAVE ANY JOB PROSPECTS IN KENYA THAT YOU KNOW OF?

5       *MR. BETTWY:*  YOUR HONOR, I'M JUST GOING TO OBJECT TO

6   RELEVANCE.

7       *THE WITNESS:*  NO.

8       *THE COURT:*  I'LL OVERRULE IT AT THIS TIME.  YOU MAY

9   CONTINUE.

10      *MR. FIFE:*  THANK YOU, YOUR HONOR.

11  *Q.  (BY MR. FIFE)*  ARE YOU AWARE OF WHETHER KENYA HAS ANY

12  SYSTEM OF SOCIAL WELFARE PAYMENTS, UNEMPLOYMENT OR --

13  *A.*  NOPE, THEY DON'T HAVE NONE.

14  *Q.*  OKAY.  MR. OWINO, DID ICE OFFICERS APPROACH YOU TO FILL OUT

15  AN APPLICATION FOR TRAVEL DOCUMENTS IN AUGUST OF 2006?

16  *A.*  YES, THEY DID.

17  *Q.*  DO YOU REMEMBER WHICH ICE OFFICER APPROACHED YOU AT THAT

18  TIME?

19  *A.*  OFFICER PADILLA.

20  *Q.*  AND WHAT DID YOU TELL OFFICER PADILLA WHEN HE ASKED YOU TO

21  FILL OUT THE TRAVEL DOCUMENT APPLICATION?

22  *A.*  I TOLD HIM --

23      *MR. BETTWY:*  OBJECTION.  HEARSAY, YOUR HONOR.

24      *THE COURT:*  OVERRULED.

25      *THE WITNESS:*  I TOLD HIM THAT I DIDN'T WANT TO FILL

1    THEM BECAUSE BY FILLING THEM, I WOULD LOSE MY RIGHT TO APPEAL.

2    SO I TOLD HIM I WAS SCARED TO GO BACK TO MY COUNTRY AND I

3    WANTED TO APPEAL MY CASE, SO I DIDN'T WANT TO SIGN THOSE TRAVEL

4    DOCUMENTS.

5    Q.   *(BY MR. FIFE)*  YOU REFUSED TO FILL THEM OUT?

6    A.   YES, I REFUSED.

7    Q.   DID YOU HAVE A LAWYER AT THAT TIME, MR. OWINO?

8    A.   NO, I DIDN'T HAVE NONE.

9    Q.   DID OFFICER PADILLA EXPLAIN TO YOU THAT SIGNING THE FORMS

10   WOULD NOT WAIVE YOUR APPEAL?

11   A.   NO.  WHEN I REFUSED, HE DIDN'T SAY NOTHING, JUST SENT ME

12   BACK.

13   Q.   OKAY.  DID YOU FILE A PETITION FOR REVIEW WITH THE NINTH

14   CIRCUIT?

15   A.   YES, I DID.

16   Q.   WOULD THAT BE ABOUT THREE WEEKS LATER, TO YOUR

17   RECOLLECTION?

18   A.   AROUND THAT TIME.  I BELIEVE AUGUST 29TH, AROUND THAT TIME.

19   Q.   OKAY.  AND AT THE SAME TIME, DID YOU ASK FOR A STAY OF

20   REMOVAL?

21   A.   YES, I DID.

22   Q.   AND DID YOU GET A TEMPORARY STAY?

23   A.   I DID GET A TEMPORARY STAY.

24   Q.   AND DO YOU RECALL DID THE COURT GRANT YOUR PERMANENT STAY?

25   A.   NO, THEY DENIED IT.

1   *Q.*  DO YOU REMEMBER WHEN THAT WAS?

2   *A.*  UH, I BELIEVE IN FEBRUARY 2007.

3   *Q.*  DID ICE RETURN WITH TRAVEL DOCUMENT REQUESTS AFTER THE STAY

4   WAS LIFTED?

5   *A.*  YES, THEY RETURN IN LATE LAST YEAR, LIKE 2008, AROUND

6   DECEMBER, THAT'S AROUND THE TIME THEY CAME BACK WITH THE TRAVEL

7   DOCUMENT.

8   *Q.*  OKAY.  SO IN 2008, THEY RETURNED WITH ANOTHER REQUEST?

9   *A.*  AROUND -- AROUND DECEMBER.

10  *Q.*  DID THEY AT ANY TIME BETWEEN THOSE DATES, FEBRUARY 2007 AND

11  2008, DID THEY REQUEST TRAVEL DOCUMENTS?

12  *A.*  NO, THEY DIDN'T.

13  *Q.*  ASK YOU FILL OUT THE APPLICATIONS?

14  *A.*  NO, NOBODY CAME TO ME.

15  *Q.*  SO WHEN THE -- ICE RETURNED IN AUGUST -- OR JANUARY 2008

16  WITH NEW TRAVEL DOCUMENT REQUESTS, WHICH OFFICER REQUESTED

17  THAT?

18  *A.*  CORONADO.

19  *Q.*  CORONADO.  WHAT DID YOU TELL OFFICER CORONADO WHEN HE

20  OFFERED YOU THESE APPLICATION FORMS?

21  *A.*  I ASKED HIM FOR LIKE A COUPLE OF DAYS SO THAT I COULD

22  CONTACT YOU SO THAT, UH -- SEE IF IT'S OKAY, BECAUSE I DIDN'T

23  KNOW.  I THOUGHT LIKE BY FILLING THEM, MAYBE I MESS UP, SO I

24  WANTED SOME TIME TO CONTACT YOU FIRST.

25  *Q.*  WAS I YOUR ATTORNEY REPRESENTING YOU AT THAT TIME?

1  *A.*  YES, YOU WERE.

2  *Q.*  AND THAT WAS ON THE HABEAS CORPUS THAT WAS --

3  *A.*  YES, SIR.

4  *Q.*  THIS CASE THAT IS FILED HERE?

5  *A.*  THIS CASE.

6  *Q.*  DID YOU CALL ME AFTER WHEN HE ASKED THAT?

7  *A.*  IMMEDIATELY.  WHEN THEY SENT ME BACK TO THE UNIT, I CALLED

8  YOU IMMEDIATELY.

9  *Q.*  OKAY.  WHAT DID I TELL YOU ABOUT THAT?

10 *A.*  YOU SAID, OH, BY SIGNING THAT THERE IS NO PROBLEM, GO AHEAD

11 AND SIGN THEM.

12 *Q.*  AND DID YOU SIGN THEM?

13 *A.*  YES, I DID.  AND THEN I WROTE THE REQUEST TO COME GET THEM,

14 BUT THEY NEVER CAME GOT THEM.

15 *Q.*  SO YOU SENT A WRITTEN REQUEST THAT THEY COME RETRIEVE THE

16 DOCUMENT?

17 *A.*  YES, I TOLD THEM I FILLED THE PAPERWORK ALREADY AND PLEASE

18 COME GET IT.

19       *MR. FIFE:*  YOUR HONOR, MAY I APPROACH THE WITNESS?

20       *THE COURT:*  YES.

21 *Q.*  (BY MR. FIFE)  MR. OWINO, DOES THIS LOOK LIKE THE DOCUMENT

22 YOU FILLED OUT AND PROFFERED BACK TO ICE?

23 *A.*  YES, SIR.

24 *Q.*  SO THIS IS AN APPLICATION FOR RENEWAL OF PASSPORT?

25 *A.*  YES, IT IS.

1          *MR. FIFE:*  THIS IS EXHIBIT 6 THAT WAS IN THE RECORD.

2  *Q.  (BY MR. FIFE)*  AND IN JANUARY 28 WHEN -- JANUARY OF 2008

3  WHEN YOU ASKED TO CALL YOUR ATTORNEY FIRST, WERE YOU SERVED

4  WITH A NOTICE A FAILURE TO DEPART?

5  *A.*  IMMEDIATELY.  HE SEND ME THE PAPER, FAILURE TO COMPLY.

6  *Q.*  SO THAT SAME DAY THAT THEY ASKED YOU?

7  *A.*  YES, SIR.

8  *Q.*  MR. OWINO, DID YOU EVER REFUSE TO BE REMOVED FROM THE

9  UNITED STATES?

10  *A.*  REFUSE?  I'M SCARED TO GO OVER THERE, BUT I TRIED TO GO TO

11  OTHER COUNTRIES.

12  *Q.*  SO YOU NEVER SAID THAT I WOULD NOT -- I REFUSE TO BE

13  DEPORTED?

14  *A.*  I TOLD THEM I WAS SCARED.  I DIDN'T WANT TO GO BACK TO

15  KENYA.

16  *Q.*  DID YOU OFFER TO GO TO ANOTHER COUNTRY BESIDES KENYA?

17  *A.*  YES, I TRIED APPLYING TO SO MANY COUNTRIES.

18          *MR. BETTWY:*  YOUR HONOR, OBJECT TO RELEVANCE.

19          *THE COURT:*  OVERRULED.

20  *Q.  (BY MR. FIFE)*  DID YOU MAKE ANY EFFORTS TO SEEK RELOCATION

21  IN A THIRD COUNTRY?

22  *A.*  YES, I TRIED.

23  *Q.*  HOW DID YOU DO THAT?

24  *A.*  I WENT TO THE LIBRARY, GOT ADDRESSES AND WROTE SOME LETTERS

25  AND SENT IT TO THOSE CONTINENTS.

1    *Q.* AND DID YOU GET ANY RESPONSES FROM THOSE COUNTRIES?

2    *A.* YES, I DID.

3         *MR. FIFE:* YOUR HONOR, MAY I APPROACH TO IDENTIFY THE

4    EXHIBIT?

5              *THE COURT:* YES, THOSE ARE -- IS THAT ONE THAT --

6              *MR. FIFE:* YES, THIS IS EXHIBIT 7, YOUR HONOR.

7              *THE COURT:* ALL RIGHT.

8    *Q.* *(BY MR. FIFE)* IF YOU COULD LOOK AT EXHIBIT 7, MR. OWINO.

9    COULD YOU TELL US WHAT THOSE DOCUMENTS ARE?

10   *A.* THESE ARE RESPONSES FROM THE COUNTRIES THAT I TRIED TO

11   APPLYING TO.

12   *Q.* SO THOSE ARE COPIES OF THE LETTERS THAT YOU GOT FROM THE --

13   *A.* YES, SIR.

14   *Q.* -- FROM THE EMBASSIES AND -- OKAY. MR. OWINO, WHY DID YOU

15   TRY TO FIND A THIRD COUNTRY TO BE REMOVED TO?

16   *A.* BECAUSE I WAS SCARED TO GO BACK TO MY COUNTRY. THEY'VE GOT

17   PROBLEMS OVER THERE.

18   *Q.* DID THE ICE OFFICERS ASSIST YOU IN MAKING EFFORTS IN

19   SENDING OUT THESE LETTERS?

20   *A.* NO, NOBODY HELPED. JUST DID IT BY MYSELF.

21   *Q.* WHAT ABOUT AFTER THE -- THIS PETITION WAS FILED IN THIS

22   CASE, DID YOU GET ANY ASSISTANCE FOR RELOCATION TO A THIRD

23   COUNTRY?

24   *A.* FROM ICE?

25   *Q.* AFTER THIS PETITION WAS FILED?

1    *A.* YES.  I THINK -- I BELIEVE THIS YEAR, THEY TRIED ONE

2    COUNTRY, ENGLAND.

3    *Q.* WAS THAT ONE THE COUNTRIES YOU HAD WRITTEN TO BEFORE?

4    *A.* YES, I DID.

5    *Q.* WHAT HAPPENED TO THAT -- WHEN YOU -- WHEN THEY ASKED YOU TO

6    PARTICIPATE IN APPLYING TO THE UNITED KINGDOM, DID YOU FILL OUT

7    FORMS?

8    *A.* YEAH, THEY GAVE ME FORMS, AND I FILL THEM OUT, AND I GAVE

9    THEM MY BROTHER'S PHONE NUMBER AND EVERYTHING.  SO I GAVE THE

10   APPLICATION TO HAYES, AND SHE TOOK THE APPLICATION.

11   *Q.* YOUR BROTHER'S ADDRESS?  WHY DID YOU GIVE YOUR BROTHER'S

12   ADDRESS?

13   *A.* BECAUSE IT WAS UNITED KINGDOM, AND I NEEDED TO CONTACT MY

14   BROTHER BECAUSE THEY MIGHT ACCEPT ME BECAUSE HE'S OVER THERE.

15   *Q.* AND DO YOU KNOW WHAT HAPPENED AS A RESULT OF SUBMITTING

16   THAT APPLICATION TO THE UNITED KINGDOM?

17   *A.* AFTER SOME TIME, THEY DENIED ME.

18   *Q.* THEY DENIED.  DID ANY OF THESE COUNTRIES THAT YOU APPLIED

19   TO ASK FOR DOCUMENTS, THE TRAVEL DOCUMENTS, IDENTITY DOCUMENTS?

20   *A.* THEY TOLD ME, LIKE I HAVE TO BE IN THEIR TERRITORY, SO THAT

21   IS WHY I TRIED TO GET A PASSPORT.  AND I CONTACTED MY EMBASSY

22   TO GET A PASSPORT TO LEAVE THE TERRITORY.

23   *Q.* DO YOU HAVE A PASSPORT NOW?

24   *A.* NO.

25   *Q.* WHAT HAPPENED TO YOUR PASSPORT?

1    *A.*  WHEN I GOT ARRESTED IN 2003, IT GOT LOST.

2    *Q.*  DID YOU TRY TO REPLACE THAT PASSPORT?

3    *A.*  I -- I TRIED BY ASKING ICE TO HELP ME GET A POLICE REPORT,

4    BECAUSE THE CONSULATE WANTED A POLICE REPORT AND SOME OTHER

5    STUFF, DOCUMENTS WHICH I HAD TO REPLACE THE PASSPORT, GIVE ME A

6    NEW PASSPORT.

7    *Q.*  SO YOU CONTACTED KENYAN CONSULATE ABOUT THE MISSING

8    PASSPORT?

9    *A.*  YEAH, I WANTED TO REPLACE THE PASSPORT AND I ASKED THEM,

10   WHAT ARE THE REQUIREMENTS.  THEY TOLD ME I NEEDED A POLICE

11   REPORT AND FORMS AND ALL THAT STUFF.

12   *Q.*  DO YOU KNOW WHO YOU SPOKE TO?

13   *A.*  ALICENT ODIPO.

14       *(COURT REPORTER INTERRUPTION.)*

15           *THE COURT:*  PLEASE REPEAT THE NAME, PLEASE.

16           *THE WITNESS:*  ALICENT ODIPO. A-L-I-C-E-N-T O-D-I-P-O.

17   *Q.*  (BY MR. FIFE)  AND MS. ODIPO TOLD YOU THAT THEY NEED A

18   POLICE REPORT?

19   *A.*  ONLY TO REPLACE THE PASSPORT.

20   *Q.*  YES, TO REPLACE THE PASSPORT.

21   *A.*  YES THEY DO.

22   *Q.*  IN FACT, DID THE CONSULATE SEND A LETTER TO YOU STATING THE

23   SAME THING, THAT YOU NEEDED A POLICE REPORT OR THAT YOU NEEDED

24   SOME SORT OF DOCUMENTATION OF THE MISSING PASSPORT?

25   *A.*  YEAH, THEY SENT A LETTER FROM THAT, AND THEY ALSO SAID LIKE

1 ONCE APPEAL IS PENDING, THEY CANNOT ISSUE TRAVEL DOCUMENTS.

2 *Q.* SO DID YOU TRY TO OBTAIN A POLICE REPORT?

3 *A.* YES, I TRIED.

4 *Q.* AND WHAT HAPPENED? DID YOU -- HOW DID YOU TRY TO GET THE

5 POLICE REPORT?

6 *A.* I CONTACTED LA MESA, UH, PD, AND, UH, I MADE A PHONE CALL.

7 THEY GAVE ME THE NUMBER. SO WHEN I WAS TALKING TO THEM, LIKE

8 MAYBE TWO DAYS LATER, DEPORTATION HAYES CAME AND TOLD ME I'M

9 NOT SUPPOSED TO CONTACT THE LA MESA POLICE DEPARTMENT.

10 *Q.* AND DID YOU CONTACT THE LA MESA POLICE?

11 *A.* YES, I DID.

12 *Q.* AND WHAT DID THEY -- WHAT DID THEY TELL YOU THEY NEEDED TO

13 GET A POLICE REPORT?

14 *A.* THEY SAID I NEEDED A POLICE REPORT.

15 *Q.* DID THEY ASK YOU TO SUBMIT SOMETHING IN ORDER TO GET THE

16 POLICE REPORT?

17 *A.* ID. THEY TOLD ME TO PRODUCE AN ID. I TOLD THEM I DIDN'T

18 HAVE NO ID. AND I WROTE A REQUEST TO ICE TO HELP ME GET A

19 POLICE REPORT.

20 *Q.* DID YOU FILL OUT AN AFFIDAVIT IN SUPPORT OF OBTAINING A

21 POLICE REPORT?

22 *A.* YES, THOSE ARE PART OF THE REQUIREMENTS, SO I MADE ALL

23 THOSE, AND THE ONLY THING I WAS LACKING WAS A POLICE REPORT.

24 *Q.* AND DID YOU SUBMIT THAT AFFIDAVIT TO OBTAIN THE POLICE

25 REPORT?

1   *A.* YES, I SENT THEM TO THE KENYAN EMBASSY, BUT THEY SAID, NO,

2   YOU NEED A POLICE REPORT.

3   *Q.* AND -- ALL RIGHT. DID YOU REQUEST ICE' ASSISTANCE IN

4   SENDING YOUR REQUEST FOR POLICE REPORT?

5   *A.* YES, I DID. I WROTE THEM A REQUEST, AND ONCE I THOUGHT OF

6   CONTACTING THEM THE LA MESA POLICE, MS. HAYES, SHE CAME AND

7   TOLD ME, HEY, YOU NEED TO STOP CONTACTING LA MESA POLICE, AND

8   YOU NEED TO STOP CONTACTING THE EMBASSY. I TOLD HER, I NEED A

9   POLICE REPORT. I NEED A PASSPORT. I NEED TO GO TO ANOTHER

10  COUNTRY. SHE SAID, NO, YOU DON'T NEED TO DO THAT. DON'T CALL

11  THEM NO MORE. SO I STOPPED CALLING.

12  *Q.* BUT PREVIOUSLY, YOU HAD CONTACTED THE EMBASSY AND THE

13  CONSULATE ABOUT THE CASE?

14  *A.* YES, I DID. I CONTACTED THEM WHEN I WAS ASKING FOR A

15  POLICE REPORT. AND ONE TIME WHEN I CONTACTED THEM, THEY SAID,

16  LIKE, IS YOUR CASE OVER OR WHAT? I SAID, NO, MY CASE IS NOT

17  OVER. IT IS ON APPEAL. WHY DO YOU NEED A PASSPORT? I SAID, I

18  WANT TO GO TO ANOTHER COUNTRY BECAUSE I'M SCARED TO GO TO

19  KENYA. THAT'S WHEN THEY TOLD ME, OKAY, THE REQUIREMENTS YOU

20  NEED. THAT IS WHEN THEY TOLD ME, YOU NEED A POLICE REPORT,

21  AFFIDAVIT, AND ALL THAT STUFF. THAT'S WHY I WAS PUTTING

22  EVERYTHING TOGETHER.

23  *Q.* SO YOU CONTACTED PEOPLE AT THE EMBASSY IN WASHINGTON?

24  *A.* YES, I DID.

25  *Q.* DO YOU KNOW WHO YOU TALKED TO THERE?

1    *A.*  FELISINA NDWIGA.

2    *Q.*  AND YOU ALSO SPOKE TO PEOPLE AT THE CONSULATE IN

3    LOS ANGELES?

4    *A.*  YES, BEFORE.

5    *Q.*  WHAT DID THEY TELL YOU ABOUT THEIR POLICY ABOUT TAKING

6    DEPORTEES BACK?

7    *A.*  THEY TOLD ME LIKE --

8         *MR. BETTWY:*  OBJECTION, YOUR HONOR.  HEARSAY.

9         *THE COURT:*  IS THAT UNDER FEDERAL RULES OF EVIDENCE,

10   IS THAT THE OBJECTION?

11        *MR. BETTWY:*  YES, YOUR HONOR.

12        *THE COURT:*  DO THEY APPLY IN THIS PROCEEDING UNDER

13   1101(D)?

14        *MR. BETTWY:*  I DON'T KNOW, YOUR HONOR.

15        *MR. FIFE:*  I WOULD SAY, IN ANY CASE, YOUR HONOR THIS

16   IS COVERED BY AN EXCEPTION BECAUSE THESE ARE COMMUNICATIONS

17   THAT WERE MADE OFFICIAL DUTY OF THE KENYAN MISSION.

18        *THE COURT:*  I DON'T -- I THINK IF THE RULES APPLY, I

19   DON'T KNOW THAT THAT WOULD BE AN EXCEPTION TO THE HEARSAY RULE.

20   BUT UNDER 1101(D) WHERE THEY TALK ABOUT THE FEDERAL RULES OF

21   EVIDENCE AND THEY TALK ABOUT THE RULES BEING INAPPLICABLE AND

22   THEN THEY TALK ABOUT THAT THE RULES DO NOT APPLY IN THE

23   FOLLOWING SITUATIONS:

24        PRELIMINARY QUESTIONS OF FACT, WHICH IS THE

25   DETERMINATION OF QUESTIONS OF FACT PRELIMINARY TO THE

1  ADMISSIBILITY OF EVIDENCE WHEN THE ISSUE IS TO BE DETERMINED BY

2  THE COURT UNDER RULE 1104.

3       TWO, IS GRAND JURY.

4       THREE, IS MISCELLANEOUS PROCEEDINGS, PROCEEDINGS FOR

5  EXTRADITION OR INDITION, PRELIMINARY EXAMINATIONS IN CRIMINAL

6  CASES, SENTENCING OR GRANTING OR REVOKING PROBATION, ISSUANCE

7  OF WARRANTS FOR ARREST, CRIMINAL SUMMONS AND SEARCH WARRANTS

8  PROCEEDINGS WITH RESPECT TO RELEASE ON BAIL AND OTHERWISE.

9       THIS PROCEEDING, BECAUSE IT'S NOT A TYPICALLY HELD

10  PROCEEDING, IT DOESN'T FALL EXACTLY WITHIN ANY OF THOSE

11  PARTICULAR EXCEPTIONS, BUT IT CERTAINLY DOES SEEM TO BE THAT IT

12  COULD BE FAIRLY CLASSIFIED AS A MISCELLANEOUS PROCEEDING, AND

13  SO I WILL OVERRULE YOUR OBJECTION AND, CERTAINLY, TO THE EXTENT

14  THAT IT'S NOT -- THAT THE STATEMENT MAY BE CONSIDERED HEARSAY

15  UNDER THE RULES OF EVIDENCE, I'LL OVERRULE THE OBJECTION.  I

16  THINK SOME OF THIS MAY TO GO TO THE WEIGHT OF THE EVIDENCE, BUT

17  I'LL OVERRULE YOUR OBJECTION.

18       *MR. BETTWY:*  AND IF I COULD JUST COMPLETE THE RECORD.

19  NOW, YOUR HONOR, I UNDERSTAND WHAT YOU'RE ASKING.  I'M NOT FOR

20  RECONSIDERATION.  BUT I DO RECALL RESEARCHING THIS WITH RESPECT

21  TO WHETHER HABEAS PETITIONS NEED TO BE SERVED UNDER THE FEDERAL

22  RULES OF CIVIL PROCEDURE AND FIND THAT THE LAW WAS NOT CLEAR ON

23  THAT QUESTION, AND IT SEEMED TO TURN ON WHETHER THERE HAS BEEN

24  A CUSTOM AND PRACTICE THAT --

25       *THE COURT:*  BUT THAT DEALS WITH THE SERVICE OF THE

1  PETITION?

2      *MR. BETTWY:*  AS WELL WE COULDN'T FIND ANY SPECIFIC

3  RULE OR CASE LAW CONCERNING WHETHER A HABEAS PETITION NEEDED TO

4  BE SERVED UNDER RULE 4, JUST LIKE ANY OTHER INITIATING

5  DOCUMENT.

6      *THE COURT:*  SO AT THIS POINT, I'LL OVERRULE IT.  I

7  UNDERSTAND YOUR OBJECTION TO BE A HEARSAY OBJECTION UNDER THE

8  FEDERAL RULES OF EVIDENCE PURSUANT 1101.  I'LL OVERRULE THE

9  OBJECTION, HEAR THE EVIDENCE AND, OBVIOUSLY, WILL CONSIDER THE

10  WEIGHT -- ANY OF THESE ADMISSIONS AS THEY GO TO THE WEIGHT OF

11  THE EVIDENCE.  BUT THAT IS A LONG WAY OF SAYING, YOUR OBJECTION

12  TO THE HEARSAY OBJECTION UNDER THE FEDERAL RULES OF EVIDENCE IS

13  OVERRULED.

14      *MR. BETTWY:*  THANK YOU, YOUR HONOR.

15      *MR. FIFE:*  THANK YOU, YOUR HONOR.

16  *Q.*  *(BY MR. FIFE)*  WHAT DID THE KENYAN EMBASSY OFFICIALS OR

17  THE CONSULATE OFFICIALS TELL YOU ABOUT THEIR POLICY ABOUT

18  RETURNING DEPORTEES?

19  *A.*  THEY TOLD ME, AS LONG AS YOU HAVE AN APPEAL PENDING, THEY

20  DON'T GIVE TRAVEL DOCUMENTS.

21  *Q.*  OKAY.  AND DO YOU REMEMBER WHICH OFFICIALS TOLD YOU THIS?

22  *A.*  UM, ALICENT ODIPO AND FELISINA NDWIGA.

23  *Q.*  SO MS. ODIPO AND MS. NDWIGA BOTH TOLD YOU THAT?

24  *A.*  YES, SIR.

25  *Q.*  DID YOU SEND EITHER TO THE CONSULATE OR THE EMBASSY ANY

1 DOCUMENTS CONFIRMING THAT YOUR APPEAL WAS PENDING?

2 *A.* YES. BECAUSE WHEN THEY ASKED FOR POLICE REPORT IT WAS

3 LIKE, WHY? YOUR CASE -- THE GOVERNMENT CALLED AND SAID YOUR

4 CASE IS FINALIZED. I SAID, NO. MATTER OF FACT, I JUST GOT A

5 RESPONSE FROM THE NINTH CIRCUIT, DO YOU WANT TO SEE THEY SAID,

6 OKAY, NO PROBLEM. SEND IT TO US. THAT IS WHEN I SENT IT TO

7 THEM.

8 *Q.* OKAY. DID ANY OF THE OFFICIALS, EITHER THE AT CONSULATE OR

9 THE EMBASSY, EVER SAY TO YOU THAT THEY WOULD REPATRIATE YOU,

10 RETURN YOU TO KENYA, IF YOU SAID, I WOULD LIKE TO RETURN HOME?

11 *A.* NOBODY TOLD ME THAT.

12 *Q.* MR. OWINO, DO YOU WANT TO RETURN TO KENYA AT THIS TIME?

13 *A.* NO.

14 *Q.* WHY NOT?

15 *A.* MY LIFE WOULD BE OVER. THE POLICE WOULD KILL ME.

16 *Q.* OKAY.

17      *MR. FIFE:* THAT'S ALL THE QUESTIONS, YOUR HONOR.

18      *THE COURT:* THANK YOU. CROSS-EXAMINATION, COUNSEL?

19      *MR. BETTWY:* THANK YOU, YOUR HONOR. YOUR HONOR, I

20 MAY?

21      *THE COURT:* YES.

22                CROSS-EXAMINATION

23 *Q.* *(BY MR. BETTWY)* MR. OWINO, GOOD AFTERNOON.

24 *A.* GOOD AFTERNOON.

25 *Q.* HAS THE GOVERNMENT OF KENYA, ANYONE YOU HAVE SPOKEN WITH AT

1 GOVERNMENT OF KENYA EVER DENY THAT YOU ARE A CITIZEN OF KENYA?

2 *A.* HAVE EVER DENIED? THEY NEVER DENIED.

3 *Q.* AND WHEN YOU CAME TO THE UNITED STATES, YOU CAME ON A VISA

4 THAT WAS ISSUED TO YOU BY THE U.S. GOVERNMENT, CORRECT?

5 *A.* YES, I DID.

6 *Q.* AND YOU OBTAINED THAT AT THE U.S. EMBASSY IN NAIROBI?

7 *A.* YES.

8 *Q.* WHEN YOU MADE AN APPLICATION FOR THAT VISA YOU PRESENTED

9 YOUR KENYAN PASSPORT, CORRECT?

10 *A.* YES, I DID.

11      *THE COURT:* EXCUSE ME, SIR. COULD YOU SPEAK MORE

12 LOUDLY INTO THE MICROPHONE. THANK YOU, SIR.

13 *Q.* *(BY MR. BETTWY)* AND YOU STILL HAVE A COPY OF YOUR KENYAN

14 PASSPORT, DON'T YOU?

15 *A.* YES, I DO.

16 *Q.* A FULL COPY OF THAT?

17 *A.* UM-HMM.

18 *Q.* IS THAT "YES"?

19 *A.* YES.

20 *Q.* WHERE IS THAT COPY?

21 *A.* IT'S -- I HAVE IT OVER THERE AT THE UNIT. IT'S IN MY

22 IMMIGRATION FILE.

23 *Q.* HAVE YOU GIVEN YOUR ATTORNEY A COPY OF THE FULL PASSPORT?

24 DOES YOUR ATTORNEY HAVE A COPY OF THE PASSPORT?

25 *A.* I BELIEVE HE DOES WITH SOME PAPERWORK.

1  *Q.* HAVE YOU EVER GIVEN A COPY OF THE PASSPORT TO ANY ICE

2  OFFICIALS?

3  *A.* NO, BUT I WHEN I WAS PROCEEDING IN MY IMMIGRATION CASE, IT

4  WAS ATTACKING MY ASYLUM APPLICATION.

5  *Q.* OKAY. A COPY OF THE ENTIRE PASSPORT?

6  *A.* YES, IN MY ASYLUM APPLICATION.

7  *Q.* SO INCLUDING THE FIRST PAGE OF THE PASSPORT THAT SHOWS YOUR

8  BIOGRAPHICAL INFORMATION?

9  *A.* YES, THE PASSPORT IS THERE IN MY ASYLUM APPLICATION.

10  *Q.* OKAY. NOW MR. FIFE, YOUR ATTORNEY, ASKED ABOUT WHEN YOU

11  REFUSED TO SIGN THE APPLICATION FOR A REPLACEMENT PASSPORT IN

12  2006. YOU WERE CONCERNED BY DOING SO YOU WOULD BE RETURNED TO

13  KENYA; IS THAT CORRECT?

14  *A.* UM, IT WASN'T A REQUEST FOR A NEW PASSPORT. IT WAS FOR

15  TRAVEL DOCUMENTS. IT WASN'T A REPLACEMENT OF PASSPORT.

16  *Q.* YOU WERE CONCERNED IF YOU SIGNED THOSE PAPERS YOU WOULD BE

17  SENT BACK TO KENYA?

18  *A.* YES. AND I'D LOSE MY RIGHT TO APPEAL. MY APPEAL WOULD BE

19  MOOT.

20  *Q.* RIGHT. I UNDERSTAND. BUT AT THAT TIME YOU BELIEVED IF YOU

21  SIGNED THOSE -- THAT APPLICATION YOU WOULD BE RETURNED TO

22  KENYA?

23  *A.* I WOULD BE RETURNED TO KENYA, AND I WOULD LOSE THE RIGHT TO

24  APPEAL.

25  *Q.* ALL RIGHT. IN OTHER WORDS, YOU HAD NO REASON TO BELIEVE

1   THAT YOU WOULD NOT BE SENT BACK TO KENYA?

2   A.  COULD YOU REPEAT YOUR QUESTION AGAIN?

3   Q.  DID YOU HAVE ANY REASON TO BELIEVE AT THAT TIME THAT THE

4   UNITED STATES WOULD BE UNABLE TO SEND YOU BACK TO KENYA?

5   A.  IT DIDN'T COME TO MY MIND, NO.

6   Q.  OKAY.  AND YOU APPEALED TO THE NINTH CIRCUIT?

7   A.  YES, I DID.

8   Q.  AND YOU APPLIED FOR A STAY OF REMOVAL, CORRECT?

9   A.  YES, I DID.

10  Q.  BECAUSE YOU WERE CONCERNED IF YOU DID NOT, YOU WOULD BE

11  RETURNED TO KENYA, CORRECT?

12  A.  YES.

13  Q.  SO YOU CONTINUED TO BELIEVE THAT ICE COULD RETURN YOU TO

14  KENYA IF YOU HAD NO STAY, CORRECT?

15  A.  I GUESS.

16  Q.  AND THEN THE NINTH CIRCUIT IN JUNE OF 2007 DENIED YOUR STAY

17  REQUEST, CORRECT?

18  A.  THEY DENIED MY STAY, YEAH.

19  Q.  AND YOU UNDERSTOOD AT THAT TIME THAT ICE THEN HAD AUTHORITY

20  TO REMOVE YOU TO KENYA, CORRECT?

21  A.  YES, SIR.

22  Q.  AND THAT IS WHEN YOU STARTED WRITING TO OTHER GOVERNMENTS,

23  THE THIRD COUNTRIES SEEKING ASYLUM; IS THAT CORRECT?

24  A.  I BELIEVE I STARTED WRITING THEM BEFORE THEY DENIED MY

25  ASYLUM -- BEFORE THEY DENIED MY STAY.

1  *Q.* LET ME ASK YOU TO LOOK AT EXHIBIT B IN THAT STACK OF

2  DOCUMENTS THAT I GAVE YOU THERE. DO YOU SEE THAT DOCUMENT

3  BEHIND TAB B?

4  *A.* YES, THE SUPREME DOCUMENT.

5  *Q.* YES. DESCRIBE WHAT THAT IS?

6  *A.* THIS WAS A LETTER THAT I WROTE TO THE SUPREME CONSULATE

7  BECAUSE I HAD ASYLUM OVER THERE, AND THEY TOLD ME, LIKE THEY

8  WAS GOING TO CONTACT ME ONCE THEY MAKE A FINAL DECISION. SO I

9  WAS TELLING THEM OVER HERE, HEY, WHAT'S THE SITUATION WITH MY

10  APPLICATION BECAUSE I MIGHT BE REMOVED SOON.

11  *Q.* IS -- OKAY. SO, IN FACT, YOU SAY IN THIS LETTER STARTING

12  AT THE END OF LINE 2, I AM AT THE VERGE OF BEING DEPORTED TO

13  KENYA ANY TIME SOON, CORRECT?

14  *A.* UM-HMM.

15  *Q.* SO THAT WAS -- THAT'S A "YES"? I'M SORRY IT'S -- THIS IS

16  BEING TAKEN DOWN.

17  *A.* YES.

18  *Q.* OKAY. SO YOU WROTE THAT IN AUGUST 1 OF 2007?

19  *A.* YES, SIR.

20  *Q.* AND SO AT THAT TIME, YOU BELIEVED THAT THE UNITED STATES

21  GOVERNMENT WAS CAPABLE OF SENDING YOU BACK TO KENYA?

22  *A.* YES. AND I WAS TRYING TO -- I WAS TRYING TO MAKE THEM

23  HURRY UP AND TRY TO HELP ME BECAUSE I WAS TELLING THEM, HEY, MY

24  LIFE IS IN DANGER RIGHT HERE. PLEASE MAKE A DECISION.

25  *Q.* AND ON JANUARY 18, 2008, MR. FIFE, YOUR ATTORNEY, ASKED YOU

```
 1   ABOUT, AGAIN, YOUR REFUSAL TO SIGN, I BELIEVE THIS TIME, IT WAS
 2   AN APPLICATION FOR A NEW KENYAN PASSPORT, CORRECT?
 3   A.  YES, SIR.
 4   Q.  AND YOUR CONCERN WAS THAT IF YOU SIGNED THAT YOU WOULD BE
 5   RETURNED TO KENYA AND LOSE YOUR RIGHT TO APPEAL, I UNDERSTAND.
 6   BUT YOU --
 7   A.  I UNDERSTAND -- I JUST DIDN'T KNOW BECAUSE MR. DEMPS WAS MY
 8   LAWYER -- MR. FIFE WAS MY LAWYER, AND I WAS JUST CONFUSED, SO I
 9   ASKED CORONADO, PLEASE GIVE ME SOME TIME SO THAT I CONSULT HIM
10   AND SEE IF SIGNING WAS OKAY.
11   Q.  OKAY.  BUT YOU FINALLY SIGNED IT BECAUSE YOUR ATTORNEY
12   ADVISED YOU TO SIGN IT, CORRECT?
13   A.  YES, SIR.
14   Q.  AND THEN AFTER THAT, YOU STARTED HAVING VERBAL
15   COMMUNICATIONS WITH THE KENYAN CONSULATE, CORRECT?
16   A.  YES, SIR.
17   Q.  IN FACT, LET ME TAKE YOU TO EXHIBIT E.  DO YOU HAVE THAT?
18   A.  YES, SIR.
19   Q.  CAN YOU DESCRIBE WHAT THAT IS?
20   A.  THIS WAS TO DEPORTATION OFFICER VILLA TO HELP ME GET A
21   POLICE STATEMENT.
22   Q.  THAT IS A LETTER FROM YOU?  IT'S WRITTEN BY YOU, CORRECT?
23   A.  YEAH, TO DEPORTATION OFFICER VILLA.
24   Q.  AND IN THE SECOND PARAGRAPH IN THE SECOND LINE IN THE
25   MIDDLE THE SENTENCE BEGINS, I HAVE CONTACTED THE KENYAN
```

 1  CONSULATE FOR OBTAINING A NEW PASSPORT, CORRECT?

 2  *A.*  YES, SIR.

 3  *Q.*  AND YOU HAD CONTACTED THE KENYAN CONSULATE?

 4  *A.*  YES.  AND THEY TOLD ME THE REQUIREMENTS WAS TO OBTAIN A

 5  POLICE REPORT. OKAY.

 6  *Q.*  AND DID YOU OBTAIN A POLICE REPORT?

 7  *A.*  I DID.

 8  *Q.*  HAVE YOU OBTAINED A POLICE REPORT?

 9  *A.*  YES.

10  *Q.*  I'M SORRY.  HAVE YOU MADE A POLICE REPORT?

11  *A.*  HAVE I MADE A POLICE REPORT?

12  *Q.*  YES.

13  *A.*  ICE GAVE ME A POLICE REPORT.  I DIDN'T MAKE ONE.  ICE GAVE

14  ME A POLICE REPORT.

15  *Q.*  LET'S SEE.  LET'S FIND OUT WHAT THIS IS.  EXHIBIT K.  DO

16  YOU SEE THAT?

17  *A.*  YES, SIR.

18  *Q.*  AND WHAT IS THAT?

19  *A.*  THAT'S A POLICE REPORT, UM, OFFICE- -- DEPORTATION OFFICER

20  MELANDRES, HE BROUGHT IT TO ME. DEPORTATION OFFICER MELANDRES

21  HE BROUGHT IT FOR ME.

22  *Q.*  OKAY.  AND THAT WAS A POLICE REPORT MADE TO THE LA MESA

23  POLICE DEPARTMENT, CORRECT?

24  *A.*  I DON'T KNOW WHERE HE MADE IT FROM.  HE JUST CAME.  I WAS

25  WORKING THE KITCHEN.  I WAS WORKING IN CCA.  HE TOLD ME, OWINO,

1  I'VE GOT SOMETHING FOR YOU.  I GOT IT FOR YOU.  I DON'T KNOW

2  WHERE HE GOT IT FROM.

3  *Q.*  SO THAT'S ALL YOU KNOW ABOUT THIS POLICE REPORT?

4  *A.*  HE GAVE IT TO ME, YEAH.  HE CAME TO ME AND GAVE IT TO ME.

5  *Q.*  SO IN THE NARRATIVE, DO YOU SEE IN THE MIDDLE THERE IT

6  SAYS, OWINO -- HOW DO YOU PRONOUNCE YOUR LAST NAME, SIR?

7  *A.*  YOU'RE CORRECT, OWINO.

8  *Q.*  OWINO REPORTS THAT BETWEEN THE LIST OF DATES AND TIMES HE

9  LOST HIS KENYAN PASSPORT.  SO YOU'RE SAYING THAT IS INCORRECT?

10  YOU DIDN'T REPORT ANYTHING TO ANYBODY?

11  *A.*  TO THE POLICE.

12  *Q.*  YOU DIDN'T REPORT TO THE POLICE ANYTHING?

13  *A.*  ONLY IN CUSTODY.  ALL THE TIME I'VE BEEN IN CUSTODY.

14  *Q.*  BUT YOU MADE -- YOU NEVER REPORTED ANYTHING TO THE LA MESA

15  POLICE DEPARTMENT ABOUT THE LOSS OF YOUR PASSPORT?

16  *A.*  I JUST CALLED THEM, AND I TOLD THEM I LOST MY PASSPORT AND

17  I NEED A POLICE REPORT.

18  *Q.*  WHO DO YOU CALL?

19  *A.*  LA MESA POLICE.

20  *Q.*  SO YOU DID REPORT IT TO THE LA MESA POLICE?

21  *A.*  I CALLED THEM, YES, AND THAT'S WHEN MS. HAYES CAME AND TOLD

22  ME, STOP CALLING THEM.

23  *Q.*  DID YOU EVER RECEIVE ANYTHING IN WRITING FROM THE KENYAN

24  CONSULATE ASKING YOU FOR A POLICE REPORT?

25  *A.*  NO, THEY TOLD ME, LIKE GO TO THE INTERNET.  THERE IS A FORM

1   PPA FOR PASSPORT APPLICATIONS, WHICH ICE DIDN'T GET ME.  SO HE

2   SAID THE REQUIREMENTS FOR OF REPLACING A LOST PASSPORT ARE

3   POLICE REPORT, UM, DECLARATION, AFFIDAVIT, AND ALL THIS STUFF.

4   *Q.*  OKAY.  SO YOU GOT THAT INFORMATION ABOUT NEEDING A POLICE

5   REPORT FROM THE WEB SITE, CORRECT?

6   *A.*  IT TOLD ME -- I SAID -- I ASKED THEM, PLEASE SEND ME THE

7   PACKAGE.  THEY SAID, NO, JUST GO TO THE INTERNET.  THEY HAVE

8   SOME ON THE INTERNET.

9   *Q.*  OKAY.  DO YOU UNDERSTAND MY QUESTION?  NO ONE -- NOBODY AT

10   THE KENYAN CONSULATE SPECIFICALLY TOLD YOU TO GET A POLICE

11   REPORT, CORRECT?  THEY TOLD YOU TO GO TO THE WEB SITE?

12   *A.*  THEY TOLD ME THE REQUIREMENTS.  I TOLD THEM, SEND ME THE

13   FORMS.  THEY SAID, YOU CAN GET THEM ON THE INTERNET.

14   *Q.*  ALL RIGHT.

15   *A.*  WHICH WE HAVE A LIBRARY.  THAT'S WHAT THEY GAVE ME.

16   *Q.*  AND THEN IN MAY OF 2008, YOU CALLED A FEMALE -- HOW DO YOU

17   PRONOUNCE HER NAME?

18   *A.*  FELISINA NDWIGA.

19   *Q.*  NDWIGA?

20   *A.*  NDWIGA, YES, SIR.

21   *Q.*  AT THE CONSULATE IS IT THE EMBASSY OR CONSULATE?

22   *A.*  EMBASSY.

23   *Q.*  IN WASHINGTON D.C.?

24   *A.*  YES, SIR.

25   *Q.*  AND YOU TOLD HER YOU HAD AN APPEAL PENDING; IS THAT

1   CORRECT?

2   *A.* YES, I DID.

3   *Q.* AND YOU -- YOU SAY YOU HAD A FAX SENT TO THEM; IS THAT

4   CORRECT?  HOW DID YOU SEND THEM A COPY OF THE NINTH CIRCUIT

5   ORDER?

6   *A.* REGULAR MAIL, REGULAR CCA DETAINEE MAIL.

7   *Q.* LET'S GO TO EXHIBIT H -- I'M SORRY.  LET'S GO TO EXHIBIT I.

8   IS THIS THE -- CAN YOU DESCRIBE WHAT THIS IS?

9   *A.* THIS IS WHAT I SENT THEM.

10  *Q.* OKAY.  I'M LOOKING AT THE TOP AND THE BOTTOM.  THERE SEEMS

11  TO BE FAX INFORMATION, SOMETHING -- IT'S -- THE NUMBER IS THE

12  PHONE NUMBER IS BLOCKED OUT, SO I CAN'T TELL FROM WHERE IT WAS

13  SENT.  BUT IT INDICATES THAT SOMETHING WAS FAXED, THIS WAS

14  FAXED EITHER TO OR FROM A KENYAN EMBASSY ON MAY 28, 2008.  DOES

15  THAT REFRESH YOUR MEMORY AT ALL?

16  *A.* I DID NOT FAX THEM.  I JUST SENT THEM.

17  *Q.* DID YOU ASK -- YOU'RE SURE YOU DIDN'T ASK AN OFFICER TO FAX

18  SOMETHING FOR YOU?

19  *A.* NO.

20  *Q.* DO YOU HAVE ACCESS TO FAX?

21  *A.* WE DON'T HAVE, NO.

22  *Q.* OKAY.  AND WHAT -- DID YOU SEND A LETTER THAT ACCOMPANIED

23  THIS FAX?

24  *A.* THAT'S NOT A LETTER.

25  *Q.* I'M SORRY.  THIS ORDER, DID YOU SEND A COVER LETTER WITH

1  THIS TO THE EMBASSY?

2  *A.*  THAT IN THE LETTER WITH THIS -- WHEN THIS -- YES, I DID.

3  *Q.*  OKAY.  DO WE HAVE A COPY OF THAT LETTER YOU SENT?

4  *A.*  I DON'T HAVE IT RIGHT HERE.  I DON'T EVEN KNOW IF I HAVE

5  IT.

6  *Q.*  WHAT DID YOU SAY IN THE LETTER?

7  *A.*  I JUST SAID, LIKE THIS PERTAINS TO THE CONVERSATION WE

8  TALKED.  YOU ASKED ME TO SEND YOU, UH -- TO SEND YOU SOMETHING

9  SAYING MY APPEAL WAS ACTIVE, AND THIS IS MY RECENT

10  COMMUNICATION WITH THE NINTH CIRCUIT AND THIS WOULD SHOW THAT

11  MY APPEAL IS PENDING AND IS ACTIVE, IS WHAT I SENT THEM.

12  *Q.*  OKAY.  BECAUSE OF THEIR POLICY, RIGHT, THAT THEY'RE NOT

13  GOING TO ISSUE TRAVEL DOCUMENTS AS LONG AS YOU HAVE PROCEEDINGS

14  PENDING, CORRECT?

15  *A.*  THAT'S THEIR POLICY.  THAT IS WHAT THEY SAID.

16  *Q.*  AND THAT IS WHY YOU SENT THIS, TO CONFIRM WITH THEM THAT

17  YOU HAVE PROCEEDINGS PENDING, CORRECT?

18  *A.*  THE REASON I SENT THEM THIS IS BECAUSE THEY SAID THAT

19  SOMEBODY -- THE GOVERNMENT IS CALLING THEM AND SAYING MY NINTH

20  CIRCUIT CASE IS OVER WITH.

21  *Q.*  OKAY.  SO YOU WANTED TO CONFIRM TO THEM THAT YOUR NINTH

22  CIRCUIT CASE WAS STILL PENDING, CORRECT?

23  *A.*  YES, SIR.

24  *Q.*  SO THAT'S WHY YOU SENT IT TO THEM?

25  *A.*  YES, SIR.

1    *Q.* AND IF YOU LOOK AT EXHIBIT J. I THINK THAT IS -- THIS IS

2    ALSO ONE OF YOUR EXHIBITS. I BELIEVE IT'S EXHIBIT -- YOUR

3    EXHIBIT 2 AT PAGE 71. BUT CAN YOU DESCRIBE WHAT THIS IS?

4    *A.* THIS IS A LETTER THAT THE KENYAN CONSULATE FROM LOS ANGELES

5    SEND ME.

6    *Q.* WAS THIS IN RESPONSE TO THE LETTER THAT YOU SENT THEM?

7    *A.* NO, THIS IS SOMETHING DIFFERENT.

8    *Q.* NOW YOU SEE THE FIRST LINE OF THE LETTER, IT SAYS, WE

9    ACKNOWLEDGE RECEIPT OF YOUR LETTER, CORRECT?

10   *A.* YES.

11   *Q.* AND THE CONTENTS THEREIN NOTED?

12   *A.* YES.

13   *Q.* WHAT IS THAT REFERRING TO?

14   *A.* THIS IS THE FIRST TIME I CONTACTED THEM. I THINK IT WAS IN

15   MAY OR MARCH LAST YEAR, AND I WAS IN EL CENTRO. I WAS TRYING

16   TO ASK THEM, LIKE THE REQUIREMENT WAS REPLACING A PASSPORT.

17   THIS IS THE FIRST COMMUNICATION I HAD WITH THE CONSULATE. I

18   WAS TRYING TO GET A --

19   *Q.* WELL, TAKE A LOOK AT THE SECOND LINE, THE SECOND SENTENCE.

20   WE HAVE CONFIRMED THAT YOUR CASE IS SET TO BE ALLOCATED A

21   HEARING DATE. WHAT ARE THEY TALKING ABOUT? WHAT IS IT THEY'RE

22   CONFIRMING?

23   *A.* MY CASE IS ON APPEAL.

24   *Q.* RIGHT. AND SO THEY SENT -- DIDN'T THEY SEND THIS LETTER TO

25   YOU IN RESPONSE TO THE COPY OF THE ORDER THAT YOU HAD SENT TO

1 THEM?

2 *A.* I DON'T THINK I SENT THIS GUY THE COPY. I SENT -- THE ONES

3 I SENT A COPY WAS IN WASHINGTON D.C. THIS IS LOS ANGELES

4 CONSULATE, AND THESE GUYS -- I WAS TRYING TO GET A POLICE

5 REPORT. I WAS TRYING TO HAVE THEM REPLACE MY PASSPORT. THAT

6 IS WHY I CONTACTED THEM.

7 *Q.* IS THERE ANYTHING MENTIONED ABOUT YOUR PASSPORT IN THIS

8 LETTER?

9 *A.* NO.

10 *Q.* DO YOU HAVE ANY CORRESPONDENCE FROM THE KININ CONSULATE

11 REFERRING TO YOUR PASSPORT OR AN APPLICATION FOR RENEWAL OF THE

12 PASSPORT?

13 *A.* NO, THIS IS ONLY CORRESPONDENCE I HAVE WITH THEM.

14      *MR. BETTWY:* THAT'S ALL THE QUESTIONS I HAVE, YOUR

15 HONOR.

16      *THE COURT:* ANY REDIRECT, COUNSEL?

17      *MR. FIFE:* JUST ONE QUESTION, YOUR HONOR. WELL, A

18 COUPLE.

19                REDIRECT EXAMINATION

20 *Q.* *(BY MR. FIFE)* MR. OWINO, DO YOU KNOW HOW MANY PEOPLE ARE

21 REMOVED EVERY YEAR FROM THE UNITED STATES TO KENYA?

22 *A.* I DON'T KNOW. I HAVE NO IDEA.

23 *Q.* DO YOU HAVE ANY -- DO YOU KNOW WHAT REQUIREMENT OR

24 CONDITIONS KENYA PUTS ON RECEIVING OR ACCEPTING BACK DEPORTEES

25 FROM THE UNITED STATES?

1   *A.*  I DON'T KNOW.

2   *Q.*  DO YOU KNOW WHETHER -- DO YOU HAVE ANY KNOWLEDGE ABOUT THE

3   REQUIREMENTS OR CONDITIONS FOR KENYA ACCEPTING REPATRIATION?

4   *A.*  NO, IDEA.

5   *Q.*  SO WHEN MR. BETTWY ASKED YOU, WERE YOU AFRAID YOU WOULD BE

6   RETURNED IMMEDIATELY TO KENYA, DID YOU HAVE ANY INFORMATION TO

7   TELL YOU THAT YOU WOULDN'T BE RETURNED?

8   *A.*  REPEAT YOUR QUESTION AGAIN.

9   *Q.*  MR. BETTWY ASKED YOU, YOU WERE AFRAID WHEN YOU ASKED FOR

10  THE STAY THAT YOU -- YOU STATED THAT YOU WERE AFRAID YOU WOULD

11  BE RETURNED TO KENYA IF THERE WASN'T A STAY; IS THAT CORRECT?

12  *A.*  YES, SIR.

13  *Q.*  DID YOU HAVE ANY INFORMATION ABOUT HOW QUICKLY OR HOW

14  LIKELY KENYA WOULD BE TO ACCEPT YOUR RETURN?

15  *A.*  NO, NO, SIR.

16         *MR. FIFE:*  OKAY.  THANK YOU.

17         *THE COURT:*  ANY RECROSS ON THAT AREA, COUNSEL?

18         *MR. BETTWY:*  NO, YOUR HONOR, I JUST -- EXHIBIT A, I

19  NEED TO AUTHENTICATE WITH THE WITNESS.  I JUST NEED TO KNOW IF

20  THERE IS OBJECTION TO THE AUTHENTICATION.

21         *THE COURT:*  IS THERE ANY OBJECTION TO EXHIBIT A,

22  COUNSEL?

23         *MR. FIFE:*  NO OBJECTION, YOUR HONOR.

24         *THE COURT:*  ALL RIGHT.  SO THEN A WILL BE RECEIVED.

25     *(RESPONDENT'S EXHIBIT A, RECEIVED.)*

1        THE COURT:  SO WITH THAT IN MIND THEN, MAY MR. OWINO

2  BE EXCUSED?

3        MR. BETTWY:  YES, YOUR HONOR.

4        THE COURT:  YOU MAY STEP DOWN, SIR.  THANK YOU.  YOU

5  CAN LEAVE THOSE EXHIBITS UP ON THE TABLE.  THANK YOU, SIR.

6        ANY ADDITIONAL WITNESSES, COUNSEL?

7        MR. FIFE:  NO ADDITIONAL WITNESSES, YOUR HONOR.

8        THE COURT:  I BEG YOUR PARDON?

9        MR. FIFE:  NO ADDITIONAL WITNESSES FROM THE

10  PETITIONER.

11        THE COURT:  ANY ADDITIONAL WITNESSES FROM THE

12  GOVERNMENT?

13        MR. BETTWY:  YES, I HAVE TWO WITNESSES.  I WOULD LIKE

14  TO CALL OFFICER HAYES SO THAT SHE CAN STAY WHEN OFFICER

15  MC CORMICK TESTIFIES BY TELEPHONE.

16        THE COURT:  THAT'S FINE.

17    ELIANA HAYES, CALLED AS A WITNESS, TESTIFIED AS FOLLOWS:

18    (WITNESS GIVEN AN OATH.)

19        THE CLERK:  PLEASE TAKE THE STAND.  PLEASE STATE YOUR

20  NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

21        THE WITNESS:  ELIANA HAYES, H-A-Y-E-S.

22                        DIRECT EXAMINATION

23  Q.  (BY MR. BETTWY)  OFFICER HAYES, WHAT IS YOUR CURRENT

24  TITLE?

25  A.  I CURRENTLY WORK IN THE REMOVAL UNIT AT THE OTAY DETENTION

1  FACILITY.

2  *Q.* AND WHAT IS YOUR TITLE?

3  *A.* DEPORTATION OFFICER.

4  *Q.* WHEN DID YOU START WITH -- YOU STARTED WITH IMMIGRATION AND

5  NATURALIZATION SERVICES?

6  *A.* YES, SIR.

7  *Q.* WHEN DID YOU START WORKING FOR INS?

8  *A.* 1997.

9  *Q.* WHAT TRAINING DID YOU HAVE INITIALLY?

10  *A.* I HAD FOUR WEEKS OF FLETC TRAINING, IMMIGRATION TRAINING.

11  *Q.* AT GLYNCO, GEORGIA?

12  *A.* YES.

13  *Q.* AND WHERE WERE YOU FIRST ASSIGNED?

14  *A.* EL CENTRO SERVICE PROCESSING CENTER.

15  *Q.* AND HOW MANY YEARS DID YOU WORK THERE?

16  *A.* I WORKED THERE ABOUT FIVE YEARS.

17  *Q.* AND AT ANY OF THOSE YEARS, DID YOU WORK WITH CONSULATES IN

18  OBTAINING TRAVEL DOCUMENTS?

19  *A.* YES, I DID.

20  *Q.* HOW MANY YEARS?

21  *A.* UH, ABOUT TWO YEARS; TWO OR THREE YEARS, I BELIEVE.

22  *Q.* AND THEN AFTER EL CENTRO, WHERE WERE YOU ASSIGNED?

23  *A.* OTAY DETENTION FACILITY.

24  *Q.* THAT IS WHERE YOU ARE NOW?

25  *A.* YES, SIR.

 1   *Q.*  AND HOW -- CURRENTLY DO YOU WORK WITH CONSULATES AND

 2   EMBASSIES TO OBTAIN TRAVEL DOCUMENTS?

 3   *A.*  YES, SIR.

 4   *Q.*  HOW LONG HAVE YOU BEEN DOING THAT?

 5   *A.*  SINCE JANUARY '07.

 6   *Q.*  AND COULD YOU DESCRIBE GENERALLY WHAT THAT ENTAILS, YOUR

 7   DUTY -- NOT ALL OF YOUR DUTIES BUT THE DUTIES RELATED TO

 8   OBTAINING TRAVEL DOCUMENTS FROM CONSULATES AND EMBASSIES?

 9   *A.*  ONCE THE CASE IS COMPLETED, UH, I WILL FIRST INTERVIEW THE

10   ALIEN TO FIND OUT IF THEY HAVE A PASSPORT.  FROM THERE, UM, I

11   WILL HAVE THEM COMPLETE AN APPLICATION FOR A TRAVEL DOCUMENT

12   FOR THAT PARTICULAR CONSULATE, I'LL MAIL THAT TRAVEL DOCUMENT,

13   UM, APPLICATION OFF TO THE CONSULATE AND IF THE CONSULATE NEEDS

14   ANYTHING ELSE, THEY WILL, UM, TELEPHONE ME AND LET ME KNOW.

15   *Q.*  AND SO YOU SAY ONCE THE CASE IS COMPLETED, YOU MEAN THE

16   REMOVAL PROCEEDINGS?  WHAT ARE YOU REFERRING TO?

17   *A.*  THE REMOVAL PROCEEDING.  THERE ARE NO OTHER COURT CASES

18   PENDING, BIA, NINTH CIRCUIT, ANYTHING LIKE THAT.

19   *Q.*  HAVE YOU EVER ATTEMPTED TO START THE PROCESS BEFORE THE

20   COURT PROCEEDINGS WERE THROUGH AT THE NINTH CIRCUIT BUT WHEN

21   THERE WAS NO STAY?  DO YOU UNDERSTAND MY QUESTION?

22   *A.*  YES, I UNDERSTAND YOUR QUESTION.  UM, I HAVEN'T ATTEMPTED

23   THAT BECAUSE THE CASE IS STILL PENDING, EVEN THOUGH THERE ISN'T

24   A STAY.

25   *Q.*  IS THAT BASED ON YOUR EXPERIENCE WORKING WITH THE

1 CONSULATES?

2 *A.* THAT IS BASED ON MY EXPERIENCE WORKING WITH CONSULATES,

3 YES.

4 *Q.* AND WHAT IS THAT EXPERIENCE?

5 *A.* THAT EXPERIENCE IS THAT WHEN THERE ISN'T A STAY TO SPEAK

6 BECAUSE THERE IS STILL A CASE PENDING, NUMBER ONE, THE CASE

7 USUALLY DOESN'T COME INTO THE REMOVAL UNIT UNTIL THEN, UNTIL

8 EVERYTHING GETS COMPLETED.  BUT IF A CASE DOES COME INTO THE

9 REMOVAL UNIT BECAUSE THERE IS NOT A STAY PENDING, IN MY

10 EXPERIENCE, WE DO NOT GIVE THE TRAVEL DOCUMENT BECAUSE OF THE

11 PENDING CASE.

12 *Q.* HAVE YOU BEEN MANAGING A PETITIONER OWINO'S CASE -- HOW

13 LONG -- PARDON ME.  YOU'RE MANAGING HIS CASE NOW; IS THAT

14 CORRECT?

15 *A.* SOMEWHAT.

16 *Q.* WHO IS THE DEPORTATION OFFICER?

17 *A.* DEPORTATION OFFICER IS ACTUALLY OFFICER MELANDRES BECAUSE

18 THE CASE IS STILL PENDING, SO I WOULDN'T GET THE FILE OR THE

19 CASE UNTIL ALL OF THE PETITIONS ARE COMPLETED AND THERE IS

20 NOTHING ELSE PENDING.

21 *Q.* OKAY.  SO YOU'RE TALKING ABOUT CURRENTLY AT THIS VERY

22 MOMENT?

23 *A.* AT THIS VERY MOMENT, YES.

24 *Q.* BEFORE, WHEN HE WAS AT THE NINTH CIRCUIT, WERE YOU WORKING

25 WITH THE FILE, MR. OWINO'S FILE?

1    *A.* BEFORE, WHEN HE WAS AT THE NINTH CIRCUIT, THE ONLY REASON I

2    HAD THE FILE WAS BECAUSE THERE WASN'T A STAY, AND THE FILE HAD

3    COME TO ME.

4    *Q.* WHAT DID YOU DO THEN?

5    *A.* AT THAT TIME, I HAD HIM -- WELL, I'M TRYING TO REMEMBER

6    BECAUSE THERE HAS BEEN TWICE THAT I HAD TO, UM, SPEAK WITH

7    THEM.  WHEN THE CASE WAS PENDING BECAUSE THERE WASN'T A STAY, I

8    ONLY CONTACTED THE EMBASSY BECAUSE I WAS TOLD, OKAY, THERE

9    ISN'T ANYTHING PENDING, SO IT WAS MORE LIKE AN INQUIRY, LIKE

10   COULD WE POSSIBLY GET TRAVEL DOCUMENTS FOR THIS PERSON.  IT'S

11   NOT SOMETHING THAT I NORMALLY DO, EVEN THOUGH THERE ISN'T A

12   STAY.  SO I HAD HIS CASE, EVEN THOUGH THERE WASN'T A STAY, AND

13   I DID SUBMIT THE APPLICATION TO THE, UM, EMBASSY.

14   *Q.* WHAT DID YOU SUBMIT?

15   *A.* THE PASSPORT APPLICATION AND THE SET OF PICTURES.

16   *Q.* THIS WAS -- WAS THIS AFTER HE SIGNED IT IN -- AFTER

17   MR. OWINO FINALLY SIGNED THE APPLICATION?  IS THAT THE

18   APPLICATION YOU'RE TALKING ABOUT?

19   *A.* YES, THIS WAS THE ONE IN 2008.

20   *Q.* OKAY.  AND THEN -- OKAY SO YOU SUBMITTED A PACKET REQUEST.

21   AND WHAT WAS THE RESPONSE THAT YOU GOT FROM THE KENYAN

22   CONSULATE OR EMBASSY?

23   *A.* THE EMBASSY WOULD NOT ISSUE ANYTHING OR EVEN BEGIN A

24   PROCESS BECAUSE HIS CASE WAS STILL PENDING, THERE WAS STILL

25   SOMETHING GOING ON IN COURT, SO SHE SAYS, WE WON'T EVEN DO

1  ANYTHING.

2  *Q.*  OKAY.  DID THEY EVER ASK YOU -- DID THE KININ CONSULATE

3  EVER ASK YOU FOR MORE INFORMATION ABOUT HIS IDENTITY?

4  *A.*  NO, THEY DID NOT.

5  *Q.*  DID THEY EVER EXPRESS ANY CONCERN ABOUT WHETHER HE WAS

6  KENYAN?

7  *A.*  NO, THEY DID NOT.

8  *Q.*  DID YOU EVER CALL THE CONSULATE ASKING ABOUT WHETHER THEY

9  NEEDED A POLICE REPORT CONCERNING MR. OWINO'S MISSING PASSPORT?

10  *A.*  YES, I DID.

11  *Q.*  AND WHAT WERE YOU TOLD?

12  *A.*  I WAS TOLD THAT SHE WOULD NOT NEED A POLICE REPORT.

13  *Q.*  OKAY.  WHO WERE YOU TALKING TO, DO YOU KNOW?

14  *A.*  I'M SORRY.  I CAN'T RECALL HER NAME.

15  *Q.*  WAS IT A FEMALE?

16  *A.*  IT WAS A FEMALE, YES.

17  *Q.*  SOMEONE -- WAS IT AT THE CONSULATE OR THE EMBASSY?

18  *A.*  IT WAS SOMEONE AT THE EMBASSY.

19  *Q.*  IN WASHINGTON, D.C.?

20  *A.*  YES.

21  *Q.*  WHY DID YOU CALL TO ASK HER THAT?

22  *A.*  ONLY BECAUSE, UM, I WAS -- I WAS TOLD THAT I NEEDED TO FIND

23  OUT IF WE COULD POSSIBLY GET A TRAVEL DOCUMENT FOR MR. OWINO.

24  *Q.*  WERE YOU AWARE OF THE FACT THAT MR. OWINO WAS STATING THAT

25  HE NEEDED A POLICE REPORT TO GET A REPLACEMENT PASSPORT?

1    *A.*  YES, I DID GET THAT INFORMATION, YES.

2    *Q.*  SO IS IT YOUR UNDERSTANDING -- WHAT IS YOUR UNDERSTANDING?

3    WILL THE EMBASSY OR THE CONSULATE PROCEED NOW WITH AN

4    APPLICATION FOR A NEW PASSPORT BEFORE PROCEEDINGS ARE OVER?

5    *A.*  NO, THEY WILL NOT.

6    *Q.*  AND THEN WHEN PROCEEDING ARE OVER, HE WILL SUBMIT AN

7    APPLICATION FOR PASSPORT?

8    *A.*  YES, I WILL.

9    *Q.*  WILL IT HELP IF YOU HAVE A COPY OF HIS OLD PASSPORT?

10   *A.*  IT WOULD HELP, YES.

11   *Q.*  HAVE YOU WORKED WITH THE KENYAN EMBASSY OR CONSULATE ON ANY

12   OTHER CASES?

13   *A.*  ONE CASE, YES.

14   *Q.*  AND DID YOU OBTAIN A TRAVEL DOCUMENT FROM THE KENYAN

15   DOCUMENT?

16   *A.*  YEAH, I HAVE -- I DID.

17   *Q.*  HAS THAT PERSON BEEN RETURNED YET?

18   *A.*  SHE HAS NOT BEEN RETURNED YET, NO.

19   *Q.*  WHY IS THAT?

20   *A.*  BECAUSE WE'RE STILL WAITING FOR THE PASSPORT TO ARRIVE --

21   I'M SORRY, THE TRAVEL DOCUMENTS TO ARRIVE IN THE MAIL.  BUT THE

22   CONSULATE DID TELL ME THEY WERE GOING TO ISSUE, AND THEY WOULD

23   BE MAILING IT OUT TO ME.  SO WE SHOULD HAVE IT SOMETIME THIS

24   WEEK.

25        *MR. BETTWY:*  THANK YOU.  NO MORE QUESTIONS, YOUR

1  HONOR.

2            *THE COURT:* CROSS-EXAMINATION, COUNSEL?

3            *MR. FIFE:* YES, YOUR HONOR.

4                      CROSS-EXAMINATION

5  *Q.  (BY MR. FIFE)* GOOD AFTERNOON, OFFICER HAYES.

6  *A.* GOOD AFTERNOON.

7  *Q.* WHAT DOCUMENTS DID YOU REVIEW IN ORDER TO PREPARE TO

8  TESTIFY HERE TODAY?

9  *A.* TO TESTIFY HERE?

10 *Q.* YES.

11 *A.* WHAT DID I REVIEW?

12 *Q.* YES.

13 *A.* I REVIEWED THE, UM, OUR COMPUTER.  WE HAVE TO WRITE

14 EVERYTHING THAT WE DO CONCERNING A CASE, SO I REVIEWED THAT SO

15 I COULD TRY TO REFRESH MY MEMORY AS TO WHAT OCCURRED WHEN.

16 THAT WAS ABOUT IT ACTUALLY.

17 *Q.* SO YOU RAN A REPORT FROM THE COMPUTER DATABASE?

18 *A.* UH, WELL, IT'S NOT SO MUCH A REPORT.  UH, I LOOKED AT THE

19 COMPUTER DATABASE, AND THEN I —— YEAH, I RAN OFF WHAT WE CALL

20 COMMENTS.  IT'S NOT REALLY A REPORT.

21 *Q.* OKAY.  IF I CAN SHOW YOU THIS ——

22            *MR. FIFE:* CAN I APPROACH THE WITNESS, YOUR HONOR?

23            *THE COURT:* CERTAINLY.

24 *Q.  (BY MR. FIFE)* THIS IS A DOCUMENT THAT COUNSEL HANDED ME

25 BEFORE THE HEARING.  DOES THIS LOOK LIKE A COPY OF THE

1  DOCUMENT?

2  *A.*  YES.

3      *THE COURT:*  WOULD YOU PLEASE MARK THAT AS AN EXHIBIT.

4      *MR. FIFE:*  OH, YES.  THANK YOU.  WE WILL MARK IT.

5  *Q.  (BY MR. FIFE)*  I NOTICE ON THIS PRINTOUT THAT THERE IS A

6  NOTATION "SHOW REVISIONS HISTORY."  CAN YOU EXPLAIN WHAT THAT

7  MEANS?

8  *A.*  SHOW REVISIONS HISTORY IS -- USUALLY THE PROGRAM DOESN'T

9  ALLOW YOU TO, LIKE, ERASE AND THEN PUT IN MORE COMMENTS OR PUT

10  IN ADDITIONAL COMMENTS.  AND THE ONLY WAY YOU CAN PUT IN ANY

11  ADDITIONAL COMMENTS IS IF YOU -- YOU HAVE TO REVISE THE

12  COMMENTS.  PRETTY MUCH YOU CAN'T JUST -- YOU KNOW, IN THAT

13  PARTICULAR -- ON THAT PARTICULAR DATE, LIKE IF IT'S THE 17TH OF

14  DECEMBER, AND THEN TODAY IS THE 18TH, IF I FORGOT TO PUT

15  SOMETHING IN ON THE 17TH OF DECEMBER, USUALLY I HAVE TO JUST

16  SAY, OKAY, I HAVE TO PUT IT IN THE FOLLOWING DAY AND SAY THIS

17  REFERS TO THAT DATE, OR I HAVE TO GO IN AND REVISE IT.

18  *Q.*  SO THE SYSTEM ALLOWS YOU TO GO BACK TO MAKE CHANGES TO

19  PREVIOUS REPORTS OR PREVIOUS ENTRIES?

20  *A.*  UH, IT'S NOT -- NOT CHANGES ON THE SAME DAY.  THAT IS WHERE

21  THE REVISION COMES IN, BECAUSE YOU STILL HAVE THAT ORIGINAL

22  COMMENT, BUT YOU HAVE REVISED IT BY ADDING TO IT OR SAYING

23  WHATEVER YOU NEED TO SAY, SO THERE IS LIKE AN ADDITIONAL

24  SOMETHING.

25  *Q.*  OKAY.  THANK YOU.

1          THE COURT:  WHY DON'T WE MARK THAT, COUNSEL.

2    THAT'S -- THE REPORT YOU'RE REFERRING TO, WOULD THAT BE THEN

3    MARKED FOR IDENTIFICATION THEN DEFENSE -- OR PETITIONER 13?

4          MR. FIFE:  YES, YOUR HONOR.

5          THE COURT:  WE'LL MARK THAT.  I THINK WE HAVE AN

6    EXHIBIT STICKER HERE.

7          MR. FIFE:  OKAY.

8          THE COURT:  THAT WILL BE MARKED FOR IDENTIFICATION

9    PETITIONER 13.

10   Q.  (BY MR. FIFE)  OFFICER HAYES, YOU WERE AT LEAST ONE TIME--

11   OR STILL CONNECTED WITH MR. OWINO'S CASE, BUT YOU WERE AT ONE

12   TIME HIS DEPORTATION OFFICER?

13   A.  YES, I WAS.

14   Q.  SO YOU'RE FAMILIAR WITH THE A-FILE IN MR. OWINO'S CASE?

15   A.  SOMEWHAT FAMILIAR.  IT'S A PRETTY BIG FILE, SO.

16   Q.  OKAY.  YOU TESTIFIED THAT YOU CONTACTED THE KENYAN EMBASSY

17   IN WASHINGTON?

18   A.  YES, I DID, UM-HMM.

19   Q.  IN MAY OF 2008?

20   A.  YES.

21   Q.  AND YOU SPOKE WITH CONSULATE OFFICER NDWIGA THERE?

22   A.  IF THAT IS WHAT NAME IS ON THERE, YES.

23   Q.  YOU SPOKE WITH SOME CONSULATE OFFICER AT THE EMBASSY?

24   A.  YES.

25   Q.  AND SHE TOLD YOU THAT THE POLICY WAS NOT TO ISSUE TRAVEL

1   DOCUMENTS WHILE THE APPEAL WAS PENDING?

2   *A.* EXACTLY, YES.

3   *Q.* IN FACT, YOU TESTIFIED THAT THAT IS COMMON THAT COUNTRIES

4   DO NOT ISSUE TRAVEL DOCUMENTS INN THERE IS AN APPEAL PENDING?

5   *A.* YES, IT IS.

6   *Q.* YOU EXPLAINED TO HER THAT THERE WAS NO STAY ON MR. OWINO'S

7   CASE?

8   *A.* YES, I DID.

9   *Q.* AND SHE ASKED YOU WHAT THAT MEANT?

10  *A.* YES, SHE DID.

11  *Q.* AND YOU EXPLAINED THAT THAT MEANS THAT THERE IS NO BAR TO

12  MR. OWINO'S REMOVAL?

13  *A.* YES.

14  *Q.* AND THERE IS NO LEGAL REASON THAT A PERSON CANNOT BE

15  REMOVED IF THERE IS NOT A STAY IN PLACE?

16  *A.* AS FAR AS THE LAW IS CONCERNED, NO, THERE IS STILL LEGAL

17  REASON.

18  *Q.* BUT YOU'RE SAYING, AS A PRACTICE, YOU NORMALLY DON'T SEEK

19  TRAVEL DOCUMENTS EVEN IF THERE IS NO STAY?

20  *A.* AS A PRACTICE, WE DO NOT.

21  *Q.* BECAUSE YOU'RE PRETTY SURE THAT THE CONSULATE IS GOING TO

22  REFUSE TO REPATRIATE?

23  *A.* YES, AT THAT TIME, UM-HMM.

24  *Q.* THE PERSON IN THE EMBASSY ASKED YOU TO SEND SOME

25  CONFIRMATION THAT THERE WAS A STAY IN MR. OWINO'S CASE?

1    *A.* I DON'T RECALL.

2    *Q.* DO YOU RECALL -- YOU HAVE -- YOU FILED DECLARATIONS IN

3    THIS -- IN SUPPORT OF THE RESPONDENT'S PETITION IN THIS CASE;

4    IS THAT CORRECT?

5    *A.* YES, I HAVE.

6    *Q.* AND YOU RECALL THAT IN ONE OF YOUR DECLARATIONS YOU STATED

7    THAT THE EMBASSY OFFICIAL ASKED YOU TO SEND CONFIRMATION OF THE

8    STAY?

9         *MR. BETTWY:* YOUR HONOR, I'M GOING TO OBJECT. WHAT

10    ARE WE REFERRING TO THERE?

11         *THE COURT:* IS YOUR QUESTION BASED ON AN EXHIBIT THAT

12    HAS BEEN RECEIVED, COUNSEL?

13         *MR. FIFE:* YES. I BELIEVE IT'S -- THIS IS EXHIBIT 3,

14    YOUR HONOR, WHICH WILL BE -- IT'S IN THE PACKET IN FRONT OF YOU

15    THERE.

16         *MR. BETTWY:* THANK YOU, YOUR HONOR.

17    *Q.* *(BY MR. FIFE)* EXHIBIT 3. DO YOU RECALL DECLARING IN YOUR

18    DECLARATION THAT MS. NDWIGA ASKED ME TO SEND HER THE COURT

19    ORDER DENYING THE STAY?

20    *A.* IF THAT'S WHAT I HAVE, THEN THAT'S WHAT I HAVE.

21    *Q.* YOU DON'T RECALL SAYING THAT?

22    *A.* I DON'T RECALL.

23    *Q.* AND YOU ALSO DECLARE THAT YOU SENT HER A COPY OF THAT STAY?

24    *A.* OKAY. IF THAT'S WHAT I HAVE, THAT'S WHAT I DID.

25    *Q.* OKAY. YOU ALSO SAID THAT SHE SAID SHE WOULD GET BACK TO

1   YOU AFTER SHE REVIEWED THE ORDER THAT SHE SENT, DO YOU RECALL

2   THAT?

3   *A.* OKAY.

4   *Q.* YOU DON'T RECALL?

5   *A.* I DON'T RECALL. I REALLY DON'T. I'M SORRY.

6   *Q.* DO YOU RECALL WHETHER SHE DID CONTACT YOU AGAIN AFTER YOU

7   SENT THE COPY OF THE STAY ORDER?

8   *A.* I DON'T RECALL.

9   *Q.* AFTER THIS CONTACT IN MAY, IN FACT, YOU CONTACTED THE

10  EMBASSY SEVERAL TIMES DURING MAY 2008?

11  *A.* OKAY.

12  *Q.* IS THAT CORRECT?

13  *A.* I BELIEVE I DID HAVE SEVERAL -- A FEW PHONE CALLS WITH

14  THEM, YES.

15  *Q.* AND DO YOU RECALL THAT YOU CALLED THE EMBASSY AGAIN IN THE

16  BEGINNING OF JUNE 2008?

17  *A.* I VAGUELY RECALL THAT, YES.

18  *Q.* WHEN YOU CONTACTED THE EMBASSY IN JUNE, SHE, AGAIN, TOLD

19  YOU THAT THEY DON'T ACCEPT PEOPLE WHILE THEY HAVE APPEALS

20  PENDING; IS THAT CORRECT?

21  *A.* SHE PROBABLY DID, YES.

22  *Q.* YOU DON'T RECALL?

23  *A.* I DON'T RECALL.

24      (PETITIONER ATTORNEY DISCUSSION OFF THE RECORD.)

25  *Q.* *(BY MR. FIFE)* JUST TO GET BACK BRIEFLY TO THE DATABASE.

1   IS THAT SIMILAR TO WHAT USED TO BE CALLED THE DAX DATABASE?

2   *A.* YES, IT IS.

3   *Q.* SO THESE ARE ENTRIES THAT THE DEPORTATION OFFICER MAKES FOR

4   ACTIONS ON THE CASE?

5   *A.* YES, THEY ARE.

6   *Q.* WOULD THAT INCLUDE NOTATIONS OF TELEPHONE CONTACTS WITH THE

7   CONSULATE?

8   *A.* YES.

9   *Q.* WOULD THERE BE ANY REASON WHY THESE CONTACTS IN MAY 2008

10   WOULD NOT BE REFECTED IN THE DATABASE?

11   *A.* PROBABLY BECAUSE I FORGOT TO PUT THEM IN, BUT.

12   *Q.* IN JUNE AFTER YOU, AGAIN, CONFIRMED WITH THE CONSULATE THAT

13   THEY DON'T ISSUE TRAVEL DOCUMENTS WHILE APPEAL IS PENDING, DID

14   YOU CALL BACK THE NEXT DAY AND TALK TO MS. NDWIGA AGAIN?

15   *A.* I DON'T RECALL.

16   *Q.* YOU DON'T RECALL. AND YOU DON'T RECALL WHAT SHE TOLD YOU

17   AT THAT POINT?

18   *A.* I DON'T, SIR. IT WAS OVER A YEAR AGO. I DON'T RECALL.

19   *Q.* DO YOU RECALL HER, AT ANY POINT, TELLING YOU THAT

20   MR. OWINO -- THEY WOULD REPATRIATE MR. OWINO IF HE SAID HE

21   WANTED TO COME WHACK TO KENYA?

22   *A.* I RECALL THAT, YES.

23   *Q.* DO YOU RECALL WHEN THAT WAS?

24   *A.* I DON'T RECALL WHEN THAT WAS, BUT I DO RECALL THAT

25   CONVERSATION WITH HER. UH, IT WAS AFTER I EXPLAINED THE STAY.

1   *Q.* SO THIS WAS AFTER YOU HAVE HAD PREVIOUS CONTACTS WHERE SHE

2   TOLD YOU THE POLICY WAS THAT THEY DON'T REPATRIATE WHILE THE

3   APPEAL IS PENDING?

4   *A.* EXACTLY. I BELIEVE SHE SAID SHE WOULD REPATRIATE HIM IF HE

5   WROTE AND SIGNED A LETTER SAYING THAT I WANT TO RETURN TO

6   KENYA, WHICH IS USUALLY THE WAY IT GOES.

7   *Q.* SO SHE SPECIFICALLY WANTED A WRITTEN STATEMENT FROM

8   MR. OWINO?

9   *A.* WHAT SHE SAID WAS, IF HE TOLD HER -- IF HE TOLD HER THAT HE

10  WANTED TO RETURN TO KENYA, THEN SHE WOULD SAY OKAY. NOW FOR

11  ICE, I WOULD REQUIRE HIM TO HAVE A WRITTEN, SIGNED LETTER FROM

12  HIM AND HIS ATTORNEY.

13  *Q.* SO THAT WASN'T A REQUIREMENT THE EMBASSY WAS PUTTING ON

14  THAT?

15  *A.* NO, THE EMBASSY, SHE DID TELL ME, SHE SAYS IF HE WRITES AND

16  TELLS ME -- I CAN'T REMEMBER IF SHE SAID IF HE WRITES OR JUST

17  TELLS ME, BUT IT HAD TO COME FROM HIM THAT HE WANTED TO RETURN

18  TO KENYA.

19  *Q.* AND THIS WAS THE FIRST TIME THAT YOU HAD EVER HEARD THAT

20  KENYA WOULD REPATRIATE IF SOMEONE STATED THEY WANTED TO GO

21  BACK?

22  *A.* THIS WAS THE FIRST TIME SHE HAD SAID THAT TO ME.

23  *Q.* NOW IN THE OTHER CASE OF THE KENYAN WHOSE DEPORTATION

24  OFFICER YOU WERE, WAS THAT A REQUIREMENT IN THIS CASE?

25  *A.* NO, IT WAS NOT. AND THE ONLY REASON IT WAS A REQUIREMENT

1   IN THAT CASE WAS BECAUSE HE WAS FIGHTING HIS CASE.  SO THERE

2   WAS STILL SOMETHING PENDING.

3   *Q.*  IS THAT WHAT THE EMBASSY OFFICIAL TOLD YOU?

4   *A.*  WELL, SHE DID TELL ME, SHE TOLD ME, SHE SAYS, BECAUSE

5   MR. OWINO HAD A CASE PENDING THAT SHE WAS NOT WILLING TO ISSUE

6   A TRAVEL DOCUMENT TO HIM.  AND I EXPLAINED TO HER ABOUT THE

7   STAY.  AND I SAID, YOU KNOW, HE DOESN'T HAVE A STAY, SO WE

8   REALLY COULD REMOVE HIM.  AND SHE SAYS, I UNDERSTAND THAT, BUT

9   IF MR. OWINO TOLD ME THAT HE WANTS TO COME BACK TO KENYA, THEN

10   I WOULD CONSIDER ISSUING A TRAVEL DOCUMENT TO HIM.  BUT HE HAS

11   TO TELL HER BECAUSE HE HAS A CASE PENDING.

12   *Q.*  DID SHE TELL YOU THAT THE EMBASSY HAD CHANGED THEIR POLICY?

13   *A.*  NO, SHE DID NOT.

14   *Q.*  DID SHE TELL YOU SHE TALKED WITH ANY OF HER SUPERVISORS

15   REGARDING THIS CHANGE IN REPATRIATION?

16   *A.*  NO, SHE DID NOT.

17   *Q.*  DID SHE TELL YOU WHETHER SHE CONTACTED ANYBODY IN THE

18   GOVERNMENT OF NAIROBI ABOUT THIS?

19   *A.*  NO, SHE DID NOT.

20   *Q.*  HAVE YOU EVER TALKED TO THE OFFICIALS IN THE CONSULATE

21   GENERAL IN LOS ANGELES?

22   *A.*  I HAVE.

23   *Q.*  WHO HAVE YOU SPOKEN TO THERE?

24   *A.*  I BELIEVE HER NAME IS MARY.

25   *Q.*  IN ONE OF YOUR DECLARATIONS, YOU STATED THAT THE EMBASSY

1  OFFICIAL SAID IN MAY THAT MR. OWINO TOLD HER THAT HE HAD AN

2  APPEAL PENDING?

3  *A.*  YES, SHE DID.

4  *Q.*  IN JUNE, YOUR DECLARATION STATES -- YOUR OTHER DECLARATION

5  STATES -- THIS IS EXHIBIT 4 -- STATES THAT IN JUNE, SHE TOLD

6  YOU THAT HER ATTORNEY -- HIS ATTORNEY HAD TOLD HER THAT?

7  *A.*  OKAY.

8  *Q.*  DO YOU RECALL THAT?

9  *A.*  I RECALL SOMETHING LIKE THAT, YES.

10  *Q.*  DO YOU RECALL DECLARING UNDER OATH THAT, MS. NDWIGA ALSO

11  TOLD ME SHE LEARNED OF THE PENDING NINTH CIRCUIT APPEAL FROM

12  INFORMATION THAT WAS MAILED TO THE CONSULATE BY OWINO'S

13  ATTORNEY?

14  *A.*  YES, I RECALL THAT.

15  *Q.*  DO YOU RECALL THAT SHE ALSO TOLD YOU THAT HIS ATTORNEY HAD

16  SENT HER A COPY OF AN ORDER FROM THE NINTH CIRCUIT?

17  *A.*  I BELIEVE SHE TOLD ME THAT, YES.

18  *Q.*  DID SHE TELL THAT YOU MR. OWINO CLAIMED TO HAVE A STAY IN

19  PLACE?

20  *A.*  I DON'T BELIEVE SHE TOLD ME THAT.

21  *Q.*  AND, IN FACT, HIS STAY WAS DENIED IN 2007?

22  *A.*  I DON'T RECALL.

23  *Q.*  YOU DON'T RECALL FROM YOUR FAMILIARITY WITH THE A-FILE IN

24  THIS CASE?

25  *A.*  IF IT WAS DENIED IN '07?

1   Q.  YES.

2   A.  NO.  I SERVED HIM A 229 IN '07 BECAUSE THAT IS WHEN I

3   STARTED THE REMOVAL UNIT, SO THAT COULD BE WHAT HAPPENED, YES.

4   Q.  YOU DECLARED IN EXHIBIT 4, YOU SAID, THE EMBASSY OFFICIALS

5   TOLD YOU THAT MR. OWINO DID NOT NEED A POLICE REPORT FOR

6   EMERGENCY TRAVEL DOCUMENT?

7   A.  YES.

8   Q.  DID SHE -- BUT SHE -- DID SHE TELL YOU THAT HE DIDN'T NEED

9   THE POLICE REPORT IN ORDER TO GET A PERMANENT REPLACEMENT FOR

10  HIS PASSPORT?

11  A.  SHE TOLD ME HE DIDN'T NEED A POLICE REPORT TO GET A TRAVEL

12  DOCUMENT.

13  Q.  WHAT ABOUT A REPLACEMENT PASSPORT?  DID YOU TALK ABOUT THAT

14  AT ALL?

15  A.  I CAN'T RECALL IF WE TALKED ABOUT THAT.

16  Q.  NOW MR. OWINO HAS NEVER REFUSED TO CONDUCT AN INTERVIEW

17  WITH THE EMBASSY, HAS HE?

18  A.  I HAVE NEVER ASKED HIM.

19  Q.  FROM YOUR FAMILIARITY WITH THE DATABASE AND THE A-FILE, ARE

20  YOU AWARE OF ANY INSTANCE IN WHICH MR. OWINO HAS REFUSED TO

21  CONDUCT AN INTERVIEW WITH AN EMBASSY?

22  A.  NOT THAT I KNOW OF.

23  Q.  HE HAS NEVER REFUSED TO PROVIDE ANY AVAILABLE DOCUMENTS?

24  A.  NOT THAT I KNOW OF.

25  Q.  DO YOU KNOW IF HE HAS EVER PROVIDED ANY MISLEADING OR FALSE

1  INFORMATION?

2  *A.* NOT THAT I KNOW OF.

3  *Q.* YOU'RE AWARE THAT HE REFUSED TO FILL OUT TRAVEL DOCUMENT

4  APPLICATIONS IN AUGUST 2006?

5  *A.* YES.

6  *Q.* AND ALSO IN JANUARY OF 2008, HE WAS PROFFERED TRAVEL

7  DOCUMENT APPLICATIONS AGAIN?

8  *A.* OKAY.

9  *Q.* DO YOU KNOW IF THAT'S TRUE?

10  *A.* IT COULD BE TRUE, YES.

11  *Q.* ARE YOU AWARE FROM YOUR REVIEWS?

12  *A.* I CAN'T RECALL.

13  *Q.* MR. OWINO -- IF A DEPORTEE ASKS TO SPEAK WITH HIS ATTORNEY

14  BEFORE FILLING OUT TRAVEL APPLICATION DOCUMENTS, IS IT ICE'S

15  POLICY TO FILE AN I229 IMMEDIATELY IN THAT CASE?

16  *A.* WELL, WHEN I SERVE SOMEONE THE I229, UM, WHICH IS THE

17  WARNING OF FAILURE TO DEPART, IF THEY SAY, WELL, I WON'T SIGN

18  IT UNTIL I SPEAK WITH MY ATTORNEY, I SIMPLY SAY, OKAY.  AND

19  THAT'S IT AND MY PART IS DONE.  THEN I WILL SIMPLY SAY, REFUSE

20  TO SIGN.  AND THEY WILL SPEAK WITH THEIR ATTORNEY.

21  *Q.* SO YOUR POLICY IS NOT TO ALLOW THEM TO SPEAK TO HIS

22  ATTORNEY BEFORE YOU SERVE THE NOTICE?

23  *A.* ONCE -- ONCE AN ORDER IS FINAL, WE IMMEDIATELY SERVE THE

24  NOTICE, THE WARNING OF FAILURE TO DEPART.  UH, I INTERVIEW

25  PEOPLE, I TELL THEM WHAT THE NOTICE IS.  IF THEY SAY, I DON'T

1　WANT TO SIGN ANYTHING UNTIL I SPEAK WITH MY ATTORNEY, I SIMPLY

2　SAY, OKAY, THAT'S FINE.  I PUT ON THAT 229, REFUSE TO SIGN.

3　*Q.*  SO YOU TREAT ASKING TO SPEAK WITH HIS ATTORNEY AS REFUSAL

4　TO SIGN?

5　*A.*  YES, I DO.  SOMETIMES WHEN PEOPLE SPEAK WITH THEIR

6　ATTORNEYS, THEIR ATTORNEY WILL CALL ME OR I'LL GET A LETTER

7　SAYING, HEY, I'LL SIGN THE DOCUMENT NOW.  FINE.  I'LL GO BACK

8　UPSTAIRS, SERVE THEM THE DOCUMENT.  IF THEY SIGN IT, EVERYTHING

9　IS KOSHER.

10　*Q.*  IF A DETAINEE REFUSES TO SIGN AND THEN LATER FILLS THEM OUT

11　AND OFFERS THEM BACK, THE POLICY IS TO GO RETRIEVE THEM WHEN

12　THEY'RE PROFFERED TO GO AND OBTAIN THE FORMS FROM THE DETAINEE

13　ONCE HE HAS FILLED THEM OUT?

14　　　*MR. BETTWY:*  I WILL OBJECT.  VAGUE AND AMBIGUOUS.  I

15　CAN'T UNDERSTAND THE QUESTION, YOUR HONOR.

16　*Q.*  *(BY MR. FIFE)*  LET ME REPHRASE IT THEN.  IF A DETAINEE

17　REFUSES TO FILL OUT THE FORMS AND THEN HE DOES FILL THEM OUT

18　AND OFFERS THEM BACK TO THE DEPORTATION OFFICER, DO YOU GO GET

19　THEM?  DO YOU TAKE THE FORMS THEN?

20　*A.*  I WILL TAKE THE FORMS.  IF HE'S HE IS GOING TO FILL THEM

21　OUT, SURE, I'LL TAKE THEM.

22　*Q.*  AND HE FILLS THEM OUT --

23　*A.*  UH-HUH.

24　*Q.*  -- DO YOU REFUSE TO ACCEPT THEM AT THAT POINT?

25　*A.*  NO, I DON'T.

1    *Q.* IS THERE ANY REASON TO REFUSE TO TAKE THE FORMS AT THAT

2    POINT?

3    *A.* NO.

4    *Q.* FROM YOUR FAMILIARITY WITH THE A-FILE AND THE CIRCUMSTANCES

5    HERE, IS THERE ANY REASON WHY THE TRAVEL DOCUMENTS HAD TO BE

6    SUBMITTED IN JANUARY OF 2008?

7    *A.* WHAT DO YOU MEAN "HAD TO BE"?

8    *Q.* WHAT I MEAN IS, ARE YOU AWARE OF ANY DEADLINE THAT REQUIRED

9    THE DOCUMENTS TO BE SUBMITTED TO KENYA IN JANUARY OF 2008?

10   *A.* IF THE CASE WAS COMPLETE IN JANUARY '08 AND I WENT TO SERVE

11   A 229, I ALSO SERVE A TRAVEL DOCUMENT APPLICATION IF THAT IS

12   NEEDED AT THAT TIME, SO THE ALIEN HAS THAT TIME TO COMPLETE THE

13   TRAVEL DOCUMENT APPLICATION AND SIGN THE 229. IF HE DOESN'T,

14   THEN I SIMPLY LOOK AT IT AS A FAILURE TO COMPLY. THERE IS

15   NOTHING THAT SAYS WE HAVE TO SEND IT WITHIN 30 DAYS TO THE

16   CONSULATE. UM, THE ICE POLICY REQUIRES THAT WE DO SEND IT

17   WITHIN 5 DAYS. THERE IS NOTHING THAT SAYS, OKAY, IF YOU DON'T

18   SIGN THIS, YOU DON'T TAKE IT EVER AGAIN.

19   *Q.* OKAY. JUST SO WE'RE CLEAR, THE I229 THAT WE'RE TALKING

20   ABOUT, THE NOTICE OF WARNING FOR FAILURE TO DEPART --

21   *A.* UM-HMM.

22   *Q.* -- IS THAT A NOTICE THAT YOU ONLY ISSUE FOR PEOPLE WHO ARE

23   NOT COOPERATIVE?

24   *A.* NO, WE ISSUE THAT TO EVERYONE AT THE BEGINNING AND IF THEY

25   CONTINUE TO FAIL TO COMPLY, IF THEY SAY, I DON'T WANT TO SIGN

1   IT, I DON'T WANT TO FILL OUT AN APPLICATION, OKAY, FINE.  THEN

2   EVERY 30 DAYS, WE WILL SERVE THAT NOTICE TO THEM.

3   *Q.*  OR IF THEY ASK TO SPEAK TO THEIR ATTORNEY?

4   *A.*  IF THEY ASK TO SPEAK WITH THEIR ATTORNEY, THEN THEIR

5   ATTORNEY WILL USUALLY CALL OR THE PERSON WILL CALL AND SAY, I

6   WILL SIGN THAT FORM.

7   *Q.*  BACK IN MAY 2008, DID YOU LEARN THAT MR. OWINO WAS TRYING

8   TO SEND A REQUEST TO THE SHERIFF FOR A POLICE REPORT?

9   *A.*  UM, I DO RECALL FINDING OUT THAT HE WAS TRYING TO SEND A

10   REQUEST FOR A POLICE REPORT.

11   *Q.*  AND DID YOU -- YOU CONTACTED HIM OVER THE TELEPHONE, OVER

12   THE UNIT MANAGER'S TELEPHONE?

13   *A.*  MR. OWINO?

14   *Q.*  YES.

15   *A.*  OKAY.

16   *Q.*  DO YOU RECALL THAT?

17   *A.*  I DON'T RECALL THAT, BUT.

18   *Q.*  YOU RECALL GOING TO UNIT TO SPEAK TO HIM PERSONALLY ABOUT

19   THIS?

20   *A.*  I REMEMBER SPEAKING WITH MR. OWINO, UH AT THE UNIT IN THE

21   UNIT MANAGER'S OFFICE ONCE AND ONCE, I THINK, IN THE ICE

22   INTERVIEW ROOM.

23   *Q.*  DO YOU RECALL WHEN YOU WENT TO THE UNIT TO SPEAK TO HIM

24   THAT YOU TOLD HIM THAT ICE WOULD NOT HELP HIM IN OBTAINING THE

25   POLICE REPORT?

1   *A.*  I MAY HAVE SAID THAT.

2   *Q.*  DO YOU RECALL WHETHER YOU SAID THAT?

3   *A.*  I DON'T RECALL SPECIFICALLY YES OR NO, BUT I MAY HAVE SAID

4   THAT.

5   *Q.*  DO YOU RECALL TELLING HIM THAT HE DIDN'T NEED A PASSPORT TO

6   GET TRAVEL DOCUMENTS TO KENYA?

7   *A.*  UH, YES.

8   *Q.*  AND THIS WAS ACTUALLY BEFORE YOUR CONVERSATION WITH THE

9   EMBASSY -- WITH MS. NDWIGA AT THE EMBASSY ABOUT THE NEED FOR A

10  PASSPORT?

11  *A.*  YES.

12  *Q.*  A POLICE REPORT.  SO WHAT KNOWLEDGE WAS THIS BASED ON THAT

13  HE DID NOT NEED A POLICE REPORT.

14  *A.*  BECAUSE WHEN ICE -- WHEN ICE -- WHEN ICE REQUESTS A TRAVEL

15  DOCUMENT, UM, THE EMBASSIES OR THE CONSULATES DON'T REQUIRE THE

16  ICE AGENCY TO PRODUCE THE SAME DOCUMENTS THAT THEY WOULD

17  REQUIRE OF AN INDIVIDUAL.  SO WHEN WE SEND -- BECAUSE WE HAVE

18  PEOPLE ALL THE TIME WHO HAVE LOST THEIR PASSPORTS OR CAN'T GET

19  THEM OR WHATEVER AND WE NEVER HAVE A PROBLEM SO FAR WITH

20  SENDING JUST THE REQUEST TELLING THE CONSULATE, LISTEN, THIS

21  PERSON LOST THEIR PASSPORT.

22  *Q.*  SO THIS IS BASED ON YOUR EXPERIENCE IN OTHER PEOPLE --

23  *A.*  EXACTLY, RIGHT.

24  *Q.*  DID MR. OWINO TELL YOU THAT HE NEEDED A REPLACEMENT

25  PASSPORT, SO HE COULD RELOCATE TO A THIRD COUNTRY?

1   *A.*  I RECALL HIM SAYING THAT, YES.

2   *Q.*  SO IT WASN'T HE NEEDED THE REPLACEMENT FOR TRAVEL DOCUMENTS

3   TO KENYA?

4   *A.*  I DON'T UNDERSTAND WHAT YOU'RE SAYING.

5   *Q.*  SO HE NEEDED THE -- HE DIDN'T NEED THE REPLACEMENT PASSPORT

6   SO HE COULD GO TO KENYA?

7   *A.*  OKAY.

8   *Q.*  IS THAT CORRECT?

9   *A.*  I BELIEVE HE MIGHT HAVE SAID SOMETHING LIKE THAT.  I CAN'T

10  BE FOR CERTAIN, THOUGH.

11  *Q.*  YOU TOLD MR. OWINO TO STOP CONTACTING HIS EMBASSY?

12  *A.*  I CAN'T RECALL THAT.

13  *Q.*  YOU TOLD HIM TO HAVE HIS ATTORNEY STOP CONTACTING THE

14  EMBASSY?

15  *A.*  I DON'T RECALL THAT EITHER, TO SAY THAT.

16  *Q.*  YOUR TRAINING INCLUDING INSTRUCTION IN IMMIGRATION LAW,

17  CORRECT?

18  *A.*  YES, IT DOES.

19  *Q.*  DO YOU KNOW ANY LEGAL BASIS FOR FORBIDDING ALIENS FROM

20  CONTACTING THEIR EMBASSIES?

21  *A.*  THERE IS NO LEGAL BASIS.

22  *Q.*  OR TO BAR THEIR ATTORNEYS FROM CONTACTING THEM?

23  *A.*  NO LEGAL BASIS THAT I KNOW OF.

24  *Q.*  BASED ON YOUR REVIEW OF THE HISTORY IN THIS CASE, YOU KNOW

25  THAT ICE FIRST APPROACHED MR. OWINO TO FILL IN FORMS OF AUGUST

1  OF 2006?

2  *A.*  I BELIEVE I RECALL THAT, YES.

3  *Q.*  AND THIS WAS SHORTLY AFTER THE DECISION FROM THE BIA?

4  *A.*  OKAY.

5  *Q.*  DO YOU KNOW WHEN THE --

6  *A.*  I DON'T RECALL.

7  *Q.*  AND THE NEXT TIME THAT ICE ASKED FOR HIM TO FILL IN

8  APPLICATION FORMS WAS IN JANUARY 2008?

9  *A.*  OKAY.

10  *Q.*  DO YOU KNOW WHETHER THAT IS TRUE OR NOT?

11  *A.*  UH, I CAN'T RECALL, SIR.

12  *Q.*  OFFICER HAYES, ARE YOU FAMILIAR WITH THE LEGAL REQUIREMENTS

13  FOR THE CONVENTION AGAINST TORTURE UNDER SECTION 208.16?

14       *MR. BETTWY:*  OBJECTION.  RELEVANCE, YOUR HONOR.

15       *THE COURT:*  WHAT THE RELEVANCE OF THIS, MR. FIFE?

16       *MR. FIFE:*  YOUR HONOR, I UNDERSTAND THE COURT'S RULING

17  THAT WE'RE NOT GOING TO GET INTO THE MERITS OF THE CAT CLAIM.

18  BUT I THINK WE'RE -- WE JUST WANT TO SET UP THE PARAMETERS OF

19  WHETHER OR NOT A CAT CLAIM HAS ANY LIKELY BEARING ON THE

20  REMOVABILITY.  IT IS RECOGNIZED AS A ZADVYDAS POINT, AND WE'RE

21  NOT GOING TO GO INTO THE DETAILS OF WHETHER MR. OWINO IS

22  ENTITLED BUT WHETHER OR NOT, IN FACT, AS PUT ON THE RECORD A

23  CAT CLAIM WILL HAVE SOME IMPACT ON THE ABILITY TO REMOVE IN THE

24  FUTURE.

25       *THE COURT:*  I'LL OVERRULE IT FOR THIS LIMITED PURPOSE.

1  *Q.   (BY MR. FIFE)*  ARE YOU FAMILIAR WITH THE REQUIREMENTS

2  UNDER SECTION 208.16?

3  *A.*  I AM, YES.

4  *Q.*  AND IF -- SO IF CAT RELIEF IS GRANTED, DO YOU ATTEMPT TO

5  OBTAIN TRAVEL DOCUMENTS TO THAT COUNTRY?

6  *A.*  NO, WE DID NOT.

7  *Q.*  IS THAT BECAUSE IT'S ILLEGAL TO REMOVE SOMEONE TO A COUNTRY

8  WHERE THEY HAVE CAT PROTECTION?

9  *A.*  IT IS, YES.

10        *MR. FIFE:*  THANK YOU, YOUR HONOR.  THAT'S ALL I HAVE.

11        *THE COURT:*  MAY THE WITNESS BE EXCUSED?  ANY

12  ADDITIONAL --

13        *MR. BETTWY:*  NO THANK YOU, YOUR HONOR.

14        *THE COURT:*  YOU MAY STEP DOWN.  THANK YOU.

15        *MR. BETTWY:*  YOUR HONOR, I WOULD LIKE TO HAVE OFFICER

16  MC CORMICK CALLED, PLEASE.

17        *THE COURT:*  IS THAT BY PHONE?  DO YOU HAVE THE

18  NUMBERS?

19        *MR. BETTWY:*  YES, YOUR HONOR, I GAVE THE NUMBERS TO

20  THE CLERK.

21        *THE COURT:*  AND THIS IS OFFICER MC CORMICK?

22        *MR. BETTWY:*  YES, AND --

23        *THE COURT:*  WHERE ARE THEY LOCATED?

24        *MR. BETTWY:*  WASHINGTON D.C.  I BELIEVE SHE IS GOING

25  TO HAVE AN AGENCY ATTORNEY WITH HER.  I WILL HAVE HER IDENTIFY

1    HERSELF.

2      MARCY MC CORMICK, CALLED AS A WITNESS, TESTIFIED AS FOLLOWS:

3              *THE CLERK:*  CAN YOU HEAR US?

4              *THE WITNESS:*  YES, I CAN.

5              *THE COURT:*  ARE YOU PRESENT?

6              *THE CLERK:*  CAN YOU HEAR US?

7              *THE WITNESS:*  YES, I CAN.

8              *THE COURT:*  PLEASE IDENTIFY YOURSELF.

9              *THE WITNESS:*  THIS IS MARCY MC CORMICK WITH

10   IMMIGRATION AND CUSTOMS ENFORCEMENT DEPORTATION HEADQUARTERS.

11   ALL RIGHT.

12             *THE COURT:*  IS ANYONE ELSE PRESENT THERE WITH YOU?

13             *MS. TINKHAM:*  YES.  ALEXANDRA TINKHAM.  I'M AN

14   ATTORNEY WITH IMMIGRATION AND CUSTOMS ENFORCEMENT IN THE OFFICE

15   OF LEGAL ADVISER.

16             *THE COURT:*  ALL RIGHT.  PLEASE STATE YOUR NAME SLOWLY.

17             *MS. TINKHAM:*  ALEXANDRA TINKHAM, T-I-N-K-H-A-M.

18             *THE COURT:*  AND PLEASE SWEAR MS -- OFFICER MC CORMICK.

19        *(WITNESS GIVEN AN OATH.)*

20             *THE CLERK:*  PLEASE TAKE THE STAND.  PLEASE STATE YOUR

21   NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

22             *THE WITNESS:*  IT'S MARCY ROSARIO MC CORMICK.  LAST

23   NAME, M-C C-O-R-M-I-C-K.

24                       DIRECT EXAMINATION

25   *Q.  (BY MR. BETTWY)*  GOOD AFTERNOON, OFFICER MC CORMICK.  THIS

1    IS SAM BETTWY.

2    *A.*   HELLO.

3    *Q.*   WHAT IS YOUR CURRENT TITLE?

4    *A.*   CURRENTLY, I'M A DETENTION AND DEPORTATION OFFICER ASSIGNED

5    TO HEADQUARTERS DETENTION AND REMOVAL OPERATIONS.

6    *Q.*   THAT IS FOR IMMIGRATION AND CUSTOMS ENFORCEMENT?

7    *A.*   THAT'S CORRECT.

8    *Q.*   AND WHEN DID YOU START WORKING WITH THE DEPARTMENT OF

9    HOMELAND SECURITY, DHS?

10   *A.*   UH, DEPARTMENT OF HOMELAND SECURITY AS A WHOLE, I STARTED

11   BACK IN APRIL OF 2003.

12   *Q.*   AND WHAT TRAINING, INITIAL TRAINING DID YOU RECEIVE?

13   *A.*   I RECEIVED AT YOUR BASIC ACADEMY AT GLYNCO, GEORGIA,

14   FEDERAL TRAINING CENTER.

15   *Q.*   AND WHERE WERE YOU FIRST ASSIGNED?

16   *A.*   THE MIAMI FIELD OFFICE IN MIAMI, FLORIDA.

17   *Q.*   NOW SINCE YOU BEGAN WITH DHS, WHEN DID YOU START WORKING

18   WITH CONSULATES AND EMBASSIES TO OBTAIN TRAVEL DOCUMENT?

19   *A.*   MY FIRST POSITION BACK IN MAY OF 2003 WAS DETAINED

20   DEPORTATION OFFICER AT WHICH POINT MY DUTIES THEN WERE TO

21   COMMUNICATE WITH VARIOUS CONSULATES AND EMBASSIES.

22   *Q.*   WHERE WERE YOU THEN?

23   *A.*   IN THE MIAMI FIELD OFFICE.

24   *Q.*   WHEN DID YOU START WORKING IN WASHINGTON?

25   *A.*   EARLY SEPTEMBER 2008.

1   *Q.* AND, IN GENERAL, WHAT ARE YOUR RESPONSIBILITIES AS A

2   DETAINED CASE MANAGEMENT IN YOUR CURRENT POSITION?

3   *A.* RIGHT NOW, AS A DETENTION AND DEPORTATION OFFICER, I

4   OVERSEE CASES, PENDING REMOVALS FOR 27 AFRICAN COUNTRIES.

5   *Q.* DOES THAT INCLUDE KENYA?

6   *A.* THAT DOES.

7   *Q.* AND ARE THERE ANY OTHER CASE MANAGEMENT OFFICERS AT

8   HEADQUARTERS WHO MANAGE KENYAN CASES?

9   *A.* AS FAR AS I KNOW, THERE IS ONLY, I BELIEVE, ONE OFFICER IN

10  THE COUNTRY, AND I AM THE ONLY OFFICER ASSIGNED TO KENYA.

11  *Q.* AND WHEN DOES THAT -- WHEN DO YOU GET INVOLVED DIRECTLY

12  WITH ATTEMPT TO OBTAIN THE TRAVEL DOCUMENT FROM ANOTHER

13  COUNTRY?

14  *A.* IT VARIES FOR COUNTRIES, BUT MOSTLY WHEN A SUBJECT HAS BEEN

15  IN CUSTODY FOR OVER 90 DAYS, THE CASE IS REFERRED TO US FROM

16  THE FIELD OFFICE PERSON.

17  *Q.* SO DURING THE FIRST 90 DAYS, IS IT THE LOCAL ICE OFFICE

18  THAT IS ATTEMPTING TO OBTAIN TRAVEL DOCUMENTS?

19  *A.* CORRECT, WITHIN THE FIRST 90 DAYS, THEY WORK DIRECTLY WITH

20  THEIR LOCAL CONSULATE AND, UH, IN HOPES OF OBTAINING A DOCUMENT

21  A TRAVEL DOCUMENT.

22  *Q.* NOW SINCE YOU BEGAN WORKING THERE MANAGING THE KENYAN

23  REMOVALS, HOW MANY CASES, APPROXIMATELY, HAVE YOU BEEN MANAGING

24  OVERALL?

25  *A.* OVERALL OVERSEEING?

1   *Q.* YES.

2   *A.* OVERALL MANAGING HANDS ON?

3   *Q.* OVERALL OVERSEEING?

4   *A.* OVERSEEING OVERALL HAS BEEN ROUGHLY ABOUT 130 KENYANS.

5   *Q.* AND OF THOSE 130, HOW MANY HAVE BEEN -- APPROXIMATELY HAVE

6   BEEN RETURNED TO KENYA?

7   *A.* UM, WITH THE EXCEPTION OF -- I'M GUESSING ABOUT 70 THAT ARE

8   STILL PENDING.  THE REST HAVE ALL BEEN -- THE MAJORITY, I WOULD

9   SAY -- DEFINITELY OVER 50 PERCENT HAVE ALREADY BEEN RETURNED OR

10  AWAITING REMOVAL.

11  *Q.* AND HOW MANY -- APPROXIMATELY WHAT PERCENTAGE OF THOSE

12  KENYANS THAT HAVE OBTAINED TRAVEL DOCUMENTS SINCE YOU HAVE BEEN

13  OVERSEEING THEM, ABOUT WHAT PERCENTAGE HAVE REQUIRED YOUR

14  PARTICIPATION DIRECTLY?

15  *A.* MY DIRECT AND ACTIVE PARTICIPATION, IT WOULD BE ROUGHLY

16  MAYBE ABOUT 20.

17  *Q.* 20 PERCENT?

18  *A.* NO, MY DIRECT INVOLVEMENT THE CASE HANDS-ON AT MY LEVEL, 20

19  CASES TOTAL.

20  *Q.* OKAY.  AND THEN TO YOUR KNOWLEDGE OF ALL THE CASES YOU

21  HAVE -- YOU HAVE MANAGED, HAVE YOU EVER SEEN THE CONDITION

22  KENYAN CONSULATE OR EMBASSY DENY ISSUANCE OF TRAVEL DOCUMENT?

23  *A.* I HAVE ONLY -- I HAVE HAD ONE FORMAL DENIAL.

24  *Q.* AND WHAT WAS THE BASIS FOR THAT DENIAL?

25  *A.* BASICALLY THE SUBJECT NOT BEING (PHONE CUT OUT.)

1  *Q.*  I'M SORRY.  COULD YOU REPEAT THAT?

2  *A.*  THE SUBJECT WAS DETERMINED TO BE OF ANOTHER COUNTRY, NOT

3  A--

4  *Q.*  NOT A KENYAN?

5  *A.*  -- NOT A KENYAN.  BUT WAS THE REASON FOR THE DENIAL.

6  *Q.*  ALL RIGHT.  THANK YOU.  HAVE YOU EVER PERSONALLY SEEN A

7  KENYAN RETURN TO KENYA?

8  *A.*  YES, I HAVE.

9  *Q.*  WHEN WAS THAT?

10  *A.*  MOST RECENTLY WAS JUNE OF THIS YEAR 2009, I TRAVELED TO

11  KENYA WITH THE REMOVAL MISSION.

12  *Q.*  I'M SORRY.  WITH?

13  *A.*  WITH -- WE HAD A CHARTER AIRCRAFT, AND ON THAT FLIGHT, WE

14  HAD ROUGHLY 20-SOMETHING KENYAN CITIZENS THAT WERE REMOVED, AND

15  I WAS ON THE AIRCRAFT WITH THEM DURING THE TRIP.

16  *Q.*  IN YOUR EXPERIENCE, WHAT IS THE AVERAGE TIME IT TAKES TO

17  OBTAIN A TRAVEL DOCUMENT FROM KENYA IF THE ALIEN HAS A CURRENT

18  KENYAN PASSPORT?

19  *A.*  WITH A RECENTLY ISSUED KENYAN PASSPORT AND NO OTHER

20  IDENTITY DOCUMENTS, WITHIN A -- OR PRIOR TO THAT, WE WILL

21  RECEIVE A DOCUMENT FROM THE GOVERNMENT OF KENYA.

22  *Q.*  HOW MANY DAYS?

23  *A.*  90.  FOR THE 90-DAY MARK.

24  *Q.*  AND THEN IN CASES WHERE THE KENYAN DOES NOT HAVE A

25  CURRENT-- CURRENTLY VALID PASSPORT, HOW LONG DOES IT TAKE

1   ROUGHLY TO GET A TRAVEL DOCUMENTS?

2   *A.*  ROUGHLY, IT WOULD TAKE ANYWHERE FROM ABOUT 90 TO 120 DAYS,

3   WHICH (PHONE CUTTING OUT.)

4   *Q.*  I'M SORRY.  YOU'RE GETTING CUT OFF.  DID YOU SAY WHICH, AND

5   THEN COMPLETE THE PHRASE?

6   *A.*  WE WOULD -- NORMALLY IT WOULD TAKE AN AVERAGE 90 TO 120

7   DAYS.

8   *Q.*  ALL RIGHT.  THANK YOU.  AND OF THE CASES THAT YOU -- OF THE

9   KENYANS THAT YOU HAVE SEEN RECEIVED TRAVEL DOCUMENTS, CAN YOU

10  GIVE US A ROUGH PERCENTAGE OF HOW MANY DID NOT HAVE A CURRENT

11  VALID PASSPORT?

12  *A.*  UM, I WOULD HAVE TO GUESS HERE.  IT WOULD BE ROUGHLY MAYBE

13  HALF AND HALF, BECAUSE WE HAVE A GOOD NUMBER.  TYPICALLY EVEN

14  IF IT'S NOT A CURRENT PASSPORT, THEY HAVE A COPY OF A PREVIOUS

15  PASSPORT.

16  *Q.*  NOW YOU SAY YOU DEAL WITH HOW MANY AFRICAN COUNTRIES?

17  *A.*  27 AFRICAN COUNTRIES RIGHT NOW.

18  *Q.*  HOW DOES THE KENYAN GOVERNMENT COMPARE WITH OTHER AFRICAN

19  GOVERNMENTS COMPARED WITH SPEED WITH REQUESTS?

20  *A.*  SINCE I HAVE BEEN ASSIGNED FOR A YEAR, THEY'RE ONE OF THE

21  MORE COOPERATIVE COUNTRIES.

22  *Q.*  IS KENYA CONSIDERED TO BE A PROBLEM COUNTRY WITH RESPECT TO

23  OBTAINING TRAVEL DOCUMENTS?

24  *A.*  NO, IT IS NOT.

25  *Q.*  ARE YOU FAMILIAR WITH MR. OWINO'S CASE?

1    *A.*  I AM SOMEWHAT FAMILIAR WITH HIS CASE, YES.

2    *Q.*  HAVE YOU BEEN PERSONALLY INVOLVED IN HIS CASE?

3    *A.*  I HAVE NOT BEEN PERSONALLY INVOLVED WITH THE, UH, TRAVEL

4  DOCUMENT REQUEST PROCESS.

5    *Q.*  IF MR. OWINO DOES NOT HAVE HIS ORIGINAL PASSPORT, IS THAT

6  GOING TO POSE A PROBLEM IN OBTAINING TRAVEL DOCUMENTS FOR HIS

7  RETURN?

8    *A.*  NOT HAVING A PASSPORT IN ITSELF IS NOT A PROBLEM FOR A

9  KENYAN CITIZEN, TYPICALLY.

10    *Q.*  WILL IT MAKE IT EASIER IF HE HAS A COPY OF HIS COMPLETE

11  PASSPORT?

12    *A.*  IT THERE IS A COPY, IT WILL MAKE IT EASIER, YES.

13    *Q.*  IN YOUR OPINION, FROM WHAT YOU KNOW ABOUT MR. OWINO'S CASE

14  AND WHAT YOU KNOW -- YOUR EXPERIENCE WITH THE KENYAN CONSULATE,

15  WHAT IS YOUR OPINION ON HOW LIKELY IT IS HE WILL OBTAIN A

16  TRAVEL DOCUMENT ONCE HIS REMOVAL PROCEEDING EVER OVER?

17        *MR. FIFE:*  OBJECTION, YOUR HONOR.  CALLS FOR IMPROPER

18  OPINION.

19        *THE COURT:*  SHE IS REALLY GIVING HER POINT OF VIEW.

20  AND SO SHE IS NOT REALLY TESTIFYING AS AN EXPERT.  AND I

21  UNDERSTAND THE QUESTION AS PHRASED.  I'LL OVERRULE THE

22  OBJECTION AND GIVE IT THE WEIGHT THAT I BELIEVE THE RECORD

23  SUPPORTS.

24    *Q.*  *(BY MR. BETTWY)*  DO YOU UNDERSTAND THE QUESTION?

25    *A.*  CAN YOU REPEAT THE QUESTION?

1  *Q.* IN YOUR OPINION, BASED ON YOUR EXPERIENCE WITH THE KENYAN

2  CONSULATE AND WHAT YOU KNOW ABOUT MR. OWINO'S CASE, DO YOU HAVE

3  AN OPINION ON HOW LIKELY IT IS THAT HE WILL RECEIVE A TRAVEL

4  DOCUMENT ONCE HIS REMOVAL PROCEEDINGS ARE COMPLETED?

5  *A.* BASED ON THE IDENTITY DOCUMENTS AND IDENTIFYING INFORMATION

6  THAT WE HAVE ON HIS CASE, I HAVE HAD OTHER CASES WITH JUST AS

7  MUCH OR LESS INFORMATION PRESENTED, AND I HAVE BEEN ABLE TO

8  OBTAIN A DOCUMENT. SO BASED ON THAT, I DO NOT FOR SEE A

9  PROBLEM GETTING INFORMATION OF HIS KENYAN CITIZENSHIP FROM THE

10 GOVERNMENT OF KENYA.

11      *MR. BETTWY:* THANK YOU. I HAVE NO FURTHER QUESTIONS,

12 YOUR HONOR.

13      *THE COURT:* CROSS-EXAMINATION, COUNSEL?

14      *MR. FIFE:* YES, YOUR HONOR.

15    *(PETITIONER ATTORNEY DISCUSSION OFF THE RECORD.)*

16              CROSS-EXAMINATION

17 *Q.* *(BY MR. FIFE)* GOOD AFTERNOON, MS. MC CORMICK. THIS IS

18 JAMES FIFE, ATTORNEY FOR PETITIONER, MR. OWINO.

19 *A.* GOOD AFTERNOON.

20 *Q.* WHAT MATERIALS DID YOU REVIEW IN PREPARATION FOR YOUR

21 TESTIMONY TODAY?

22 *A.* BASICALLY REVIEWING AND CORRESPONDING WITH MR. BETTWY BASIC

23 GENERAL INFORMATION ON CASES AND LIBERIANS IN WORKING WITH THE

24 GOVERNMENT OF KENYA.

25      *MR. FIFE:* YOUR HONOR, WE WOULD REQUEST PRODUCTION OF

COMPUTER-AIDED TRANSCRIPTION

1    ANY MATERIALS WHICH THE WITNESS HAS USED TO PREPARE.

2             *THE COURT:* IT DEPENDS WHAT SHE HAS REVIEWED.

3    MR. BETTWY, HAVE YOU SEEN ANYTHING SHE HAS REVIEWED?

4             *MR. BETTWY:* NO, YOUR HONOR.

5             *THE COURT:* YOU CAN ASK THE WITNESS TO DESCRIBE WHAT

6    IT WAS SHE REVIEWED.

7    *Q. (BY MR. FIFE)* YOU REVIEWED CORRESPONDENCE WITH

8    MR. BETTWY?

9    *A.* I REVIEWED -- I E-MAILED MR. BETTWY IN REFERENCE TO

10   COORDINATING OUR MEETING AND INFORMATION WITH THAT.

11   *Q.* AND DID YOU REVIEW ANY DOCUMENTS SPECIFICALLY RELATING TO

12   MR. OWINO'S CASE?

13   *A.* I DID REVIEW ONE INTERNAL CASE MANAGEMENT SYSTEMS TO

14   BASICALLY LOOK AT BIOGRAPHICAL INFORMATION AND INFORMATION FOR

15   HIS DEPORTATION CASE.

16   *Q.* HOW ABOUT FOR YOUR STATEMENT OF THE STATISTICS AND THE

17   NUMBER OF PEOPLE THAT HAVE BEEN REMOVED, IS FROM MEMORY, OR DO

18   YOU CONSULT MATERIALS?

19   *A.* I CONSULTED -- UM, I WOULD HAVE TO GUESS. WE HAVE ONE

20   INTERNAL, UH, EXECUTIVE INFORMATION UNIT THAT BASICALLY HAS OUR

21   STATISTICAL -- HOW MANY PEOPLE WE REMOVE IN PREVIOUS FISCAL

22   YEARS.

23   *Q.* IS THIS INFORMATION IN WRITTEN FORM?

24   *A.* UM, I FORGET THE SOURCE. IT IS WRITTEN, AND IT IS

25   PUBLISHED IN A BOOK. IT IS PUBLISHED EVERY YEAR, AT THE END OF

1   THE FISCAL YEAR.

2   *Q.* IS THAT SOMETHING SEPARATE FROM THE YEARBOOK OF IMMIGRATION

3   STATISTICS?

4   *A.* I BELIEVE ACTUALLY THAT WOULD BE IT, PERHAPS.

5   *Q.* OKAY.

6         *MR. FIFE:* YOUR HONOR, WE WOULD REQUEST THAT ANY OF

7   THE MATERIALS BESIDES THE PUBLISHED MATERIALS THAT SHE HAS

8   CONSULTED THAT WE HAVE ACCESS TO, THAT SHE, CERTAINLY, PROVIDE

9   FOR US.

10        *THE COURT:* WELL, WHAT SPECIFICALLY ARE THEY? THE

11  PUBLISHED STATISTICS, DO YOU HAVE COPY OF THOSE? THOSE ARE

12  AVAILABLE.

13        *MR. FIFE:* THAT'S CORRECT, YOUR HONOR. THAT IS ONE OF

14  THE EXHIBITS WHICH I WILL BE ADMITTING INTO EVIDENCE.

15        *THE COURT:* SO THERE IS THAT, AND THEN THERE IS THE

16  E-MAILS THAT ADDRESS -- THE E-MAILS THEN JUST ADDRESS THE TIME

17  AND PLACE OF THE HEARING?

18        MS. MC CORMICK, WHAT IS IN THE E-MAILS? IS THAT JUST

19  ADDRESSING THE TIME AND PLACE OF THE HEARING?

20        *THE WITNESS:* BASICALLY PRETTY MUCH, YES, AND

21  INTRODUCTION OF MR. BETTWY, WHO I WAS WE HADN'T SPOKEN PRIOR TO

22  THIS OR EVEN MET EACH OTHER. SO LETTING HIM KNOW WHAT IT WAS

23  THAT I DID AND MY ROLE HERE AT HQ, HEADQUARTERS DEPORTATION.

24        *THE COURT:* MR. BETTWY, DO YOU HAVE COPIES OF THE

25  E-MAILS?

1      *MR. BETTWY:*  I BELIEVE SO.  I WOULD OBJECT ON

2  ATTORNEY/CLIENT PRIVILEGE.

3      *THE COURT:*  YOU CAN REVIEW THE E-MAILS, BUT IT DOESN'T

4  SEEM THERE IS ANYTHING OF SUBSTANCE IN THE E-MAILS.  DO YOU

5  AGREE, MR. FIFE?

6      *MR. FIFE:*  IT SOUNDS LIKE SHE WAS JUST GETTING

7  INSTRUCTIONS ABOUT THE TESTIMONY.

8      *THE COURT:*  RIGHT.

9      *MR. FIFE:*  THERE IS THAT ONE DOCUMENT IT SOUNDS LIKE

10  IT IS A REGULAR IMMIGRATION DOCUMENT.  I'M NOT QUITE SURE BY

11  THE DESCRIPTION WHAT IT COVERS.

12      *THE COURT:*  SO THEN, MS. MC CORMICK, THERE IS THE

13  THIRD DOCUMENT WAS THERE A -- SEPARATE AND APART FROM THE

14  E-MAIL AND THE PUBLISHED INFORMATION, WAS THERE A DOCUMENT OR A

15  SOURCE OF INFORMATION THAT YOU REVIEWED THAT DEALT WITH SOME

16  STATISTICS?

17      *THE WITNESS:*  NO.  I LOOKED INTO OUR CASE (PHONE

18  CUTTING OUT) TO LOOK AT PERSONAL OR INDIVIDUAL CASE FULLY, NOT

19  A WHOLE.

20      *THE COURT:*  AND THAT IS MR. OWINO'S CASE YOU LOOKED

21  INTO?

22      *THE WITNESS:*  THAT WOULD BE CORRECT.

23      *THE COURT:*  WAS IN THE CASE -- DESCRIBE THE DOCUMENTS

24  THAT YOU LOOKED AT TO PREPARE FOR YOUR TESTIMONY.

25      *THE WITNESS:*  THAT WAS NOT A DOCUMENT.  THAT IS

1    ELECTRONIC CASE MANAGEMENT SYSTEM WHERE IT PRETTY MUCH TELLS

2    YOU STANDARD INFORMATION.  I MEAN, WITHOUT GETTING INTO THE

3    DETAILS THE ARREST REPORTS AND ALL (PHONE CUTTING OUT) IT IS

4    WHERE THE SUBJECT IS FROM, HOW LONG THEY HAVE BEEN IN CUSTODY,

5    DIFFERENT LEGAL ACTIONS THEY HAVE TAKEN ON THEIR CASE,

6    DIFFERENT INFORMATION THAT THEY HAVE GIVEN.  BUT MOSTLY, IT HAS

7    IMMIGRATION COURT INFORMATION.  BUT IT'S IN ELECTRONIC FORM NOT

8    A PAPER FORM.

9    *Q.  (BY MR. FIFE)*  OFFICER MC CORMICK, WOULD THIS BE A

10   PRINTOUT FROM THE EARM?

11   *A.*  IT WAS NOT A PRINTOUT.  I LOOKED AT THE SYSTEM.  I LOOKED

12   AT THE EARM.

13   *Q.*  YOU -- BUT IS THE INFORMATION THAT IS IN THE DATABASE, THE

14   COMPUTER DATABASE?

15   *A.*  IT IS THAT DATABASE, YES.

16        *MR. FIFE:*  I BELIEVE THAT WOULD BE SIMILAR TO THE

17   INFORMATION WE HAVE IN EXHIBIT 13.

18        *THE COURT:*  CAN YOU MAKE A PRINTOUT OF THAT

19   INFORMATION THAT YOU LOOKED AT ON LINE, MS. MC CORMICK?

20        *THE WITNESS:*  I DON'T KNOW THAT FOR THIS PURPOSES THAT

21   WOULD BE DONE.  UH, CAN THE SYSTEM HAVE THE CAPABILITY TO?  I

22   WOULD SUPPOSE, BUT THAT IS NOT -- I MEAN, THAT IS NOT SOMETHING

23   I DO.  I LOOK AT THE INFORMATION.  NOT BEING A CASE OFFICER, I

24   LOOK AT IT AND THAT'S IT.

25        *THE COURT:*  OKAY.  AND SO, MR. FIFE, IS THAT THE

1    INFORMATION THAT YOU'RE REQUESTING?

2          *MR. FIFE:*  YES, YOUR HONOR, IF IT'S ANY DIFFERENT FROM

3    WHAT WE HAVE ALREADY BEEN PROVIDED IN EXHIBIT 13.  THIS HAS

4    BEEN A RUNDOWN OF CASE NOTES IN MR. OWINO'S CASE FROM MAY 2008

5    TO SEPTEMBER OF THIS YEAR.  I DON'T KNOW WHETHER SHE HAS GOT

6    EXACTLY THE SAME ENTRIES SHE WAS LOOKING AT OR WHETHER THERE

7    WAS ADDITIONAL INFORMATION.  THAT CASE CERTAINLY GOES BACK

8    BEFORE 2008, SO.

9          *THE WITNESS:*  IF I MAY, YOUR HONOR, THIS ISN'T ALONG

10   THE LINES OF ANYTHING I LOOK AT HERE.  THE CASE OFFICER WOULD

11   LOOK AT THE SAME EXACT INFORMATION.  I DON'T HAVE ANY

12   ADDITIONAL ACCESS.

13         *THE COURT:*  ALL RIGHT.  AND SO IS THE INFORMATION THAT

14   YOU LOOKED AT, IS THAT AVAILABLE TO ANYBODY HERE WHO WOULD LOG

15   ONTO THE SYSTEM?

16         *THE WITNESS:*  YES, SIR.

17         *THE COURT:*  MR. BETTWY, DO YOU KNOW IS THIS THE SAME

18   INFORMATION THAT OFFICER HAYES LOOKED AT?  IS THIS THE

19   IDENTICAL INFORMATION?

20         *MR. BETTWY:*  I BELIEVE SO.  I THINK SHE MENTIONED

21   LOOKING AT SOME BIOGRAPHICAL INFORMATION.  THAT MIGHT BE --

22         *THE WITNESS:*  THAT IS THE HOME SCREEN IN THE SYSTEM

23   WHEN YOU LOG ON AND YOU DO NAME, DATE OF BIRTH OF THE

24   INDIVIDUAL.

25         *MR. BETTWY:*  I THINK THAT SOUNDS LIKE THE ONLY

1  DIFFERENCE THERE IS AN ADDITIONAL SCREEN THAT HAS HIS NAME AND

2  BIOGRAPHICAL INFORMATION.

3      *THE COURT:*  IS THAT CORRECT, THAT IS WHAT THE SCREEN

4  SAYS IS HIS NAME AND BIOGRAPHICAL INFORMATION AND THEN IS IT

5  THE REST OF THE INFORMATION THAT HAS ALREADY BEEN PROVIDED TO

6  MR. FIFE, MR. BETTWY; IS THAT WHAT IT IS?

7      *MR. BETTWY:*  YOUR HONOR, IF I COULD CLARIFY WITH THE

8  WITNESS?

9      *THE COURT:*  CERTAINLY.

10 *Q.   (BY MR. BETTWY)*  OFFICER MC CORMICK, WHAT WE HAVE IS THE

11 EARM CASE COMMENTS, AND THERE ARE FOUR OR FIVE COLUMNS.  YOU

12 DON'T HAVE IT IN FRONT OF YOU?

13 *A.*  THAT IS -- I'M FAMILIAR WITH THE SYSTEM, THOUGH.  THAT IS

14 THE SAME EXACT SCREEN, YES.

15     *MR. BETTWY:*  OKAY.  YES, YOUR HONOR, I BELIEVE SO.

16     *THE COURT:*  ALL RIGHT.  SO IT APPEARS THEN THAT YOU

17 HAVE THAT, MR. FIFE.

18     *MR. FIFE:*  YES.

19     *THE COURT:*  AND SO THEN THE ONLY OTHER INFORMATION

20 WOULD BE JUST APPARENTLY THE BIOGRAPHICAL INFORMATION.  AND

21 WHEN YOU SAY THE BIOGRAPHICAL INFORMATION, WAS THAT JUST

22 MR. OWINO'S NAME AND DATE OF BIRTH?

23     *THE WITNESS:*  OFF THE TOP OF MY HEAD, IT WOULD BE

24 NAME, DATE OF BIRTH, COUNTRY OF CITIZENSHIP, COUNTRY OF BIRTH.

25 UM, AND I'M TRYING TO THINK OF PERHAPS HIS FINAL ORDER DATE.

1      *(COURT REPORTER INTERRUPTION.)*

2         *THE COURT:* IS THAT FINAL ORDER DATE?

3         *THE WITNESS:* THAT'S CORRECT.

4         *THE COURT:* IT WOULD SEEM THE OBJECT OF THE WITNESS'S

5 TESTIMONY, SHE'S NOT REALLY TESTIFYING WHAT WHEN HE WAS BORN.

6         *MR. FIFE:* CORRECT.

7         *THE COURT:* SO IN LIGHT OF THAT, NOW THAT WE HAVE THE

8 CLARIFICATION ON WHAT THE WITNESS HAS REVIEWED, ARE YOU

9 SATISFIED THAT YOU HAVE THE MATERIAL?

10         *MR. FIFE:* IF I COULD HAVE ONE MORE FOLLOW-UP

11 QUESTION.

12 *Q.* *(BY MR. FIFE)* DID YOU REVIEW -- ARE YOU AWARE THAT YOU

13 REVIEWED ANY MATERIALS ON THE -- IN THE DATABASE BEFORE MAY OF

14 2008?

15 *A.* I -- I DON'T UNDERSTAND THE QUESTION. I'M SORRY.

16 *Q.* DID ANY OF ENTRIES THAT YOU REVIEWED ON THE SCREEN DATE

17 BEFORE MAY OF 2008?

18 *A.* NOT THAT I RECALL, BECAUSE I MOST RECENTLY LOOKED AT THE

19 RECENT INFORMATION GIVEN THAT THE FINAL ORDER. NOW THE CASE

20 COME TO ME AFTER THAT DATE.

21 *Q.* DID YOU REVIEW ANY MATERIAL MORE RECENT THAN SEPTEMBER

22 15TH, 2009?

23 *A.* DEFINITELY NOT.

24 *Q.* OKAY.

25         *MR. FIFE:* I THINK THIS IS PROBABLY SUBSTANTIALLY THE

1    SAME, YOUR HONOR.

2            *THE COURT:*  ALL RIGHT.  THANK YOU, SIR.  YOU MAY

3    CONTINUE WITH YOUR EXAMINATION.

4            *MR. FIFE:*  THANK YOU.

5    *Q.  (BY MR. FIFE)*  LET ME JUST CLARIFY YOUR TESTIMONY.  YOU

6    SAID, OVERALL, YOU HAVE SEEN 130 KENYAN CASES?

7    *A.*  IN THE TIME THAT I HAVE BEEN HERE, YES.

8    *Q.*  SINCE SEPTEMBER OF LAST YEAR?

9    *A.*  I HAVEN'T OVERSEEN BY MYSELF.  I DID HAVE COORDINATED, YES.

10   *Q.*  OKAY.  AND YOU TESTIFIED THAT ABOUT 50 PERCENT OF THOSE

11   PEOPLE ARE STILL AWAITING REMOVAL?

12   *A.*  I DON'T REMEMBER THAT.  I THOUGHT IT WAS ABOUT 50 PERCENT

13   HAD VERSUS DID NOT HAVE PASSPORTS PROVIDED.

14   *Q.*  OKAY.  SO DO YOU KNOW HOW MANY OF THOSE 130 YOU HAVE BEEN

15   SUCCESSFUL IN REMOVING?

16   *A.*  I DON'T KNOW OFF THE TOP OF MY HEAD.  I DO KNOW WE HAVE

17   REMOVED IN THE LAST FISCAL YEAR, IT'S VERY ROUGH THE NUMBER,

18   BUT I GUESS IT WOULD BE ABOUT 150, PERHAPS 130.  BUT I DO NOT--

19   CANNOT SAY THAT THOSE ARE THE EXACT 130 THAT I WORKED.

20   *Q.*  SO SOME OF THOSE 150 SINCE THERE WAS MORE THAN THE NUMBER

21   OF CASES YOU SUPERVISED, SOME OF THOSE MAY BE FOR PEOPLE FROM

22   PREVIOUS YEARS?

23   *A.*  I CAN'T SAY HONESTLY UNTIL I LOOK AT THEM.

24   *Q.*  SO YOU CAN'T EXPLAIN HOW YOU ONLY HAVE 130 CASES BUT YOU

25   HAVE REMOVED 150?

1    *A.* NO, I CAN'T SAY, BECAUSE NOT ALL CASE MEETS -- A DOCUMENT

2    DOESN'T NEED TO BE REQUESTED FOR EACH CASE.  WE HAVE

3    INDIVIDUALS THAT ARE LOCATED OR APPREHENDED WITH A VALID KENYAN

4    PASSPORT.  WE UTILIZE THAT DOCUMENT FOR REMOVAL.  I ONLY GET

5    INVOLVED WITH CASE WE HAVE TROUBLE GETTING TRAVEL DOCUMENTS.

6    *Q.* SO YOU'RE NOT THE -- THE CASES THAT YOU HANDLE, THESE

7    AREN'T ALL THE KENYANS WHO ARE REMOVABLE FROM THE UNITED

8    STATES, IT'S JUST THE ONES THAT THEY NEED SPECIAL ASSISTANCES

9    ON?

10   *A.* THE ONES WE NEED TO OBTAIN A DOCUMENT FOR REMOVAL, THAT IS

11   CORRECT.  THE ONES WE HAVE A DOCUMENT FOR AND WE REMOVE, I

12   TYPICALLY DO NOT GET INVOLVED IN THOSE CASES.

13   *Q.* OKAY.  SO THERE'S A NUMBER OF OTHER KENYANS WHO ARE OUT

14   THERE IN THE FIELD AWAITING REMOVAL, BUT THEY HAVEN'T BEEN

15   REFERRED TO YOUR OFFICE?

16   *A.* THEY HAVE NOT BEEN REFERRED TO MY OFFICE FOR ASSISTANCE IN

17   OBTAINING TRAVEL DOCUMENTS, CORRECT.

18   *Q.* SO YOUR TESTIMONY IS NOT BASED ON THE WHOLE UNIVERSE OF

19   REMOVABLE KENYANS IN THE UNITED STATES, JUST THE ONES IN YOUR

20   OFFICE?

21   *A.* THAT IS NOT CORRECT.  I AM AWARE AND FAMILIAR WITH A NUMBER

22   OF CASES OF KENYANS WE HAVE OUT IN THE UNIVERSE BUT CURRENTLY

23   DETAINED WITH IMMIGRATION AND PENDING REMOVAL WITH A FINAL

24   ORDER.

25   *Q.* SO YOU'RE FAMILIAR WITH THE GENERAL NUMBERS OF KENYANS WHO

1  ARE AWAITING TO BE REMOVED?

2  *A.*  THAT IS CORRECT.

3  *Q.*  DO YOU KNOW HOW MANY KENYANS WERE WAITING TO BE REMOVED IN

4  2008?

5  *A.*  NO, I DON'T.  I JUST KNOW THE ONES I DEALT WITH, NOT THE

6  ONES THAT WERE, YOU KNOW, RE-- OR PENDING AT ANY GIVEN TIME.

7  *Q.*  DO YOU KNOW HOW MANY KENYANS WERE REMOVED FROM THE UNITED

8  STATES IN 2008?

9  *A.*  IN 2008, IF I RECALL CORRECTLY, I BELIEVE IT WAS ABOUT 160.

10 *Q.*  BUT YOU DON'T KNOW THE EXACT NUMBER?

11 *A.*  I WOULD HAVE TO REFER TO THE MANUAL FOR THE ACTUAL

12 PUBLISHED NUMBER, BUT I DO KNOW IT WAS ROUGHLY 160.

13 *Q.*  SO THOSE ARE 160 ACROSS THE COUNTRY, NOT JUST THE ONES THAT

14 HAVE BEEN PROCESSED THROUGH YOUR OFFICE?

15 *A.*  THAT IS CORRECT, ACROSS THE COUNTRY.

16 *Q.*  ALL RIGHT.  DO YOU KNOW HOW MANY OF THOSE PEOPLE THAT

17 WERE -- WHO WERE REMOVED HAD WAITED MORE THAN SIX MONTHS TO BE

18 REMOVED?

19 *A.*  I DO NOT HAVE THAT INFORMATION READILY AVAILABLE RIGHT NOW,

20 NO.

21 *Q.*  DO YOU KNOW HOW MANY HAVE BEEN WAITING FOR TWO AND A HALF

22 YEARS?

23 *A.*  I DO NOT HAVE THAT INFORMATION, NO.

24 *Q.*  DO YOU HAVE ANY INFORMATION ON HOW MANY HAD CRIMINAL

25 CONVICTIONS?

*A.* I CAN GET THE INFORMATION, BUT I DO NOT HAVE IT READILY

AVAILABLE, UM, BEING THAT WE CAN LOOK FOR DOCUMENTS ON

REMOVABILITY NOT ON CRIMINALITY.

*Q.* OKAY. DO YOU HAVE ANY INFORMATION ON HOW MANY HAD NO

FAMILY REMAINING IN KENYA?

*A.* THAT IS NOT SOMETHING (PHONE CUTTING OUT) MY COURSE OF MY

CASE AND WITH FOREIGN GOVERNMENTS THAT IS A TOPIC OF

DISCUSSION.

*Q.* SO THAT IS NOT SOMETHING YOU KEEP ANY INFORMATION ON?

*A.* THAT WOULD BE CORRECT.

*Q.* DO YOU KNOW HOW MANY WERE -- WHO WERE REMOVED HAD LEFT THE

KENYA MORE THAN TEN YEARS AGO?

*A.* THAT IS NOT SOMETHING THAT IS DISCUSSED, AGAIN, IN

OBTAINING TRAVEL DOCUMENTS.

*Q.* DO YOU KNOW HOW MANY PEOPLE REMOVED HAD RAISED TORTURE

CLAIMS AGAINST KENYA?

*A.* I DO NOT KNOW, BUT I PRESUME MANY I HAVE THAT IS NOT

SOMETHING THAT -- THAT ISSUE HAS -- BY THE TIME A CASE COMES TO

ME HAS BEEN ADDRESSED IN OTHER COURT SYSTEMS, WHETHER IT'S

IMMIGRATION COURT, THE APPELLATE COURT, ET CETERA, UM, AND HAS

BEEN ADDRESSED BY A JUDGE. THEREFORE, IT IS NOT ADDRESSED BY

ME AT THAT POINT.

*Q.* SO YOU DON'T KEEP TRACK OF THAT INFORMATION?

*A.* I AM NOT SAYING I DON'T. I KNOW I DO NOT KEEP TRACK OF IT.

WHETHER OR NOT THE AGENCY AS A WHOLE HAS THE INFORMATION, I

1  CAN'T ANSWER THAT.  BUT I PERSONALLY DO NOT KEEP TRACK OF THAT

2  OR ADDRESS THAT IN THE COURSE OF MY DUTIES.

3  Q.  OKAY.  DO YOU KNOW HOW MANY PEOPLE WHO ARE REMOVED HAD TOLD

4  THE EMBASSY THAT THEY WANT TO RETURN TO KENYA?

5  A.  I AM NOT INVOLVED WITH THE DIRECT COMMUNICATION.  UM, PART

6  OF OUR DETENTION STANDARDS, WE MUST ALLOW COMMUNICATION BETWEEN

7  ALL ALIENS AND THEIR GOVERNMENT, AND WE ARE NOT LISTENING TO A

8  CONVERSATION, SO I CANNOT SAY.

9  Q.  AND YOU DON'T KEEP TRACK OF THAT INFORMATION IN YOUR

10  REMOVAL STATISTICS?

11  A.  OF WHAT INFORMATION?

12  Q.  WHETHER THEY HAD TOLD THE EMBASSY THAT THEY WANT TO RETURN

13  TO KENYA.

14  A.  WE DO NOT TRACK WHAT THEY TELL THE EMBASSIES, IF THAT IS

15  WHAT I'M BEING ASKED.  WHAT AN ALIEN COMMUNICATES (PHONE

16  CUTTING OUT) THE LETTERS THAT THEY WRITE ON THEIR OWN FREE

17  WILL, THAT IS THEIR RIGHT IN THE CASE OF THEIR FOREIGN

18  GOVERNMENT, AND WE DO NOT TRACK THAT INFORMATION.

19  Q.  YOU SAY ARE YOU FAMILIAR WITH THE OFFICE OF IMMIGRATION

20  STATISTICS YEARBOOK?

21  A.  I HAVE NOT READ IT, BUT I DO KNOW OF IT, YES.

22  Q.  OKAY.  AND IT'S AN OFFICIAL PUBLICATION OF THE DEPARTMENT

23  OF HOMELAND SECURITY?

24  A.  I DO NOT KNOW WHO PUBLISHED IT, SO I CAN'T ANSWER THAT.  I

25  KNOW I HAVE REFERENCED IT.  I HAVE NOT LOOKED AT EXACTLY WHO

1  PUBLISHED THAT OR THAT FAMILIAR WITH IT.

2  *Q.* YOU KNOW IT CONTAINS FIGURES FOR HOW MANY DEPORTABLE ALIENS

3  THERE ARE?

4  *A.* I DO KNOW THAT.

5  *Q.* AND YOU KNOW IT HAS THE NUMBERS OF REMOVALS FOR EACH

6  COUNTRY LISTED?

7  *A.* I BELIEVE SO, YES.

8  *Q.* IS THERE ANY REASON WHY THE NUMBERS THAT YOU HAVE GIVEN US

9  SHOULD DIFFER FROM THE NUMBERS THAT DIFFER FROM THE NUMBERS IN

10 THE YEARBOOK?

11 *A.* I CANNOT SAY. I WOULD HAVE TO LOOK AT MY SOURCES AND

12 COMPARE TO THE BOOK. I CAN'T COMMENT ON THAT UNLESS I HAVE

13 MORE INFORMATION AVAILABLE TO ME.

14 *Q.* DO YOU KNOW OF ANY REASON WHY THEY MIGHT OR SHOULD DIFFER?

15 *A.* IT WOULD DEPEND. AND, AGAIN, I -- DO WANT YOU ME TO BE

16 HYPOTHETICAL? IF A PERSON -- IF A PERSON IS CATEGORIZED

17 DIFFERENTLY ON WHETHER OR NOT IT'S CRIMINAL REMOVAL, WHETHER OR

18 NOT IT WAS CATEGORIZED A VOLUNTARY RETURN OR A VOLUNTARY

19 DEPARTURE VERSUS DEPORTATION. THERE COULD BE A NUMBER OF

20 THINGS I CAN'T -- YOU KNOW, DEPENDING EXACTLY ON THE SITUATION.

21 *Q.* SO THE STATISTICS THAT YOU GAVE US, YOU'RE NOT -- WE JUST

22 WENT THROUGH THAT LIST. YOU'RE NOT TRACKING ANY OF THAT

23 INFORMATION ON YOUR NUMBERS?

24 *A.* NO, I HAVE SOURCES, INTERNAL SOURCES WITHIN THAT (PHONE

25 CUTTING OUT) THAT I -- THAT COULD BE REFERENCED TO GET THE

1    NUMBER THAT WE SHOW WERE REMOVED.  THE NUMBER THAT I -- I DO

2    NOT TRACK OR HAVE WITH ME IS HOW MANY INDIVIDUALS CLAIMED

3    ASYLUM.  THAT IS SOMETHING THAT IS NOT -- SOMETHING THAT I DEAL

4    WITH.

5    *Q.*  ARE YOU FAMILIAR WITH THE 2007 INSPECTOR GENERAL'S REPORT

6    ON ICE'S COMPLIANCE WITH DETENTION?

7    *A.*  I AM NOT FAMILIAR WITH IT RIGHT NOW, NO.

8    *Q.*  SO YOU PERSONALLY HAVE NOT IMPLEMENTED ANY OF THE INSPECTOR

9    GENERAL'S RECOMMENDATIONS THAT MAY BE IN THAT REPORT?

10    *A.*  I WOULD HAVE TO SEE THAT REPORT OR BE REMINDED OF THE

11    REPORT.  THERE ARE MANY REPORTS I READ ON A DAILY BASIS, AND I

12    CANNOT SAY I KNOW THE EXACT OF EVERY SINGLE ONE RIGHT NOW.  I

13    MEAN, IF YOU ASKED ME SPECIFICALLY PARTS OF IT, I COULD

14    PROBABLY ANSWER THAT BETTER.

15    *Q.*  THANK YOU.  YOU SAID THAT -- YOU EXPRESSED AN OPINION OF

16    WHETHER MR. OWINO WAS LIKELY TO BE REMOVED?

17    *A.*  OKAY.

18    *Q.*  YOU SAID THAT WAS BASED ON THE AVAILABILITY OF IDENTITY

19    DOCUMENTS IN HIS CASE?

20    *A.*  IT WAS A NUMBER OF THINGS.  THAT WOULD BE ONE OF THEM, YES.

21    *Q.*  SO WAS YOUR OPINION BASED ON ANY OF THOSE FACTORS I

22    MENTIONED BEFORE, LIKE WHETHER HE HAS A CRIMINAL CONVICTION?

23    *A.*  NO, SIR.  THOSE ARE BASED ON WHETHER OR NOT HE HAS TO

24    MAKE -- OR WHETHER OR NOT HIS ORDER OF REMOVAL IS FINAL AND NOT

25    BEING ADDRESSED IN ANY COURT SYSTEM.  IT'S ALSO BASED, AS I

1    MENTIONED, ON THE AVAILABILITY OF IDENTITY DOCUMENTS.  IT'S

2    ALSO BASED ON IDENTIFIABLE INFORMATION THAT EITHER HE WOULD

3    PROVIDE OR IMMIGRATION HAS AVAILABLE.  IT GIVES HIS GOVERNMENT

4    THAT CONFIRMS ANY CITIZENSHIP, NOT BASED ON HIS CRIMINALITY.

5    *Q.*  OR IT'S NOT BASED ON YOUR KNOWLEDGE OF WHETHER HE HAS ANY

6    FAMILY LEFT IN THE COUNTRY?

7    *A.*  NO, SIR.  THAT IS NOT PART OF OUR IDENTITY CONFIRMATION AND

8    CITIZENSHIP CONFIRMATION PROCESS, NO.

9    *Q.*  AND IT'S NOT BASED ON HOW LONG AGO HE LEFT KENYA?

10   *A.*  AGAIN, I (PHONE CUTTING OUT) KENYA IS TO CONFIRM FOR ONE

11   MAIN REASON IS THIS THE INDIVIDUAL IN QUESTION A CITIZEN OF

12   THAT COUNTRY.

13       *(COURT REPORTER INTERRUPTION.)*

14           *THE COURT:*  OKAY.  PLEASE RESTATE YOUR ANSWER.

15           *THE WITNESS:*  IT'S TO CONFIRM WHETHER OR NOT THE

16   INDIVIDUAL IN QUESTION IS A CITIZEN OF THAT COUNTRY.

17           *MR. FIFE:*  I HAVE NO OTHER QUESTIONS, YOUR HONOR.

18           *THE COURT:*  ANY REDIRECT, COUNSEL?

19           *MR. BETTWY:*  NO, THANK YOU, YOUR HONOR.

20           *THE COURT:*  ALL RIGHT.  SO MS. MC CORMICK MAY BE

21   EXCUSED?

22           *MR. BETTWY:*  YES, YOUR HONOR.

23           *MR. FIFE:*  YES.

24           *THE COURT:*  THANK YOU VERY MUCH, OFFICER MC CORMICK.

25           *THE WITNESS:*  THANK YOU ALL.  GOOD-BYE.

1        *THE COURT:* NOW THE PROOF HAS ENDED, COUNSEL? YOU

2 HAVE NO ADDITIONAL WITNESSES?

3        *MR. BETTWY:* NO ADDITIONAL WITNESSES.

4        *THE COURT:* NO ADDITIONAL WITNESSES FROM THE

5 PETITIONER?

6        *MR. FIFE:* NO, YOUR HONOR.

7        *THE COURT:* WE'LL BE IN RECESS FOR 15 MINUTES. THANK

8 YOU.

9    *(COURT IN RECESS AT 2:54 P.M.)*

10        *THE COURT:* ALL RIGHT. COUNSEL, THE EVIDENCE IS

11 CLOSED, I'M PREPARED TO HEAR ANY ORAL ARGUMENT THAT THE SIDES

12 WOULD LIKE TO GIVE, ALTHOUGH I WILL ALSO OFFER YOU AN

13 OPPORTUNITY, NOW THAT YOU HAVE HEARD ALL THE EVIDENCE, TO

14 SUBMIT AN ADDITIONAL BRIEFING IF YOU BELIEVE IT'S NECESSARY.

15        MR. FIFE, WOULD YOU LIKE SUCH AN OPPORTUNITY?

16        *MR. FIFE:* I BELIEVE SO, YOUR HONOR, JUST SIMPLY

17 BECAUSE I CAN RUN OVER THE MAIN POINTS OF THE ARGUMENT HERE,

18 BUT IT MIGHT BE COHERENT IN WRITING THAN IF I JUST DO IT

19 ORALLY.

20        *THE COURT:* THEN BEFORE WE GET TO THAT, LET'S SEE IF

21 THERE ARE ANY OBJECTIONS TO THE RESPECTIVE EXHIBITS. MR. FIFE,

22 THE GOVERNMENT HAS OFFERED EXHIBITS A THROUGH K. ANY

23 OBJECTIONS TO THOSE EXHIBITS?

24        *MR. FIFE:* YOUR HONOR, I THINK THE ONLY THING THAT

25 WASN'T ALREADY IN THE RECORD OF THIS CASE WAS EXHIBIT A, AND I

1  HAVE ALREADY SAID THERE DOESN'T APPEAR TO BE ANY OBJECTION TO

2  THAT.  IT'S JUST A COPY OF HIS PASSPORT.

3       *THE COURT:*  ALL RIGHT.  SO THEN, GOVERNMENT EXHIBITS A

4  THROUGH K WILL BE RECEIVED.

5     *(RESPONDENT'S EXHIBITS B-K, RECEIVED.)*

6       *THE COURT:*  AS I UNDERSTAND IT WITH RESPECT TO THE

7  PETITIONER EXHIBITS, 1 THROUGH 7 ARE SIMPLY IN THE -- ARE

8  ALREADY IN THE RECORD; IS THAT CORRECT?

9       *MR. FIFE:*  THAT'S CORRECT, YOUR HONOR.

10      *THE COURT:*  SO, MR. BETTWY, ANY OBJECTION TO 1 THROUGH

11  7?

12      *MR. BETTWY:*  NO, YOUR HONOR.

13      *THE COURT:*  1 THROUGH 7 ARE RECEIVED.

14    *(PETITIONER'S EXHIBITS 1-7, RECEIVED.)*

15      *THE COURT:*  ANY OBJECTIONS TO 8 THROUGH 12?

16      *MR. BETTWY:*  I DON'T THINK SO, YOUR HONOR.  I JUST --

17  BECAUSE OF MY OWN IGNORANCE, I AM NOT FAMILIAR WITH EXHIBIT 10.

18  MR. FIFE TELLS ME THAT IS A STATE DEPARTMENT PUBLICATION.  ALL

19  THE OTHER EXHIBITS ARE DESCRIBED BY WHO THE PUBLISHER IS, BUT

20  IF THAT IS, INDEED, PUBLISHED BY THE STATE DEPARTMENT, THEN I

21  HAVE NO OBJECTION.

22      *THE COURT:*  ALL RIGHT.  AND NUMBER 10, IS THAT

23  PUBLISHED BY THE STATE DEPARTMENT,COUNSEL?

24      *MR. FIFE:*  THAT'S RIGHT, YOUR HONOR, THAT IS JUST THE

25  DOWNLOADED PRINTED EDITION OF THE HUMAN RIGHTS REPORT ON THE

1  STATE DEPARTMENT'S WEB SITE.

2      *THE COURT:* ALL RIGHT. WITH THAT IN MIND THEN, ANY

3  OBJECTION FROM MR. BETTWY WITH RECEIVING PETITIONER EXHIBITS 1

4  THROUGH 12?

5      *MR. BETTWY:* NONE YOUR HONOR.

6      *THE COURT:* SO 1 THROUGH 12 ARE SIMILARLY RECEIVED.

7  AND THEN --

8      *MR. FIFE:* EXCUSE ME, YOUR HONOR. I SHOULD NOTE FOR

9  THE RECORD, EXHIBITS 8 THROUGH 11 ARE COMPLETE COPIES OF THOSE

10  DOCUMENTS, BUT EXHIBIT 12 IS JUST EXCERPTS RELATING TO KENYA

11  FROM THE STATISTIC BOOK.

12      *THE COURT:* FAIR ENOUGH.

13    *(PETITIONER'S EXHIBITS 8-12, RECEIVED.)*

14      *THE COURT:* ARE THERE ANY CLOSING COMMENTS YOU WOULD

15  LIKE TO MAKE? I'LL GIVE YOU AN OPPORTUNITY TO FILE ANY

16  ADDITIONAL BRIEFING NOW THAT YOU HAVE HEARD ALL THE EVIDENCE

17  AND THE EXHIBITS HAVE BEEN RECEIVED.

18      BEFORE YOU MAKE YOUR CLOSING ARGUMENTS WE CAN SET THE

19  BRIEFING SCHEDULE. HOW MUCH TIME WOULD YOU LIKE, SIR?

20      *MR. FIFE:* YOUR HONOR, MY SCHEDULE HAS TO BE VERY

21  SHORT BECAUSE I WILL BE GOING TO VACATION IN ANOTHER TEN DAYS

22  OR SO.

23      *THE COURT:* SO I LEAVE IT TO YOU. WOULD YOU RATHER

24  HAVE IT -- RATHER A SHORT BRIEFING SCHEDULE OR WOULD YOU RATHER

25  HAVE A LENGTHY BRIEFING SCHEDULE? WHAT IS YOUR PREFERENCE?

1          MR. FIFE:  A SHORT ONE, I THINK, WOULD BE MOST

2    CONSISTENT WITH THE EXPEDITIOUS SCHEDULE THEN.

3          THE COURT:  ALL RIGHT.  SO IF I WAS TO REQUIRE YOUR

4    BRIEF TO BE FILED -- I TAKE IT THEN, WHEN YOU SAY RATHER BRIEF,

5    YOU'RE REFERRING TO ABOUT A WEEK?

6          MR. FIFE:  SIX WOULD BE THE OUT --

7          THE COURT:  SIX DAYS?

8          MR. FIFE:  THE 6TH OF OCTOBER WOULD BE THE FURTHEST

9    DATE.  SO IF WE SET IT FOR THE 6TH OF OCTOBER.

10         THE COURT:  WOULD YOU PREFER THAT?

11         MR. FIFE:  YES.

12         THE COURT:  SO PETITIONER BY 10/6.  AND THEN THE

13   GOVERNMENT WILL -- I'LL GIVE THEM TO 10/14 BECAUSE ONE OF THE

14   DAYS IN THERE IS A HOLIDAY.  I TAKE IT, MR. BETTWY, THAT WORKS

15   FOR YOU?

16         MR. BETTWY:  YOUR HONOR, I'M GOING TO BE GONE AT THE

17   NATIONAL ADVOCACY CENTER OCTOBER 7 THROUGH 9.  I JUST WONDER IF

18   I CAN HAVE A COUPLE MORE DAYS THAT WEEK.

19         THE COURT:  HOW ABOUT THEN --

20         MR. BETTWY:  THE 16TH.

21         THE COURT:  THAT'S FINE.  DOES THAT WORK FOR YOU?

22         MR. BETTWY:  YES, YOUR HONOR.

23         THE COURT:  ALL RIGHT.  SO THE 16TH FOR THE

24   RESPONDENT.  AND THEN WOULD YOU WISH TO FILE ANY REPLY?  YOU

25   DON'T KNOW YET, BUT WOULD YOU LIKE THE OPTION OF FILING A

1    REPLY.

2         *MR. FIFE:* YES, YOUR HONOR, THE OPTION OF REPLY WOULD

3    BE GREAT.

4         *THE COURT:* HOW ABOUT ONE WEEK FOR THAT? IS THAT

5    SUFFICIENT FOR YOU, SIR?

6         *MR. FIFE:* YES.

7         *THE COURT:* WOULD YOU BE BACK THEN?

8         *MR. FIFE:* RIGHT.

9         *THE COURT:* WOULD YOU -- SOMEBODY BE ABLE TO OR DO YOU

10   WANT ME TO SET THE REPLY AFTER YOU HAVE HAD AN OPPORTUNITY TO

11   GET BACK?

12        *MR. FIFE:* I THINK THE SIMPLEST THING IS TO KEEP THE

13   ONE WEEK OCTOBER 23RD, AND I'LL ARRANGE FOR SOMEONE IN THE

14   OFFICE TO DO THE REPLY.

15        *THE COURT:* YOU'LL HAVE UNTIL 10/6. MR. BETTWY WILL

16   HAVE UNTIL 10/16, AND THEN THE OPTIONAL REPLY IS 10/23. AND I

17   UNDERSTAND THAT YOU ARE GOING TO HAVE SOME TRAVEL PLANS. I

18   WOULD EXTEND THAT OUT, SO YOU CAN DO IT IF YOU WOULD LIKE, BUT

19   YOUR PREFERENCE IS WE KEEP IT AT 10/23?

20        *MR. FIFE:* YES, I WOULD PREFER THAT.

21        *THE COURT:* WOULD YOU LIKE TO MAKE ANY COMMENTS?

22        *MR. FIFE:* YES, I WOULD LIKE TO REVIEW WHAT HE HAVE

23   HEARD TODAY AND HOW IT RELATES TO THE ARGUMENT MR. OWINO WANTS

24   TO PRESENT TO THE ISSUE THAT HAS BEEN SET HERE THAT THERE IS

25   GOOD REASON TO BELIEVE THAT THE REMOVAL IS NOT SIGNIFICANTLY

1    LIKELY IN THE REASONABLY FORESEEABLE FUTURE.  AND I WANT TO

2    PREFACE THE COMMENTS BY DRAWING THE COURT'S ATTENTION TO THE

3    REQUIREMENTS OF ZADVYDAS, THAT ALL THIS EVIDENCE BE WEIGHED ON

4    A SLIDING SCALE; THAT THE LONGER THE DETENTION IS, THE MORE

5    IMMEDIATE THE LIKELY REMOVAL HAS TO BE.

6         SO HERE WHERE WE HAVE A DELAY IN REMOVAL THAT IS FIVE

7    TIMES GREATER THAN THE PRESUMPTIVELY REASONABLE PERIOD THAT THE

8    SUPREME COURT HAS SET, THAT REMOVAL MUST BE, INDEED, IMMINENT

9    FOR IT TO OVERCOME THE ZADVYDAS SHOWING.  AND THAT SHOWING

10   CANNOT BE BASED ON MR. OWINO'S BELIEF IN HIS REMOVABILITY.  IT

11   HAS TO BE BASED ON OBJECTIVE EVIDENCE OF WHETHER THERE IS A

12   REASONABLE LIKELIHOOD, NOT SIMPLY ON WHETHER HE BELIEVED HE WAS

13   LIKELY TO BE REMOVED OR HOW QUICKLY.

14        AND I THINK THE EVIDENCE THAT YOU HAVE HEARD THEN HAS

15   BEEN PRESENTED TO THE COURT SHOWS THERE IS VERY GOOD REASON TO

16   BELIEVE THAT THERE IS NO SIGNIFICANT LIKELIHOOD.  SIMPLY THE

17   HISTORY OF THE DELAY IN THIS CASE, TWO AND A HALF YEARS SINCE

18   THE STAY WAS VACATED.  AND AS OFFICER HAYES TESTIFIED, THERE IS

19   NO LEGAL REASON WHY A PERSON CANNOT BE REMOVED WHEN THERE IS NO

20   JUDICIAL STAY THAT IS BARRING THEIR REMOVAL.  IT'S SIMPLY SOME

21   UNOFFICIAL POLICY THAT ICE IS NOT GOING TO SEEK IT, OR THEY

22   THINK IT'S FUTILE.

23        BUT THAT DOESN'T -- THAT DOESN'T EXCUSE A DETAINEE WHO

24   WOULD SAY, WELL, I DON'T THINK YOU'RE GOING TO GET IT ANYWAYS.

25   I MEAN, THEY HAVE TO COMPLY WHENEVER ICE EXPECTS.  BUT ICE

1  ISN'T REQUIRED TO PURSUE THIS DILIGENTLY.  I THINK THEY ARE.

2  ONE OF THE CASE I HAVE CITED TO THE COURT IS THE CASE ULYSSE V.

3  DHS.  THAT'S AT 291 F. SUPP. 2D 1318, WHICH SAID THAT ICE'S

4  UNREASONABLE DELAY IN PROCESSING THE REMOVAL CANNOT BE CHARGED

5  AGAINST THE DETAINEE.  THE DETAINEE DOESN'T HAVE TO BEAR THE

6  BURDEN OF ICE'S INACTIVITY.  AND, IN FACT, IN DEMORE V. KIM,

7  THE SUPREME COURT APPROVED THE CONSTITUTIONALITY OF CIVIL

8  DETENTION ON THE PREMISE THAT REMOVAL WAS GOING TO BE DONE IN

9  AN EXPEDITIOUS FASHION.

10       AND THE NINTH CIRCUIT HAS RECONFIRMED THAT IN

11  CASAS-CASTRILLON THAT, AGAIN, THE IMMIGRATION DETENTION

12  STATUTES ARE CONSTITUTIONAL ONLY ON THE ASSUMPTION THAT ICE IS

13  GOING TO PROCEED EXPEDITIOUSLY.  SIMPLY WAITING FOR TWO AND A

14  HALF YEARS BECAUSE THEY DON'T THINK IT'S LIKELY OR THEY THINK

15  THAT, YOU KNOW, FROM OTHER CASES, THEY'RE GOING TO GET A

16  NEGATIVE RESPONSE DOESN'T EXCUSE THEIR FAILURE FOR TWO AND A

17  HALF YEARS TO SEEK REMOVAL.

18       BUT, IN FACT, KENYA'S REASONS WHY THEY'RE NOT GOING TO

19  ACCEPT MR. OWINO BACK ARE SHIFTING AND UNPREDICTABLE.  OFFICER

20  HAYES AND MR. OWINO CONFIRM THAT WHEN THEY SPOKE TO THE

21  EMBASSY, THEIR POLICY WAS NOT TO ACCEPT REMOVALS WHILE THE

22  APPEAL WAS PENDING, AND THEY CONFIRM THAT EVEN AFTER THEY WERE

23  GIVEN A COPY OF THE STAY ORDER.  BUT THEN AFTER REPEATED

24  INQUIRIES, SOME LOW-LEVEL EMBASSY OFFICIAL CHANGES HER MIND AND

25  SAYS, WITHOUT CONSULTING WITH THE AMBASSADOR, WITHOUT

1  CONSULTING WITH THE GOVERNMENT SAYS, WELL, IN FACT, WE'LL

2  ACCEPT HIM IF HE SAYS HE WANTS TO RETURN.

3       IF THAT IS THE CURRENT POLICY, IF THAT IS THE

4  CRITERION -- AND THAT IS THE LAST WORD WE HAVE FROM KENYA IS

5  THAT IS THE CRITERION IN ORDER TO REMOVE HIM -- REMOVAL IS NOT

6  FORESEEABLE AS MR. OWINO TESTIFIED, HE DOES NOT WANT TO RETURN.

7  HE IS AFRAID OF THE ABUSE HE WILL UNDERGO IF HE IS RETURNED TO

8  KENYA WHILE THERE IS A WARRANT OUTSTANDING AND WHERE HE WILL BE

9  RETURNED TO POLICE CUSTODY.  AND THERE IS NO REASON TO BELIEVE

10 THAT HE WILL NOT HONESTLY EVER FEEL LIKE HE WANTS TO GO BACK.

11 SO IF THAT IS TRULY THE KENYAN'S FINAL WORD ON WHAT THEY

12 REQUIRE FOR HIM TO BE REMOVED, IT'S NOT FORESEEABLE THAT THAT

13 IS GOING TO CHANGE AT ANY TIME IN THE FUTURE, REGARDLESS OF

14 WHAT HAPPENS WITH HIS IMMIGRATION CASE.

15       I POINT OUT TO THE COURT THAT THIS CASE IS EXACTLY ON

16 POINT WITH TWO CASES WHICH WE HAVE CITED BEFORE, THE RAJIGAH

17 CASE, 268 F. SUPP. 2D, 159, WHERE THE DETAINEE'S ATTORNEY TOLD

18 THE EMBASSY THAT HE WAS CONSIDERING FILING A FURTHER APPEAL AND

19 GUYANA SAID IT WAS THEIR POLICY NOT TO RETURN PEOPLE WHILE THEY

20 HAVE PENDING APPEALS, WHICH IS CONSISTENT WITH OFFICER HAYES'

21 TESTIMONY.  NOW THE COURT HELD, THIS WAS NOT BAD FAITH

22 OBSTRUCTION BECAUSE IT WAS TELLING THE TRUTH, AND IF THE

23 COUNTRY SIMPLY REFUSES FOR THEIR OWN REASONS, THAT IS A REASON

24 THAT HE SHOULD BE RELEASED.  AND, IN FACT, THE COURT -- THE

25 DISTRICT COURT IN RAJIGAH ORDERED THE DETAINEE RELEASED.

1          LIKEWISE, IN SERETSE-KHARMA, ANOTHER CASE WE CITED AT

2    215 F. SUPP. 2D 37, THE DETAINEE, THE ALIEN HAD LEFT HIS

3    COUNTRY LONG AGO, AND HE NO LONGER HAD ANY FAMILY TIES LEFT IN

4    THAT COUNTRY.  HE DIDN'T WANT TO RETURN, AND HE TOLD THE

5    LIBERIAN GOVERNMENT, THE CONSUL, HE DIDN'T WANT TO GO BACK.

6    AND ON THAT BASIS, LIBERIA SAID, WE WON'T TAKE HIM BACK.  HE

7    DOESN'T WANT TO COME BACK.  HE DOESN'T HAVE ANY TIES LEFT TO

8    THIS COUNTRY.  WE'RE NOT GOING TO TAKE HIM BACK.  THE

9    GOVERNMENT TRIED TO ARGUE THAT THAT WAS OBSTRUCTION.  BUT,

10   AGAIN, THE COURT SAID, NO, HE IS SIMPLY TELLING THE TRUTH, AND

11   IF LIBERIA WILL NOT TAKE HIM BACK SIMPLY BECAUSE HE DOESN'T

12   WANT TO, AND HE TRUTHFULLY SAYS HE DOESN'T WANT TO, HE CANNOT

13   BE DETAINED.  HE IS NOT LIKELY TO BE REMOVED.  AND THE COURT

14   ORDERED HIM RELEASED.

15         THE CIRCUMSTANCES -- I MEAN, THE SPECIFIC FACTS OF

16   MR. OWINO'S CASE SHOW THAT KENYA IS NOT LIKELY TO TAKE HIM BACK

17   BECAUSE HE IS NOT GOING TO TRUTHFULLY EXPRESS A DESIRE TO GO

18   BACK THERE.  BUT IN THE DOCUMENTS THAT WE SUBMITTED IN EVIDENCE

19   HERE, IF THE COURT LOOKS AT THE REPORTS, I WOULD NOTE

20   SPECIFICALLY IN THE REPORT BY THE GOVERNMENT ACCOUNTABILITY

21   OFFICE, THEY CITE THAT -- ON PAGE 21, THEY CITE THAT THERE ARE

22   A VARIETY OF REASONS WHY COUNTRIES REFUSE TO REPATRIATE, AMONG

23   THEM LONG ABSENCES AND LOSS OF TIES WITH THE COUNTRY, ECONOMIC

24   BURDENS ON THE COUNTRY TO REPATRIATE BECAUSE THEY HAVE NO

25   PROSPECTS OR THAT THERE IS NO SOCIAL SERVICES PROVIDED FOR

1   PEOPLE WHO ARE RETURNING.  SO ECONOMIC CONDITIONS ARE A

2   DISINCENTIVE FOR COUNTRIES TO REPATRIATE.  THERE IS A

3   DISINCENTIVE TO REPATRIATE PEOPLE WHO HAVE CRIMINAL

4   CONVICTIONS, AND THE GAO CITES, POLITICAL FACTORS IN THE

5   INDIVIDUAL COUNTRY.

6       ALL OF THOSE FACTORS ARE HERE.  MR. OWINO LEFT OVER

7   TEN YEARS AGO.  HIS FAMILY NO LONGER LIVES THERE.  HE HAS NO

8   PROPERTY.  HE HAS NO JOB PROSPECTS THERE.  THE ECONOMIC BURDENS

9   TO KENYA ARE GREAT.  I HAVE SUBMITTED THE CIA'S WORLD FACT BOOK

10   ON THE ECONOMY IN KENYA, AND IT SHOWS THAT IN LAST YEAR THEIR

11   ECONOMY HAS DROPPED.  THE GDP HAS DROPPED TO A THIRD OF ITS

12   RATE JUST A YEAR AGO.  THE UNEMPLOYMENT RATE IS OVER 40

13   PERCENT.  THE POVERTY RATE IS 50 PERCENT.  IT'S -- THE ECONOMIC

14   SITUATION KENYA IS DIRE.  THEY'RE NOT LIKELY TO WANT TO

15   REPATRIATE PEOPLE WHO NO LONGER HAVE ANY TIES, NO LONGER HAVE

16   ANY PROPERTY THERE, NO WAY OF MAINTAINING THEMSELVES.  THE

17   INFLATION RATE IS 26 PERCENT IN KENYA IN THE LAST YEAR, THE CIA

18   REPORTS.

19       AND THERE ARE THE POLITICAL FACTORS WHICH WE'RE AWARE

20   OF THAT MR. OWINO HAS BEEN IDENTIFIED BY THE KENYAN GOVERNMENT

21   AS A MEMBER OF A LEADING INSURGENT MINORITY IN KENYA.  HE HAS

22   BEEN IDENTIFIED BY THE POLICE AND KNOWN TO THE POLICE AS A

23   GOVERNMENT OPPONENT.  THAT IS THE REASON FOR HIS PERSECUTION.

24   AND NOW HE HAS RAISED A CAT CLAIM AGAINST THE GOVERNMENT.  ALL

25   THESE ARE REASONS THAT WOULD BE A DISINCENTIVE, DISINCLINATION

1  FOR THE GOVERNMENT TO RETURN SOMEONE THAT THEY THINK IS LIKELY

2  TO BE A TROUBLEMAKER.  THESE ARE ALL REASONS FOUND IN MANY

3  OTHER CASES IN MANY OTHER COUNTRIES WHY COUNTRIES ARE RELUCTANT

4  TO REPATRIATE, AND THESE ARE ALL FOUND HERE IN THIS CASE.

5          I SUBMITTED THE STATE DEPARTMENT'S HUMAN RIGHTS REPORT

6  NOT TO SHOW -- NOT TO SUPPORT THE MERITS OF MR. OWINO'S CAT

7  CLAIM BUT TO SHOW THAT BECAUSE OF THE BREAKDOWN IN HUMAN RIGHTS

8  IN KENYA IN RECENT YEARS AND THE WIDESPREAD CORRUPTION, THAT

9  IT'S UNLIKELY THAT KENYA IS GOING TO BE COMMITTED TO THE RULE

10 OF LAW AND TO PROCEED FAIRLY AND EXPEDITIOUSLY IN DETERMINING

11 WHETHER TO REPATRIATE MR. OWINO.  THERE IS A BREAKDOWN IN THE

12 SYSTEM.  THERE IS A QUALITATIVE DIFFERENCE BETWEEN THE ABILITY

13 TO REMOVE TO CANADA VERSUS ZIMBABWE BECAUSE OF THE LEVEL OF

14 CORRUPTION IN THE COUNTRY.  AND A COUNTRY THAT DOES NOT FOLLOW

15 THE RULE OF LAW IN ITS OWN TERRITORY IS LIKELY TO COMPLY IN A

16 FAIR AND JUST MANNER IN EXECUTING REPATRIATIONS.

17         THE EVIDENCE HAS ALSO SHOWN THAT THE CLAIM OF

18 NONCOOPERATION IS JUST FALSE.  THERE IS NO EVIDENCE THAT HE

19 REFUSED TO INTERVIEW OR PROVIDE DOCUMENTS OR THAT HE EVER

20 PROVIDED ANY INCORRECT INFORMATION.  THE ONLY INCIDENT WAS A

21 GOOD FAITH MISTAKE IN 2006 THAT HE REFUSED TO FILL OUT

22 DOCUMENTS AT A TIME WHEN HE WAS NOT REPRESENTED BY COUNSEL.

23         HE WAS NOT ASKED AGAIN UNTIL JANUARY OF 2008.  AND

24 WHEN HE ASKED FOR A SHORT DELAY TO CONSULT WITH HIS ATTORNEY ON

25 A FRIDAY AND HE DIDN'T REACH ME UNTIL MONDAY OR TUESDAY AND

1  THEN PROFFERED THEM BACK ON THE VERY NEXT TUESDAY, FOUR DAYS
2  LATER, ICE REFUSED TO COME RETRIEVE THEM SO THAT HE WAS NOT
3  GIVEN ANY OPPORTUNITY.

4          AND SAYING THAT ASKING TO SPEAK TO YOUR ATTORNEY IS
5  TANTAMOUNT TO BEING NONCOOPERATIVE OR OBSTRUCTING REMOVAL JUST
6  DOESN'T SEEM VERY WISE OR FAIR.  EVEN IF IT WERE TRUE, IN
7  YOU'VE, THE NINTH CIRCUIT HELD THAT ONCE THE DETAINEE COMES
8  BACK INTO COMPLIANCE, ICE HAS 90 DAYS TO EFFECT REMOVAL, IN
9  THIS CASE, MR. OWINO RETURNED TO COMPLIANCE AT THE LATEST,
10 JANUARY 22ND, 2008.  ICE HAD UNTIL APRIL 21ST TO REMOVE HIM.
11 THAT IS 17 MONTHS AGO.

12         MR. OWINO HAS MADE EXTRAORDINARY EFFORTS TO REMOVE
13 HIMSELF.  HE IS NOT MALINGERING AND TRYING TO STAY IN THE
14 UNITED STATES.  HE HAS BEEN TRYING WITH OUT ANY HELP FROM ICE
15 TO FIND ANOTHER PLACE TO GO WHERE HE IS NOT GOING TO BE ABUSED.
16 AND THAT IS SHOWN BY THE FACT AFTER -- AFTER THE HABEAS CORPUS
17 WAS FILED AND ICE AGREED TO HELP HIM, HE HAS COOPERATED FULLY.
18 THEY ATTEMPTED TO GET HIM RELOCATED TO THE UNITED STATES UNITED
19 KINGDOM, BUT, UNFORTUNATELY, THAT EFFORT FAILED.  HE WOULD
20 COOPERATE WITH ANY OF THE OTHER COUNTRIES HE HAS ALREADY
21 WRITTEN TO, EXCEPT ICE HASN'T BEEN WILLING TO PROVIDE ANY
22 ASSISTANCE WITH THAT.

23         IN THE END, A LOT OF THE DELAY HAS TO BE CHARGED TO
24 ICE, NOT TO MR. OWINO.  THEY MADE AN ATTEMPT IN AUGUST OF 2006
25 TO GET DOCUMENTS LESS THAN A WEEK LESS -- THAN A WEEK AFTER THE

1   BIA DENIAL AND WHILE THE 30 DAYS FOR HIS APPEAL WAS STILL

2   RUNNING, SO IT WAS POSSIBLE THAT IT WOULD BE STOPPED DEAD

3   IMMEDIATELY. BUT THEY WENT TO IT IMMEDIATELY WITHIN A WEEK

4   AFTER THE DENIAL AND DIDN'T EXPLAIN TO HIM THAT HIS SIGNING WAS

5   NOT GOING TO WAIVE HIS APPEAL. AND -- BUT WITHIN 20 DAYS, HE

6   FILED HIS PETITION AND GOT A STAY.

7       NOW COMPARE THAT WITH 17 MONTHS LATER WHERE THEY

8   WERE -- THERE WAS SUCH A SHOWING OF ALACRITY TO ASK HIM FOR

9   THESE DOCUMENTS THAT ONCE THE STAY WAS LIFTED IN FEBRUARY 2007,

10   THEY NEVER CAME BACK AGAIN AND ASKED HIM TO FILL OUT THE

11   APPLICATION FORM. SO IT'S KIND OF A STRANGE MIX OF PROCEEDING

12   VERY QUICKLY AND THEN NOT.

13       AND THEN BACK IN JANUARY 2008, WHEN THE RETURN TO THE

14   PETITION WAS DUE, THE DEPORTATION OFFICER RETURNS, ASKS HIM TO

15   FILL OUT THESE DOCUMENTS AND SAYS, I NEED A COUPLE OF DAYS, I

16   NEED TO CONTACT MY ATTORNEY. BUT THEY INSIST THAT HE

17   IMMEDIATELY SIGNS THEM AND SERVES HIM WITH A NOTICE THAT HE IS

18   NOT COOPERATING IMMEDIATELY, THAT THE GOVERNMENT USED AS A

19   BASIS TO ARGUE NONCOOPERATION IN THIS VERY CASE.

20       NOW THE -- I HAVE ALSO SUBMITTED THE -- A REPORT BY

21   THE OFFICE OF INSPECTOR GENERAL OF DHS, WHICH NOTES THERE ARE

22   SOME STRUCTURAL DEFICIENCIES IN THE ICE REMOVAL EFFORTS THAT

23   ARE INCONSISTENT WITH SOME OF THE TESTIMONY WE HAVE HEARD FROM

24   OFFICER HAYES. NOW, FOR INSTANCE, THE INSPECTOR GENERAL NOTED

25   THAT -- THAT AT THE FIELD LEVEL, THE DEPORTATION OFFICERS CAN

1    SEND THE WRONG MATERIALS TO THE EMBASSY, THAT SOME OF THE DELAY

2    IS DUE SIMPLY BECAUSE ICE DOESN'T SEND THE MATERIALS OR THEY

3    DON'T CHECK TO SEE WHAT THE EMBASSY REQUIRES AND THEY JUST SEND

4    THEM STANDARD PACKETS WITHOUT TAILORING THEM TO THE PARTICULAR

5    REQUIREMENTS OF THE EMBASSY.  THE INSPECTOR GENERAL NOTES THAT

6    ICE FAILS TO PRIORITIZE THE DETAINEES, THAT IS, TRYING TO

7    DEPORT THE MOST DANGEROUS TERRORISTS OR NATIONAL SECURITY

8    THREATS, THAT THEY TRY TO DEPORT THOSE FIRST.  THEY JUST DON'T

9    PRIORITIZE THEIR EFFORTS VERY WELL.  AND THE INSPECTOR GENERAL

10   NOTES THAT THERE IS A TENDENCY TO BLAME THE DETAINEES FOR THE

11   LACK OF SUCCESS, AND THE INSPECTOR GENERAL NOTES, UNFAIRLY, AND

12   IMPROPERLY BLAME THE DETAINEES FOR LACK OF SUCCESS.  AND THAT

13   IS ALL DOCUMENTED IN THE INSPECTOR GENERAL'S REPORT.  AND I'LL

14   GIVE THE EXACT PAGE NUMBERS IN MY BRIEFING FOR THE COURT'S

15   ASSISTANCE.

16          AS FAR AS THE GOVERNMENT'S REBUTTAL INFORMATION FROM

17   THE STATISTICS FROM HEADQUARTERS, THAT TELLS US VERY LITTLE.  I

18   MEAN, THOSE WERE ONLY CASES WHICH OFFICER MC CORMICK HAD IN HER

19   OFFICE DURING THE LAST 12 MONTHS.  SHE HAD ONLY A VAGUE NOTION

20   WHAT THE STATISTICS ARE ON A NATIONAL BASIS.  AND SO WE REALLY

21   ONLY KNOW WHAT HAS SHE DONE IN THE LAST YEAR AND THAT DOESN'T

22   GIVE US A VERY GOOD STATISTICAL PICTURE OF THE LIKELIHOOD OF

23   REMOVAL TO KENYA IN GENERAL.  IN FACT, HER CITATION OF 130

24   REMOVALS IS INCONSISTENT WITH THE OFFICIALLY PUBLISHED

25   STATISTICS IN EXHIBIT 12.  THERE IS A COMPLETELY DIFFERENT

1  NUMBER THERE, AND SHE DIDN'T REALLY GIVE A GOOD EXPLANATION WHY

2  THOSE MIGHT DIFFER.  I MEAN, THESE ARE SUPPOSEDLY THE DHS'

3  INTERNAL STATISTICS.

4          IN FACT, THE INSPECTOR GENERAL REPORT NOTES THAT ICE

5  DOES NOT KEEP TRACK OF REMOVAL RATES.  IT SPECIFICALLY NOTES

6  THAT ICE IS RESISTENT TO KEEPING TRACK OF OBJECTIVE MEASURES

7  AND THAT THE INSPECTOR GENERAL URGED ICE TO USE OF THESE

8  OBJECTIVE MEASURES AND TO IMPLEMENT THEM DO DECIDE WHEN IS

9  SOMEONE LIKELY TO BE REMOVED AND WHEN ARE THEY NOT LIKELY TO BE

10  REMOVED.  AND THE RESPONSE FROM ICE WAS, WE DON'T THINK THIS IS

11  NECESSARY.  AND THE INSPECTOR GENERAL NOTED THAT THAT WAS AN

12  UNSATISFACTORY RESPONSE.

13          SO IT'S NOT SURPRISING THAT SOME OF THESE -- SOME OF

14  THESE PROBLEMS THAT THE INSPECTOR GENERAL NOTED JUST DON'T SEEM

15  TO HAVE TRICKLED DOWN TO THE PEOPLE WHO ARE IMPLEMENTING THEM

16  AT THIS POINT BECAUSE THE WITNESS -- OFFICER MC CORMICK SEEMED

17  TO BE UNAWARE OF THESE PARTICULAR RECOMMENDATIONS AND WHETHER

18  SHE WAS FOLLOWING THEM.

19          AND IN ANY CASE, THE STATISTICS THAT SHE HAD WERE NOT

20  BROKEN DOWN IN A WAY THAT ARE REALLY MEANINGFUL TO THIS CASE.

21  SHE SAID SHE HAD REMOVED 130 PEOPLE, BUT THAT IS JUST A RAW

22  NUMBER.  OUT OF HOW MANY?  HOW MANY PEOPLE ARE STILL WAITING?

23  SHE DIDN'T KNOW HOW MANY PEOPLE THERE WERE OUT THERE IN THE

24  UNITED STATES WHO ARE WAITING TO BE REMOVED TO KENYA AND WHO

25  GETS REMOVED AND WHO DOESN'T.

1  SHE DIDN'T KNOW HOW MANY CRIMINALS HAD -- PEOPLE WITH
2  CRIMINAL CONVICTIONS HAD BEEN ACCEPTED FOR REMOVAL, HOW MANY
3  WHO HAD BEEN AWAY FROM THE COUNTRY FOR A LONG TIME HAD BE BEEN
4  SUCCESSFULLY REMOVED, HOW MANY HAD BEEN REMOVED WHEN THEY NO
5  LONGER HAD ANY TIES, FINANCIAL OR FAMILIAL TO THE COUNTRY, AND
6  SHE DIDN'T KNOW WHETHER ANY ETHNIC OR POLITICAL FACTORS
7  INFLUENCED WHO GETS REMOVED AND WHO DOESN'T.  SO THE RAW
8  NUMBERS DON'T TELL US VERY MUCH ALL.
9  SHE DID TELL US WAS AROUND 50 PERCENT GET REMOVED.
10 WELL, ACCORDING TO THE INSPECTOR GENERAL, THE GLOBAL AVERAGE
11 FOR TIMELY REMOVALS, THE GLOBAL AVERAGE IS 80 PERCENT, WHICH
12 MEANS THAT KENYA IS SIGNIFICANTLY BELOW THE GLOBAL AVERAGE,
13 THEREFORE, IT'S ACTUALLY LESS LIKELY COMPARED TO THE WORLD AT
14 LARGE THAT SOMEONE IS GOING TO -- ANYONE IS GOING TO BE REMOVED
15 TO KENYA THAN TO OTHER COUNTRIES.
16 SO ON THAT BASIS THEY SAY THAT THERE IS NO -- THE
17 EVIDENCE HERE SHOWS THAT KENYA ITSELF HAS DRAGGED ITS FEET FOR
18 NO GOOD REASON AND MADE UP PRETEXTURAL REASONS FOR REMOVAL.
19 BUT, IN FACT, MR. OWINO HAS BEEN VERY COOPERATIVE.  HE IS QUITE
20 WILLING TO REMOVE AND WAS COOPERATIVE WITH ANY EFFORTS TO
21 REMOVE HIM TO A THIRD COUNTRY, BUT HE CAN'T SAY -- HE HONESTLY
22 CANNOT SAY HE WANTS TO RETURN TO KENYA.  SO IF THAT IS THE
23 CRITERIA, NOTHING IS GOING TO REMOVE THAT.  AND I DON'T THINK
24 THE GOVERNMENT STATISTICS SHOW THAT IN HIS CASE, SOMEONE WITH
25 HIS CIRCUMSTANCES, SPECIFIC FEATURES HE IS LIKELY TO BE

1  REMOVED.

2       *THE COURT:*  ALL RIGHT.  THANK YOU.

3       MR. BETTWY, ANY COMMENT?

4       *MR. BETTWY:*  YOUR HONOR, I WOULD JUST LIKE TO MAKE IT

5  CLEAR, MOST OF WHAT MR. FIFE SAID IS IRRELEVANT BECAUSE HE

6  STARTED FROM A TOTALLY INCORRECT PREMISE OF WHAT THE LEGAL

7  STANDARD IS, WHAT THIS COURT HAS BEEN TOLD TO DO BY THE NINTH

8  CIRCUIT, WHICH IS -- AND I HAVE THIS IN THE HEARING BRIEF THAT

9  I SUBMITTED WITH THE LIST OF EXHIBITS, THE RECORD IS, QUOTE, TO

10  DETERMINE, QUOTE, WHETHER OWINO FACES A SIGNIFICANT LIKELIHOOD

11  OF REMOVAL TO KENYA ONCE HIS JUDICIAL AND HIS ADMINISTRATIVE

12  REVIEW PROCESS IS COMPLETE.

13       THIS IS NOT THE ZADVYDAS STANDARD OF REASONABLY

14  FORESEEABLE FUTURE.  THIS CASE IS A COMPLETELY DIFFERENT

15  POSTURE BECAUSE OF THE FACT THAT HE HAS BEEN REMANDED TO -- HIS

16  CASE -- I'M SORRY.  HIS REMOVAL PROCEEDINGS WERE BEFORE THE

17  NINTH CIRCUIT ON PETITION FOR REVIEW.  WHEN THEY WERE THERE, WE

18  HAD COMPLETELY DIFFERENT ISSUES, AND THERE WAS A QUESTION OF

19  DELAY AND COOPERATIVENESS AND SO ON.  THOSE ISSUES ARE GONE NOW

20  BECAUSE HE IS NOW BACK IN HIS REMOVAL PROCEEDINGS BEFORE THE

21  IMMIGRATION JUDGE.  HE CANNOT BE REMOVED AT THIS TIME.  THERE

22  IS AN AUTOMATIC STAY.  LEGALLY HE CANNOT BE REMOVED BECAUSE HE

23  IS -- THERE IS A STAY AUTOMATICALLY WHEN HE IS IN IMMIGRATION

24  PROCEEDINGS BEFORE THE IMMIGRATION JUDGE.

25       HE HAS ALREADY -- WE ALREADY KNOW FROM CASAS AND THE

1   NINTH CIRCUIT IN THIS CASE AFFIRMED, HE IS ENTITLED TO A BOND

2   HEARING.  WE ALREADY KNOW THAT.  THIS IS NOT A TEHANI CASE.  IN

3   TEHANI, HE WAS NOT ENTITLED TO A BOND HEARING.  THAT IS WHAT

4   TEHANI WAS ALL ABOUT, THAT HE WAS IN CUSTODY FOR ALL THOSE

5   YEARS AND NEVER GOT TO SEE AN IMMIGRATION JUDGE FOR A BOND

6   HEARING.  THIS IS NOT A TEHANI CASE.  THIS IS NOT A ZADVYDAS

7   CASE.  THIS IS A CASAS CASE, AND MORE IT'S AN OWINO/CASAS CASE.

8        THIS WAS THE KIND OF CASE CASAS REFERRED TO WHAT WOULD

9   HAPPEN IF A CASE WERE REMANDED FROM THE -- REMOVAL PROCEEDINGS

10  WERE REMANDED FROM THE NINTH BACK TO THE IMMIGRATION JUDGE.

11  CONCERN WAS, DOES THAT MEAN THE ALIEN WILL GO BACK TO MANDATORY

12  CUSTODY AND NOT BE ABLE TO HAVE A BOND HEARING.  CASAS SAID,

13  NO, THE ALIEN WILL CONTINUE TO HAVE A RIGHT TO THE BOND

14  HEARING.  AND OWINO MADE THAT PERFECTLY CLEAR.  HE IS STILL

15  ENTITLED TO A BOND HEARING.

16        SO THIS CASE IS NOT ABOUT WHETHER HE IS COOPERATING,

17  WHETHER -- HOW MUCH DELAY THERE IS.  IT'S -- IT'S SIMPLY -- THE

18  ONLY FACTUAL ISSUES ARE WHETHER ONCE HIS JUDICIAL AND

19  ADMINISTRATIVE REVIEW PROCESS IS COMPLETE, HE FACES A

20  SIGNIFICANT LIKELIHOOD OF REMOVAL TO KENYA, OKAY, AND THE

21  ONLY-- I HAVE NOT SEEN ANY EVIDENCE PRESENTED, AND THE BURDEN

22  LIES WITH PETITIONER SHOWING THAT THERE IS ANYTHING THAT THE

23  KENYAN GOVERNMENT HAS EVER SAID OR DONE IN THIS CASE OR ANY

24  OTHER CASE THAT INDICATES THAT IT WON'T TAKE BECOME SOMEBODY

25  WHO DOESN'T HAVE FAMILY OR WHO IS A CRIMINAL OR WHO HAS MADE A

1    CAT CLAIM OR DOESN'T OWN PROPERTY OR DOES OWN PROPERTY OR HOW

2    LONG THEY HAVE BEEN GONE.

3        THERE IS NOTHING, THERE IS ABSOLUTELY NO EVIDENCE THAT

4    HAS BEEN PRESENTED INDICATING THIS IS A PROBLEM WITH THE KENYAN

5    GOVERNMENT.  AND THE TESTIMONY FROM OFFICER MC CORMICK WAS

6    PRESENTED TO SHOW THAT WE ARE HAVING NO PROBLEM WHATSOEVER

7    SENDING KENYANS BACK.  WE HAVE ONLY HAD, UNDER HER WATCH, ONE

8    DENIAL, AND IT WASN'T FOR ANY OF THESE REASONS, IT WAS BECAUSE

9    THE ALIEN WAS NOT A KENYAN.  THAT IS ALSO EVIDENCE, HER

10   TESTIMONY, THAT THAT IS ALL THAT THE CONSULATE CARES ABOUT, IS

11   THIS PERSON THAT YOU WANT TO SEND BACK TO US A NATIONAL OF OUR

12   COUNTRY.  THAT IS THE -- THAT IS THE CONSIDERATION.

13       SO TO -- I HAVE TO READ THIS GAO REPORT THAT MR. FIFE

14   CITES, BUT HE DIDN'T SAY WHICH COUNTRIES HE WAS TALKING ABOUT.

15   MAYBE THE GAO REPORT IS MORE SPECIFIC.  BUT I HAVE SEEN NO

16   EVIDENCE THAT THE COUNTRY OF KENYA CONSIDERS ANYTHING OTHER

17   THAN WHETHER THE ALIEN -- TO US, AN ALIEN IS A NATIONAL OF

18   THEIR COUNTRY, AND THAT IS THE EVIDENCE WE HAVE PRESENTED.  I

19   HAVE SEEN NO EVIDENCE TO THE CONTRARY.

20       AND I DON'T UNDERSTAND -- I DIDN'T QUITE UNDERSTAND

21   MR. FIFE'S ARGUMENT ABOUT STATISTICS, BUT I DO THINK THAT --

22   YEAH.  OFFICER MC CORMICK TESTIFIED 130 UNDER HER WATCH, AND I

23   DON'T THINK SHE SAID THAT WAS AN EXACT FIGURE.  THAT WAS HER

24   ESTIMATE.  ACCORDING TO THE STATISTICS THAT THANKFULLY HAS BEEN

25   SUBMITTED BY PETITIONER, IT SAYS FOR 2008 THAT IT WAS 135, SO I

1    DON'T KNOW WHY MR. FIFE ARGUES THAT HER NUMBER WAS COMPLETELY

2    DIFFERENT.  APPARENTLY IT WAS 135 HERE, AND HER ESTIMATE WAS

3    130.  THAT SOUNDS PRETTY CLOSE TO ME.

4         BUT, YOU KNOW, WE CAN SIT HERE AND PLAY WITH

5    STATISTICS.  THE BOTTOM LINE IS, WE HAVE NO TROUBLE -- YOUR

6    HONOR, YOU CAN LOOK AT THESE STATISTICS.  WE ARE SENDING MORE

7    BACK EACH YEAR, ACCORDING TO THESE STATISTICS, AND WE HAVE BEEN

8    UNDER -- WE ONLY KNOW OF, BECAUSE I ASKED OFFICER MC CORMICK

9    HOW MANY HAVE BEEN DENIED, ONE, WHY, BECAUSE HE WASN'T A

10   KENYAN.  AND NOTHING HAS BEEN PRESENTED HERE TO SUGGEST THAT

11   THERE ISN'T ANY QUESTION THAT MR. OWINO ISN'T KENYAN.  THANK

12   YOU, YOUR HONOR.

13        *THE COURT:*  ALL RIGHT.  THANK YOU, COUNSEL.  YOUR

14   ARGUMENTS AND BRIEFING HAVE BEEN HELPFUL.  I LOOK FORWARD TO

15   YOUR BRIEFING AND WILL ISSUE A WRITTEN DECISION.  THANK YOU,

16   COUNSEL.  ENJOY THE REST OF YOUR DAY.

17        *(COURT IN RECESS AT 3:32 P.M.)*

18   ***  END OF REQUESTED TRANSCRIPT ***

19                          -OOO-

20

21

22

23

24

25

```
 1                 C E R T I F I C A T I O N

 2          I HEREBY CERTIFY THAT I AM A DULY APPOINTED, QUALIFIED

 3   AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES

 4   DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT

 5   TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE

 6   ON SEPTEMBER 29, 2009; THAT SAID TRANSCRIPT IS A TRUE AND

 7   CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE

 8   FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS OF

 9   THE UNITED STATES JUDICIAL CONFERENCE.

10

11   DATE:  OCTOBER 5, 2009, AT SAN DIEGO, CALIFORNIA.

12                              S/MAURALEE A. RAMIREZ

13                              MAURALEE A. RAMIREZ
                                OFFICIAL COURT REPORTER
14                              RPR, CSR NO. 11674

15

16

17

18

19

20

21

22

23

24

25
```