1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVESTER OWINO, | CASE NO. 07cv2267 WQH (POR) |
| Petitioner, | ORDER |
| vs. | |
| JANET NAPOLITANO, Secretary of the Department of Homeland Security, et al., | |
| Respondents. | |

HAYES, Judge:

　　The matter before the Court is Petitioner Sylvester Owino's Petition for Writ of Habeas Corpus.   (Doc. # 1).

## BACKGROUND

　　Petitioner is a native and citizen of Kenya who was admitted to the United States on a student visa in 1998. (Doc. # 1).  In 2003, Petitioner was convicted of second degree robbery. (Doc. # 1).  Upon the completion of Petitioner's sentence on November 8, 2005, he was transferred into the custody of the Department of Homeland Security ("DHS").  (Doc. # 1). Petitioner conceded removability before the Immigration Judge ("IJ"), but applied for asylum, withholding of removal, and Convention Against Torture ("CAT") relief.  (Doc. # 1).  The IJ denied his claims and the Board of Immigration Appeals ("BIA") affirmed that ruling.  (Doc. # 1).  Petitioner appealed to the Court of Appeals for the Ninth Circuit.  (Doc. # 1).

　　On December 3, 2007, Petitioner initiated this action by filing a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. # 1).  On August 6, 2008, this Court issued an order denying the petition.  (Doc. # 28).  The Court held that Petitioner failed to meet his burden to show that there was no significant likelihood of removal in the reasonably foreseeable future because Petitioner had not made a full effort to secure travel documents, barring his claim under *Lema v. INS,* 341 F.3d 853, 856 (9th Cir. 2003).

On August 18, 2008, Petitioner appealed this Court's denial of his petition.  (Doc. # 30). On August 4, 2009, the Court of Appeals for the Ninth Circuit entered judgment in this case reversing and remanding.  *Owino v. Napolitano*, 575 F.3d 952 (9th Cir. 2009) (per curiam). The Ninth Circuit stated: "We need not decide whether the district court properly found Owino's detention authorized by § 1231, because in Owino's related appeal we have granted his petition for review and remanded his CAT claim for further proceedings before the agency."  *Id.,* at 955.  The Ninth Circuit stated: "[W]hile administrative proceedings are pending on remand, Owino will not be subject to a *final* order of removal, so § 1231 cannot apply. . . .  Instead, Owino is an alien whose case is being adjudicated before the agency for a second time—*after* having fought his case in this court. . . .  [D]etention of an alien in this posture falls under 8 U.S.C. § 1226(a)."  *Id.* (internal quotations and citations omitted).  The Ninth Circuit remanded to this Court to "decide in the first instance whether Owino's detention is authorized by 8 U.S.C. § 1226(a)."  *Id.*  The Ninth Circuit held that "the question whether Owino faces a significant likelihood of removal cannot be resolved without an evidentiary hearing," and "urge[d] the district court to expedite the hearing."  *Id.* at 956.  The Ninth Circuit also ordered this Court to appoint counsel for Owino.

On August 12, 2009, this Court appointed Federal Defenders, Inc. as counsel for Petitioner and ordered briefing on the proceedings on remand.  (Doc. # 46).  Both parties submitted briefing on August 24, 2009 (Docs. # 49, 50) and Petitioner submitted a response to the government's briefing on August 31, 2009 (Doc. # 51).  On September 1, 2009, the Court ordered supplemental briefing on whether there was any bar to this court ordering an immediate bond hearing before an IJ and on the proper scope of hearing pursuant to *Zavydas v. Davis*, 533 U.S. 678, 701 (2001) before this court. (Doc. # 52).  The parties submitted their

1    briefing on September 8, 2009.  (Docs. # 53, 54).

2        Petitioner claimed that the *Zavydas* hearing must determine whether he will "obtain

3    relief from removal on remand" of his CAT claim to the IJ and whether Kenya will accept

4    repatriation of Petitioner if he loses his CAT claim.  (Doc. # 53).  Petitioner further claimed

5    that this Court was required by the mandate from the Ninth Circuit to conduct a *Zavydas*

6    hearing before ordering an IJ to hold a bond hearing.  (Doc. # 53).  Respondents claimed that

7    the *Zavydas* hearing should be "limited to issues such as whether there is a repatriation

8    agreement between the United States and an alien's home country."  (Doc. # 54).

9        The Court ruled that the hearing would address whether Petitioner "faces a significant

10   likelihood of removal to [Kenya] once his judicial and administrative review process is

11   complete."  (Doc. # 57).  *See Casas-Castrillon v. Dep't of Homeland Security*, 535 F.3d 942,

12   948 (9th Cir. 2008).  The Court declined to hear evidence regarding the merits of Petitioner's

13   CAT claim, because *Diouf v. Mukasey* "require[d] the alien to show that he would be

14   unremovable *even if* the government defeated his petition for review." 542 F.3d 1222, 1233

15   (9th Cir. 2008) (emphasis added) (citing *Prieto-Romero v. Clark*, 542 F.3d 1053, 1063

16   (9th Cir. 2008)).  The Court held that further detention pursuant to 8 U.S.C. § 1226(a) was

17   unauthorized unless Petitioner received a bond hearing and ordered a bond hearing within

18   thirty days of the date of the order.  (Doc. # 57).  Petitioner filed a motion to amend the order

19   to allow reasonable continuances of the bond hearing beyond thirty days to allow his *pro bono*

20   immigration counsel to prepare for the hearing.  (Doc. # 66).  The Court granted that motion

21   on October 9, 2009.  (Doc. # 68).

22       The Court held the *Zavydas* hearing on September 29, 2009.  At the request of the

23   parties, the Court also allowed supplemental briefing after the hearing.  *See* Doc. # 62.

24   Briefing was completed on October 23, 2009.  *Id.*  At the hearing, Petitioner presented his own

25   testimony and entered several documents into evidence relating to the repatriation process and

26   conditions in Kenya.  *See* Docs. # 63, 64.  Respondent presented the testimony of two

27   witnesses, Eliana Hayes, the deportation officer in charge of Petitioner's case, and Marcy

28   McCormick, the deportation officer in charge of ICE's nationwide program to repatriate

1   Kenyans. (Docs. # 61, 63.)

2       Petitioner had a bond hearing before an IJ on November 2, 2009.  (Doc. # 75 at 1). *Id.*

3   On December 4, 2009, the IJ issued a written decision denying bond.  *Id.*

4                                    **EVIDENCE PRESENTED**

5   **(1) Petitioner's Testimony**

6       Petitioner no longer has family in Kenya, and  he does not own any property in Kenya.

7   (Doc. # 67 at 28-29).[1]  Petitioner stated Kenya has no system of social welfare.  *Id.*  Petitioner

8   refused to sign an application for travel documents in August of 2006 because he mistakenly

9   believed that doing so would waive his right to appeal his immigration case.  *Id.* at 30.  The

10  ICE officer did not explain that signing the travel forms would not waive Petitioner's right to

11  appeal his immigration case.  *Id.*  After his initial refusal to sign the documents in August of

12  2006, ICE did not contact him again to sign the documents until December of 2007, well after

13  his stay of deportation was lifted in February of 2007.  *Id*. at 31.  When an ICE officer

14  approached him a second time with an application for travel documents, Petitioner  asked the

15  officer to allow him to consult with his attorney before signing the papers.  *Id.* at 31.  Petitioner

16  was then served with a Notice of Failure to Comply.  *Id.*  Petitioner signed the documents after

17  consulting with counsel, but the ICE officer failed to retrieve the documents despite

18  Petitioner's efforts to get the ICE officer to do so.  *Id.* at 32.

19      Petitioner described his efforts to get a new passport so he could seek asylum in a third

20  party country instead of returning to Kenya. *Id.* at 33-37.  Based on information on the Kenyan

21  Consulate's website, he attempted to obtain a police report about the loss of his passport so he

22  could apply for a new passport.  *Id.* at 37-38, 49-50.  Petitioner further testified about his

23  contacts with the Kenyan embassy and consulate, which told him that they would not give him

24  travel documents as long as his immigration appeal was pending before the Ninth Circuit, even

25  if he had been denied a stay of removal.  *Id.* at 41.  Petitioner stated he does not want to return

26  to Kenya because if he did "My life would be over.  The police would kill me." *Id.* at 42.

27

28      [1] Citations are to the page numbers in the CM/ECF-generated heading in the upper right corner of the document, not to the internal pagination of the transcript.

On cross examination, the government elicited testimony that Petitioner has a photocopy of his Kenyan passport and is a Kenyan citizen. *Id.* at 42-43.

**(2) Officer Eliana Hayes's Testimony**

Eliana Hayes is a deportation officer at the Otay Detention facility who has worked on Petitioner's case. (Doc. # 67 at 56).  Officer Hayes testified that she normally does not attempt to start the deportation process while  the final order of removal is on appeal to the Ninth Circuit because the case is still pending. *Id*. at 58.  However, because she was asked to do so in this case, she attempted to get travel documents for Petitioner. *Id.* at 60.  When Officer Hayes contacted the embassy, she was told it was not possible to get travel documents while there was still a pending appeal before the Ninth Circuit. *Id.*  Officer Hayes stated that in general, consulates refuse to accept repatriation of citizens until the conclusion of an immigration case, regardless of whether there is a stay of a final order of removal. *Id.* at 66.

On cross examination, Petitioner elicited testimony that Officer Hayes did not recall portions of her previous declarations filed by the government in the case. *Id.* at 67-68.  Officer Hayes also stated that she failed to enter a record of all of her contacts with the embassy into the DACS database, which is ICE's electronic record of the case. *Id.* at 69.  However, she recalls an official with the Kenyan consulate stating that Kenya would be willing to repatriate Petitioner if he said he wished to return to Kenya. *Id.* at 69-70.  The official did not tell her that Petitioner claimed to have a stay in place when he contacted the consulate. *Id.* at 72. Officer Hayes stated that Petitioner has never refused to conduct an interview with the embassy, never refused to provide any available documents, and has never provided false or misleading information. *Id.* at 73-74.  Officer Hayes explained the procedure for using an I-229 warning for failure to depart, clarifying that the document is issued to all aliens with final orders of removal. *Id.* at 74-76.  Officer Hayes stated that ICE does not need to obtain a passport for Petitioner to get travel documents. *Id.* at 78.  Finally, Officer Hayes said she did not recall telling Petitioner not to contact his embassy and that there is no legal basis for forbidding an alien to do so. *Id.*

**(3) Officer Marcy Rosario McCormick**

Officer McCormick is a Detention and Deportation Officer assigned to the Headquarters Detention and Removal Operations in Washington, D.C. who oversees pending removals for 27 African countries. *Id.* at 83-84. Officer McCormick manages all of the Kenyan removal cases nationwide, although she only has "direct and active" participation in about 20 of those cases. *Id.* at 84-85. If "a subject has been in custody for over 90 days" while the local ICE office is attempting to process their removal, Officer McCormick will "get involved directly" in the effort to obtain travel documents. *Id.* Of the approximately 130 Kenyan cases she has overseen since she began working in the Washington office in September of 2008, more than half have already resulted in removal to Kenya. *Id.* at 85. Of the approximately 20 Kenyan cases which required her "direct and active" participation, only one has resulted in a "formal denial" of repatriation. *Id.* In that case, "the subject was determined to be of another country . . . not a Kenyan." *Id.* at 86.

In cases where a Kenyan national has a currently valid passport, the average time it takes ICE to obtain travel documents is 90 days. *Id.* at 86-87. In cases where a Kenyan national does not have a current passport, the average time it takes ICE to obtain travel documents is 90 to 120 days. *Id.* at 87. Roughly half of the Kenyans Officer McCormick has worked with have had current passports. *Id.* Compared to other African governments, Kenya is "one of the more cooperative countries." *Id.*

Because Petitioner has a copy of his passport, although he does not have the passport itself, and because he does not dispute his Kenyan citizenship, Officer McCormick stated her opinion that ICE would be able to obtain travel documents for Petitioner. *Id.* at 69. Officer McCormick stated: "I have had other cases with just as much or less information presented and I have been able to obtain a document. So based on that, I do not forsee a problem . . . ." *Id.*

On cross examination, Officer McCormick stated that she estimated 130-150 Kenyans were removed in the last fiscal year. *Id.* at 97. She explained that she does not handle all of the cases of Kenyans who are removable, but only the subset of Kenyans where the government needs to obtain a travel document for removal. *Id.* at 98. She did not know how many of the Kenyans who had been removed had waited more than six months or how many

1  had waited more than two and a half years. *Id.* at 99.  She also did not know how many had

2  criminal convictions, how many had left Kenya more than ten years ago, how many had family

3  in Kenya, or how many had raised torture claims against the Kenyan government.  *Id.*  She

4  stated she did not know how many Kenyans who were removed had told the embassy that they

5  wanted to return.  *Id.*

6  **(4) Petitioner's Exhibits**

7  Petitioner entered several documents into evidence during the hearing.  Petitioner

8  submitted seven documents which had previously been filed in support of his habeas writ: his

9  own declarations in support of his habeas petition, his own declaration updating the status of

10  his travel document request, two declarations by Eliana Hayes, the Warning for Failure to

11  Depart Petitioner received, Petitioner's application for Renewal of Passport, and

12  correspondence between Petitioner and the embassies of third-party countries where he sought

13  asylum. *See* Doc. # 64. In addition to these documents, Petitioner submitted six additional

14  documents to the Court: the United States General Accounting Office's ("GAO") Report to

15  Congressional Requesters entitled Immigration Enforcement, the CIA World Fact Book's entry

16  on Kenya, the United States Department of State's 2008 Human Rights Report on Kenya, the

17  DHS Office of the Inspector General's report on ICE's compliance with detention limits for

18  aliens with a final order of removal, an excerpt from the DHS's 2008 Yearbook of Immigration

19  Statistics, and the DACS electronic case notes used by Officer Hayes and Officer McCormick

20  to prepare to testify.  *Id.*

21  Petitioner's declarations detailed ICE's efforts to get Petitioner to sign forms he says

22  he did not understand, stated that ICE failed to retrieve the forms after he signed them, and

23  described Petitioner's efforts to find a third-party country to accept him and to replace his

24  passport.  (Docs. # 13-2, 19, submitted as Pet. Ex. 1 and Ex. 2).  Eliana Hayes's first

25  declaration stated she spoke to a consular official on May 19, 2008, who stated Petitioner had

26  called the consulate and told the official that he had an appeal pending.  (Doc. # 17-2,

27  submitted as Pet. Ex. 3, at 1).  Officer Hayes further stated that the consular official told her

28  the consulate was unwilling to process Petitioner's application because of the pending appeal.

*Id.* at 2. Officer Hayes stated the consular officer believed she was receiving conflicting information from Petitioner and the government. *Id.* Officer Hayes's second declaration stated that she had a second conversation with the Kenyan consular official, who stated Kenya will not issue a travel document to Petitioner until there are no longer any appeals pending. (Doc. # 20-2, submitted as Pet. Ex. 4). Officer Hayes also stated that the Kenyan consular official told her that if Petitioner wishes to return prior to the completion of his appeals, he "need only tell the consulate he would like to return home." *Id.*

The GAO's report discusses changes that are needed in the immigration detention system to comply with *Zavydas*. (Pet. Ex. # 8). The report lists countries that have "consistently refused to issue travel documents or delayed issuing them." *Id.* at 21. The list does not include Kenya. *Id.* The CIA World Fact Book's entry on Kenya discusses the violence that followed an election in December 2007 as well as discussing economic and social conditions in Kenya generally. (Pet. Ex. # 9). The U.S. Department of State's 2008 Human Rights Report on Kenya discusses the violence following the 2007 election, various human rights violations by the Kenyan government, and interethnic violence in Kenya. (Pet. Ex. # 10). The DHS Office of Inspector General's report on ICE's compliance with detention limits concludes that while approximately 80% of aliens under a final order of removal are removed within or released within 90 days, ICE fails to timely review detention in 19% of cases. (Pet. Ex. # 11 at 1). A 2006 review of aliens in detention found that while 20% of all aliens with final orders of removal are detained beyond 90 days, 47% of aliens from Africa with final orders of removal are detained beyond 90 days. *Id.* at 10. An excerpt from the 2008 Yearbook of Immigration statistics shows the number of Kenyans detained and removed over the past ten years. (Pet. Ex. # 11).

**(5) Respondent's Exhibits**

Respondents submitted eleven exhibits. Seven of the exhibits had been submitted with previous filings in the case: Petitioner's letter to the Spanish Consulate, Petitioner's application for renewal of his Kenyan passport, Petitioner's declarations, Petitioner's letters to a deportation officer about obtaining a police statement to renew his passport, Petitioner's

Affidavit sent to the Kenyan consulate about his lost passport, and a letter from the Kenyan consulate acknowledging that Petitioner's case was still pending before the Ninth Circuit. Four of the exhibits had not previously been submitted: a photocopy of part of Petitioner's passport, part of Petitioner's application for a new passport, the Ninth Circuit's Order referring Petitioner's case to a merits panel that was faxed to the Kenyan embassy, and a lost property report from the La Mesa Police Department.

## LEGAL STANDARD

Petitioner is currently detained pursuant to 8 U.S.C. § 1226(a), which authorizes detention "pending a decision on whether the alien is to be removed from the United States." Detention pursuant to 1226(a) is only constitutionally permissible if it is for a limited period of time. *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1080 (9th Cir. 2006). Indefinite detention is not authorized by 1226(a) because of the constitutional problems it presents. *See id.* at 1079. "[T]he government does not possess the authority under the general detention statutes to hold [an alien] indefinitely." *Id.*

Whether detention is indefinite is not a question of how long an alien has been held, but rather whether the detention has an eventual endpoint—that is, whether alien is likely to be returned to his home country at the end of his immigration proceedings. *See Casas-Castrillon v. Dep't of Homeland Security*, 535 F.3d 942, 948 (9th Cir. 2008) (authorizing the continued detention of an alien already detained for seven years because his home country was likely to accept him at the conclusion of his immigration proceedings). If an alien can be repatriated to his home country at the end of his immigration proceedings, "he is not stuck in a 'removable-but-unremovable limbo'" which runs the risk of indefinite detention. *See Prieto-Romero v. Clark*, 534 F.3d 1053, 1063 (9th Cir. 2008). Although it is uncertain how long Petitioner's immigration proceedings will take "this uncertainty alone does not render his detention *indefinite* in the sense that the Supreme Court found problematic in *Zavydas*." *Id.* (citing *See Zavydas v. Davis*, 533 U.S. 678, 701 (2001)).

The Court must therefore determine whether Petitioner "faces a significant likelihood of removal to [Kenya] once his judicial and administrative review process is complete."

1   *Casas-Castrillon*, 535 F.3d at 948.  In *Diouf v. Mukasey*, 542 F.3d 1222, 1233 (9th Cir. 2008),

2   the Ninth Circuit explained that the relevant question is whether Petitioner "would be

3   unremovable *even if* the government defeated his petition for review." (emphasis added).  If

4   Petitioner can establish "good reason to believe that there is no significant likelihood of

5   removal in the reasonably foreseeable future, the government must respond with evidence

6   sufficient to rebut that showing." *See Zavydas*, 533 U.S. at 701.

7                          **CONTENTIONS OF THE PARTIES**

8          In his post-hearing brief, Petitioner contends Kenya's justifications for refusing to issue

9   travel documents during his 32-month confinement after the Ninth Circuit's stay of the order

10  of removal was lifted have been "shifting and unpredictable." (Doc. # 67 at 7, Doc. # 71 at 4).

11  Petitioner contends "this 32-month delay is strong evidence that he is not likely to be removed

12  once he has exhausted review" in his immigration proceedings. (Doc. # 71 at 1).  Petitioner

13  contends Kenya's statement that it will repatriate him if he states he is willing to return home

14  shows that "removal is unlikely to occur" because Petitioner does not, in fact, wish to return

15  to Kenya. (Doc. # 67 at 7-8).  Petitioner contends his lack of family ties in Kenya, the fact that

16  he left Kenya ten years ago, his lack of a means to support himself in Kenya, his criminal

17  record, and his membership in a minority ethnic tribe associated with the opposition movement

18  make it less likely that Kenya will accept him because they will view him as a burden on

19  society. *Id.* at 9.

20         Petitioner contends he has not attempted to thwart the government's efforts to remove

21  him.  *Id.* at 11.  Petitioner contends that instead, the delay in his removal is attributable to

22  ICE's mishandling of his case, including a practice of waiting to even begin attempting to

23  remove an alien until his appeals are completed, which "seems in contradiction to the clear

24  statutory duty to remove deportees within 90 days." *Id.* at 14 (citing 8 U.S.C. § 1231(a)(1)(A)).

25  Petitioner contends he has presented sufficient evidence that he cannot be removed to shift the

26  burden to the government to rebut that showing.  *Id.* at 15.  Petitioner contends Officer

27  McCormick's testimony that removal would not be difficult because Petitioner has a copy of

28  his passport and his citizenship is not in question "fails to take account for the fact that those

same documents were present in the A-file since February 2007, when the stay was lifted, *and yet the removal has still not proceeded in the last 31 months*." *Id.* at 16-17. Petitioner finally contends that "there is no significant likelihood removal will come reasonably soon." *Id.* at 18.

Respondent contends Petitioner "has presented only conjecture" and documents which fail to establish that Kenya is unlikely to accept him when his immigration proceedings are completed. (Doc. # 70 at 1). Respondent contends "DHS regularly repatriates Kenyans," Petitioner's citizenship is not in question, and Kenya has expressed a willingness to repatriate Petitioner either at the end of his proceedings or immediately if Petitioner agrees to it. *Id.* at 2. Respondent contends the *Zavydas* standard does not apply until after removal proceedings are complete, and the case should instead be adjudicated under *Casas-Castrillon*, and contends Respondent is entitled to a second six-month period of "presumptively reasonable" detention if a final order of removal is entered against Petitioner. *Id.* at 2-3.

Respondent contends Petitioner's reliance on the GAO report (Pet. Ex. # 8) is misplaced because it does not list Kenya among the problem countries where repatriation is difficult or impossible. *Id.* at 4. Respondent further contends that the U.S. Department of State's 2008 Human Rights Report on Kenya shows that Kenya "generally respects the constitutional right to repatriation and does not practice forced exile." *Id.* (citing Pet. Ex. 9 at 16, § 2(d)). Respondent notes that Officer McCormick's testimony shows that Kenya only refuses to repatriate "when it determines that the applicant is not a Kenyan national." (Doc. # 70 at 5). Respondent contends that Petitioner can be repatriated at the end of his immigration process because there is no dispute that Petitioner is Kenyan. *Id.* Although Respondent concedes Petitioner's detention will be lengthy, Respondent contends it is not indefinite. *Id.* at 6.

**RULING**

Based on the testimony of the Government's witnesses, the State Department's 2008 Human Rights Report on Kenya, and the 2008 Yearbook of Immigration Statistics, the Court finds that Kenya routinely repatriates Kenyan citizens who have reached the conclusion of their immigration proceedings in the United States. In the 2008 Fiscal Year, 135 Kenyans were repatriated. (Pet. Ex. 12 at 103). According to the testimony of Officer McCormick, who

oversees removals to African countries, between September of 2008 and September of 2009, approximately half of the Kenyans with final orders of removal who needed travel documents were repatriated. (Doc. # 67 at 85).

Petitioner asserts that Kenya will be less likely to accept his repatriation because he has no family ties, no means of support, left Kenya more than ten years ago, is a member of a minority tribe, and has a criminal record, but he offered only general evidence that these factors play into foreign governments' repatriation decisions.  Petitioner failed to present evidence that Kenya refuses to take back its citizens who possess these characteristics.  The GAO's report notes that some of these characteristics are linked with delays or refusals of repatriation, but Kenya is not included in the GAO's list of problem countries which refuse repatriation for these reasons.  (Pet. Ex. 8 at 21).  Officer McCormick's testimony also establishes that Kenya is generally cooperative in repatriating its nationals.  (Doc. # 67 at 87). While data are not collected on the other characteristics Petitioner contends are barriers to repatriation, the 2008 Yearbook of Immigration Statistics shows that Kenyans with criminal records are routinely repatriated.  Over the past ten years, approximately one third of repatriated Kenyans have had criminal records.  *See* Pet. Ex. 12 at 97-103.  The only instance of Kenya refusing to repatriate an alien either party presented to the Court involved an alien who was not, in fact, a Kenyan citizen.  Petitioner has conceded he is a Kenyan citizen and the Kenyan consulate has never raised any doubt as to his citizenship.

The government's failure to previously procure travel documents does not show that Petitioner cannot be repatriated once he reaches the end of his immigration proceedings.  The evidence presented shows that the Kenyan government, like many other governments, is reluctant to accept repatriation of its citizens while they have immigration appeals pending. The evidence presented indicates that Petitioner was not repatriated after his stay of removal was lifted due to the Kenyan policy of waiting until the conclusion of immigration proceedings to accept repatriation of its citizens. Although Petitioner's future detention may last until the conclusion of his immigration appeals, it is not indefinite.  Once Petitioner's immigration proceedings have concluded, the evidence presented shows Kenya is likely to promptly issue

1  travel documents allowing his repatriation.

2      The Court concludes that Petitioner has failed to establish "good reason to believe that

3  there is no significant likelihood of removal in the reasonably foreseeable future."  However,

4  even if the evidence Petitioner has presented is sufficient to shift the burden to the government

5  pursuant to *Zavydas*, 533 U.S. at 701, the government has presented "evidence sufficient to

6  rebut that showing."  The testimony of the two ICE officers establishes that Kenya has taken

7  the position that it will not issue travel documents for Petitioner while he has immigration

8  proceedings pending unless he states he affirmatively wants to return to Kenya, which explains

9  the delay in repatriating Petitioner.  In light of Kenya's record of repatriating its nationals and

10  the fact that the Kenyan consulate  has never taken the position that Kenya will not accept

11  Petitioner, it appears likely that the government will succeed in repatriating Petitioner to Kenya

12  at the conclusion of his immigration proceedings.

13      IT IS HEREBY ORDERED that the Petition for Writ of Habeas Corpus (Doc. # 1) is

14  **DENIED**.

15  DATED:  December 9, 2009

16

17

**WILLIAM Q. HAYES**
United States District Judge

18

19

20

21

22

23

24

25

26

27

28